UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MICHAEL A. MOORE,

                                        Plaintiff,
                                                        9:13-CV-00616
v.                                                      (FJS/TWD)

THOMAS GRIFFIN, Deputy of Security, Eastern
NY Correctional Facility; and ANTHONY
RUSSO, Captain, Eastern NY Correctional
Facility,

                                        Defendants.
_____

APPEARANCES:                                            OF COUNSEL:

MICHAEL A. MOORE
Plaintiff pro se
92-A-9240
Sing Sing Correctional Facility
354 Hunter Street
Ossining, New York 10562


HON. ERIC T. SCHNEIDERMAN                               COLLEEN D. GALLIGAN, ESQ.
Attorney General for the State of New York              Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

This pro se prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable Frederick J. Scullin,

Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

Plaintiff Michael Moore claims that Defendant Thomas Griffin ("Griffin") violated Plaintiff's

Fourteenth Amendment right to due process at a Tier III disciplinary hearing. Currently pending

before the Court is Defendant's motion for summary judgment pursuant to Federal Rule of Civil

Procedure 56. (Dkt. No. 33.) For the reasons discussed below, I recommend that Defendant's

motion be granted.

## I.      FACTUAL AND PROCEDURAL SUMMARY[1]

On November 30, 2010, Plaintiff was an inmate in the custody of the Department of

Corrections and Community Supervision ("DOCCS") at Eastern NY Correctional Facility

("Eastern C.F."). (Dkt. No. 34 at 2.)[2] At that time, Plaintiff was a porter assigned to the

---

[1]      Local Rule 7.1(a)(3) states:

Summary Judgment Motions
Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of
Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving
party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the
record where the fact is established. The record for purposes of the Statement of Material Facts
includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response
shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's
assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the
record where the factual issue arises. The non-movant's response may also set forth any additional
material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of
Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

Local Rule 7. 1(a)(3).

Defendant filed a Statement of Material Facts. Plaintiff has not properly responded or objected to
Defendant's Statement of Material Facts. Defendant advised Plaintiff of the potential consequences
of failing to respond to the motion for summary judgment. (Dkt. No. 33 at 3.) To the extent that the
"facts" asserted by Defendant in the Statement of Material Facts are supported by the record, the Court
will consider them in the context of the within motion. The facts recited are for the relevant time
period as referenced in the complaint. In addition, on the motion, both parties annexed documents that
have not been properly authenticated. To the extent that the parties do not object to the admissibility
of any document(s), the Court will consider the document(s) in the context of the within motion. *See
Livingston v. Griffin*, 2007 WL 1500382, at *2, n. 2 (N.D.N.Y. 2007) (citing *H. Sand & Co. v.
Airtemp Corp.*, 934 F.2d 450, 454–55 (2d Cir. 1991)).

[2]      Page numbers in citations to the Docket refer to the page numbers assigned by the Court's
electronic filing system.

basement of the Family Reunion Program ("FRP") area. *Id*. Plaintiff's duties included: bringing supplies such as towels, bedding and utensils to the FRP units in advance of family visits; snow blowing and shoveling; and grounds keeping. *Id*. at 3. On November 30, 2010, after a suspicious cell search, Plaintiff received a Misbehavior Report charging him with possessing contraband, destroying state property, and altering an electrical device. (Dkt. No. 33-4 at 3.) On December 3, 2010, at a Tier II hearing, Plaintiff pled guilty to having excessive property and altering a pair of gloves and was sentenced to thirty days in the Special Housing Unit ("SHU") and loss of privileges. (Dkt. No. 34 at 3.)

On December 4, 2010, Plaintiff was served with a Tier III Misbehavior Report prepared by Sergeant Parkhurst, dated December 3, 2010. (Dkt. Nos. 33-4 at 16; 34 at 3.) The Misbehavior Report charged Plaintiff with the following violations: 113.13 Inmate shall not posses alcohol; 113.17 Inmate shall not possess unauthorized jewelry; 113.21 Inmate shall not possess non-approved media; and 113.22 Inmate shall not possess article where it is prohibited. *Id*. The Misbehavior Report described the incident as follows:

> Subsequent to an area search of the FRP Basement Area and a corresponding investigation, the following items of contraband were discovered. 3 - 1 Gallon plastic containers half full with homemade alcoholic beverage, 1 bottle of Pina Colada Drink Mix, 1 bottle of Vanilla Extract which contains alcohol, 12 Pornographic DVD's, 4 Pornographic VHS Tapes, 25 Pornographic Magazines, 17 Male Condoms, 2 female condoms, 1 Polaroid Camera with package of film, 1 Computer Memory Card, 1 Electric Motor, 8 coins, 5 Earrings, 1 Necklace, [and] other assorted non-serious contraband items. All items were discovered in well hidden areas of the FRP Basement, secreted inside or amongst other non-contraband items. Inmate Moore is one of only two inmates to have regular access to the basement in the FRP area. He has been assigned as a porter in this area for approximately 8 years.

*Id*. at 4.

On or about December 4, 2010, Plaintiff wrote a letter to an inmate in the facility law library with regard to the December 3, 2010, Misbehavior Report.[3]  During his deposition, Plaintiff testified that he wrote the letter to "Mustaph" stating:

> . . . basically, I just told them, you know, the magazines, I can explain. The clothes, the rings, that stuff was left in the lost and found.  The other porter was not there at the time and that I had word that they were trying to change things.

(Dkt. No. 33-5 at 42.)

Plaintiff did not receive a response to this correspondence.  *Id*. at 43. On December 7, 2010, Plaintiff was released from the SHU and advised that the charges in the December 3, 2010, Misbehavior Report had been dropped because Plaintiff did not receive timely notice of the charges.  (Dkt. No. 34 at 5.)  Plaintiff remained confined to keeplock due to his disciplinary time for his Tier II violations.  *Id*. at 6.

On December 14, 2010, Plaintiff returned to the SHU.[4]  (Dkt. No. 34 at 6.)  On December 15, 2010, Plaintiff received a Tier III Misbehavior Report, written by Captain Russo ("Russo"), dated December 14, 2010.  *Id*.  The December 14, 2010, Misbehavior Report charged Plaintiff with the following violations: 107.20 Lying; 130.11 Failing to Follow Correspondence Procedures; 109.10 Out of Place; and 103.20 Solicitation.  *Id*.  Under "Description of Incident," the Misbehavior Report provided:

> On November 30, 2010 as I entered the Family Reunion Compound, Inmate Moore 92A9240 was observed exiting the basement area.  As a result of the inspection and subsequent frisk[,] numerous amounts of contraband were discovered[,] some of which included: 4 altered video cassettes which contained pornographic movies, 12 DVD's which contained pornographic movies, 3 ½ gallon jugs of homemade alcohol,

---

[3]      The letter is part of the record herein but it has not been properly authenticated by Plaintiff and thus, is not in proper evidentiary form.

[4]      The record lacks information regarding why Plaintiff was returned to the SHU.

4

1 necklace, 5 earrings, 1 brassiere, 19 condoms, 1 memory card.

During a subsequent interview on November 30, 2010 with Inmate Moore, he claimed to have no knowledge of the items found in the R.F.P. basement area.

However, on December 5, 2010 Officer DuBois received a letter in the law library written to an inmate 'Mustaph' who has been identified as Rodriguez 83B2044, one of the SHU clerks in the law library soliciting him to do law library work. Furthermore, in this letter he admits to knowing of the contraband items in the FRP basement, specifically, the pornographic movies, magazines, jewelry, memory card and condoms.

Additionally, further information obtained during this investigation indicates that on numerous occasions Inmate Moore was in the occupied units (while other inmates and their families were present) without authorization.

*Id*. at 6-7.

On December 15, 2010, Plaintiff requested legal assistance with his Tier III Misbehavior Report. (Dkt. No. 34 at 7.) Officer Ahearn[5] ("Ahearn") was assigned to assist Plaintiff in preparing for his hearing.[6] *Id*. On December 19, 2010, Plaintiff met with Ahearn and requested copies of the following documents: Request for Urinalysis; the November 30, 2010, Strip Frisk Form; and the FRP log book entry for November 30, 2010. *Id*.

Defendant Griffin, the Deputy of Security at Eastern C.F., was assigned as the hearing officer for Plaintiff's Superintendent's Hearing regarding the December 14, 2010, Misbehavior Report. *Id*. at 8. On December 20, 2010, the hearing commenced. (Dkt. No. 34 at 8.) Plaintiff confirmed that on December 15, 2010, at 9:45 a.m., he received a copy of the Misbehavior Report. (Dkt. No. 33-1 at 23.)[7] Plaintiff

---

[5]     In Dkt. No. 34, "Ahearn" is spelled "Ahern."

[6]     Ahearn is not a defendant herein.

[7]     Dkt. No. 33-1 is a copy of the transcript from Plaintiff's Tier III disciplinary hearing. The transcript is a certified record and therefore, in proper admissible form. *See* Dkt. No. 33-1 at 22.

pled "not guilty" to all four charges. (Dkt. No. 34 at 9.) On the first day of the hearing, Plaintiff

objected to Griffin acting as the hearing officer claiming that Griffin was present on the day of the

incident. *Id*. at 9; Dkt. No. 33-1 at 24. Plaintiff also cited to DOCCS Directive 254.1 and stated:

> [t]he following person should not be appointed to conduct the
> proceeding, the person who actually witness [sic] the incident[,] the
> person who is directly involved in the incident, the review office[,] who
> reviewed the misbehavior report and the person who has investigated
> the incident. Again, you were there on 11/30[.]

Dkt. No. 33-1 at 25.

Griffin responded, ". . . I didn't conduct an investigation regarding these charges and the Captain

did and therefore I am going to continue to do the hearing [and] that objection is noted." *Id*. at 25.

Griffin continued, "I'm here a lot of days when things happen and when evidence gets written up[,] again

your objection is noted for the record." *Id*. Plaintiff requested an adjournment so that he could obtain

additional documents including his "original tickets." *Id*. at 24. The hearing was adjourned so that

Plaintiff could review the Misbehavior Report and his letter to "Mustaph." *Id.* at 27.

On January 12, 2011, the hearing resumed. (Dkt. No. 33-1 at 27.) Russo was called as a witness

and provided testimony regarding Plaintiff's letter:

> HO: Captain[,] I'm going to hand you a document that was handed
> to me with the [ ] misbehavior report, can you explain exactly
> what that is?
>
>                               \*      \*      \*
>
> CAPT: This letter that was forwarded by inmate Torres in SHU in unit
> 2, inmate in the law library that was intercepted by one of the
> staff members.
>
> HO: Ok can you tell me what [ ] in that letter is of particular
> importance regarding inmate Moore's charges against him
> which includes lying in correspondence procedures, out of place
> and solicitation[?]

6

> CAPT: [ ] in this letter he basically states that he was senior man in the FRP area. [H]e cleaned out the units, he [brought] stuff downstairs and disposed of it . . . more was found and put back where it was found. Because the Deputy ILC was out on the site [sic] had to put it back, all porn magazines where [sic] his they was holding [sic] them until they downsize his cell, condoms have always been collected, the condom return supply. The camera that was there was a back up he's claiming when the officer left there was one FRP visit.

*Id.* at 27.

Russo also testified that during his interview with Plaintiff, Moore claimed to have no knowledge of the contraband. *Id.* Plaintiff was given an opportunity to ask Russo questions. *Id.* at 28. Plaintiff asked Russo about the "out of place" charges. (Dkt. No. 33-1 at 28.) Specifically, Plaintiff asked, "[m]y question is on numerous occasions, I was observed going into an occupied unit why wasn't I written up before, nobody said nothing before, if that was true." *Id.* Russo responded, "I don't know why." *Id.*

At Plaintiff's request, Sergeant Barg ("Barg"), the sergeant in charge of the FRP area, and Correction Officer Segal ("Segal") were called to testify. *See id.* at 29-32. Upon questioning from Plaintiff, both witnesses testified that they never saw Plaintiff enter an FRP area when family was present. (Dkt. No. 33-1 at 29.) Plaintiff also asked Griffin to call two inmates, Livingston and McCrone[8], as witnesses. *Id.* at 31. Griffin denied Plaintiff's request due to relevancy. *Id.* At Griffin's request, Corrections Counselor DeJesus ("DeJesus") testified. (Dkt. No. 33-1 at 33.) DeJesus stated that, on more than one occasion, she witnessed Plaintiff go into the housing units without security present. *Id.* at 33-34. Plaintiff was given an opportunity to ask DeJesus questions. *See id.* Plaintiff asked DeJesus why she never reported this to the officer on duty. (Dkt. No. 33-1 at 33.) DeJesus responded, "I didn't think that I had to." *Id.* At Plaintiff's request, Officer Meineke ("Meineke") was

---

[8]        "McCrone" is also referred to as "McCullum" by the correctional officer. (Dkt. No. 33-1 at 31.)

called to testify. *See id.* at 34. Plaintiff asked Meineke if he ever saw Plaintiff enter the FRP units while the units were occupied by other inmates and their families. *Id*. at 35. Meineke responded, "Nope, I never known [sic] him to [do] that." (Dkt. No. 33-1 at 35.)

On February 14, 2011, after an adjournment, Plaintiff asked Griffin to call Officer Wilson ("Wilson") as a witness. *Id*. at 36. Wilson testified that she escorted Plaintiff from the FRP area on November 30, 2010, with Officer Torres ("Torres"). *Id*. at 37. Wilson stated that Captain Ramirez and Russo may have been present. *Id*. Plaintiff asked if Wilson remembered seeing Griffin and she responded, "Well, when he showed up to pick you up wasn't it just Ramirez standing there with you, when me and Torres came to get you?" (Dkt. No. 33-1 at 37.) At that time, Griffin interjected and stated, "[i]ts not on the report you have to say if you don't recall." *Id*. Wilson stated, "I don't . . . remember Captain Ramirez." *Id*.

On February 25, 2011, after an adjournment, Plaintiff asked Griffin to call Torres to testify. *See id.* at 38. Torres testified that he escorted Plaintiff from the FRP site for a strip frisk on November 30, 2010. (Dkt. No. 33-1 at 38.) The strip frisk was authorized by Griffin. *Id*. at 39.

On March 2, 2010, after an adjournment, Plaintiff asked Griffin to call Sergeant Mikesh ("Mikesh"), the sergeant in charge of the law library, to testify. *Id*. at 40. Upon Plaintiff's questioning, Mikesh testified that it is normal procedure for an officer to forward any suspicious letters to his/her supervisor. *Id*. at 41.

At the conclusion of Mikesh's testimony, Griffin asked Plaintiff if there were any other witnesses he wished to call to testify. (Dkt. No. 33-1 at 42.) Plaintiff stated, "I don't believe there is nobody [sic] else . . . I'm done." *Id*.

Griffin prepared a written disposition finding Plaintiff guilty of the four charges and read it into

the hearing record on March 3, 2011. *Id*. at 42-43. On March 3, 2011, Plaintiff signed the Hearing

Disposition. (Dkt. No. 33-1 at 43; 34 at 15.) On the Hearing Disposition, in the section entitled

"Statement of Evidence Relied Upon," Griffin handwrote the following:

> The written report of Captain Russo detailing how his investigation
> revealed I/M Moore secreted several items of contraband in his work
> area including 12 DVDs, pornographic video cassettes, three ½ gallons
> of homemade alcohol, necklace, 5 earrings, 1 memory card and female
> clothing (bra). Capt. Russo testified at the hearing detailing his
> investigation of confiscated letter (kite) sent from I/M Moore detailing
> where and why he stored previously listed contraband items and
> showing his solicitation to do unapproved legal work. CO Menieke
> [sic] and CO Segal testimony that they never authorized Moore to enter
> occupied FRP trailer. Testimony of CC DeJesus that she saw I/M
> Moore enter occupied FRP units w/o security escort or authorization.
> Sgt. Barg testify as the area supervisor that I/M's are not permitted in
> the FRP units that are occupied. I/M Moore never offered testimony of
> CC that the confiscated letter that details Moore's involvement was not
> written by him. In closing, I/M Moore never provided credible
> testimony or evidence to contradict Capt. Russo misbehavior report.

*Id.*

Griffin imposed a penalty of twelve months in the SHU and loss of phone, commissary and

packages and loss of 12 months of good time. (Dkt. No. 34 at 15.) On or about March 21, 2011,

Plaintiff appealed the decision. *Id*. at 16. On May 23, 2011, the Hearing Disposition was reviewed and

reversed by Albert Prack, Director, Special Housing/Inmate Disciplinary Program. *Id*. at 17. As a result

of the reversal, the December 14, 2010, Misbehavior Report, Hearing Determination and finding of guilt

were expunged from Plaintiff's record. *Id*. On May 23, 2011, Plaintiff was released from the SHU into

the general population. (Dkt. No. 34 at 17.)

On May 30, 2013, Plaintiff filed this action. (Dkt. No. 1.) On August 14, 2013, the Court issued

a Memorandum-Decision and Order dismissing Plaintiff's claim that Griffin violated Plaintiff's Eighth

Amendment rights and dismissing all claims against Russo. (Dkt. No. 9.) Griffin filed an Answer to

Plaintiff's Complaint and an Amended Answer. (Dkt. Nos. 16, 18.) On May 2, 2014, Plaintiff was

deposed. (Dkt. No. 33-5.) Presently before the Court is Defendant's motion for summary judgment.

(Dkt. No. 33.) Plaintiff filed opposition to the motion. (Dkt. No. 36.)

## II. LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of

showing, through the production of admissible evidence, that no genuine issue of material fact exists.

*Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). Only after the moving party has met this

burden is the nonmoving party required to produce evidence demonstrating that genuine issues of

material fact exist. *Id*. at 273. The nonmoving party must do more than "rest upon the mere allegations

. . . of [the plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 & n.11 (1986). Rather, a

dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In

determining whether a genuine issue of material[9] fact exists, the Court must resolve all ambiguities and

draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino,

Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

Where a plaintiff has failed to properly respond to a defendant's Statement of Material Facts, the

facts as set forth in that Rule 7.1 Statement will be accepted as true to the extent that (1) those facts are

---

[9]     A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson*, 477
U.S. at 248.

supported by the evidence in the record, and (2) the non-moving party, if he is proceeding pro se, has

been specifically advised of the potential consequences of failing to respond to the movant's motion for

summary judgment.  *See* L.R. 7.1(a)(3); *Vermont Teddy Bear Co. v. 1 800 Beargram Co.*, 373 F.3d 241,

244 (2d Cir. 2004); *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).  As noted *supra*, Defendant

provided Plaintiff with notice of the potential consequences.  (*See* Dkt. No. 33 at 3.)

## III.    ANALYSIS

Defendant moves for judgment as a matter of law and dismissal of all of Plaintiff's allegations.

Defendant argues that Plaintiff was afforded the procedural protections guaranteed by the Fourteenth

Amendment during his Tier III disciplinary hearing.

### A.    Fourteenth Amendment

The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . .

deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV,

§ 1.  "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they

are nevertheless entitled to certain procedural protections when disciplinary actions subject them to

further liberty deprivations such as loss of good-time credit or special confinement that imposes an

atypical hardship."  *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted); *see also J.S. v.

T'Kach*, 714 F.3d 99, 106 (2d Cir. 2013) ("We have held that a prisoner has a liberty interest that is

implicated by SHU confinement if it 'imposes [an] atypical and significant hardship on the inmate in

relation to the ordinary incidents of prison life.'") (quoting *Sandin v. Conner*, 515 U.S. 472, 484, 115

S.Ct. 2293, 132 L.Ed.2d 418 (1995)); *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004).

#### 1.    Liberty Interest

Defendant concedes, for the purposes of the motion, that the amount of time Plaintiff was

confined in the SHU was sufficient to implicate a protected liberty interest.[10]  (Dkt. No. 33-8 at 4, n. 2.)

## 2.    Procedural Due Process

The Fourteenth Amendment due process protections afforded a prison inmate do not equate to "the full panoply of rights due to a defendant in a criminal prosecution." *Sira*, 380 F.3d at 69.  An inmate is entitled to "(a) written notice of the claimed violations . . .; (b) disclosure [to the prisoner] of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body . . .; and (f) a written statement by the fact finders as to the evidence relied on . . ." *Wolff v. McDonnell*, 418 U.S. 539, 559, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).  The due process clause also requires that a hearing officer's determination be supported by "some evidence." *Sup't v. Hill*, 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). "This standard is extremely tolerant and is satisfied if there is *any* evidence in the record that supports the disciplinary ruling." *Sira*, 380 F.3d at 69 (quoting *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)).  In the Second Circuit, the "some evidence" standard requires some "reliable evidence." *Luna v. Pico*, 356 F.3d 481, 488 (2d Cir. 2004).

### a.    Notice

An accused prisoner has the right to be provided with advanced written notice of the charges brought against him. *Sira*, 380 F.3d at 69.  Here, it is undisputed that Plaintiff received a copy of the Misbehavior Report on December 15, 2010. (Dkt. No. 33-1 at 23.)  Plaintiff does not contest that he

---

[10]    The parties offer conflicting accounts of the total number of days that Plaintiff was confined to the SHU.  Defendant argues that Plaintiff served 80 days.  (Dkt. No. 33-8 at 4.)  Plaintiff claims that he remained confined to the SHU for a total of 177 days.  (Dkt. No. 36 at 5.)

received timely notice of the charges.[11]

###### b.    Assistance

Plaintiff was confined to the SHU and thus was entitled to an inmate assistant. *See Murray v. Arquitt*, No. 9:10-CV-1440 (NAM/CFH), 2014 U.S. Dist. LEXIS 68665, at \*48, 2014 WL 4676569, at \*19 (N.D.N.Y. Sept. 18, 2014) (citation omitted).[12] An inmate's right to assistance is limited, and an inmate has no right to full counsel. *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993). The assistant need only perform what the plaintiff would have done but need not go beyond. *See Lewis v. Johnson*, No. 9:08-CV-482 (TJM/ATB), 2010 U.S. Dist. LEXIS 98116, at \*33-35, 2010 WL 3785771, at \*10 (N.D.N.Y. Aug. 5, 2010).

In his opposition to Defendant's motion, Plaintiff claims that he was denied legal assistance for "over a month" and that the responses to his F.O.I.L. requests "omit[ted] the defendant as being present at the time of the investigation, for the purpose [of] being confronted at the Hearing." (Dkt. No. 36 at 10.) During his deposition, Plaintiff testified that on December 16, 2010, he spoke with C.O. Ahearn, who "was assigned as my assistant in helping me obtain requested documents and to get in touch with possible witnesses." (Dkt. No. 33-5 at 52.) On December 19, 2010, Plaintiff had a second conversation with Ahearn. *Id*. at 53. Plaintiff requested, but did not receive, a copy of the urinalysis request, the strip search request, and the log book for the FRP area. (Dkt. No. 33-5 at 53.) Ahearn told Plaintiff that he could not obtain the paperwork that Plaintiff requested. *Id*. Plaintiff was then, "left on his own." *Id*.

---

[11]    In Plaintiff's Memorandum of Law, he includes the heading "Timeliness of the Hearing". (Dkt. No. 36 at 10.) However, the arguments set forth in the section do not relate to timely notice of the disciplinary hearing and charges at issue. Rather, the arguments involve Plaintiff's res judicata claims and thus will be discussed *infra*.

[12]    The Court will provide Plaintiff with a copy of all unpublished decisions in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

On December 20, 2010, at approximately 2:27 p.m., the Tier III disciplinary hearing commenced. (Dkt. No. 33-1 at 24.) Before any testimony was offered or any evidence presented, Griffin gave Plaintiff a copy of the Misbehavior Report and his letter to "Mustaph." *Id.* At 2:37 p.m., Griffin adjourned the hearing so that Plaintiff could review the documentation. *Id.* at 27. Twenty-three days later, on January 12, 2011, the hearing resumed. *Id.* After Russo and Barg testified, Plaintiff asked Griffin to call Officer Segal. (Dkt. No. 33-1 at 31.) The hearing was adjourned so that Griffin could contact Segal. *Id.* at 32. On January 18, 2011, the hearing resumed. *Id.* After Segal testified, Griffin asked Plaintiff if he had any other witnesses or if he wished to make a statement. *Id.* at 33. Griffin noted that one of Plaintiff's witnesses, Meineke, was not present and would be called to testify upon his arrival, along with any other witnesses Plaintiff wished to call. *Id.* Plaintiff indicated that he needed to retrieve paperwork in his cell. *Id.* The hearing was adjourned and resumed on January 24, 2011. *Id.* After Meineke and DeJesus testified, Plaintiff asked Griffin to call Torres. (Dkt. No. 33-1 at 35.) Plaintiff also advised Griffin that he previously requested a copy of the strip frisk and urinalysis authorization but that his legal assistant did not provide the documents. *Id.* at 36. Griffin told Plaintiff that he would provide him with copies of those documents and adjourned the hearing. *Id.*

On February 14, 2011, the hearing resumed. *Id.* After Wilson testified, Griffin noted, "the record indicates that you were given copies of some of the documents you requested by your assistant and by a sergeant, is that correct?" *Id.* at 37. Plaintiff replied, "Yes sir." (Dkt. No. 33-1 at 38.) Griffin then asked, "[d]id you have any questions you want to make or any statements that you want to make in regards to those documents you received?" *Id.* Plaintiff responded, "No." *Id.* Plaintiff then asked Griffin to call Torres to testify and the hearing was adjourned. *Id.* On February 25, 2011, the hearing resumed and Torres testified. (Dkt. No. 33-1 at 38.) While questioning Torres, Plaintiff referred to the

14

documents he was provided regarding the strip frisk. *See id.* at 39. Plaintiff asked Griffin to call one

further witness, Mikesh, and the hearing was adjourned. *Id*. at 40. On March 2, 2011, the hearing

resumed and Mikesh was questioned. *Id.* At the completion of Mikesh's testimony, Griffin asked

Plaintiff if he received the "2176 form" explaining why Griffin was denying Plaintiff's request to call

Livingston and McCrone. (Dkt. No. 33-1 at 42.) Plaintiff responded in the affirmative. *Id.*

After an exhaustive review of the hearing transcript, the Court finds that even assuming Ahearn's

assistance was inadequate, no reasonable factfinder could conclude that the deprivation resulted in any

prejudice to Plaintiff. There is no evidence that Plaintiff was unable to present a defense or that the

result of Plaintiff's hearing would have been any different had Ahearn supplied Plaintiff with the

requested documents in December 2010. *See Lewis v. Murphy*, No. 9:12-CV-0268 (NAM/CFH), 2014

U.S. Dist. LEXIS 102659, at *36, 2014 WL 3729362, at *13 (N.D.N.Y. July 25, 2014) (the plaintiff

alleged that his counselor failed to interview witnesses but did not show how this shortcoming

prejudiced the results). Plaintiff testified, at the beginning of the hearing, that he understood the charges

in the Misbehavior Report. (Dkt. No. 33-1 at 23.) Plaintiff was given ample opportunity, with several

adjournments, to prepare for the hearing. Moreover, Griffin provided Plaintiff with all requested

documentation/evidence. *See Murray*, 2014 U.S. Dist. LEXIS 68665, at *48-49, 2014 WL 4676569, at

*19 (the record established that the hearing officer took steps to provide the inmate with the requested

evidence). Griffin permitted Plaintiff to call six witnesses and provided Plaintiff with sufficient time to

question each witness. The questions posed by Plaintiff to Russo, Barg, Segal, DeJesus, and Meineke

regarding the "out of place" charge clearly indicate that Plaintiff understood the charge. *See* Dkt. No.

33-1 at 29-34; *see also Lewis*, 2014 U.S. Dist. LEXIS 102659, at *37, 2014 WL 3729362, at *13 (the

questions posed by the inmate demonstrated that he had an understanding of the bribery charge).

Similarly, Plaintiff's questions to Mikesh reveal that he had an understanding of the "correspondence procedures." *See* Dkt. No. 33-1 at 40-41.

Accordingly, the Court finds that Plaintiff did not suffer from any constitutional violation as a result of the purported lack of assistance.

### c.    Opportunity to Be Heard and Present Witnesses

An accused prisoner has the right to a hearing where he is given a reasonable opportunity to call witnesses and present documentary evidence. *Sira*, 380 F.3d at 69. The record establishes that Plaintiff was present at the hearing, able to call witnesses, question witnesses and offer evidence. Plaintiff does not dispute that he was given an opportunity to be heard. With respect to the two witnesses that Griffin refused to call, Griffin stated, on the record,

> I'm going to answer it on the form 2176[13] which is a witness interview notice. And basically, what it says is Livingston 10a2302 permission to call his witnesses [is] denied. The request[ed] witnesses no [sic] other [relevant] testimony as to Moore entering FRP trailer. Inmate Moore is being [alleged] to ha[ve] gone inside trailers on numerous occasions without authorization. The [hearing officer] will [concede that the witness will testify that Moore did not go into his trailer during Livingston's visit.] Also on inmate McCrone. . . the request[ed] witness [has] no relevant testimony as to inmate Moore entering numerous . . . FRP trailers. The hearing officer concedes . . . the fact that this witness will testify that Moore never entered this trailer during his visit.

(Dkt. No. 33-1 at 31; 53.)

The Court finds that no triable issue of fact exists as to whether Plaintiff had an opportunity to appear and call witnesses.

---

[13]    The Witness Interview Notice Form is part of the record herein (*see* Dkt. No. 33-1 at 53) but the document is not in proper evidentiary form.

### d. Impartial Hearing Officer and "Some Evidence"

An accused prisoner has the right to have a fair and impartial hearing officer preside over his disciplinary hearing. *Sira*, 380 F.3d at 69. "It is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) (citations omitted); *see also Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989) ("We recognize that the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally. Because of the special characteristics of the prison environment, it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process."). Prison officials "enjoy a rebuttable presumption that they are unbiased." *See Rodriguez v. Selsky*, No. 9:07-CV-0432 (LEK/DEP), 2011 U.S. Dist. LEXIS 21023, at *34, 2011 WL 1086001, at *11 (N.D.N.Y. Jan. 25, 2011) (citation omitted). However, "both DOCS regulations and the law of this Circuit prohibit a prison official who was involved in investigating the underlying charges from acting as a hearing officer." *Silva v. Sanford*, No. 91 Civ.1776 (KMW)(KAR), 1994 U.S. Dist. LEXIS 11568, at *38, 1994 WL 455170, at *12 (S.D.N.Y. Aug. 18, 1994) (internal citation omitted) (the hearing officer was the watch commander at time of the incident and received reports from other officers regarding the incident); *see also Powell v. Ward*, 542 F.2d 101, 103 (2d Cir. 1976) ("[N]o person who has participated in the investigation of [the] acts complained of or who has been a witness to such acts could be a member of a . . . Superintendent's Proceeding relating to those acts."). However, "the mere involvement of a hearing officer in related investigations or proceedings does not evidence bias." *Phelan v. Hersch*, No. 9:10-CV-0011 (GLS/RFT), 2011 U.S. Dist. LEXIS 140025, at *32-33, 2011 WL 6031940, at *9

(N.D.N.Y. Sept. 13, 2011) (citations omitted).  "A hearing officer may satisfy the standard of impartiality if there is some evidence in the record to support the findings of the hearing." *Fernandez v. Callens*, No. 06-CV-0506(Sr), 2010 U.S. Dist. LEXIS 115496, at *36, 2010 WL 4320362, at *12 (W.D.N.Y. Oct. 29, 2010) (internal quotation marks and citation omitted).  To establish a constitutional violation, the hearing officer must "present a hazard of arbitrary decisionmaking." *Black v. Selsky*, 15 F. Supp. 2d 311, 317 (W.D.N.Y. 1998) (citing *Wolff*, 418 U.S. at 571).

Here, Plaintiff claims that Griffin should not have presided over his disciplinary hearing because Griffin was present on the day of the incident and investigated the incident.  (Dkt. No. 36 at 6-7.) Defendant argues that he was not part of the investigation and further, that he did not issue the subject Misbehavior Report.  (Dkt. No. 37 at 4-6.)

The record indicates that Griffin ordered the strip frisk of Plaintiff and was present in the FRP area when Plaintiff was escorted, by other officers, for the search.  However, Griffin did not participate in the actual search and there is no evidence that Griffin was present during the search of Plaintiff or his cell.  Based upon the record herein, the Court finds that Griffin's involvement in the incident does not, without more, equate to bias and impartiality.  *See Madera v. Goord*, 103 F. Supp. 2d 536, 541 (N.D.N.Y. 2000) (the hearing officer ordered the search but was not involved in the search or its execution) *but cf. Silva*, 1994 U.S. Dist. LEXIS 11568, at *38, 1994 WL 455170, at *12 (the hearing officer was involved in the investigation and told someone before the hearing began the punishment he would impose); *compare Vigliotti v. Selsky*, No. 08-CV-00875-JJM, 2014 U.S. Dist. LEXIS 51442, at *16, 2014 WL 1451984, at *5 (W.D.N.Y. April 14, 2014) (question of fact with respect to the hearing officer's impartiality as he was the "reporting person" on the Unusual Incident Report and was responsible to "insure that the report [was] complete and factual").  Plaintiff has failed to cite to any

portion of the hearing transcript that establishes Griffin's predisposition to finding Plaintiff guilty or any other mishandling of the testimony, evidence or procedure that would indicate bias.[14]  Plaintiff claims that Griffin, "intentionally [lied] about his part in the investigation, . . . to ensure that Plaintiff was transferred out of his jail; for reasons being that a large amount of contraband found in an area exposed to civilians and other inmates.  Defendant charged Plaintiff to no avail, (the first ticket) then trumped up another ticket to fit the incident of the first failed attempt."  (Dkt. No. 36 at 7-8.)  These conclusory and speculative allegations are unsupported by competent, admissible evidence.  *See Rodriguez*, 2011 U.S. Dist. LEXIS 21023, at *34, 2011 WL 1086001, at *11 (the plaintiff's conclusory allegations of bias, due to hearing officer seeking assistance from the author of the misbehavior report, were unsupported by evidence and failed to suggest a predetermination on the hearing officer's part or impact on the proceedings).  The Court has reviewed the entire hearing transcript and finds no evidence that Griffin was biased or predisposed to any conclusion.  Indeed, the transcript establishes that Plaintiff was permitted to call six witnesses in his defense, present documents in support of his defense, pose relevant questions to all witnesses, and make objections.

While not addressed in his opposition, during Plaintiff's deposition Plaintiff stated that on "several" occasions throughout the hearing Griffin turned the tape off during the proceeding.  (Dkt. No. 33-5 at 55.)  Due process does not require that proceedings be recorded.  *See Livingston v. Griffin*, 9:04-CV-00607-JKS, 2007 U.S. Dist. LEXIS 36941, at *17, 2007 WL 1500382, at *5 (N.D.N.Y. May 21, 2007) (while it may be contrary to New York law, the failure to record a part of the proceeding or use a defective recorder that does not accurately record the entire proceeding does not violate

---

[14] On Page 10 of Plaintiff's Memorandum of Law, Plaintiff recites a conversation that allegedly occurred during the disciplinary hearing.  However, Plaintiff does not cite to any portion of the record supporting that recitation.  Further, on it's own accord, the Court has reviewed the hearing transcript and finds no support in the record for Plaintiff's allegations.  *See* Dkt. No. 36 at 10.

constitutional due process); *see also Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003) (New York

State's regulation requiring that a disciplinary hearing be recorded does not impute a federal

constitutional protection).  The "failure to record the entire [h]earing [does] not deprive Plaintiff of any

minimum requirements of due process." *Scott v. Frederick*, No. 9:13-CV-605, 2014 U.S. Dist. LEXIS

179705, at *40-41, 2015 WL 127864, at *15 (N.D.N.Y. Jan. 8, 2015) (citing *Ramsey v. Goord*, 661 F.

Supp. 2d 370, 393 (W.D.N.Y. 2009) (failure to record a portion of Plaintiff's disciplinary hearing did not

rise to a due process violation)).

 Moreover, the record shows that Griffin's determination of guilt was supported by "some

evidence" as required in *Hill*, 472 U.S. at 455, and "reliable evidence" pursuant to *Luna,* 356 F.3d at 488.

The evidence considered in Plaintiff's disciplinary hearing included the Misbehavior Report; the letter to

inmate Mustaph; and testimony from Russo.  The Misbehavior Report was written by Russo, who

participated in the investigation, frisk, and inspection and interviewed Plaintiff.  Thus, Russo had first

hand knowledge of the events.  *See Hinton v. Prack*, No. 9:12-CV-1844 (LEK/RFT), 2014 U.S. Dist.

LEXIS 126955, at *39, 2014 WL 4627120, at *15 (N.D.N.Y. Sept. 11, 2014) (citation omitted) ("some

evidence" standard satisfied where the misbehavior report was made by the officer personally involved

in the incident and was based upon his first hand observation and detailed account of the incident).

Plaintiff has not come forward with evidence of any motive for Russo to falsely accuse Plaintiff or any

reason to doubt the conclusions in the Misbehavior Report.  *See Reed v. Terbush*, No. 9:10-CV-1449

(LEK/RFT), 2015 U.S. Dist. LEXIS 68963, at *11, 2015 WL 3447743, at *5 (N.D.N.Y. May 28, 2015).

While the guilty determination was later reversed, there was "some evidence" to support Griffin's

decision that Plaintiff was guilty of the charges set forth in the Misbehavior Report.  *See Shabazz v.

Bezio*, No. 9:10-CV-1212 (NAM/DEP), 2014 U.S. Dist. LEXIS 134904, at *5, 2014 WL 4794432, at *2

(N.D.N.Y. Sept. 25, 2014) (the guilty determination was later reversed but the plaintiff testified during the hearing that he refused to cut his hair, which supported the due process requirement that there be "some evidence" to support the decision to find the plaintiff guilty of refusing to obey a direct order). Further, Plaintiff's reliance upon DOCCS regulations governing hearing officers to create a constitutional violation is misplaced. "[A]bsent some proof of actual bias," a violation of state regulations regarding the assignment of hearing officers does not rise to the level of a constitutional violation. *See Russell v. Coughlin*, 774 F.Supp. 189, 197 (S.D.N.Y. 1991) (rev'd on other grounds) 15 F.3d 219 (2d Cir. 1993) *aff'd* 35 F.3d 61 (2d Cir. 1994). The Court finds that Griffin was impartial and that his guilty determination was supported by "some evidence" sufficient for due process.[15]

Based upon the aforementioned, the Court finds that Plaintiff received due process during his Tier III disciplinary hearing with respect to his December 14, 2010, Misbehavior Report. Therefore, I recommend that Griffin's motion for summary judgment be granted on the grounds that he did not violate Plaintiff's due process rights.

## B.     Res Judicata

In further opposition to Defendant's motion, Plaintiff claims that the charges in the December 14, 2010, Misbehavior Report are barred by the doctrine of res judicata and the December 3, 2010, Misbehavior Report. (Dkt. No. 36 at 10-11.) Plaintiff relies upon *In re Gustus*, 883 N.Y.S.2d 624 (N.Y. App. Div. 2009). *See* Dkt. No. 36 at 11. Defendant argues that *In re Gustus* does not apply because the charges in the December 3, 2010, Misbehavior Report were dismissed before Plaintiff's Tier III disciplinary hearing was held. (Dkt. No. 33-8 at 10.)

---

[15]      It is undisputed that Plaintiff received a written decision with the evidence relied upon and the reasons for the determination.

In *In re Gustus*, the plaintiff received a misbehavior report for fighting and refusing a direct order in an incident on April 17, 2007. *See In re Gustus*, 883 N.Y.S.2d at 625. After a Tier III hearing, the plaintiff was found guilty of both charges. *Id*. Upon appeal, the charge of fighting was dismissed. *Id*. A few days after the incident, as a result of an investigation of the same incident, the plaintiff received a second misbehavior report charging him with assaulting an inmate and engaging in violent conduct. *Id*. Following a second Tier III hearing, the plaintiff was found guilty. *Id*. The plaintiff commenced an Article 78 proceeding claiming that the second determination was barred by res judicata. *Id*. The State Supreme Court dismissed the petition and the State Appellate Division reversed. *Id*.

The Court noted that "res judicata bars a cause of action that was raised and adjudicated, or which could have been raised or adjudicated, in a prior action of proceeding." *Id*. (citing *In re Burgess*, 729 N.Y.S.2d 203, (N.Y. App. Div. 2001)). The Court held that both misbehavior reports charged the plaintiff with violations related to his conduct on April 17, 2007. *Id*. Moreover, while the second report was generated with additional information, that information was available before the first hearing began. *Id*. Indeed, the hearing on the second report commenced one hour after the first hearing was completed. *Id*. "Because the two misbehavior reports charged violations concerning one incident and all of the information necessary to support the charges was available before the commencement of the first hearing, the hearing on the second misbehavior report was barred by the doctrine of res judicata." *Id*. at 626. (citation omitted).

An exception to the res judicata doctrine may exist where there is newly discovered, material evidence. *In re Josey*, 826 N.Y.S.2d 479 (N.Y. App. Div. 2006). Moreover, res judicata does not apply if the factual bases for the disciplinary determinations are based upon different conduct. *In re Alicea*, 968 N.Y.S.2d 736 (N.Y. App. Div. 2013) (finding that res judicata did not bar a hearing on a second

misbehavior report that charged the plaintiff with possessing gang-related material when first misbehavior report charged the plaintiff with possessing contraband, an altered item, and forgery).

Here, Plaintiff was served with a Tier III Misbehavior Report prepared by Sgt. Parkhurst and dated December 3, 2010. (Dkt. No. 34 at 3.) The Misbehavior Report charged Plaintiff with the following violations: 113.13 Inmate shall not possess alcohol; 113.17 Inmate shall not possess unauthorized jewelry; 113.21 Inmate shall not possess non-approved media; and 113.22 Inmate shall not possess article where it is prohibited. *Id.* On or about December 4, 2010, Plaintiff wrote a letter to an inmate in the facility law library with regard to the December 3, 2010, Misbehavior Report. *Id.* at 4. On December 7, 2010, Plaintiff was released from the SHU and advised that the charges in the December 3, 2010, Misbehavior Report had been dropped because Plaintiff did not receive timely notice of the charges. *Id.* at 5. On December 15, 2010, Plaintiff received a copy of a Tier III Misbehavior Report, written by Captain Russo, dated December 14, 2010. *Id.* at 6. The December 14, 2010, Misbehavior Report charged Plaintiff with the following violations: 107.20 Lying; 130.11 Failing to Follow Correspondence Procedures; 109.10 Out of Place; and 103.20 Solicitation. *Id.*

The Court finds that the doctrine of res judicata does not bar the disciplinary hearing because the issues raised in the two misbehavior reports are not "identical." The second misbehavior report charged Plaintiff with different conduct arising out of the same incident as the first misbehavior report. The second misbehavior report was issued based upon events that occurred <u>after</u> the first misbehavior report was prepared; i.e., Plaintiff's letter to "Mustaph." The information upon which the second misbehavior report was based was not available at the time the first report was prepared. To the extent that Plaintiff is attempting to assert "collateral estoppel," the doctrine only bars relitigation of an issue if the identical issues were "necessarily decided" in a prior action and the party to be precluded from relitigating had a

"full and fair opportunity" to litigate the issue in the prior action. *See Sidney v. Fischer*, No. 9:09-CV-1326 (GTS/ATB), 2012 U.S. Dist. LEXIS 137180, at *32-33, 2012 WL 4450015, at *8 (N.D.N.Y. Jan. 3, 2012). In this case, the first misbehavior report was dismissed prior to the commencement of the disciplinary hearing. Therefore, the parties did not have the opportunity to fully and fairly litigate the issues.

## C.    Qualified Immunity

"The doctrine of qualified immunity shields public officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Salahuddin*, 467 F.3d at 273 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

> For a constitutional right to be 'clearly established' for purposes of determining whether an officer is entitled to qualified immunity, the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that *in light of pre-existing law the unlawfulness must be apparent.*'

*Mollica v. Volker*, 229 F.3d 366, 370  71 (2d Cir. 2000) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)) (emphasis in original). Even if a state official violates a plaintiff's constitutional rights, the official is afforded protection under the qualified immunity doctrine if "he objectively and reasonably believed that he was acting lawfully." *Creech v. Schoellkoph*, 688 F. Supp. 2d 210, 215 (N.D.N.Y. 2010) (citing *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") (citation and internal quotation marks omitted).

In light of the foregoing, I recommend that in the event Griffin is not found to be entitled to summary judgment on the grounds that he did not violate Plaintiff's due process rights, that he be granted summary judgment on qualified immunity grounds because his conduct did not violate clearly established statutory or constitutional rights.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendant's motion for summary judgment (Dkt. No. 33) be

**GRANTED**; and it is further

**ORDERED**, that the Clerk provide Plaintiff with copies of *Murray v. Arquitt*, No. 9:10-CV-1440 (NAM/CFH), 2014 U.S. Dist. LEXIS 68665, 2014 WL 467656 (N.D.N.Y. Sept. 18, 2014); *Lewis v. Johnson*, No. 9:08-CV-482 (TJM/ATB), 2010 U.S. Dist. LEXIS 98116, 2010 WL 3785771 (N.D.N.Y. Aug. 5, 2010); *Lewis v. Murphy*, No. 9:12-CV-0268 (NAM/CFH), 2014 U.S. Dist. LEXIS 102659, 2014 WL 3729362 (N.D.N.Y. July 25, 2014); *Rodriguez v. Selsky*, No. 9:07-CV-0432 (LEK/DEP), 2011 U.S. Dist. LEXIS 21023, 2011 WL 1086001 (N.D.N.Y. Jan. 25, 2011); *Silva v. Sanford*, No. 91 Civ. 1776 (KMW) (KAR), 1994 U.S. Dist. LEXIS 11568, 1994 WL 455170 (S.D.N.Y. Aug. 18, 1994); *Phelan v. Hersch*, No. 9:10-CV-0011 (GLS/RFT), 2011 U.S. Dist. LEXIS 140025, 2011 WL 6031940 (N.D.N.Y. Sept. 13, 2011); *Fernandez v. Callens*, No. 06-CV-0506(Sr), 2010 U.S. Dist. LEXIS 115496, 2010 WL 4320362 (W.D.N.Y. Oct. 29, 2010); *Vigliotti v. Selsky*, No. 08-CV-00875-JJM, 2014 U.S. Dist. LEXIS 51442, 2014 WL 1451984 (W.D.N.Y. April 14, 2014); *Livingston v. Griffin*, No. 9:04-CV-00607-JKS, 2007 U.S. Dist. LEXIS 36941, 2007 WL 1500382 (N.D.N.Y. May 21, 2007); *Scott v. Frederick*, No. 9:13-CV-605, 2014 U.S. Dist. LEXIS 179705, 2015 WL127864 (N.D.N.Y. Jan. 8, 2015); *Hinton v. Prack*, No. 9:12-CV-1844 (LEK/RFT), 2014 U.S. Dist. LEXIS 126955, 2014 WL 4627120 (N.D.N.Y. Sept. 11, 2014); *Reed v. Terbush*, No. 9:10-CV-1449 (LEK/RFT), 2015 U.S. Dist. LEXIS 68963, 2015

WL 3447743 (N.D.N.Y. May 28, 2015); *Shabazz v. Bezio*, No. 9:10-CV-1212 (NAM/DEP), 2014 U.S. Dist. LEXIS 134904, 2014 WL 4794432 (N.D.N.Y. Sept. 25, 2014); and *Sidney v. Fischer*, No. 9:09-CV-1326 (GTS/ATB), 2012 U.S. Dist. LEXIS 137180, 2012 WL 4450015 (N.D.N.Y. Jan. 3, 2012).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: August 4, 2015
        Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

Not Reported in F.Supp.2d, 2010 WL 4320362 (W.D.N.Y.)
**(Cite as: 2010 WL 4320362 (W.D.N.Y.))**



Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
W.D. New York.
Francisco FERNANDEZ, Plaintiff,
v.
Corrections Officer J. CALLENS, et al., Defendants.

No. 06–CV–0506(Sr).
Oct. 29, 2010.

Francisco Fernandez, Carreteras Jaya, Dom. Rep., pro se.

Michael A. Siragusa, Attorney General's Office, Buffalo, NY, for Defendants.

### DECISION AND ORDER

H. KENNETH SCHROEDER, JR., United States Magistrate Judge.

**\*1** Pursuant to 28 U.S.C. § 636(c), the parties have consented to the assignment of this case to the undersigned to conduct all proceedings in this case, including the entry of final judgment (Dkt.# 21).

### PRELIMINARY STATEMENT

Currently before the Court is the defendants' motion for summary judgment (Dkt.# 31).

Plaintiff commenced this *pro se* action on or about July 27, 2006 pursuant to 42 U.S.C. § 1983 (Dkt.# 1). Plaintiff's amended complaint alleges various violations of the Eighth and Fourteenth Amendments to the United States Constitution (Dkt.# 6). At all times relevant to the allegations in plaintiff's complaint, plaintiff was incarcerated at Wende Correctional Facility ("Wende"). Defendants were all employees of the New York State Department of Correctional Services ("DOCS"). Defendant Correctional Officers James Callens ("Callens") and Christopher Czarnecki, ("Czarnecki"), Sergeant Scott Lambert ("Lambert"), Hearing Officer Thomas Schoellkopf ("Schoellkopf"), Dr. Jacqueline Levitt ("Levitt"), and Robert Stachowski, R.N. ("Stachowski"), were assigned to Wende. Defendant Donald Selsky ("Selsky"), Director of Special Housing/Inmate Disciplinary Programs, was assigned to DOCS office in Albany, New York.

Plaintiff has asserted four causes of action, sub-divided into the following claims: (1) Correctional Officers Callens and Czarnecki assaulted plaintiff without provocation in violation of the Eighth Amendment; (2) Callens and Czarnecki deprived petitioner of his due process rights when they denied plaintiff recreation and withheld his property; (3) Sergeant Lambert failed to supervise Callens and Czarnecki; (4) Dr. Levitt and R.N. Stachowski failed to provide plaintiff with adequate and appropriate medical treatment in violation of the Eighth Amendment; (5) Schoellkopf violated plaintiff's due process rights at a disciplinary hearing; and (6) Selsky violated plaintiff's due process rights by refusing to reverse the disciplinary hearing disposition. Plaintiff seeks compensatory and punitive damages. Dkt. # 6, ¶ 56–62.

Since filing his opposition to the instant motion for summary judgment (Dkt. 46–48), the plaintiff has been deported from the United States to the Dominican Republic.

For the reasons that follow, defendants' motion for summary judgment is granted in part, and denied

Not Reported in F.Supp.2d, 2010 WL 4320362 (W.D.N.Y.)
**(Cite as: 2010 WL 4320362 (W.D.N.Y.))**

in part.

### FACTS

The following facts are undisputed unless other-wise noted.

### A. Plaintiff's arrival at Wende; Incident of August 9, 2004

On August 2, 2004, plaintiff arrived at Wende from Upstate Correctional Facility ("Upstate"). He was in keep-lock status from August 2 through August 8. Dkt. # 32, ¶¶ 44–45. During that time, plaintiff did not receive his personal property from Upstate. *Id.* at ¶ 46. On August 12, 2004, plaintiff filed a grievance requesting the return of his personal property. The grievance was reviewed by the Inmate Grievance Review Committee ("IGRC"), which informed plaintiff that his property arrived and was reviewed and processed on August 14, and was issued to him that same day. Plaintiff appealed the response of the IGRC to the Superintendent, who affirmed the response on August 27, 2004. Plaintiff then appealed the decision of the Superintendent to the Central Office Review Committee ("CORC"), alleging that he was called out to receive his property on August 7, 2004, but that his property was intentionally withheld from him. The CORC observed that there was no record of plaintiff being called out to receive his property on August 7, and that his property did not arrive until August 14, 2004. *Id.* at ¶ 47–48.

**\*2** On August 9, 2004, Correctional Officer Callens received information that an inmate in 11 Company, Cell 2, may be in possession of a weapon. Dkt. # 32, ¶ 9. After receiving authorization to search plaintiff's cell, Callens ordered plaintiff out of his cell. According to defendants, as plaintiff exited the cell, he raised his fist at Callens, who then grabbed plaintiff's right arm while Czarnecki assisted in restraining plaintiff. *Id.* at ¶ 10–12. Plaintiff has disputed this fact, alleging that he was assaulted by the two officers without provocation. Dkt. # 48, ¶¶ 13, 15. The two Correctional Officers then placed plaintiff's hands behind his back and escorted him to the second floor lobby. Dkt. # 32, ¶¶ 10–13. Sergeant Lambert heard the commotion and responded to the second-floor lobby. Callens explained the situation, and Lambert placed mechanical restraints on the plaintiff. *Id.* at ¶ 14.

Arrangements were then made for the plaintiff to be moved to the Special Housing Unit ("SHU") at Wende. *Id.* at ¶ 8. Plaintiff did not attend recreation the day of the incident. *Id.* at ¶¶ 49–50.

Callens returned to plaintiff's cell and, in searching it, he recovered a plastic, sharpened object concealed in a cardboard sheath. The object was taken to Lambert, who placed it in the Captain's Evidence Locker. *Id.* at ¶ 21. Plaintiff was thereafter charged with violating DOCS Rule 100.11 (Assault on Staff) and Rule 113.10 (Weapon Possession) and a Misbehavior Report was issued by Callens. *Id.* at ¶ 22. As a result of the August 9, 2004 incident, plaintiff was moved to SHU. *Id.* at ¶ 8.

### B. Medical Treatment

Shortly after the incident of August 9, 2004, plaintiff was examined by R.N. Robert Stachowski. Plaintiff complained of pain to his nose, left shoulder, and left wrist. Stachowski observed a small avulsion to the nose, approximately three millimeters in length, and documented the results of his exam on a Use of Force Report and Inmate Injury Report, in accordance with DOCS procedure. He determined that there was no evidence of any additional injury and that plaintiff did not require further medical treatment. *Id.* at ¶¶ 9, 16–17; Dkt. # 35, Ex. B–C.

On August 11, 2004 Dr. Jacqueline Levitt examined plaintiff after he complained of pain to his left wrist and nose. Levitt observed a small bruise on the bridge of plaintiff's nose with no deformities, and no deformity to his wrist. In her medical judgment, Dr. Levitt determined that plaintiff had suffered a soft

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 4320362 (W.D.N.Y.)
**(Cite as: 2010 WL 4320362 (W.D.N.Y.))**

tissue injury and that no further treatment was needed at that time. Dkt. # 32, ¶ 54. On August 18, 2004, plaintiff complained of pain in his left wrist and left shoulder, and decreased flexion of the fifth digit on his left hand. Levitt's examination revealed that his wrist showed no swelling and had a normal range of motion. Plaintiff also had a normal grip. She did observe some decreased flexion of his left fifth digit, and normal range of motion of his left shoulder. Levitt determined that no treatment was needed for those injuries at that time. *Id.* at ¶ 56. One week later, plaintiff again complained of pain in his left wrist and shoulder and requested x-rays. Levitt saw no deformities to his shoulder, wrist, or left fifth digit and determined that there was no bony injury and thus no need for x-rays at that time. Her assessment had not changed when she saw plaintiff again on September 1, 2004. *Id.* at ¶ 59–60. On September 8, 2004, plaintiff again complained of wrist and shoulder pain and decreased range of motion of his fifth left digit. Dr. Levitt examined plaintiff and observed decreased flexion but no deformity in the fifth left digit. She determined that the decreased flexion of plaintiff's finger was not clinically significant. *Id.* at ¶ 62.

**\*3** On September 15, plaintiff was examined by another physician following complaints of poor flexion of the left fifth finger. That doctor noted that plaintiff had persisting left upper extremity complaints and ordered an x-ray of his left finger, and indicated that he would follow-up with an orthopedic consultation if necessary. Dr. Levitt agreed with that plan of care. *Id.* at ¶ 64.

Plaintiff was transferred out of Wende on September 23, 2004. *Id.* at ¶ 68. Upon his transfer to Upstate Correctional Facility, plaintiff was examined by a physician and it was determined that his left fifth digit had full range of motion and no treatment was needed. The finger was again examined at Upstate on October 18, 2004. The nurse noticed decreased flexion, but that it did not warrant any treatment. *Id.* at ¶¶ 69–70. Finally, an orthopedist consulted with plaintiff

on May 26, 2005, and concluded that there was decreased flexion of plaintiff's left fifth digit but that there was no "long term problem." *Id.* at ¶ 71. Due to plaintiff's chronic complaints of pain in his shoulder and ulnar and failed conservative treatment, a diagnostic study of his left shoulder was completed at Clinton Correctional facility. An MRI did not reveal any injuries, therefore an arthoscopic surgery was required to diagnose and treat the affected shoulder. That surgery was performed on December 21, 2006. *Id.* at ¶ 73.

**C. Misbehavior Report and Disciplinary Hearing**

In preparation for the Tier III Superintendent's Hearing arising from the Misbehavior Report dated August 9, 2004, plaintiff was assigned an employee assistant pursuant to 7 N.Y.C.R.R. § 251.4. *Id.* at ¶ 23. Plaintiff requested that seven inmates be interviewed as potential witnesses. The employee assistant was unable to locate one of the witnesses, three refused to testify, and two were denied as witnesses by Hearing Officer Schoellkopf. The remaining witness agreed to testify at the hearing. *Id.* at ¶ 24. The hearing was then conducted before Shoellkopf on August 11, 2004. *Id.* at ¶ 25.

At the commencement of the hearing, plaintiff complained that his employee assistance was inadequate, and requested additional witnesses. He also requested that another Hearing Officer complete the hearing. *Id.* at ¶ 26. Schoellkopf adjourned the hearing and proceeded to locate and interview four witnesses based on the plaintiff's requests. That testimony was recorded and played for the plaintiff at the SHU hearing room on August 31, 2004. *Id.* at ¶ 27–28. Testimony was also given by Correctional Officers Callens and Sergeant Lambert. Schoellkopf denied plaintiff's requests for additional witnesses, determining that further testimony would be redundant pursuant to 7 N.Y.C.R.R. § 253.5. *Id* . Plaintiff objected to the proceedings, claiming that he did not have the opportunity to question witnesses and did not receive certain documentary evidence. He also

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

claimed that he was denied the right to a fair and impartial hearing officer. *Id.* at ¶ 29.

**\*4** After hearing and considering the evidence, Schoellkopf found plaintiff guilty of assault on staff and weapons possession and sentenced him to one year in SHU, and one year loss of packages, commissary, phone, personal television, and good time. *Id.* at ¶ 31. Plaintiff appealed the hearing disposition to the Commissioner of DOCS. Upon review, Donald Selsky, Director of Special Housing/Inmate Disciplinary Programs, affirmed the hearing disposition on November 18, 2004. *Id.* at ¶ 35. Plaintiff then brought a proceeding pursuant to N.Y. C.P.L.R. Article 78 to review the Commissioner's determination. The Appellate Division, Third Department, dismissed the weapon possession charge for insufficient evidence and directed that all references thereto be expunged from plaintiff's record. *Id.* at ¶ 37; *see Fernandez v. Goord,* 27 A.D.3d 806, 809 N.Y.S.2d 685 (3rd Dept.2006). The Appellate Division further determined that plaintiff was afforded meaningful assistance from his employee assistant and that there was no merit to the assertions that Hearing Officer Schoellkopf was biased and improperly denied plaintiff the right to call witnesses. *Id.*

In accordance with the Appellate Division's determination, Director Selsky modified the hearing disposition by removing the guilty finding pertaining to the weapon possession charge.[FN1] Dkt. # 32, ¶ 40.

> [FN1]. Plaintiff also received a reduction in his other sanctions to 330 days to SHU and 330 days loss of packages, phone, and personal television. *See* Dkt. # 32 at ¶ 40.

## D. Grievance Relating to the August 9, 2004 Incident

On August 12, 2004, plaintiff filed a grievance alleging that Callens slammed plaintiff's face and body into a wall and hit his left shoulder with a baton.

He further alleged that Czarnecki and Callens spun him around and again slammed him into a wall. *Id.* at ¶ 41, 809 N.Y.S.2d 685. Following an investigation, the Superintendent concluded that the use of force was consistent with the manner prescribed by DOCS rules. Plaintiff's grievance was denied, and an appeal was taken to CORC, which unanimously upheld the determination of the Superintendent denying the grievance, observing that the medical records and documentation of the Use of Force Report did not substantiate plaintiff's allegation that he was struck with a baton. *Id.* at ¶¶ 42–43, 809 N.Y.S.2d 685.

## DISCUSSION AND ANALYSIS
### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a pro se plaintiff." *Thomas v. Irvin,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see Bryant v. Maffucci,* 923 F.2d 979 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

**\*5** Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward

Not Reported in F.Supp.2d, 2010 WL 4320362 (W.D.N.Y.)
**(Cite as: 2010 WL 4320362 (W.D.N.Y.))**

with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant,* 923 F.2d at 982. A party seeking to defeat a motion for summary judgment must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

Pursuant to Fed.R.Civ.P. 56(e), affidavits in support of or in opposition to a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Thus, affidavits "must be admissible themselves or must contain evidence that will be presented in an admissible form at trial." *Santos v. Murdock,* 243 F.3d 681, 683 (2d Cir.2001) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also H. Sand & Co. v. Airtemp Corp.,* 934 F.2d 450, 454–55 (2d Cir.1991) (hearsay testimony that would not be admissible if testified to at trial may not properly be set forth in an affidavit).

**B. Plaintiff's Claims**

**1. First Cause of Action: Excessive Force**

**a. Defendants Callens and Czarnecki**

Plaintiff first claims that Correctional Officers Callens and Czarnecki used excessive force against him in violation of the Eighth Amendment prohibition against cruel and unusual punishment. Dkt. # 6, ¶ 56.

A claim of cruel and unusual punishment in vio-

lation of the Eighth Amendment to the United States Constitution has both a subjective and objective component. To satisfy the subjective component, a plaintiff must demonstrate that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the circumstances surrounding the challenged conduct." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (quoting *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999); *Wilson v. Seiter,* 501 U.S. 294, 299, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Whether conduct of prison officials can be characterized by "wantonness" is determined by "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wright,* 554 F.3d at 268 (quoting *Hudson v. McMillian,* 503 U.S. 1, 7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). The objective component of a claim of cruel and unusual punishment concentrates on the harm done in light of "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8).

"Where a prisoners' allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that Correctional Officers used force maliciously and sadistically, our Court has reversed summary dismissals of Eighth Amendment claims of excessive force even where the plaintiff's evidence of injury was slight and the proof of excessive force was weak." *Wright,* 554 F.3d at 269 (citing *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) ("reversing summary dismissal of prisoner's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was 'thin' as to his claim that a Correctional Officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the 'medical records after the ... incident with [that officer] indicated only a slight injury' "); *Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999) ("vacating district court's sua sponte dismissal of prisoner's complaint, though characterizing his 'excessive force claim [a]s weak and his evidence [as] extremely thin' where prisoner alleged that he was hit by prison

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 4320362 (W.D.N.Y.)
**(Cite as: 2010 WL 4320362 (W.D.N.Y.))**

guards 'after he was handcuffed' but 'the only injuries he suffered were a bruised shin and swelling over his left knee' ")). Notwithstanding the foregoing, "de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind," is not proscribed by the Eighth Amendment's prohibition against cruel and unusual punishment. *Hudson,* 503 U .S. at 10. Indeed, the Supreme Court has further elaborated, "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Id.* at 9.

**\*6** Plaintiff has alleged that Callens and Czarnecki assaulted him without provocation, causing injury to his nose, pinky finger, wrist, arm, shoulder, and back. Dkt. # 6, ¶¶ 24–28, 42, 56. Defendants contend that "plaintiff came out of his cell with a clenched fist, and he attempted to strike [ ] Callens." According to defendants, the Correctional Officers then applied a reasonable use of force to protect themselves and others. Dkt. # 33, pp. 24–25. Plaintiff's "Answer to Defendants' Statement of Undisputed Facts" states that plaintiff's attempt to strike Officer Callens "never happened" and therefore the defendants' use of force is not justified. Dkt. # 48, ¶ 13. He also maintained this position during his disciplinary hearing. Dkt. # 46, Ex. 3 at 38. The parties thus dispute whether the Correctional Officers had a "wanton" state of mind and whether the degree of force involved under the circumstances was reasonable.

As noted below [FN2], plaintiff has not adduced any evidence demonstrating that his alleged injuries were serious. However, it is disputed whether "force was applied in a good faith effort to maintain or restore discipline ...." *Hudson,* 503 U.S. at 6–7. Hence, a material fact is in dispute as to the subjective component of plaintiff's excessive force claim. *See Griffen,* 193 F.3d at 91 ("Although [prisoner] appellant's excessive force claim is weak and his evidence extremely thin, dismissal of the excessive force claim was inappropriate because there are genuine issues of

material fact concerning what transpired ...."); *Ali v. Szabo,* 81 F.Supp.2d 447, 458 (S.D.N.Y.2000) ( "[B]ecause there is a material issue of fact as to whether any force was needed, the Court cannot determine whether the force allegedly used ... reasonably correlates to the need for the application of force."); *Johnson v. Doherty,* 713 F.Supp. 69, 72 (S.D.N.Y.1989) (summary judgment on an excessive force claim is inappropriate where there are disputed facts as to the context in which the incident occurred and the signs of provocation).

FN2. See discussion at B.2.

Accordingly, defendants' motion for summary judgment with respect to plaintiff's excessive force claim is denied.

**b. Supervisory Liability**

Plaintiff also contends that Sgt. Lambert failed to properly supervise Callens and Czarnecki with regard to the alleged assault against plaintiff. Dkt. # 6, ¶ 57.

"Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (May 18, 2009). Thus, it is well settled that the personal involvement of defendants in an alleged constitutional deprivation is a prerequisite to an award of damages under § 1983. *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *AlJundi v. Estate of Rockefeller,* 885 F.2d 1060,1065 (2d Cir.1989). Personal involvement may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created or permitted the continuation of a policy or custom under which unconstitutional prac-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 4320362 (W.D.N.Y.)
**(Cite as: 2010 WL 4320362 (W.D.N.Y.))**

tices occurred; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating unconstitutional acts were occurring. *Colon,* 58 F.3d at 873.[FN3]

> FN3. At least one district court in this Circuit has opined that the holding in *Iqbal* substantially limited the *Colon* categories. *See Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801, 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009)* ("Only the first and part of the third *Colon* categories pass *Iqbal' s* muster .... The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated."); *but see D'Olimpio v. Crisafi,* Nos. 09 Civ. 7283, 09 Civ. 9952, 718 F.Supp.2d 340, 2010 WL 2428128, at *4–*5 (S.D.N.Y. June 15, 2010)* ("[T]he five *Colon* categories for personal liability of supervisors may still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated."). Even when examined under the broader *Colon* approach, plaintiff cannot establish the personal involvement of Lambert.

*7 Plaintiff has not alleged that Lambert participated in any of the alleged conduct of Callens or Czarnecki, or that he created a policy or custom that effectively sanctioned their conduct. His allegation that Lambert was made aware of the complained of conduct but did nothing to remedy or protect could implicate categories two (2), four (4) or five (5) under *Colon.* However, plaintiff presents no evidence that Lambert failed to remedy a wrong after being informed through a report or appeal or failed to act on information indicating that unconstitutional acts were occurring. Rather, the only evidence plaintiff proffers is that he vaguely testified at his disciplinary hearing that he had informed Lambert about the alleged assault

while in Lambert's office, and Lambert reacted by ordering plaintiff to SHU. Dkt. # 46, Ex. 3 at 41. Such conclusory allegations are clearly insufficient to create a question of fact regarding Lambert's personal involvement with the alleged actions of his co-defendants. Further, plaintiff has presented no evidence concerning Lambert's management or training of any of the co-defendants. Hence, there is no evidence from which a factfinder could evaluate or construe gross negligence. In sum, plaintiff has not established Lambert's personal involvement in a constitutional violation.

With respect to plaintiff's first cause of action, defendants' motion for summary judgment is granted, except as to plaintiff's excessive force claim against Callens and Czarnecki.

**2. Second Cause of Action: Deliberate Indifference**

Plaintiff next contends that R.N. Stachowski and Dr. Levitt failed to provide adequate treatment to plaintiff, in violation of his Eighth Amendment right to be free from cruel and unusual punishment. Dkt. # 6, ¶ 58.

The Eighth Amendment not only prohibits "physically barbarous punishments," but also "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency ... 'against which we must evaluate penal measures.'" *Estelle v. Gamble,* 429 U.S. 97,102 (1976) (quoting *Jackson v. Bishop,* 404 F.2d 571, 579 (8th Cir.1968)). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Id.* at 103. The *Estelle* court concluded that an unconstitutional denial of medical care occurs when there is a "deliberate indifference to serious medical needs of prisoners." *Id.* at 104. The deliberate indifference standard "incorporates both objective and subjective elements. The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant

Not Reported in F.Supp.2d, 2010 WL 4320362 (W.D.N.Y.)
**(Cite as: 2010 WL 4320362 (W.D.N.Y.))**

prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003) (citations and internal quotations omitted).

With respect to the objective component, the alleged deprivation must be "sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). A serious medical condition exists where the "failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Chance v. Armstrong,* 143 F.3d 698, 701–02 (2d Cir.1998).

**\*8** After the August 9, 2004 incident, plaintiff complained of pain to his nose, left shoulder, and left wrist. Stachowski examined plaintiff and noted that the only apparent injury to plaintiff was a small avulsion to his nose, approximately 3 millimeters in length. Dkt. # 32, ¶ 17. Dr. Levitt then examined plaintiff when he complained of pain to his left wrist and nose. She observed a small bruise on the bridge of his nose with no deformities and no deformity to his wrist. In her medical judgment, Levitt determined that plaintiff had suffered a soft-tissue injury and that no further treatment was needed at that time. Dkt. # 32, ¶ 54. These types of injuries cannot be said to be "sufficiently serious", nor are they a condition of urgency, one that may produce death, degeneration, or extreme pain. *See, e.g., Davidson v. Scully,* 914 F.Supp. 1011, 1015–16 (S.D.N.Y.1996) (holding that a plaintiff's "allergy condition, his podiatric condition, his post-surgery hernia condition, his knee condition, his urological problems, his dermatological problems, and his cardiological problems do not present urgent medical conditions the maltreatment of which amounts to cruel and unusual punishment in violation of the Eighth Amendment."); *Pabon v. Goord,* No. 99 Civ. 5869(THK), 2003 WL 1787268, \*4 (S.D.N.Y. March 28, 2003) (clival lesion at the base of the inmate's skull not sufficiently serious); *Rodriguez v.*

*Mercado,* No. 00 CIV. 8588 JSRFM, 2002 WL 1997885, \*8 (S.D.N.Y. Aug.28, 2002) (bruises to head, back, and wrists not sufficiently serious); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F .Supp.2d 303, 311 (S.D.N.Y.2001) (bleeding finger not a severe injury); *Henderson v. Doe,* No. 98 Civ. 5011, 1999 WL 378333, \*2 (S.D.N.Y. June 10, 1999) (broken finger not severe).

Even if plaintiff had demonstrated injuries severe enough to rise to the level of a serious medical need, he still has not raised a material issue of fact that named medical professionals at Wende were deliberately indifferent to that need.

To satisfy the subjective element of the deliberate indifference standard, an inmate must demonstrate that the prison official's conduct was more than negligent, but he need not show that it was "undertaken for the very purpose of causing harm." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Rather, it must be established that the prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Stated another way, "[a] showing of medical malpractice is therefore insufficient to support an Eighth Amendment claim." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003).

Plaintiff encountered defendant Stachowski immediately following the incident on August 9, 2004. Stachowski examined plaintiff and, in his medical judgment, determined that plaintiff did not require medical treatment at that time. Dkt. # 32, ¶ 17. An issue of medical judgment is "precisely the sort of issue that cannot form the basis of a deliberate indifference claim." *Hernandez,* 341 F.3d at 147. Following Stachowski's initial examination, medical staff saw the plaintiff a total of seventeen times from the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 4320362 (W.D.N.Y.)
(Cite as: 2010 WL 4320362 (W.D.N.Y.))

date of the incident to September 23, 2004 when he was transferred out of Wende. Dkt. # 32, ¶ 72. During the exams at Wende, plaintiff complained of pain to his left wrist, shoulder, and pinky finger seven times. Plaintiff contends that Levitt provided inadequate medical treatment because she did not order x-rays or order a specialist consultation, *see* Dkt. # 6, ¶¶ 40–41. However "[t]he failure to perform an X-ray or to use additional diagnostic techniques does not constitute cruel and unusual punishment but is, at most, medical malpractice cognizable in the state courts." *Estelle,* 429 U.S. at 107; *see also Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) (The fact that a plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation); *see also Sonds,* 151 F.Supp.2d at 312 (holding that disagreements over medications, diagnostic techniques (e.g., the need for x-rays), forms of treatment or the need for specialists are not adequate grounds for a § 1983 claim).

**\*9** Furthermore, in the brief period of time that plaintiff was in defendant Levitt's care, both defendants concluded that plaintiff did not warrant extensive radiological studies and/or orthopedic consultation. Dkt. # 32, ¶ 75. Both Stachowski and Levitt examined plaintiff and made their own independent medical judgments to determine the best course of treatment for him. Plaintiff has not presented any evidence to raise a material issue of fact of negligence, much less deliberate indifference. On this basis, plaintiff's claims are dismissed and the defendants' summary judgment motion is granted on the second cause of action.

### 3. Third Cause of Action: Due Process–Disciplinary Proceedings

#### a. Inadequate Assistance

Plaintiff contends that he was denied his right to employee assistance at his Tier III disciplinary hearing. Dkt. # 6, ¶¶ 46, 59.[FN4]

> FN4. The Court notes that plaintiff has not sued the employee assistant. In any event, the record belies plaintiff's complaint that he was denied meaningful assistance.

In *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court recognized that prisoners retain a liberty interest and may not be deprived of that interest without due process of law. 418 U.S. at 556. Thus, an inmate facing disciplinary charges that could result in punitive segregation is entitled, at a minimum, to receive advance written notice of the charges against him and of the evidence available to the factfinder. *Id.* at 563–64. The purpose of this notice is to give the inmate an opportunity to marshal the facts and prepare his defense. *Id.* at 564. Due process further requires that a written record of the proceedings be kept, along with a written statement by the factfinder as to the evidence relied upon and reasons for the disciplinary action imposed. *Id.; see also Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985). In addition, the inmate is entitled to call witnesses and present documentary evidence in his defense "when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." 418 U.S. at 566; see also *McCann v. Coughlin,* 698 F.2d 112, 122 (2d Cir.1983).

The Second Circuit has elaborated on the minimum due process requirements set forth in *Wolff* that pertain to an inmate facing disciplinary charges. In *Eng v. Coughlin,* 858 F.2d 889 (2d Cir.1988), for instance, the Second Circuit held that "prison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges." 858 F.2d at 897. In *McCann v. Coughlin,* 698 F.2d 112 (2d Cir.1983), the Second Circuit recognized that the factfinder presiding over the disciplinary hearing must be fair and impartial. 698 F.2d at 122 (citing *Crooks v. Warne,* 516 F.2d 837 (2d

Not Reported in F.Supp.2d, 2010 WL 4320362 (W.D.N.Y.)
**(Cite as: 2010 WL 4320362 (W.D.N.Y.))**

Cir.1975)).

New York's regulations entitle a prisoner to an employee assistant to help him prepare for a disciplinary hearing. *See* 7 N.Y.C.R.R. §§ 251–4.1, 251–4.2. The Supreme Court has held that a prisoner's right to assistance as a matter of federal constitutional law is more limited, determining that the institutional concerns implicated in prison administration would not be furthered by entitling inmates to legal counsel in the form of a retained or assigned attorney. *See Wolff,* 418 U.S. at 570 ("The insertion of counsel into the disciplinary process would inevitably give the proceedings a more adversary cast and tend to reduce their utility as a means to further correctional goals. There would also be delay and very practical problems in providing counsel in sufficient numbers at the time and place where hearings are to be held. At this stage of the development of these procedures we are not prepared to hold that inmates have a right to either retained or appointed counsel in disciplinary proceedings."); *accord Silva v. Casey,* 992 F.2d 20, 21 (2d Cir.1993).

**\*10** It is undisputed that plaintiff was assigned an employee assistant pursuant to 7 N.Y.C.R.R. § 251–4.1. Dkt. # 32, ¶ 23. Plaintiff contends, however, that the employee assistant assigned to him failed to interview witnesses and supply him with documents to assist in his defense. The record before the Court indicates that after meeting with the assistant, plaintiff requested that seven inmates be interviewed as potential witnesses. The assistant was unable to locate one of the requested witnesses, three refused to testify, and two were rejected by the hearing officer. *Id.* at ¶ 24; Dkt. # 39, Ex. B–C. Moreover, the Assistant Form indicates that several documents were issued to plaintiff upon his request. Dkt. # 39, Ex. B. When given the chance at the disciplinary hearing to elaborate on his claim that his assistance was "incomplete," plaintiff was unable to identify the documents that he claimed to be entitled to but did not receive. He also re-stated his assertion that his assistant failed to interview potential inmate witnesses. Dkt. # 46, Ex. 3 at

7; Dkt. # 39, Ex. D. Hearing Officer Schoellkopf informed plaintiff that certain requested documents were not available for "security reasons" and that plaintiff would be able to request witnesses at the hearing. *Id.* at 7–11.

Under *Eng,* an assigned assistant who does nothing to assist an inmate "has failed to accord the prisoner his limited constitutional due process right of assistance." *Eng,* 858 F.2d at 898. Such is not the case here. The employee assistant did reach out to each of the requested witnesses, and thus did not fall short of the required level of employee assistance. *See Jermosen v. Coughlin,* No. 89 CV 1140, 1993 WL 328482, at \*4 (W.D.N.Y. Aug.9, 1993), *aff'd,* 29 F.3d 620 (1994) (where an employee assistant interviewed witnesses and reported to the inmate, nothing else was required of the assistant). Accordingly plaintiff's claim of inadequate employee assistance does not rise to a due process violation.

**b. Denial of Request for Witnesses**

Plaintiff next avers that Hearing Officer Schoellkopf denied him of his right to call witnesses on his behalf and confront witnesses against him at his disciplinary hearing. Dkt. # 6, ¶ 46.

Although a New York inmate has a due process right to call witnesses, *see* 7 N.Y.C.R.R. § 254.5(b), that right is not absolute. *See Ponte v. Real,* 471 U.S. 491, 495, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985); *Wolff,* 418 U.S. at 566. (1974). "Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority ...." *Ponte,* 471 U.S. at 496 (quoting *Wolff,* 418 U.S. at 566). A hearing officer may also refuse to call a witness "on the basis of irrelevance or lack of necessity." *Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991); *see also Scott v. Kelly,* 962 F.2d 145, 146–47 (2d Cir.1992) ("It is well settled that an official may refuse to call witnesses as long as the refusal is justifiable"). To establish a procedural due process

Not Reported in F.Supp.2d, 2010 WL 4320362 (W.D.N.Y.)
**(Cite as: 2010 WL 4320362 (W.D.N.Y.))**

claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing. *See Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991).

**\*11** In the case at bar, Hearing Officer Schoellkopf adjourned the hearing so the plaintiff's requested witnesses could be located and interviewed. Ultimately, only four inmates agreed to testify. That testimony was recorded and played for the plaintiff when the hearing resumed on August 31, 2004. Dkt. # 32, ¶ 28.[FN5] Testimony was also given by Sergeant Lambert and Correctional Officer Callens. Following their testimony, Schoellkopf determined that any further testimony would be redundant, and denied plaintiff's requests for "all staff" to testify pursuant to 7 N.Y.C.R.R. § 253.5(a)[FN6]. *Id.*

> **FN5.** Plaintiff was being held in the SHU, and the hearing was conducted there. The inmates that plaintiff had sought to testify were located in the general population. The hearing officer thus recorded the inmates' testimony in the general population hearing room, to be played for plaintiff once the hearing was resumed in the SHU hearing room. *See* Dkt. # 32, ¶ 27; *see* 7 N.Y.C.R.R. § 253.5(b).

> **FN6.** 7 N.Y.C.R.R. § 253.5(a) reads, "[t]he inmate may call witnesses on his behalf provided their testimony is material, is not redundant, and doing so does not jeopardize institutional safety or correctional goals. If permission to call a witness is denied, the hearing officer shall give the inmate a written statement stating the reasons for the denial, including the specific threat to institutional safety or correctional goals presented."

The record indicates that Schoellkopf did not deny plaintiff the opportunity to call witnesses on his behalf. He did, however, deny plaintiff's request that two additional officers testify on the grounds that plaintiff could not call an unlimited number of witnesses and because any further testimony would be redundant. A hearing officer in a prison disciplinary proceeding does not violate due process by excluding irrelevant or unnecessary testimony. *Kalwasinski v. Morse,* 201 F.3d 103,109 (2d Cir.1999). Rather, all that is required to satisfy due process is that the hearing officer prove he had a rational basis for denying the witnesses. *Fox v. Coughlin,* 893 F.2d 475, 478 (2d Cir.1990). Here, plaintiff had six witnesses at his disciplinary hearing, four inmates and two Correctional Officers. In light of the testimony already given, Schoellkopf refused to interview the additional Correctional Officer because he believed such testimony would be redundant. The denial was thus not a violation of plaintiff's right to due process. *See Afrika v. Selsky,* 750 F.Supp. 595, 600–601 (S.D.N.Y.1990) (refusal to call some witnesses whose testimony was not believed to be relevant, after hearing testimony of several requested eyewitnesses, did not violate due process); *see generally Russell v. Selsky,* 35 F.3d 55, 59 (2d Cir.1994) (a prison disciplinary hearing officer may refuse to allow willing witnesses to testify where their testimony would be cumulative).

Finally, it is well settled that "[a]n inmate does not possess a constitutional right to confront or cross-examine witnesses in prison disciplinary hearings. *Wolff,* 418 U.S. at 567–68; *Kalwasinski,* 201 F.3d at 109. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993). To that end, plaintiff's complaint that the inmate testimony was taken outside of his presence and tape-recorded does not pose a due process violation. In any event, Schoellkopf did give plaintiff the opportunity to present questions to the inmate-witnesses, but plaintiff did not provide any. Dkt. # 46, Ex. 3 at 19–20. Plaintiff has thus not established a due process violation.

**c. Denial of Fair Hearing**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 4320362 (W.D.N.Y.)
(Cite as: 2010 WL 4320362 (W.D.N.Y.))

Plaintiff alleges that Hearing Officer Schoellkopf was not fair and impartial, thereby depriving him of due process. Dkt. # 6, ¶ 46. Specifically, plaintiff complains that Schoellkopf pre-judged the case against plaintiff. Dkt. # 46 at 11–12, 15.

**\*12** "An inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996); *see Wolff,* 418 U.S. at 570–71; *Russell v. Selsky,* 35 F.3d 55, 59 (2d Cir.1994). An impartial hearing officer "is one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990); *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

It is well recognized, however, "that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen,* 100 F.3d at 259. For example, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Allen,* 100 F.3d at 259; *see Francis,* 891 F.2d at 46. A hearing officer may satisfy the standard of impartiality if there is "some evidence in the record" to support the findings of the hearing. *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). The Second Circuit has explained that, "[a]lthough the Court in *Hill* stated that the question is whether there is 'any evidence' that 'could' support the disciplinary decision, this Court has not construed the phrase 'any evidence' literally. Rather, we have looked to see whether there was 'reliable evidence' of the inmate's guilt." *Luna v. Pico,* 356 F.3d 481, 488 (2d Cir.2004) (quoting *Hill,* 472 U.S. at 455–56).

Plaintiff's argument that defendant Schoellkopf had pre-determined plaintiff's guilt is belied by the evidence in the record before this Court. The disciplinary hearing spanned several days to allow for each

of plaintiff's witnesses to be interviewed and testify. In addition to the plaintiff's four witnesses, two Correctional Officers also provided testimony in front of plaintiff, who was permitted to question them. As reflected in the disciplinary hearing transcript, defendant Schoellkopf permitted plaintiff to voice his objections during the hearing, afforded plaintiff the opportunity to testify or to present evidence in his defense. Moreover, Schoellkopf set forth sufficient evidence in his disposition to support his determination of guilt of assault on staff and weapon possession, stating that he relied on the testimony of Officer Callens, who was personally involved in the altercation and completed a Misbehavior Report dated August 9, 2004; the Unusual Incident Report; the weapon recovery Unusual Incident data sheet; a "to/from memo" of Sgt. Lambert as well as his testimony; a Use of Force Report; the Watch Commander's log; the Captain's log; and the chain of custody log entry. Dkt. # 46, Ex. 3 at 45. After finding plaintiff guilty, Schoellkopf imposed the following penalty: one year SHU, one year loss of package, commissary and phone, one year loss of TV, and one year loss of good time. The hearing officer noted, "[t]he reasons for disposition is because of the serious nature of attempting to strike an officer as well as this being your second 113.10 weapon violation. The last two dispositions haven't deterred you, therefore this stronger disposition is given to emphasize to you and others to refrain from this behavior in the future." *Id.* at 46.

**\*13** Plaintiff's bare allegations of bias and prejudgment, without more, are insufficient to defeat defendant's motion for summary judgment. As reflected in the hearing transcript, defendant Schoellkopf based his determination on the Misbehavior Report, the testimony of plaintiff, testimony of witnesses present during the incident, and the documentary evidence. Thus, the record before this Court establishes that defendant Schoellkopf was neither biased nor prejudged the evidence. To the contrary, Schoellkopf based his finding of guilt on the credible evidence presented during the hearing and made an

Not Reported in F.Supp.2d, 2010 WL 4320362 (W.D.N.Y.)
**(Cite as: 2010 WL 4320362 (W.D.N.Y.))**

objectively reasonable determination based on the evidence. Thus, the Court agrees with defendant Schoellkopf that plaintiff has failed to meet his burden of demonstrating that defendant Schoellkopf was so partial so as to violate plaintiff's due process rights.

**d. Director Selsky**

In a related claim, plaintiff avers that Director Selsky refused to reverse Schoellkopf's disposition against plaintiff and thus deprived plaintiff of his due process rights. Dkt. # 33, ¶ 40. As stated earlier, there is nothing in the record to support the conclusion that Schoellkopf denied plaintiff his due process rights at the Tier III disciplinary hearing. Selsky's decision affirming (and later modifying) the hearing officer's determination does not, standing alone, establish a federal constitutional violation. *See Eleby v. Selsky,* 682 F.Supp.2d 289, 293 (W.D.N.Y.2010) ("Thus, plaintiff cannot show that his constitutional rights were violated during the disciplinary proceedings or hearing. Selsky's affirmance of the hearing officer's decision therefore cannot give rise to a § 1983 claim.") (citing *Loving v. Selsky,* No. 07–CV–6393, 2009 WL 87452, at *4 (W.D.N.Y. Jan.12, 2009)); *see also Chavis v. vonHagn,* No. 02–CV0119(Sr), 2009 WL 236060, *6, (W.D.N.Y. Jan.30, 2009) (citing *Hameed v. Mann,* 57 F.3d 217, 224 (2d Cir.1995) (Selsky entitled to dismissal of claims where plaintiff failed to establish constitutional violations at disciplinary hearing)). Accordingly, plaintiff's claim against Selsky is dismissed.

With respect to plaintiff's third cause of action, defendants' motion for summary judgment is granted.

**4. Fourth Cause of Action: Due Process–Property and Recreation**

**a. Deprivation of Recreation**

Plaintiff contends that a one-day denial of recreation denied him his right to due process. Dkt. # 6, ¶ 61.

In *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court held that the failure to comply with every state or prison regulation does not necessarily create a protected liberty interest for prisoners. *Sandin,* 515 U.S. at 483–484. Instead, to create a protected liberty interest, a state must implement a regulation or other provision providing for restraints that impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484.

**\*14** At the outset, plaintiff acknowledges that he was unable to go to recreation because the incident of August 9, 2004 occurred during the scheduled time for recreation. Dkt. # 48, ¶ 49; *Id.* at Ex. 2, Line 19. Similarly, defendants Callens and Czarnecki state that they did not deny plaintiff recreation on August 9, 2004 to punish him. Rather, if plaintiff was unable to go to recreation that day, it "may have been because of the use of force incident that occurred and the necessary procedures that had to be followed." Dkt. # 32, ¶ 49.

In any event, a one-day deprivation of recreation is insufficient to give rise to a "significant hardship" as contemplated by *Sandin. See Husbands v. McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y.1998) ("The temporary loss of the various privileges alleged in this case-i.e., telephone, package, commissary, and recreation privileges-does not represent the type of deprivation which could reasonably be viewed as imposing an atypical and significant hardship on an inmate."); *Ford v. Phillips,* No. 05 CIV. 6646, 2007 WL 946703, at * 10 (S.D.N.Y. Mar. 27, 2007) (granting summary judgment on inmate's claim that he was denied recreation, showers, and a special meal on four occasions; "These minor and temporary denials clearly do not constitute significant hardships implicating a constitutionally protected liberty interest"); *Ragland v. Crawford,* No. 95 Civ. 10069, 1997 WL 53279, *3

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 4320362 (W.D.N.Y.)
**(Cite as: 2010 WL 4320362 (W.D.N.Y.))**

(S.D.N.Y., Feb.7, 1997), ("In light of the Court's holding in *Sandin,* neither Ragland's loss of one hour daily recreation time for one week, nor his alleged confinement to keeplock on October 13, 1995, constitutes an atypical, significant hardship implicating a protected liberty interest."). Consequently, plaintiff has failed to allege any facts that his deprivation of one day of recreation resulted in an "atypical" or "significant hardship."

**b. Deprivation of Property**

Next, plaintiff alleges that Callens and Czarnecki withheld his personal properly from August 2 to August 9, 2004. Dkt. # 6, ¶ 61. Although plaintiff arrived at Wende on August 2, his property did not arrive until August 14, 2004 for reasons unbeknownst to defendants. Plaintiff's property was issued to him the same day it was received. Dkt. # 48, ¶¶ 46, 48. Defendants Callens and Czarnecki argue that they had no involvement with the delay in petiitoner's property arriving at Wende. Dkt. # 33 at 4.

Plaintiff has pointed to no evidence, or even provided a factual allegation, to support a conclusion that Callens or Czarnecki had any involvement with the delay in the receipt of plaintiff's property. Absent evidence of personal involvement by any of the relevant *Colon* methods, (e.g. direct involvement, deliberate indifference), plaintiff cannot prevail against the defendants. *See Colon,* 58 F.3d at 873.

**c. Supervisory Liability**

Plaintiff next contends that Sgt. Lambert failed to properly supervise Callens and Czarnecki with respect to the delivery of his personal property and the alleged denial of recreation time. Dkt. # 6, ¶ 62. This conclusory allegation is insufficient to establish personal involvement. *See Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (to hold a prison official liable under § 1983 "requires a showing of more than the linkage in the prison chain of command"); *Sash v. United States,* 674 F.Supp.2d 531, 543 (S.D.N.Y.2009) (holding that "[i]t is not enough to

show that a defendant 'ultimately supervised those who allegedly violated plaintiff's Constitutional rights.' " (quoting *Mallard v. Menifee,* No. 99 Civ. 0923, 2000 WL 557262, at *3 (S.D.N.Y. May 8, 2000)). Plaintiff fails to establish personal involvement under the Colon factors, especially in light of the undisputed fact that the defendants he allegedly failed to supervise had no knowledge of the delay in the arrival of plaintiff's property from Upstate to Wende, and did not deny him recreation time.

**\*15** For the foregoing reasons, defendants' motion for summary insofar as it relates to plaintiff's fourth cause of action is granted.

**IV. Conclusion**

For the reasons set forth above, the defendants' motion for summary judgment should be granted, except insofar as plaintiff claims that defendants Callens and Czarnecki used excessive force against him in violation of the Eighth Amendment. A telephone conference is scheduled for November 12, 2010 at 10:00a.m. for purposes of setting a trial date on plaintiff's first cause of action against defendants Callens and Czarnecki alleging excessive use of force. Defendants' counsel shall arrange for plaintiff's telephonic appearance and provide the court with a telephone number where he can be contacted. The court will initiate the call.

**SO ORDERED.**

W.D.N.Y.,2010.
Fernandez v. Callens
Not Reported in F.Supp.2d, 2010 WL 4320362 (W.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4627120 (N.D.N.Y.)
**(Cite as: 2014 WL 4627120 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Leonard HINTON, Plaintiff,
v.
A. PRACK, et al., Defendants.

No. 9:12–CV–1844 (LEK/RFT).
Signed Sept. 10, 2014.
Filed Sept. 11, 2014.

Leonard Hinton, Malone, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, Joshua E. Mcmahon, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*MEMORANDUM–DECISION and ORDER*
LAWRENCE KAHN, District Judge.
## I. INTRODUCTION
**\*1** This *pro se* action under 42 U.S.C. § 1983 comes before the Court following a Report–Recommendation filed on August 14, 2014, by United States Magistrate Judge Randolph F. Treece, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). Dkt. No. 59 ("Report–Recommendation"). Judge Treece recommends that all of Plaintiff Leonard Hinton's ("Plaintiff") claims be dismissed, except that he be awarded nominal damages for violation of his due process rights by Defendant Uhler. Report–Rec. at 31–32. Plaintiff timely filed Objections. Dkt. Nos. 62 ("Objections"); 63 ("Addendum"). For the following reasons, the Report–Recommendation is adopted in its entirety.

## II. STANDARD OF REVIEW
When a party makes a timely objection to a Report–Recommendation, it is the duty of the Court to "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). Where, however, an objecting "party makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error." *Farid v. Bouey,* 554 F.Supp.2d 301, 307 (N.D.N.Y.2008) (quoting *McAllan v. Von Essen,* 517 F.Supp.2d 672, 679 (S.D.N.Y.2007)) (citations omitted); *see also Brown v. Peters,* No. 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept. 22, 1997). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b).

## III. DISCUSSION

### A. First Disciplinary Hearing

Plaintiff argues that the evidence presented at his first disciplinary hearing was not "reliable evidence" sufficient to support the hearing officer's determination that Plaintiff was guilty of the alleged conduct. Objs. at 1. Specifically, Plaintiff argues that the evidence was insufficient because there was no independent credibility assessment of, or written statements by, the confidential informant or alleged victim to corroborate Sergeant Gower's testimony. *Id.* at 1–2.

Plaintiff already raised this argument in great detail in his Motion for summary judgment, *see* Dkt. No. 39 at 19–22, and Judge Treece explicitly addressed it in the Report–Recommendation, Report–Rec. at 12–15. Because Plaintiff's argument is "a mere reiteration of an argument made to the magistrate judge," *Dove v. Smith,* No. 13–CV–1411, 2014 WL

1340061, at *1 (N.D.N.Y. Apr. 3, 2014) (Kahn, J.) the Court reviews Plaintiff's objection only for clear error, *see Chylinski v. Bank of Am., N.A.,* 434 F. App'x 47, 48 (2d Cir.2011)). The Court finds that Judge Treece committed no clear error in determining that Sergeant Gower's testimony was sufficiently corroborated by his written report and other evidence in the record. *See* Report–Rec. at 12–15; *see also Kotler v. Daby,* No. 10–CV–0136, 2013 WL 1294282, at *10 (N.D.N.Y. Mar. 28, 2013) (finding guard's testimony and written report constituted "reliable evidence" under the "some evidence" standard, and that an independent assessment of the witnesses' credibility was not required).

## B. Second Disciplinary Hearing

**\*2** Plaintiff argues that his due process rights were violated at his second disciplinary hearing because Defendant Haug, who conducted the disciplinary hearing, failed to interview or make available four of Plaintiff's requested witnesses. Objs. at 2. Specifically, Plaintiff asserts that he was prejudiced by his inability to question Captain Scarafile ("Scarafile") and Deputy Superintendent Kinderman ("Kinderman") because they "ascertained the facts of th[e] incident, and would have testified of [sic] those facts." *Id.* Moreover, corrections officer Ruggerio ("Ruggerio") and inmate Burton ("Burton") both had relevant, first-hand knowledge of the circumstances of the alleged fight. *See id.; see also* Addendum at 2.

To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing. *See Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991). In his Objections, Plaintiff states that "[c]learly there is relevance of every witness that Plaintiff requested to testify on his behalf." Objs. at 2. However, Plaintiff fails to advance any specific arguments as to *how* these witnesses' testimonies would have affected the outcome of his disciplinary hearing.

Indeed, as Judge Treece points out, Kinderman and Scarafile were merely supervisors who were informed of the incident after it had already transpired. Report–Rec. at 19. Thus, they did not have first-hand knowledge of the events, and there is no indication that they would have testified favorably to Plaintiff. *See id.* Moreover, Ruggerio did not arrive until after the incident occurred, and his misbehavior report was virtually identical to that of Officer Betti, who testified at the hearing. *Id.* Thus, there is no indication that Ruggerio's testimony would have affected the outcome of the hearing. Finally, although Burton presumably could have offered relevant testimony, as he was the alleged victim of Plaintiff's attack, Plaintiff has not demonstrated how Burton's testimony would have affected the outcome of his hearing. To the contrary, as indicated in Sergeant Betti's Fight Investigation Report, Burton stated that Plaintiff began yelling at him for no reason and Plaintiff then hit him in the head with a frying pan. Report–Rec. at 20. Thus, Plaintiff's arguments that these witnesses' testimonies would have affected the outcome of his hearing are entirely speculative, and do not warrant finding a constitutional violation. *See* Report–Rec. at 2; *see also Grossman v. Bruce,* 447 F.3d 801, 805 (10th Cir.2006) ("[A] prisoner cannot maintain a due process claim for failure to permit witness testimony if he fails to show that the testimony would have affected the outcome of his case.").

## C. Third Disciplinary Hearing

Plaintiff next argues that he has established an actual injury in connection with his third disciplinary hearing because he was confined in the Special Housing Unit ("SHU") "as a result of the constitutional violations." Objs. at 2. Plaintiff is correct that his constitutional rights were violated by Defendants' failure to timely provide Plaintiff with a copy of the disciplinary hearing determination. *See* Report–Rec. at 25–26. However, the copy of the hearing determination was merely the means by which to inform Plaintiff of the penalty to be imposed. Thus, Defendants' failure to provide Plaintiff with a copy of the

Slip Copy, 2014 WL 4627120 (N.D.N.Y.)
**(Cite as: 2014 WL 4627120 (N.D.N.Y.))**

hearing decision did not affect the actual determination, because the determination had already been made. In other words, Defendants' failure to provide Plaintiff with the hearing decision did not *cause* him to be confined in SHU—the penalty had already been imposed and was entirely independent of the failure to serve Plaintiff with a written confirmation of the penalty. *See McCann v. Coughlin,* 698 F.2d 112, 126 (2d Cir.1983) (noting that failure to provide a copy of a hearing determination occurs after the decision has been rendered). Therefore, Plaintiff has failed to show actual injury in relation to his third disciplinary hearing.

**D. Qualified Immunity**

**\*3** Plaintiff's final objection is that Defendants are not entitled to qualified immunity. Objs. at 3. However, Judge Treece did not find that any Defendants were entitled to qualified immunity. Therefore, Plaintiff's argument is irrelevant.

**IV. CONCLUSION**

Accordingly, it is hereby:

**ORDERED,** that the Report–Recommendation (Dkt. No. 59) is **APPROVED and ADOPTED in its entirety;** and it is further

**ORDERED,** that Plaintiffs' Motion (Dkt. No. 39) for summary judgment is **GRANTED in part and DENIED in part** consistent with the Report–Recommendation (Dkt. No. 59); and it is further

**ORDERED,** that Defendant's Cross–Motion (Dkt. No. 42) for summary judgment is **GRANTED in part and DENIED in part** consistent with the Report–Recommendation (Dkt. No. 59); and it is further

**ORDERED,** that Plaintiff be awarded nominal damages in the amount of one dollar ($1.00); and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

LEONARD HINTON, Plaintiff,

-v-

**A. PRACK,** *Commissioner's Designee,* **D. VE-NETTOZZI,** *Commissioner's Designee,* **S. BULLIS,** *Hearing Officer,* **D. HAUG,** *Hearing Officer,* **D. ROCK,** *Superintendent; Upstate Correctional Facility,* **UHLER,** *Deputy Superintendent of Security; Upstate Correctional Facility,* Defendants.

*REPORT–RECOMMENDATION and ORDER*
RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Leonard Hinton brings this action, pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his right to due process at three separate disciplinary hearings. *See* Dkt. No. 1, Compl. Plaintiff has moved for summary judgment. Dkt. No. 39. Defendants oppose that Motion, and Cross–Move for Summary Judgment. Dkt. No. 42. Plaintiff opposes Defendants' Cross–Motion. Dkt. Nos. 44, Pl.'s Opp'n, & 45, Pl.'s Supp. Opp'n. For the reasons that follow, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED,** Defendants' Cross–Motion for Summary Judgment be **GRANTED,** and that this action be **DISMISSED.**

**I. STANDARD OF REVIEW**

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4627120 (N.D.N.Y.)
**(Cite as: 2014 WL 4627120 (N.D.N.Y.))**

and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

**\*4** To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact

to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Employees & Rest. Employees Union, Local 100 of N.Y. v. City of N.Y. Dep't of Parks & Recreation,* 311 F.3d 534, 543 (2d Cir.2002) (quoting *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993)). "[N]either side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it ... [and] a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States,* 996 F.2d at 1461.

## II. DISCUSSION
### A. Due Process
**\*5** Plaintiff alleges that Defendants violated his right to due process at three separate disciplinary hearings. *See generally* Compl.

The Due Process Clause of the Fourteenth Amendment protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner[.]" *Sandin v. Conner,* 515 U.S. 472, 484 (1995). To state a due process claim under § 1983, an inmate must first establish that he enjoys a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4627120 (N.D.N.Y.)
**(Cite as: 2014 WL 4627120 (N.D.N.Y.))**

protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). Inmates' liberty interests are derived from two sources: (1) the Due Process Clause of the Fourteenth Amendment; and (2) state statute or regulations. *Id.* With regard to liberty interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners [,]' " *Arce v. Walker,* 139 F.3d at 333 (quoting *Hewitt v. Helms,* 459 U.S. 460, 467 (1983)), and limited to freedom from restraint that "exceed[ ] the sentence in ... an unexpected manner[,]" *Sandin v. Conner,* 515 U.S. 472, 478 (1995).

Turning to liberty interests created by the state, the Supreme Court states that such liberty interests shall be limited solely to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. at 484; *see also Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (citing *Sandin* ); *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999).

Factors relevant to an analysis of what constitutes an atypical and significant hardship include "(1) the effect of the confinement on the length of prison incarceration, (2) the extent to which the conditions of segregation differ from other routine prison conditions, and (3) the duration of the disciplinary segregation compared to discretionary confinement." *Spaight v. Cinchon,* 1998 WL 167297, at *5 (N.D.N.Y. Apr. 3, 1998) (citing *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)); *see also Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (stating that in assessing what constitutes an atypical and significant hardship, "[b]oth the conditions [of confinement] and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical" (citation omitted)). Though the length of the confinement is one guiding

factor in a *Sandin* analysis, the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999) (citations omitted). Nevertheless, the Court of Appeals has stated that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer v. Richards,* 364 F.3d at 64–65 (quoting *Colon v. Howard,* 215, F.3d 227, 232 (2d Cir.2000)); *see also Hanrahan v. Doling,* 331 F.3d 93, 97–98 (2d Cir.2003) ("[W]here the actual period of disciplinary confinement is insignificant or the restrictions imposed relatively minor, such confinement may not implicate a constitutionally protected liberty interest."); *Edmonson v. Coughlin,* 1996 WL 622626, at *4–5 (W.D.N.Y. Oct. 4, 1996) (citing cases for the proposition that courts within the Second Circuit tend to rule, as a matter of law, that "disciplinary keeplock or SHU confinement to 60 days or less in New York prisons is not an atypical or significant hardship in relation to the ordinary incidents of prison life"); *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (noting that segregative sentences of 125–288 days are "relatively long" and therefore necessitate "specific articulation of ... factual findings before the district court could properly term the confinement atypical or insignificant"). Accordingly, the court must "make a fact-intensive inquiry" that would examine the actual conditions of confinement within SHU. *Palmer v. Richards,* 364 F .3d at 65 (citations omitted); *see also Wright v. Coughlin,* 132 F .3d at 137; *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997). If the conditions of confinement are undisputed, a court may decide the *Sandin* issue as a matter of law. *Palmer v. Richards,* 364 F.3d at 65. If, however, normal conditions of SHU exist, but the period of confinement is longer than the intermediate duration, then it would constitute a significant departure from ordinary prison life requiring the protection of procedural due process under *Sandin. Id.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4627120 (N.D.N.Y.)
**(Cite as: 2014 WL 4627120 (N.D.N.Y.))**

**\*6** Once a prisoner makes a threshold showing of atypical and significant confinement, the court should determine whether that prisoner, prior to his confinement, was afforded the minimum requirements of due process. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). A prisoner placed in disciplinary segregation must be provided (1) advanced written notice of the charges against them at least twenty-four hours prior to the hearing; (2) the opportunity to appear at the hearing, to call witnesses, and to present rebuttal evidence; and (3) written statement as to the evidence relied upon and the reasons for the disciplinary action. *Id.* at 564–66; *see also Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986); *Taylor v. Rodriguez,* 238 F.3d 188, 192 (2d Cir.2001) (quoting *Hewitt v. Helms,* 459 U.S. at 476).

With these principles in tow, we discuss the process that was provided at each of the disciplinary hearings at issue *seriatim.*

### *1. Liberty Interest*

Defendants concede that, in the aggregate, the amount of time Plaintiff spent in the solitary housing unit ("SHU"), as a result of the three disciplinary hearings at issue, was sufficient to implicate a protected liberty interest. [FN1] Dkt. No. 42–7, Defs.' Mem. of Law, at p. 11; *see also* Dkt. No. 42–4, Steven Bullis Decl., dated Dec. 26, 2013, at Ex. A, Disciplinary Hr'g Tr. (hereinafter "1st Hr'g Tr."), dated Oct. 13–18, 2010, at p. 1; Dkt. No. 42–5, Donald Haug Decl., dated Dec. 24, 2013, at Ex. A, Disciplinary Hr'g Report, dated Sept. 7–13, 2010; [FN2] Dkt. No. 42–6, Donald Uhler Decl., dated Dec. 27, 2013, at Ex. A, Disciplinary Hr'g Tr. (hereinafter "3rd Hr'g Tr."), dated February 2–3, 2011, at p. 1. Accordingly, we need only determine whether Plaintiff was deprived of any of the minimum requirements of due process during any of the disciplinary hearings at issue.[FN3]

> **FN1.** We agree. In the instant case, Plaintiff has alleged that he spent a total of 910 consecutive days in SHU as a result of the three

disciplinary hearings at issue. Dkt. No. 39–2, Pl.'s Mem. of Law, dated Nov. 8, 2013, at p. 2. The Second Circuit has held that "[o]verlapping disciplinary penalties may, under some circumstances, have to be aggregated for purposes of determining whether a liberty interest was ed." *Reynoso v. Selsky,* 292 F. App'x 120, 122 (2d Cir.2008) (citing *Sims v. Artuz,* 230 F.3d 14, 23–24 (2d Cir.2000)); *see also Koehl v. Bernstein,* 2011 WL 2436817, at \*7 (S.D.N.Y. June 17, 2011) (citing *Sealey v. Giltner,* 197 F.3d 578 (2d Cir.1999), for the proposition that "the Second Circuit suggested that consecutive sentences resulting from separate hearings adjudicating different misbehavior reports should be aggregated for the purpose of determining whether the confinement constitutes atypicality.").

> **FN2.** A transcript of the September 7–13 disciplinary hearing was not provided to the Court as part of his disciplinary record.

> **FN3.** In addition to time in SHU, Plaintiff also lost several months of good time credits as a result of his disciplinary hearings. *See* 1st Hr'g Tr. at p. 1; Haug Decl., Ex. A, Disciplinary Hr'g Report; 3rd Hr'g Tr. at p. 1. Ordinarily, a prisoner cannot seek monetary damages for a due process violation arising out of a prison disciplinary hearing where the loss of good time credits affects the overall length of the plaintiff's sentence without first seeking a reversal or expungement of the disciplinary conviction. *See Heck v. Humphrey,* 512 U.S. 477, 486–87 (1994)) (holding "that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or

Slip Copy, 2014 WL 4627120 (N.D.N.Y.)
**(Cite as: 2014 WL 4627120 (N.D.N.Y.))**

sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983."). However, in the instant case, Plaintiff is serving a life sentence, and accordingly, the loss of good time credits neither affects the overall length of his sentence nor prevents him from filing the instant action. *See* New York State Inmate Lookup for Inmate DIN # 96–A–0837, Leonard Hinton, http://nysdoccslookup.doccsny.gov (last checked July 31, 2014); *see also Holmes v. Grant,* 2006 WL 851753, at *18 (S.D .N.Y. Mar. 31, 2006) (surveying cases in support of the proposition that *"Heck [v. Humphrey]* does not apply [w]here, ... plaintiff is serving a life sentence, [because] the loss of good time credits ... has no effect on the length of his sentence"); N.Y. CORR. LAWW § 803(1)(a) (noting that inmates serving a maximum life sentence are not eligible for reduced sentence based on good behavior).

### 2. First Disciplinary Hearing
The following facts are undisputed.

On July 25, 2010, Sgt. Gower [FN4] issued a misbehavior report charging Plaintiff with extortion, soliciting a sexual act, and making a third party call. Defendant Bullis found Plaintiff guilty of all three violations, and sentenced him to six months in the SHU as well as six months loss of packages, commissary, phone, and good time credits. Dkt. No. 39–3, App. to Pl.'s Mot. for Summ. J. (hereinafter "Pl.'s App."), Sec. 1, at Ex. A, Misbehavior Rep., dated July 25, 2010 (hereinafter "1st Misbehavior Rep."); 1st Hr'g Tr. at p. 1. Plaintiff appealed the decision; but his

appeal was denied by Defendant Prack, the Director of the Special Housing/ Inmate Disciplinary Program, on December 20, 2010. *See* Pl.'s App., Sec. I, at Exs. E, Appeal Form, dated Oct. 18, 2010; & F, Appeal Dec., dated Dec. 20, 2010. Subsequently, Plaintiff challenged the disciplinary determination, in State Court, pursuant to N.Y. C.P.L.R. § 7803 ("Article 78"). *Id.* at Ex. G, Pl.'s Art. 78 Pet., dated Dec. 29, 2010. The New York State Appellate Division, Fourth Department, denied Plaintiff's petition, and unanimously upheld Defendant Bullis's disciplinary determination. *Id.* at Ex. I, Dec., dated Nov. 9, 2012.

> FN4. Sgt. Gower was dismissed from this action by the Honorable Lawrence E. Kahn, Senior United States District Judge, during the Court's initial review on March 7, 2013. *See* Dkt. No. 4, Dec. & Order, dated Mar. 7, 2013, at p. 5. Nonetheless, Sgt. Gower was served with process and joined in Defendants' Answer. *See* Dkt. Nos. 7 & 23. In light of his earlier dismissal and notwithstanding the subsequent errors which occurred, the Clerk of the Court is ordered to terminate Sgt. Gower from this action.

**\*7** Plaintiff now argues that he is entitled to summary judgment as to his claims against Defendants Bullis and Prack for violations of his right to due process in conjunction with this hearing, because Defendants lacked any credible evidence to support the decision or its subsequent affirmation. *See, e.g.,* Dkt. No. 44–1, Pl.'s Opp'n at p. 2.[FN5] Defendants argue that they are entitled to summary judgement as to this claim because Plaintiff was provided all of the process that was due. Dkt. No. 42–7, Defs.' Mem. of Law, at pp. 13–16.

> FN5. Document Number 42–1 is listed as Plaintiff's Affidavit. However, this document contains both sworn statements and legal arguments, in non-sequentially numbered paragraphs. Accordingly, we make reference

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

to the page numbers assigned by Plaintiff.

### a. Notice

It is undisputed that Plaintiff was served with a copy of the misbehavior report on October 6, 2010. Pl.'s App., Sec. I, Ex. D, Hr'g Disposition. Accordingly, Plaintiff received notice, as required, more than twenty-four hours prior to his hearing. *See Sira v. Morton,* 380 F.3d 57, 70 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. at 564 for the proposition that "[d]ue process requires that prison officials give an accused inmate written notice of the charges against him twenty-four hours prior to conducting a disciplinary hearing"). Moreover, the misbehavior report noted, *inter alia:* "[b]ased on an investigation [Sgt. Gower] conducted it has been determined that inmate Hinton ... was attempting to solicit sexual acts and was attempting to extort money from a family member of inmate Veach .... Inmate Hinton also gave inmate Veach two packs of tobacco without authorization of any staff." 1st Misbehavior Rep. Such notice was adequate to inform Plaintiff of the nature of the offenses for which he was charged. *See Sira v. Morton,* 380 F.3d at 70 (quoting *Taylor v. Rodriguez,* 238 F.3d at 193, for the proposition that "due process requires more than a conclusory charge; an inmate must receive notice of at least some specific facts underlying the accusation such that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report.") (internal quotation marks omitted).[FN6]

> **FN6.** In his Article 78 proceeding, Plaintiff challenged the sufficiency of the notice on the grounds that it omitted the specific dates of the events in question. *See generally* Pl.'s App., Sec. I, Ex. H. While it does not appear that Plaintiff intended to re-raise that issue here, to the extent that he may have intended to do so, such an argument would be unavailing. Although the date of the misbehavior report was actually the date Sgt. Gower conducted his investigation rather than the

date that the actual events giving rise to the report occurred, this omission was by no means fatal given the specific nature of the charges against Plaintiff. Indeed, it is clear that Plaintiff was able to understand the nature of the charges against him and to prepare a defense. *See id.* (finding that "the report provided adequate detail to apprise [Plaintiff] of the charges and afford him the opportunity to prepare his defense") (internal quotations and citation omitted); *see also Sira v. Morton,* 380 F.3d at 71 (citing *Quinones v. Ricks,* 288 A.D.2d 568, 568–69 (N.Y.App. Div.2d Dep't 2001), for the proposition that "failure to include specific date in misbehavior report may be excused if the report otherwise provides sufficient details to permit the inmate to fashion a defense"); *Cepeda v. Urban,* 2014 WL 2587746, at *6 (W .D.N.Y. June 10, 2014) (reaching similar conclusion).

### b. Opportunity to be Heard

The record clearly establishes that Plaintiff was present at the hearing, able to question witnesses, and present rebuttal evidence. *See generally* 1st Hr'g Tr. This remains true notwithstanding the fact that four of the witnesses Plaintiff called refused to testify. *See id.* at p. 10. Crucially, "it is well settled that [a]n inmate does not possess a constitutional right to confront or cross-examine witnesses in prison disciplinary hearings." *Fernandez v. Callens,* 2010 WL 4320362, at *11 (W.D.N.Y. Oct. 29, 2010) (citing *Wolff v. McDonnell,* 418 U.S. at 567–68; *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999); & *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993)). The fact that these witnesses refused to testify on Plaintiff's behalf does not alter the fact that he was given the opportunity to call witnesses. *See Creech v. Schoellkoph,* 688 F.Supp.2d 205, 213 (W.D.N.Y.2010) (finding no due process violation where two witnesses called by inmate refused to testify); *see also Edmonson v. Coughlin,* 1996 WL 622626, at *8 (W.D.N.Y. Oct. 4, 1996) (citing *Wolff v. McDonnell,* 418 U.S. at 568–69

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4627120 (N.D.N.Y.)
**(Cite as: 2014 WL 4627120 (N.D.N.Y.))**

for the proposition that *"Wolff* specifically recognized the discretion of prison officials to decline to call as witnesses fellow inmates who do not wish to testify, or witnesses who know nothing of the underlying events"); *Jamison v. Fischer,* 2013 WL 5231457, at *3 (S.D.N.Y. July 11, 2013)* (citing cases for the proposition that "if a requested witness refuses to testify at a disciplinary hearing, the hearing officer is not constitutionally required to compel the witness to testify."). Moreover, in such situations, all that is required of the hearing officer is that he provide the inmate with notice of the fact that witnesses are being withheld and explain the reasons why. *See* N.Y. COMP.CODES R. & REGS. tit. 7, § 254.5(a) ("If permission to call a witness is denied, the hearing officer shall give the inmate a written statement stating the reasons for the denial, including the specific threat to institutional safety or correctional goals presented."). Here, Defendant Bullis explained at the hearing that:

**\*8** Mr. Hinton, on your assistant form you requested four potential witnesses. It is written down that they all refused to testify and in the file there are four refusal forms, one by inmate Maida ... refuses to testify he does not want to be involved. Inmate King ... states he does not want to be involved with any of this, he doesn't want to get involved with any of this don't call me again as stated on the form. The next is from inmate Woods ... stating he does not want to be involved as he stated on the form. The next is for inmate Veach ... stating he does not want to be involved he claimed he does not know anything about this incident on 7/28/2010.

1st Hr'g Tr. at p. 10.

Thus, we can find no evidence of any constitutional deficiency in Plaintiff's opportunity to appear, call witnesses, or present rebuttal evidence at the first disciplinary hearing. *See Wolff v. McDonnell,* 418 U.S. at 564–66.

### c. Written Decision

It is clear from the record that at 11:15 a.m., on October 8, 2010, Plaintiff received a written statement as to the evidence relied upon and the reasons for the disciplinary action that was taken. Pl.'s App., Sec. I, Ex. D, Hr'g Disposition Form.

Therefore, under *Wolf v. McDonnell,* Plaintiff received all of the process due to him. 418 U.S. at 564–66.

### d. Remaining Arguments

Plaintiff also argues that there was no credible evidence to support Defendant Bullis's disciplinary determination. While an inmate is *not* entitled to a hearing officer with the same level of impartiality required by judges; it is true that he is entitled to a hearing untainted by arbitrary or pre-determined findings of guilt. *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989). Nonetheless, a hearing officer's limited impartiality requirements are satisfied where the record contains "some evidence" to support the officer's findings. *Superintendent v. Hill,* 472 U.S. 445, 455 (1985). "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached." *Id.,* 472 U.S. at 455–56 (citations omitted). That being said, only " 'reliable' evidence can constitute 'some evidence.' " *Sira v. Morton,* 380 F.3d at 76 (citing *Luna v. Pico,* 356 F.3d at 488).

Here, Defendant Bullis's determination was supported by ample reliable evidence, chiefly, the testimony and misbehavior report of Sgt. Gower. *See* Pl.'s App., Sec. I at Ex. C.

As noted above, the misbehavior report stated, *inter alia:* "[b]ased on an investigation [Sgt. Gower] conducted it has been determined that inmate Hinton

Slip Copy, 2014 WL 4627120 (N.D.N.Y.)
**(Cite as: 2014 WL 4627120 (N.D.N.Y.))**

... was attempting to solicit sexual acts and was attempting to extort money from a family member of inmate Veach .... Inmate Hinton also gave inmate Veach two packs of tobacco without authorization of any staff." 1st Misbehavior Rep. At the hearing, Sgt. Gower explained, in sum and substance, that on the morning of July 25, 2010, an unidentified inmate told him that Plaintiff had attempted to solicit sex from Inmate Veach. As a result, Sgt. Gower conducted an investigation during which he interviewed Inmate Veach, who reported that "approximately 2 weeks before that he got two packs of tobacco from [Plaintiff] he was unable to pay him so [Plaintiff] had requested he perform sexual acts for approximately ten days to pay him for the tobacco." 1st Hr'g Tr. at p. 6. Veach also informed Sgt. Gower that Plaintiff had attempted to pull him into a toilet stall but stopped when Inmate Moody walked into the bathroom area. Gower verified with Inmate Moody that he saw Veach and Hinton in the bathroom at the same time; however, Moody did not see Hinton pulling Veach into the stall. Gower ordered that Veach be examined by medical, and no evidence of sexual misconduct was found. Gower also testified that Veach informed him that Plaintiff and Inmate McGee had set up a three-way call in an attempt to extort fifteen dollars from Inmate Veach's sister for the tobacco. Gower reported that he verified this with inmate McGee who admitted to helping to orchestrate the three-way call. *Id.* at pp. 6–8.

**\*9** Standing alone, the unidentified inmate's claims that Plaintiff solicited sex from Inmate Veach would be insufficient to satisfy the "some evidence" standard applicable to prison disciplinary hearings. *See Dawkins v. Gonyea,* 646 F.Supp.2d 594, 611 (S.D.N .Y.2009) (citing *Sira v. Morton,* 380 F.3d at 78, for the proposition that "if any confidential informant's testimony was based solely on hearsay, a greater inquiry into the reliability of this hearsay information is required."); *Howard v. Wilkerson,* 768 F.Supp. 1002, 1007 (S.D.N.Y.1991) (citing *Vasquez v. Coughlin,* 726 F.Supp. 466, 471 (S.D.N.Y.1989), for

the proposition that "[s]ince *[ Superintendent v.] Hill,* [472 U.S. 445 (1985) ] it has been held that hearsay evidence does not constitute 'some evidence' "). However, here, Defendant Bullis's determination was supported by Gower's misbehavior report. More importantly, Gower testified at the hearing that prior to issuing the misbehavior report he independently corroborated the statements made to him by the unidentified inmate and the victim. Gower's investigation, report, and testimony were all valid bases from which Defendant Bullis could conclude that the information was reliable. *See Sira v. Morton,* 380 F.3d at 78 ("Where the original declarant's identity is unknown or not disclosed, the hearing officer may nevertheless consider such factors as the specificity of the information, the circumstances under which it was disclosed, and the degree to which it is corroborated by other evidence."). Since Defendant Bullis found Gower's testimony to be reliable, Bullis Decl. at ¶ 17, we need not conduct an independent assessment of Gower's credibility. *Kotler v. Daby,* 2013 WL 1294282, at * 10 (N.D.N.Y. Mar. 28, 2013) (finding guard's testimony and written report constituted some evidence, and that an independent assessment of the charging officer's credibility is neither required nor encouraged); *Thomas v. Connolly,* 2012 WL 3776698, at *23 (S.D.N.Y. Apr. 10, 2012) (finding that disciplinary determination supported by the investigating officer's report was sufficient to satisfy the some evidence requirement). Thus, we conclude that no reasonable juror could conclude that Plaintiff's disciplinary conviction was not based on some reliable evidence.[FN7]

> FN7. Indeed, the New York State Appellate Division, Fourth Department, held that the evidence adduced at Plaintiff's disciplinary hearing was sufficiently adequate to meet the "substantial evidence" standard; a burden which is much higher than the "some evidence" standard applicable to the instant action. *See* Pl.'s App., Sec. I, Exs. H, Dec. & Order, dated Oct. 26, 2011; & I, Order, dated

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4627120 (N.D.N.Y.)
**(Cite as: 2014 WL 4627120 (N.D.N.Y.))**

Nov. 9, 2012; *Smith v. Fischer,* 2010 WL 145292, at *9 (N.D.N.Y. Jan. 11, 2010) (citing *Sira v. Morton,* 380 F.3d at 76 n. 9, for the proposition that the substantial evidence " "requirement is sterner than the 'some evidence' standard necessary to afford due process" ").

Furthermore, Plaintiff's argument that Inmate Veach's statements to Sgt. Gower during his investigation are unreliable in light of the fact that Inmate Veach subsequently refused to testify at Plaintiff's hearing—reportedly, on the grounds that he knew nothing about the alleged incident—are also unavailing. *See* Pl.'s Mem. of Law at pp. 17–20; Pl.'s App., Sec. I, Ex. C, Inmate Refusal Form, dated Oct. 8, 2010; *see also Louis v. Ricks,* 2002 WL 31051633, at *13 (S.D.N.Y. Sept. 13, 2002) (surveying cases for the proposition that no due process violation occurred where the hearing assistant relied on testimony from the alleged victim which the victim later recanted).[FN8]

> [FN8.] It is also worth noting that it is not entirely clear that Inmate Veach's refusal to testify was actually a recantation of his earlier statements to Sgt. Gower. Inmate Veach stated in his refusal form that he knew nothing about any incident which occurred on July 25, 2010. Pl.'s App., Sec. I, Ex. C, Inmate Refusal Form, dated Oct. 8, 2010. However, July 25, 2010 was the day that Sgt. Gower was informed about the alleged violations, not the dates that the alleged violations occurred. *See supra* Note 6. Thus, this statement is not necessarily at odds with Veach's earlier statements to Sgt. Gower.

**\*10** Accordingly, having determined that Plaintiff received all of the process that was due to him with regard to his first disciplinary hearing, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED** as to this claim, that Defendants' Cross–Motion for Summary Judgment be **GRANT-** ED, and that this claim be **DISMISSED.**

*e. Defendant Prack*

Plaintiff alleges that Defendant Prack was liable in his supervisory capacity for Defendant Bullis's alleged due process violation because he knew of but failed to remedy the violation when he affirmed Defendant Bullis's disciplinary determination. Pl.'s Mem. of Law at p. 25. An individual cannot be held liable for damages under § 1983 merely because he holds a position of authority, but he can be held liable if he was personally involved in the alleged deprivation.

> The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citations omitted).

However, having failed to find any evidence of an underlying constitutional violation, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED** as to Plaintiff's claim against Defendant Prack arising out of his affirmation of Defendant Bullis's disciplinary determination. *See Elek v. Inc. Vill. of Monroe,* 815 F.Supp.2d 801, 808 (S.D.N.Y.2011) (collecting cases for the proposition that "because Plaintiff has not established any underlying constitutional violation, she cannot state a claim for § 1983 supervisor liability"). Furthermore, we also

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4627120 (N.D.N.Y.)
**(Cite as: 2014 WL 4627120 (N.D.N.Y.))**

recommend that Defendants' Motion be **GRANTED** with respect to the same, and that this claim be **DISMISSED.**

### 3. Second Disciplinary Hearing
The following facts are undisputed.

On August 11, 2010, Plaintiff was charged with violent conduct, assault on an inmate, and fighting by Sergeant Betti, and violent conduct, creating a disturbance, and fighting by Corrections Officer Ruggerio.[FN9] According to Sergeant Betti's report "inmate Hinton admitted to [her] that he had a verbal argument with inmate Burton over some missing food items. He said the argument ended with him picking up a frying pan and hitting inmate Burton once over the head with it." Haug Decl., Ex. A, Betti Misbehavior Rep., dated Aug. 11, 2010. According to Officer Ruggerio, on August 11, he heard a crashing noise in the room near the kitchen, and upon responding "observed inmate Hinton lying on his left side ... near his overturned wheelchair.... [He] also observed Inmate Burton standing over Hinton with a clinched fist. There was also a medium sized stainless steel frying pan lying near [Hinton's wheelchair]." *Id.,* Ex. A, Ruggerrio Misbehavior Rep., dated Aug. 11, 2010.

> FN9. Neither Sergeant Betti nor Corrections Officer Ruggerio are Defendants in this action.

**\*11** Defendant Haug conducted a disciplinary hearing between September 7 and 13, 2010, and found Plaintiff guilty of all six violations. Decl., Ex. A, Hr'g Disposition, dated Sept. 13, 2010. On November 12, 2010, Defendant D. Venettozzi, the Acting Director of the Special Housing/Inmate Disciplinary Program, affirmed the disciplinary determination. *Id.* at Ex. C, Appeal Dec., dated Nov. 12, 2010. However, as a result of an Article 78 proceeding brought by Petitioner before the Fourth Department, the determination was overturned and vacated because "the hearing

officer's effective denial of petitioner's request to call C.O. Ruggerio, Inmate Burton, Captain Scarafile and Deputy Superintendent Kinderman [FN10] as witnesses, without [ ] stated good faith reasons, constituted a clear constitutional violation[.]" *Id.* at Ex. C, Dec. & J., dated May 27, 2011. As a result, Plaintiff's September 13 disciplinary decision was administratively reversed on August 4, 2011. *Id.* at Ex. B, App. Dec., dated Aug. 4, 2011.

> FN10. These individuals are not Defendants in the instant action.

In his Motion, Plaintiff claims he is entitled to summary judgment as to his due process claims against Defendant Haug because he was improperly denied the right to call witnesses on his behalf, and against Defendant Venettozzi for affirming Defendant Haug's disciplinary determination. *See* Pl.'s Opp'n at p. 5. Defendants argue that they are entitled to summary judgment on this claim because Plaintiff received all of the process that was due at his second disciplinary hearing. Defs' Mem. of Law at pp. 17–19.

### a. Notice
It is uncontested that Plaintiff received a copy of the misbehavior reports at issue on August 12, 2010. Haug Decl. at ¶ 9 & Ex. A, Tier III Data Sheet, dated Aug. 22, 2010. Furthermore, each report contained a detailed factual account of the basis of the charges, the names of those involved, and the date of the relevant events. *Id.* at Ex A, Misbehavior Reports, dated Aug. 11, 2010. Accordingly, Plaintiff clearly received constitutionally sufficient notice.

### b. Opportunity to be Heard
According to the Fourth Department, the "denial of petitioner's request to call C.O. Ruggerio, Inmate Burton, Captain Scarafile and Deputy Superintendent Kinderman as witnesses, without a stated good faith reason[ ], constituted a clear constitutional violation." *Id.* at Ex. B, Dec. & J. at p. 5. As a result of the Fourth

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Department's decision, Plaintiff's disciplinary determination was subsequently administratively overturned. However, neither of these facts is dispositive for purposes of the instant action. *Gutierrez v. Coughlin,* 841 F.2d 484, 486 (2d Cir.1988) (citing cases for the proposition that collateral estoppel does not preclude defendants from re-litigating due process violations decided in an Article 78 proceeding in a subsequent 1983 case because, *inter alia,* "appellees could not have been held personally liable in such a proceeding, they did not have the same incentive to litigate that state court action as they did the federal § 1983 action[,]" and "the defenses of absolute or qualified immunity, or lack of personal involvement, were not available to appellees"); *see also LaTorres v. Selsky,* 2011 WL 7629515, *6 n. 10 (N.D.N.Y. Aug. 1, 2011) (citing *Gutierrez v. Coughlin* ).

**\*12** Moreover, Plaintiff's claim is subject to review for harmless error. *Sims v. Artuz,* 103 F. App'x 434, 436 (2d Cir.2004) (upholding magistrate's determination applying harmless error to defendant's undisputed failure to provide a reason for refusing to call witnesses during a disciplinary hearing); *Clark v. Dannheim,* 590 F.Supp.2d 426, 431 (W.D.N.Y.2008) (same); *Colantuono v. Hockeborn,* 801 F.Supp.2d 110, 115 (W.D.N.Y.2011) (citing *Clark v. Dannheim,* 590 F.Supp.2d 426, (W.D.N.Y.2008), for the proposition that "dismissing state prisoner's due process claim based on the hearing officer's denial of plaintiff's requests to review certain medical records, and to call DOCS sergeant as a witness, where plaintiff failed to demonstrate that he was prejudiced as a result"); *cf. Powell v. Coughlin,* 953 F.2d 744, 751 (2nd Cir.1991) ("it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial").

Here, notwithstanding the fact that a denial of the right to call witnesses without an explanation is a violation of New York's prison disciplinary regula-

tions, N.Y. COMP.CODES R. & REGS. tit. 7, § 254.5(a), Defendant Haug's decision to deny, without reason, Plaintiff's request to call as witnesses Deputy Superintendent Geoghegan, Captain Scarafile, and Officer Rugerio did not rise to the level of a due process violation because Plaintiff failed to allege, in any fashion, how he was prejudiced. Indeed, it is undisputed that Deputy Superintendent Geoghegan and Captain Scarafile had no personal knowledge of the event; their only involvement was that they were informed about the alleged fight after the fact. Haug Aff. at ¶ 18 & Ex. A, Unusual Incident Report, dated Aug. 19, 2010, at p. 2. Similarly, Officer Ruggerio's misbehavior report confirms that he arrived on scene after the event, and the details of his report are nearly identical to those provided by Officer Betti, who testified at the hearing. *Id.* at ¶¶ 10 & 16–17, & Ex. A, Misbehavior Reports. Accordingly, their testimony was at best cumulative, and quite possibly irrelevant. *See Hamilton v. Fischer,* 2013 WL 3784153, at *10 (W.D.N.Y. July 18, 2013) (dismissing due process claims based on a hearing officer's failure to call witness who were not present for the incident at issue because the error was harmless).

Likewise, the record in this case compels us to reach a similar conclusion with regard to the fourth witness, Inmate Burton, although by a slightly different route. With respect to his decision to deny Plaintiff's request to call Inmate Burton, Defendant Haug avers that "I have no recollection of who that inmate was or why his testimony would have had any bearing on whether or not Plaintiff Hinton hit another inmate with a frying pan. Had I believed that this inmate had information that was pertinent to Plaintiff Hinton's defense, I would have requested his testimony." *Id.* at ¶ 19. It cannot seriously be argued that Inmate Burton, the inmate Plaintiff allegedly hit over the head with the frying pan, did not have any relevant information with regard to the incident at issue.

**\*13** However, nothing in Plaintiff's papers [FN11] nor the many documents submitted by Defendants

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4627120 (N.D.N.Y.)
**(Cite as: 2014 WL 4627120 (N.D.N.Y.))**

indicates that had Inmate Burton been called his testimony would have altered the course of the hearing. Rather, based on the record before us, we can only conclude the opposite. In the Fight Investigation Rep., dated August 11, 2010, Sergeant Betti reported that "Burton stated [that] Hinton approached him in the day room and was yelling at him for no reason. Hinton hit him with a pan in the head." Haug Decl., Ex. A. Crucially, Burton's statement was relied upon by Defendant Haug. *Id.,* Ex. A, Hr'g Disposition Report, dated Sep. 13, 2010, at p. 2.

> FN11. It is clear from Plaintiff's Opposition to Defendant's Cross–Motion for Summary Judgment that Plaintiff was aware of Defendants' claim that he failed to identify how he was prejudiced by Defendant Haug's failure to call these witnesses. *See* Pl.'s Opp'n at pp. 6–7. However, rather than explain how he was prejudiced, Plaintiff argued that the Article 78 determination constituted "law of the case" and that Defendants' reliance on the harmless error standard was misplaced. *Id.*

Given the lack of any indication in the record that Inmate Burton would have testified favorably, as well as his own admissions to Sergeant Betti that he struck Inmate Burton with the pan, Plaintiff has failed to establish that he was prejudiced by Defendant Haug's refusal to call Inmate Burton as a witness. *See Clark v. Dannheim,* 590 F.Supp.2d at 430–31 (concluding, after examining the record, that failure to call a witness who had clearly relevant information was non-prejudicial because "there [wa]s no indication or reason to believe that his testimony would have been helpful to plaintiff"); *see also Sims v. Artuz,* 103 F. App'x at 436 (upholding magistrate's determination that exclusion of witnesses from disciplinary hearing was harmless error where plaintiff "ha[d] not shown that he was prejudiced in any way"); *Tafari v. Rock,* 2012 WL 1340799 (W.D.N.Y. Apr. 18, 2012) ("A prisoner cannot demonstrate prejudice and thus non-harmless error based upon pure speculation.").

### c. Written Decision

It is undisputed that Plaintiff received a copy of the notice of decision including the evidence that was relied upon, as well as an explanation of the reasons for the punishment assigned. *Id.* at Ex. A, Hr'g Disposition Form, dated Sep. 13, 2010, at p. 2.

Accordingly, we recommend that Plaintiff's Motion be **DENIED** as to his due process claim against Defendant Haug arising out of the second disciplinary hearing, that Defendants' CrossMotion be **GRANTED** with respect to the same, and that this claim be **DISMISSED**.

### d. Defendant Venettozzi

Having established the absence of any underlying constitutional violation, Plaintiff cannot maintain a cause of action against Defendant Venettozzi based on supervisory liability for affirming Defendant Haug's disciplinary determination. *See Elek v. Inc. Vill. of Monroe,* 815 F.Supp.2d at 808.

Accordingly, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED** with respect to his claim against Defendant Venetozzi for affirming Defendant Haug's disciplinary determination, that Defendants' Cross–Motion for Summary Judgment be **GRANTED** as to the same, and that this claim be **DISMISSED**.

### 4. Third Disciplinary Hearing

The following facts are undisputed.

On January 19, 2011, Plaintiff was charged with two counts of possessing unauthorized medication and smuggling. 3rd Hr'g Tr. at p. 1. On February 2–3, 2011, Defendant Uhler conducted a Tier III disciplinary hearing, from which Plaintiff was excluded. *See generally id.* Plaintiff was convicted of all three offenses and sentenced to thirty-six months in SHU as well as thirty-six months loss of packages, commis-

sary, phone, and good time credits. *Id.* at p. 1. On February 3, 2011, Plaintiff appealed Defendant Uhler's disciplinary determination. Compl. at p. 6. On March 29, 2011, Defendant Venettozzi modified Plaintiff's punishment to eighteen months SHU and corresponding loss of privileges. Uhler Decl., Ex. B, Appeal Dec., dated Mar. 29, 2011. On June 21, 2011, Defendant D. Rock, Superintendent of Upstate Correctional facility, refused Plaintiff's request for discretionary review of his disciplinary determination. *Id.* at Ex. C, Lt., dated June 21, 2011.

**\*14** On June 30, 2011, Plaintiff filed an Article 78 petition challenging the disciplinary determination. On December 2, 2012, the Honorable S. Peter Feldstein, Acting Supreme Court Justice in Franklin County, New York, determined that "the hearing officer did not err in conducting the Tier III Superintendent's Hearing in the absence of petitioner." Pl.'s App. at Sec. III, Ex. A, at p. 4. However, Judge Feldstein found that Plaintiff "must prevail" as to his argument that "he did not receive a copy of the written hearing disposition sheet, including the statement of evidence relied upon by the hearing officer, and the statement of reason(s) for the disposition imposed." *Id.* at pp. 5–6. Judge Feldstein further noted that prison officials should "process any additional administrative appeal from the results and disposition of the Tier III Superintendent's Hearing concluded February 3, 2011 that petitioner files within 30 days service" of his decision. *Id.* at p. 6.

Plaintiff contends that he is entitled to summary judgment against Defendant Uhler because he held the third disciplinary hearing in Plaintiff's absence and because he failed to provide Plaintiff with written notice of the disciplinary determination and the evidence on which it was based. Pl.'s Mem. of Law at pp. 25–27. Plaintiff further claims that Defendants Venettozzi, Prack, and Rock were personally involved in depriving him of his due process right because they affirmed Defendant Uhler's determination. Pl's Opp'n at ¶ 53. Defendants argue that they are entitled to

summary judgment on this claim because Plaintiff received all of the process that was due at the subsequent disciplinary hearing. Defs.' Mem. of Law at pp. 20–24.

### a. Notice

Plaintiff concedes that he "receive[d] advance notice of the charges, by service of the misbehavior report." Dkt. No. 39–2, Pl.'s Mem. of Law, at ¶ 34.

### b. Opportunity to be Heard

Originally, Plaintiff contended that Defendant Uhler violated his right to due process by unlawfully excluding him from attending the third disciplinary hearing. Pl.'s Mem. of Law at pp. 25–27. However, Plaintiff has since conceded that he is barred from re-litigating this issue in the instant matter by the doctrine of collateral estoppel.[FN12]

> **FN12.** On July 18, 2014, we stayed the parties pending Cross–Motions for Summary Judgment and ordered them to brief the Court as to whether Judge Feldstein's prior conclusion in Plaintiff's Article 78 action, that Plaintiff was properly excluded from his disciplinary hearing based on his failure to conform to facility security protocols, precluded him from arguing in the instant case that he was unlawfully excluded from attending the third disciplinary hearing. Dkt. No. 54, Order, dated July 18, 2014. In his Reply to the Defendants' Letter–Brief, Plaintiff conceded that Judge Feldstein's determination in this regard does preclude him from re-raising this issue in the instant matter. *See* Dkt. Nos. 55, Defs.' Lt.-Br., dated July 21, 2014, & 56, Pl.'s Reply Lt.-Br., dated July 25, 2014.

A review of Judge Feldstein's decision reveals that he indeed already considered the issue of whether "the Tier III Superintendent's Hearing was unlawfully

Slip Copy, 2014 WL 4627120 (N.D.N.Y.)
**(Cite as: 2014 WL 4627120 (N.D.N.Y.))**

conducted in his absence" in Plaintiff's Article 78 action. Pl.'s App. at Sec. III, Ex. A, at p. 3. Judge Feldstein noted that, "an inmate has a fundamental right to be present at a Superintendent's Hearing unless he or she refused to attend, or is excluded for reasons of institutional safety or correctional goals." *Id.* (internal quotations, alterations, and citations omitted). After considering the evidence before him, including a transcript of the hearing conducted in Plaintiff's absence—containing on-the-record testimony from multiple prison officials stating, in sum and substance, that they made every effort to bring Plaintiff to his disciplinary hearing but Plaintiff refused to comply with prison handcuffing procedures—Judge Feldstein concluded that "the hearing officer did not err in conducting the Tier III Superintendent's Hearing in the absence of petitioner." *Id.* at pp. 3–6.

**\*15** Crucially, and in keeping with the standard applied by Judge Feldstein, it is well established federal precedent that an inmate's refusal to attend a disciplinary hearing waives his due process objections where it occurs through no fault of prison authorities. *Tafari v. McCarthy,* 714 F.Supp.2d 317, 380 (N.D.N.Y.2010) (citing *Howard v. Wilkerson,* 768 F.Supp. 1002, 1006 (S.D.N.Y.1991)). Accordingly, Judge Feldstein's conclusion that Plaintiff's own actions justified holding the hearing in his absence is entitled to preclusive effect in the instant action.[FN13] *See Williams v. Pepin,* 2011 WL 7637552, *\*6* (N.D.N.Y. Dec. 23, 2011) (holding that plaintiff's due process claims which were rejected in an earlier Article 78 action were precluded from being re-litigated in a subsequent § 1983 action under the doctrine of collateral estoppel).

> FN13. Moreover, even if the issue were not precluded, it is unlikely that Plaintiff's claim would have succeeded because Plaintiff fails to allege any resulting prejudice from this alleged error. *See Lunney v. Brureton,* 2007 WL 1544629, at *\*28* (S.D.N.Y. May 29, 2007) (citing *Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991) for the proposition that "[p]rison disciplinary hearings are subject to a harmless error analysis."). Indeed, Plaintiff fails to allege that had he been offered the opportunity, he would have presented evidence or called witnesses on his own behalf, let alone that such evidence would have been likely to affect the outcome of his disciplinary determination.

Accordingly, Plaintiff's due process rights were not violated when his third disciplinary hearing was held in his absence.

### c. Some Evidence

It is clear that Defendant Uhler's disciplinary determination was supported by sufficient reliable evidence. Specifically, Defendant Uhler read the following into the record:

> The first report is by Officer Gravlin.... On 1/19/11 at approximately 9:45 AM, I conducted a pat frisk of inmate Hinton ... on 11 A 1 Gallery.... Inmate Hinton had a total of 29 pills in his front right pocket. The block nurse identified the pills as neurontin, baclofen. Both are prescription medication given to the inmate on medication rounds.... The second Report [states] ... January 19th, 2011 10:20 A.M.... On the above date and time I CO Bogardus ... was helping give inmate Hinton his level one property after being transferred from eleven building to ten building. As I was going through the letters I noticed envelopes with no addresses with objects in them sealed. I opened the envelopes and found pills. After opening all the envelopes I took the pills to the block Nurse Holmes identified them and counted them which is what came up with [sic] 319 neurontin 600 milligram, 205 baclofen 10 milligram, 100 amlodipine 5.

> 3rd Disciplinary Hr'g Tr. at p. 4.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Given the specificity of these reports as well as the fact that they were authored by officers with first hand knowledge of the events, no rational juror could conclude that Defendant Uhler lacked sufficient reliable evidence to support his determination. *See Thomas v. Connolly,* 2012 WL 3776698, at *23; *Creech v. Schoellkoph,* 688 F.Supp.2d 205, 214–15 (W.D.N.Y.2010) (finding disciplinary determination relying on misbehavior report was sufficient for purposes of "some evidence" standard where "the misbehavior report was made by the officer personally involved in the ... incident, and is based on his first hand observation, and contains a detailed account of that incident, including the time, place, circumstances, and names of participants").

### d. Written Decision

It is undisputed that Plaintiff did not receive a formal written statement of the third disciplinary determination "until at least six months after the hearing was actually held." Pl.'s Opp'n at Ex. A, Hinton Aff.[FN14]

> **FN14.** Defendants fail to adequately contest Plaintiff's contention that he was not served a written copy of the determination; indeed, with the exception of their unsupported statement that they "[d]eny information and belief about when plaintiff received a copy of the hearing determination," they fail to address the issue whatsoever. *See* Dkt. No. 42–1, Defs.' Reply to Pl.'s 7.1 Statement, at ¶ 35; *see also Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991) (finding that mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment).

**\*16** It is clear that Plaintiff's due process rights were violated by Defendants' failure to provide him with a copy of this statement. *See Lunney v. Brureton,* 2007 WL 1544629, at *28 (S.D.N.Y. May 29, 2007) (surveying cases for the proposition that "the right to receive a written statement of the disposition is a requirement that has been in place since the Supreme Court's decision in *Wolff v. McDonnell"* ) (internal quotation marks, alterations, and citations omitted). However, notwithstanding this violation, Plaintiff is not entitled to anything other than nominal damages in the instant case because he has failed to establish an actual injury. *See McCann v.. Coughlin,* 698 F.2d 112, 126 (2d Cir.1983) (citing *Carey v. Piphus,* 435 U.S. 247, 266–67 (1978), for the proposition that "[i]t is well established that to collect compensatory damages in an action brought pursuant to 42 U.S.C. § 1983, a plaintiff must prove more than mere violation of his constitutional rights. He must also demonstrate that the constitutional deprivation caused him some actual injury"); *Thomas v. Annucci,* 2008 WL 3884371, at *5 (N.D.N.Y. Aug. 19, 2008) (citing, *inter alia, McCann v. Coughlin* for the same proposition).

Here, notwithstanding the fact that Plaintiff's constitutional rights were violated, he cannot establish actual injury. To begin with, Plaintiff cannot argue that the failure to provide him with a written notice of the determination caused him to be sentenced to a term of SHU imprisonment; indeed, that determination was made before the duty to provide Plaintiff with a copy of the notice even arose. *Cf. McCann v. Coughlin,* 698 F.2d at 126 (noting that "the failure to provide McCann with a written statement of the Committee's decision and underlying reasons could not have caused his injury. If he had received such a written statement, it would have been after the Committee rendered its decision."). Thus, in order to establish that the Defendants' failure to provide him with a copy of the notice caused him actual injury, Plaintiff would have to show that because he did not have access to the information contained in the notice, he was unable to mount a meritorious appeal, and therefore, was forced to remain in SHU longer than necessary. *Cf. Miner v. City of Glens Falls,* 999 F.2d 655, 660 (2d Cir.1993) (citing *McCann v. Coughlin,* 698 F.2d at 126, for the

proposition that "[i]n this Circuit, the burden is normally on the plaintiff to prove each element of a § 1983 claim, including those elements relating to damages.... It was therefore Miner's burden to show that the property or liberty deprivation for which he sought compensation would not have occurred had proper procedure been observed.").

Yet, despite the fact that he ultimately received a copy of the notice prior to commencing the instant action, Plaintiff fails to allege that had he known the evidentiary basis for his conviction as contained in the notice earlier, he would have been able to successfully appeal the determination. Indeed, according to his Complaint, despite the fact that Judge Feldestein explicitly granted him the right to file additional appeals after he had obtained a copy of the notice, his subsequent attempts were unsuccessful. *See* Compl. at p. 6; *see also* Pl.'s App. at Sec. III, Ex. A, at pp. 5–6.[FN15] Thus, Plaintiff's claim fails because he cannot establish that the failure to provide him with a copy of the hearing disposition in a timely manner caused him to suffer any actual injury.[FN16]

> **FN15.** Plaintiff also claims that he initially appealed his disciplinary determination on February 3, 2011, the day that it was imposed. Compl. at p. 6. However, he provides conflicting and wholly inadequate explanations for the type and content of the notice he received. *See id.* at p. 8 n. 3; *see also* Pl.'s Opp'n at Ex. A, Hinton Aff. And, although it is unclear what the bases of Plaintiff's February 3 appeal were, it is axiomatic that Plaintiff would have known at that time that he was excluded from the hearing and had not received proper notice, and accordingly, the lack of notice did not prevent him from raising either of these grounds at that time. Moreover, as a result of this appeal, Plaintiff's disciplinary determination was modified, and his sentence was reduced from thirty-six months SHU to eighteen months.

Pl.'s Mem. of Law at p. 26; Uhler Decl. at Ex. B, Review of Sup't Hr'g, dated Mar. 29, 2011.

> **FN16.** To be sure, we are not positing that the relief Plaintiff received from his Article 78 action somehow extinguished any due process violation that he may have suffered between the time that violation accrued, and the time the Article 78 Petition was granted in his favor. Rather, we are merely noting the fact that Plaintiff was unable to file a successful administrative grievance appeal at the prison once he was provided with a copy of the formal notice as evidence that nothing within the notice provided Plaintiff with a meritorious ground for appeal. Therefore, the fact that he did not receive the formal notice sooner did not prejudice him. *Compare Bogle v. Murphy,* 2003 WL 22384792, at *5 (W.D.N.Y. Sept. 9, 2003) (noting that once a due process violation accrues, a subsequent Article 78 determination in the plaintiff's favor does not rectify the harm caused); *with Lunney v. Brureton,* 2007 WL 1544629, at *27–29 (dismissing due process claim based on undisputed failure to provide timely written disposition to plaintiff, in part on the basis that after receiving a transcript of the hearing, which included a statement of the evidence relied upon, Plaintiff failed to add any new substantive arguments).

**\*17** Moreover, Plaintiff is not entitled to punitive damages in the instant action. "Courts may award punitive damages in situations where a defendant's conduct is 'willful or malicious,' or where defendants have demonstrated 'reckless intent' or 'callous indifference.' " *Giano v. Kelly,* 2000 WL 876855, at *26 (W.D.N.Y. May 16, 2000) (quoting *Memphis Comty. School Dist. v. Stachura,* 447 U.S. 299, 306 (1986)). Here, nothing in the record establishes that Defendant Uhler acted maliciously or willfully with regard to his failure to provide Plaintiff with a copy of the notice.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4627120 (N.D.N.Y.)
**(Cite as: 2014 WL 4627120 (N.D.N.Y.))**

Therefore, the court recommends **DENYING** plaintiff's request for punitive damages.

Having failed to establish any actual injury, Plaintiff is only entitled to receive nominal damages in the amount of one dollar. *McCann v. Coughlin,* 698 F.2d at 126. Accordingly, we recommend that Defendants' Cross–Motion for Summary Judgment be **GRANTED** as to Plaintiff's claim that he was unlawfully excluded from the third disciplinary hearing and **DENIED** as to Plaintiff's claim that he was not provided with a copy of the hearing disposition in a timely manner. We further recommend that Plaintiff's Motion for Summary Judgment be **GRANTED** with respect to his claim that Defendants failed to provide him with a written disposition of the third disciplinary hearing, and that, in full satisfaction of his constitutional deprivation, he be awarded the sum of one dollar in nominal damages.

### e. Defendants Venettozzi, Prack, and Rock

Plaintiff claims that "[s]ince Venettozzi, Prack[,] and Rock all had [a] hand in affirming the [third disciplinary] decision, they as well are liable." Pl.'s Mem. of Law at p. 27. Courts within the Second Circuit are split over whether the mere allegation that a supervisory official affirmed a disciplinary determination is sufficient to establish personal liability. We subscribe to the affirmance plus standard, which holds that the mere rubber-stamping of a disciplinary determination is insufficient to plausibly allege personal involvement. *See Brown v. Brun,* 2010 WL 5072125, at *2 (W.D.N.Y. Dec. 7, 2010) (noting that courts within the Second Circuit are split with regards to whether the act of affirming a disciplinary hearing is sufficient to allege personal involvement of a supervisory official, and concluding that the distinction appears to hinge upon whether the official proactively participated in reviewing the administrative appeal or merely rubber-stamped the results). Here, Plaintiff fails to make a single non-conclusory allegation from which a reasonable juror could conclude that Defendants Venettozzi, Prack, and Rock did anything other than rubberstamp Plaintiff's disciplinary determination.

Accordingly, we recommend that Plaintiff's Motion for Summary Judgment as to his claims against Defendants Venettozzi, Prack, and Rock, for affirming the third disciplinary disposition be **DENIED,** and that Defendants' Motion be **GRANTED** with respect to the same, and that this claim be **DISMISSED.**

### B. Qualified Immunity

**\*18** Defendants argue that they are entitled to qualified immunity. Defs.' Mem. of Law at pp. 23–24. However, given that we have recommended dismissing all of Plaintiff's claims except his claim against Defendant Uhler, we do not discuss whether any of the other Defendants are entitled to qualified immunity. *See Saucier v. Katz,* 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."). However, some limited discussion is necessary with regard to Plaintiff's due process claim against Defendant Uhler for the failure to provide Plaintiff with a written copy of the disposition.

The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Eng v. Coughlin,* 858 F.2d 889, 895 (2d Cir.1988). Whether an official protected by qualified immunity may be held liable for an alleged unlawful action turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time the action was taken. *Anderson v. Creighton,* 483 U.S. 635, 639 (1987); *Lewis v. Cowan,* 165 F.3d 154, 166 (2d Cir.1999). Until recently, courts faced with qualified immunity defenses have applied the procedure mandated in *Saucier v. Katz,* 533 U.S. 194 (2001). That case set forth a two-pronged approach whereby the court must first decide whether the facts

alleged, or shown, make out a violation of a constitutional right. If yes, the court must then decide whether the right at issue was "clearly established" at the time of the alleged misconduct. *Saucier v. Katz,* 533 U.S. 194 at 201–02. Recently, however, the Supreme Court softened the rigid approach enunciated in *Saucier. See Pearson v. Callahan,* 555 U.S. 223 (2009). Now, the *Saucier* two-pronged test is not mandated in terms of the order in which the prongs may be addressed, though the sequence of review may remain appropriate or beneficial. *Id.* at 818.

To determine whether a right was clearly established for purposes of qualified immunity, courts must consider "whether the right was defined with reasonable specificity; whether decisional law of the Supreme Court and the [Second Circuit] supports its existence; and whether, under preexisting law, a defendant official would have reasonably understood that his [or her] actions were unlawful." *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *see also Nicholas v. Miller,* 189 F.3d 191, 195 (2d Cir.1999).

A party is entitled to summary judgment on qualified immunity grounds if the court finds that the rights asserted by the plaintiff were not clearly established, or that "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff [ ], could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Lee v. Sandberg,* 136 F.3d 94, 102 (2d Cir.1997) (citations omitted).

**\*19** As discussed *supra,* the right to receive a written copy of the hearing disposition, including the evidence relied upon and the reasons for the sentence, has been clearly established since *Wolff v. McDonnell. Lunney v. Brureton,* 2007 WL 1544629, at \*28. Moreover, no rational juror could conclude that it was objectively reasonable for Defendant Uhler not to provide Plaintiff with a copy of his third disciplinary

hearing disposition. Accordingly, Defendant Uhler is not entitled to qualified immunity with respect to this claim.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Plaintiff's Motion for Summary Judgment (Dkt. No. 39) be **GRANTED** in part and **DENIED** in part as follows:

1. **GRANTED** to the extent that Plaintiff is entitled to summary judgment as to the issue of whether Defendant Uhler violated his right to due process by failing to provide him with a copy of the hearing disposition from his third disciplinary hearing, **HOWEVER,** in light of Plaintiff's inability to establish actual injury, we further recommend that he be awarded nominal damages in the amount of one dollar; and

2. **DENIED** in all other respects; and it is further

**RECOMMENDED,** that Defendants Cross–Motion for Summary Judgment (Dkt. No. 42) be **GRANTED** in part and **DENIED** in part as follows:

1. **DENIED** with respect to Plaintiff's due process claim against Defendant Uhler for his failure to provide Plaintiff with a copy of his hearing disposition from the third disciplinary hearing; and

2. **GRANTED,** with respect to all of Plaintiff's other claims, which should be **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court **TERMINATE** Sgt. Gower from this action; [FN17] and it is further

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4627120 (N.D.N.Y.)
**(Cite as: 2014 WL 4627120 (N.D.N.Y.))**

FN17. *See supra* Note 4.

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE AP-PELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

Date: August 14, 2014.

N.D.N.Y.,2014.
Hinton v. Prack
Slip Copy, 2014 WL 4627120 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3785771 (N.D.N.Y.)
**(Cite as: 2010 WL 3785771 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Marc LEWIS, Plaintiff,
v.
J. JOHNSON, et al., Defendants.

No. 9:08–CV–482 (TJM/ATB).
Aug. 5, 2010.

Marc Lewis, pro se.

Christina L. Roberts–Ryba, Asst. Attorney General, for Defendants.

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter was referred by Senior U.S. District Judge Thomas J. McAvoy, for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). The case was transferred to me on January 4, 2010, following the retirement of U.S. Magistrate Judge Gustave J. Di Bianco. (Dkt. No. 125).

While an inmate in the custody of the Department of Correctional Services ("DOCS"), plaintiff filed his complaint, pursuant to 42 U .S.C. § 1983, regarding incidents that occurred during his incarceration at Franklin Correctional Facility ("Franklin") and Upstate Correctional Facility ("Upstate"). Liberally construed, plaintiff's amended complaint [FN1] (Dkt. No. 40) makes several claims against 14 defendants [FN2] relating to events in 2006 and 2007. He alleges that, in retaliation for his filing of a letter complaining of an assault of another inmate by correction officers at Franklin on or about June 15, 2006, defendant Johnson filed a false misbehavior report against plaintiff, and defendant Gardner made inflammatory statements regarding plaintiff to other staff, prompting further acts of retaliation. [FN3] Plaintiff claims that defendants Secore and Favro violated his Eighth Amendment rights by assaulting him on June 19, 2006, and that defendant Norcross failed to intervene. He also alleges that he was a victim of another unconstitutional assault on June 24, 2006, by defendant Reardon and other unnamed officers. Plaintiff claims that, over the following days and weeks, nurses Davenport, Volpe, Walsh, and Chesbrough, and physician assistant ("PA") Tichenor all denied him constitutionally-adequate medical care, by failing to properly treat him for the various injuries he suffered as a result of the two "assaults." He states that defendant Demars violated his due process rights, while presiding at the disciplinary hearing on the charges brought by defendant Johnson, which resulted in plaintiff's confinement in a Special Housing Unit ("SHU") until the charges were reversed by DOCS in June 2007. Finally, plaintiff suggests that defendants McCasland and Hoffnagle violated plaintiff's First Amendment rights by improperly handling his legal mail in January 2007. Plaintiff seeks substantial monetary damages from the defendants.

FN1. Plaintiff was granted leave to file an amended complaint on January 26, 2009. (Dkt. No. 39).

FN2. It is well-settled that the state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD,* 64 F.3d 810, 815 (2d Cir.1995) (citing *Will v. Michigan Department of Police,* 491 U.S. 58, 71 (1989)). An action against state officers in their official capacities is tantamount to an action

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3785771 (N.D.N.Y.)
**(Cite as: 2010 WL 3785771 (N.D.N.Y.))**

against the state. *Yorktown Medical Laboratory, Inc. v. Perales,* 948 F.2d 84, 87 & n. 1 (2d Cir.1991). To the extent that the defendants are being sued in their official capacity for money damages, that cause of action should be dismissed under the Eleventh Amendment. *Huang v. Johnson,* 251 F.3d 65, 69–70 (2d Cir.2001); *Posr v. Court Officer Shield # 207,* 180 F.3d 409, 414 (2d Cir.1999).

FN3. Plaintiff characterizes the subsequent actions of defendants Secore, Favro, Norcross, Reardon, Demars, McCasland, and Hoffnagle as retaliation, although he states or implies that their actions constituted separate constitutional violations, as well.

Presently pending is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 110). Plaintiff has responded in opposition to the motion. (Dkt.Nos.123, 124). Defendants filed a reply (Dkt. No. 128), and plaintiff submitted a sur-reply (Dkt.Nos.129, 130). For the following reasons, this court recommends that defendants' motion be granted in part and denied in part. I particular, this court recommends that summary judgment be denied with respect to the Eighth Amendment excessive force or failure-to-intervene claims against defendants Secore, Favro, Norcross, and Reardon. Dismissal is recommended with respect to the plaintiff's other causes of action.

## DISCUSSION

### I. *Facts*

**\*2** Plaintiff authored and signed a letter dated June 15, 2006, complaining to the Superintendent of Franklin and other DOCS officials about the alleged assault of another inmate by at least four correction officers that evening. (Pl.'s Decl., Ex. A, Dkt. No. 124–3). Plaintiff spoke to the Superintendent in the mess hall about the letter on Saturday, June 17th, and the Superintendent said he would look for the letter

and get back to the plaintiff. (Pl.'s Deposition ("Dep.") at 18–19, Dkt. No. 110–3). The letter was stamped as received in the administrative office at Franklin, on June 20, 2006 at 12:42 p.m. (Pl.'s Decl., Ex. A).

### A. The Misbehavior Report Filed by Defendant Johnson

On June 19, 2006, the administration at Franklin received a number of anonymous notes from inmates indicating that violence toward the facility staff was imminent because of prior staff actions involving inmates. Defendant Johnson, who was assigned to investigate these letters, was advised that the plaintiff had approached the Superintendent with "similar concerns" on June 17th. Lt. Johnson obtained samples of plaintiff's handwriting from his guidance folder and compared them to the anonymous, threatening notes. (Johnson Decl. ¶ 5, Dkt. No. 110–8).FN4 He concluded that plaintiff's known handwriting was similar to the writing on four of the anonymous letters, including one of the most threatening ones. (*Id.* ¶¶ 5, 6). Based on that and other investigation conducted by several officers, Lt. Johnson filed a misbehavior report on June 19th, accusing plaintiff of authoring some of the threatening letters. (*Id.* ¶ 6 & Ex. A, Dkt. No. 110–8 at 6). He directed that plaintiff be confined in the SHU pending the disciplinary hearing (*Id.,* Ex. A), which is permitted by DOCS directives governing inmate discipline (DOCS Directive 4932, Parts 251–1.6 & 251–1.7, *Id.,* Ex. C, Dkt. No. 110–8 at 21–22).

FN4. Lt. Johnson had prior, on-the-job experience comparing handwriting, but no formal forensic training. (*Id.* ¶ 9; Disc. Hearing Transcript at 21, 23, Dkt. No. 110–8). Citations to the disciplinary hearing transcript will reference the consecutive page numbers on the bottom righthand corner of the pages, not the page numbers in the CM–ECF header.

A disciplinary hearing regarding these charges, for which defendant Demars served as the hearing

Not Reported in F.Supp.2d, 2010 WL 3785771 (N.D.N.Y.)
**(Cite as: 2010 WL 3785771 (N.D.N.Y.))**

officer, was conducted over several days. Plaintiff and several other witnesses, including Lt. Johnson and the Franklin Superintendent testified. (Disc. Hearing Transcript at 1–67). Plaintiff was found guilty of the charges and was sentenced, on July 5, 2006, to serve nine months in SHU with corresponding loss of privileges. (Disc. Hearing Transcript at 66; Pl.'s Decl., Ex. B, Dkt. No. 124–4 at 4). After various levels of appeal and review, the guilty disposition was administratively reversed by DOCS on June 19, 2007 because the hearing officer (defendant Demars) did not conduct an independent review of the handwriting comparisons about which Lt. Johnson testified. (Pl.'s Decl., Ex. B, Dkt. No. 124–4 at 6, 13).[FN5] On or about July 2, 2007, plaintiff was ordered released from the SHU at Upstate. (*Id.,* Dkt. No. 124–4 at 14).

> FN5. During June 2006, plaintiff received several other misbehavior reports for which he was found guilty and sentenced to additional time in the SHU. Although plaintiff seems to contend that one of these other hearings was reversed, the documentation submitted seems to indicate that only the disciplinary conviction of July 5, 2005 was reversed. (*Id.,* Dkt. No. 124–4 at 4–6, 11–14).

**B. The First "Assault" on June 19, 2005**

Plaintiff alleges that defendant Gardner, then a sergeant at Franklin, was involved in plaintiff's transfer to the SHU on June 19, 2005, following the filing of the disciplinary charges relating to the threat letters. (Amended Complaint ("AC"), Statement of Facts, ¶¶ 3–4, Dkt. No. 40 at 9–10;[FN6] Gardner Decl. ¶¶ 2–7, Dkt. No. 110–10). Plaintiff alleges that, during the transfer, Sgt. Gardner told defendants Secore and Favro that the plaintiff "needed to be taught the policies and procedures of the Franklin Correctional Facility because the plaintiff liked to make threats at correctional staff and write them up." [FN7] (AC ¶ 4).

> FN6. Subsequent references to the Amended Complaint will refer only to the paragraph

number in the "Statement of Facts," unless the reference is to another section of the pleading.

> FN7. Defendant Gardner did not recall the plaintiff, but states that he would not have made such a statement to an inmate. (Gardner Decl. ¶¶ 5–6).

**\*3** Plaintiff claims that defendants Secore and Favro then escorted him into the main foyer of the SHU where they struck him on the back of the head and on the jaw. (AC ¶¶ 6–8). Plaintiff alleges these two plaintiffs then dragged him into the "strip frisk room" where these two correction officers tripped plaintiff and then repeatedly punched and kicked him while he was handcuffed on the floor. (AC ¶¶ 9–10). Plaintiff claims further that defendant Norcross was in the strip frisk room while this assault was going on, and failed to intervene. (AC ¶ 11). While there are some minor discrepancies in their accounts, defendants Secore, Favro, and Norcross all state that, during the strip frisk procedure at the SHU, plaintiff raised a fist and then struggled when the officers moved to restrain him. The officers assert that they used the minimum force necessary to bring plaintiff under control, and that he was not "assaulted." (Secore Decl., Dkt. No. 110–11; Favro Decl., Dkt. No. 110–12; Norcross Decl., Dkt. No. 110–18).[FN8]

> FN8. The correction officer's account of the incident was documented in a use-of-force report and a subsequent disciplinary hearing, which resulted in a finding that the officers used reasonable and necessary force, and that the plaintiff engaged in violent conduct and other infractions. (*Id.*).

Plaintiff claims that, as a result of the assault, he suffered injuries to his rib cage and a dislocated jaw. He alleges that, in the hours and days following the incident, Nurse Davenport and Nurse Volpe refused to

Not Reported in F.Supp.2d, 2010 WL 3785771 (N.D.N.Y.)
**(Cite as: 2010 WL 3785771 (N.D.N.Y.))**

examine him and treat his injuries. (AC ¶¶ 13–17). Both nurses state that they spoke with and examined plaintiff between June 19 and 22, and found no evidence that he was injured. (Davenport Decl., Dkt. No. 110–19; Volpe Decl., Dkt. No. 110–14). The nurses completed an Inmate Injury Report and/or medical records, which documented their examinations of plaintiff. (*Id.;* Secore Decl., Ex. B, Dkt. No. 110–11 at 8, 15, 18–19, 22–25; Medical Records [FN9] at 34–36). Plaintiff claims that these records were fabricated and false. (AC ¶ 15; Pl.'s Decl., Dkt. No. 124–2 at 4–6).

> [FN9]. The defendants submitted the plaintiff's medical records *in camera* and they are stamped with sequential page numbers.

### C. The Second "Assault" on June 24, 2005

Plaintiff alleges that, on June 24, 2005, defendant Reardon assaulted him in his cell in the presence of other unnamed correction officers. Plaintiff alleges that defendant Reardon "took the plaintiffs [sic] left arm and pulled all the way back into a 90 ° degree angle while having him in a body lock ..." (AC ¶ 20). Plaintiff claims that, as a result of this assault, he suffered a torn tendon to his left armpit. (AC ¶ 23).

Officer Reardon acknowledged having contact with plaintiff in the Franklin SHU on June 20 and 24, 2006; he issued inmate misbehavior reports against the plaintiff on both dates. (Reardon Decl. ¶¶ 3–4, 10–12, Dkt. No. 110–13). Defendant Reardon denies assaulting plaintiff and notes that, on June 29th, at the disciplinary hearing regarding the June 20th misbehavior report, plaintiff said nothing about the alleged assault five days earlier. (*Id.* ¶¶ 5–8, 14). Plaintiff did, however, complain of the alleged assault in a grievance dated June 25th. (Pl.'s Decl., Ex. C, Dkt. No. 124–5 at 39–41). As a result of the grievance, plaintiff was eventually transferred to the SHU at Upstate. (*Id.*).

### D. Further Issues Regarding Medical Treatment

**\*4** Plaintiff claims that, upon his admission to Upstate on July 12, 2006, Nurse Walsh refused to examine plaintiff for injuries relating to the two prior assaults, advising him to request sick call. He alleges further that Nurse Chesbrough refused to provide him with treatment the next day because this defendant thought the plaintiff was lying about not being treated earlier at Franklin. (AC ¶¶ 23–24). After reviewing the relevant medical records, defendants Walsh and Chesbrough both concluded that Nurse Chesbrough examined plaintiff both on July 12th and 13th, and concluded that he had no apparent medical problems. (Walsh Decl. ¶¶ 6–7, Dkt. No. 110–15; Chesbrough Decl. ¶¶ 6–9, Dkt. No. 110–16).

Plaintiff also complains that PA Tichenor examined him several months after the alleged assaults, mis-diagnosed his left arm injury, and refused to examine his rib cage and jaw despite claims of continuing pain in those areas. (AC ¶ 25). Based on her review of plaintiff's medical records, defendant Tichenor stated that she examined and treated plaintiff conservatively for various medical conditions, including back and shoulder pain, on September 6, 2006 and several times thereafter. (Tichenor Decl., ¶¶ 6–11, Dkt. No. 110–17).

### E. Issues Regarding Legal Mail

Plaintiff alleges that, on January 22 and 23, 2007, defendants McCasland and Hoffnagle attempted to deliver two pieces of legal mail that had been opened outside of plaintiff's presence, contrary to DOCS procedures. Plaintiff refused to accept the opened mail on two occasions, and claims that defendant Hoffnagle then lost or destroyed the two parcels, which should have been returned to the sender. (Dep. 66–71, AC ¶¶ 31–33). Plaintiff does not document that he was prejudiced in any particular legal proceedings as a result of the alleged mishandling of his mail.

Defendant McCasland stated that he opened the two parcels of legal mail in plaintiff's presence on January 22nd, but that plaintiff refused the mail be-

Not Reported in F.Supp.2d, 2010 WL 3785771 (N.D.N.Y.)
**(Cite as: 2010 WL 3785771 (N.D.N.Y.))**

cause he was upset that another parcel was returned to plaintiff for insufficient postage. (McCasland Decl. ¶¶ 6–9, Dkt. No. 110–20). Defendant Hoffnagle states that, when plaintiff refused the two open parcels the next day, he returned them to the mail room. (Hoffnagle Decl., ¶¶ 4–10, Dkt. No. 110–21). Based on a grievance filed by plaintiff, DOCS found no evidence that the defendants mishandled plaintiff's legal mail, although one report found that the mail officers did not properly document their handling of the parcels. (McCasland Decl., Ex. B, Dkt. No. 110–20 at 44).

## II. *Summary Judgment—Legal Standards*

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

**\*5** The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

In determining whether there is a genuine issue of

material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272. "[I]n a pro se case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers ."" *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (citing, *inter alia, Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir .1994) (a court is to read a pro se party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest")). "However, a pro se party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)). While a court " 'is not required to consider what the parties fail to point out,' " the court may in its discretion opt to conduct "an assiduous review of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted).

## III. *Excessive Force/Failure to Intervene*

### A. Legal Standards

#### 1. Eighth Amendment–Excessive Force

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v.. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3785771 (N.D.N.Y.)
**(Cite as: 2010 WL 3785771 (N.D.N.Y.))**

Cir.1999).

In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be " 'inconsistent with the contemporary standards of decency.' " *Whitely v. Albers,* 475 U.S. 312, 327 (1986) (citation omitted); *Hudson,* 503 U.S. at 9. "[T]he malicious use of force to cause harm constitute[s][an] Eighth Amendment violation per se [,]" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

**\*6** The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response. *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

**2. Failure to Intervene**

A correction officer who is present while an assault upon an inmate occurs may bear responsibility for any resulting constitutional deprivation, even if he did not directly participate. *See, e.g., Cicio v. Graham,* No. 9:08–CV–534 (NAM/DEP), 2010 WL 980272, at \*13 (N.D.N.Y. March 15, 2010); *Tafari v. McCarthy,* No. 9:07–CV654 (DNH/GHL), 2010 WL 2044705, at\*8 (N.D.N.Y. May 24, 2010) .[FN10] A law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated by other officers in his or her presence. *Id.*[FN11] In order to establish liability under this theory, a plaintiff must prove that the defendant in question (1) possessed actual knowledge of the use by another correction officer of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Id.; Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citation omitted).

FN10. *See also Fischl v. Armitage,* 128 F.3d 50, 57 (2d Cir.1997) (reversing grant of summary judgment for defendant based on evidence that defendant was in the vicinity of an assault on plaintiff and failed to intervene); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994).

FN11. *See also Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted).

**B. Application**

Plaintiff has adequately alleged that the named correction officers either participated in, or were present for and failed to intervene in, the application of excessive force. While plaintiff's excessive force claims have weak evidentiary support, he has established that there are genuine issues of material fact that should be resolved by a jury.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3785771 (N.D.N.Y.)
**(Cite as: 2010 WL 3785771 (N.D.N.Y.))**

**1. The "Assault" on June 19, 2010**

Defendants Secore and Favro admittedly used force to subdue plaintiff on June 19, 2010. In his amended complaint (Dkt. No. 40), deposition (Dep. at 31–38, and pleadings in opposition to the summary judgment motion, plaintiff consistently alleged details of an assault which, if believed, would amount to a "malicious use of force to cause harm" that constitutes a *per se* Eighth Amendment violation regardless of the seriousness of his injuries. *Blyden,* 186 F.3d at 263. Plaintiff claims he was struck in the head or face by each defendant, dragged to another room, tripped, and repeatedly punched and kicked while he was lying handcuffed on the floor. Although plaintiff admits that he kicked at the correction officers to try to defend himself from their blows once he was on the floor (Dep. at 33–34), this did not justify the alleged prior application of excessive force. As described by plaintiff, the incident involved more than an *de minimis* use of force and a malicious and wanton attempt to cause harm. *Sims,* 230 F.3d at 22; *Hudson,* 503 U.S. at 7.

**\*7** The correction officers and Sgt. Norcross all vehemently deny that more than the minimum amount of force required to restrain the plaintiff was used, and the medical evidence does not corroborate plaintiff's claims of significant injuries to his rib cage and jaw.[FN12] However, given that issues of credibility should not be resolved on a summary judgment motion, this court cannot conclude that no rational juror could find that defendants Secore and Favro violated plaintiff's Eighth Amendment rights on June 19, 2006. *See, e.g., Griffin v. Crippen,* 193 F.3d 89, 90–92 (2d Cir.1999) (although plaintiff could offer only his own testimony and evidence of a bruised shin and a swollen left knee in support of his excessive force claim, dismissal was inappropriate because there were genuine issues of material fact concerning whether correction officers, whom plaintiff admittedly assaulted, maliciously used force against him after he was subdued and handcuffed); *Sims v. Artuz,* 103 Fed. Appx. 434, 437 (2d Cir.2004) (plaintiff's allegations that he

was kicked and punched while being removed from his cell after causing a disruption, corroborated in part by documented minor injuries,[FN13] were sufficient to withstand a summary judgement motion); *Dallio v. Sanatamore,* 9:06–CV–1154 (GTS/DRH), 2010 WL 125774, at \*9 (N.D.N.Y. Jan. 7, 2010) (because the court should not weigh the evidence or make credibility determinations, summary judgment would be denied where plaintiff alleged that he was repeatedly kicked and punched after he was subdued and restrained by correction officers, notwithstanding the relatively minor injuries the plaintiff suffered and the substantial contrary evidence proffered by the defendants); *Cicio v. Lamora,* 9:08–CV–431 (GLS/DEP), 2010 WL 1063875, at \*7–8 (N.D.N.Y. Feb. 24, 2010) (denying summary judgment on plaintiff's claim that defendant correction officer hit inmate several times after he was subdued and helpless, despite "seemingly overwhelming" contradictory evidence, including the fact that plaintiff suffered only a minor bruise).

> FN12. As discussed below, medical records indicate that plaintiff complained of, and in some cases received treatment for, pain in his back and shoulder in the months following June 2006. Plaintiff may have difficulty establishing that his subsequent medical problems were caused by the alleged incident of excessive force. While that may well be the case, and plaintiff may have few, if any compensable injuries, that does not support dismissal on summary judgment. *See, e.g., Reyes v. McGinnis,* 00–CV–6352, 2003 WL 23101781, at \*6 (W.D.N.Y. Apr. 10, 2003) (whether an injury to inmates wrist was caused by trauma resulting from defendant's use of handcuffs was a factual issue for the jury); *Gibeau v. Nellis,* 18 F.3d 107, 110 (2d Cir.1994) (while plaintiff may not have proved compensable injuries caused by the use of excessive force, he still could be entitled to a judgment under Section 1983 and an

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3785771 (N.D.N.Y.)
**(Cite as: 2010 WL 3785771 (N.D.N.Y.))**

award of nominal damages at trial).

> FN13. The Second Circuit reversed the grant of summary judgment, which was based, in part, on the district judge's conclusion that the plaintiff "would have suffered 'far greater injury than actually occurred' if his account [of the incident] were accurate." *Id.*

Plaintiff alleges that he saw that Sgt. Norcross was present while he was being kicked and punched on the floor of the strip frisk room and told plaintiff to "calm down." (Dep. at 36–38). Defendant Norcross admits he was in the room with plaintiff and defendants Secore and Favro, although he denies that any excessive force was applied. (Norcross Decl. ¶¶ 4–9, Dkt. No. 110–18). Given plaintiff's allegations about the nature and duration of the beating he received while in Sgt. Norcross's presence, it would have been clear to this defendant that excessive force was being applied, and he would have had an opportunity to intervene to stop the assault by his subordinates. While there are obviously issues of credibility that may ultimately be resolved against the plaintiff, he has established that there are issues of fact regarding defendant Norcross's culpability that should be addressed at trial.

**\*8** To the extent that plaintiff is alleging that defendants Gardner and Davenport were personally involved in the application of excessive force by defendants Secore and Favro, this court recommends dismissal of those claims.[FN14] Neither defendant was present during the alleged assault and thus did not have a realistic opportunity to intervene. There is no allegation that Nurse Davenport had any reason to anticipate the alleged assault, or any knowledge of the incident until it was over. In any event, she lacked the authority to intervene while correction officers were using force on an inmate, even if she were present.[FN15]

> FN14. *See, e.g., Wright v. Smith,* 21 F.3d

496, 501 (2d Cir.1994) (personal involvement is a prerequisite to the assessment of damages in a section 1983 case); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

> FN15. *See e.g., Rendely v. Town of Huntington,* No. 2:03–CV–3805, 2006 WL 5217083, at *6 (E.D.N.Y. Aug. 30, 2006) (because defendants were civilian government employees, and thus not law enforcement officials, they had no authority or duty to prevent the police officers from taking plaintiff into custody); *Phoenix v. Reddish,* 175 F.Supp.2d 215, 220 (D.Conn.2001) (there is no Supreme Court or Second Circuit authority that imposes an affirmative duty on a non-police state actor to intervene to prevent a police officer from conducting an unlawful search and seizure).

Even if then Sgt. Gardner made the comment to defendants Secore and Favro that plaintiff "needed to be taught the policies and procedures" of the facility "because plaintiff likes to make threats at correctional staff," that alone would not suggest the state of mind required to establish his responsibility, under the Eighth Amendment, for a subsequent assault by the other correction officers. *Cf. Bouknight v. Shaw,* 08 Civ. 5187, 2009 WL 969932, at *5 (S.D.N.Y. Apr. 6, 2009) (to establish officer's liability, under Section 1983, for the assault of plaintiff by other inmates, plaintiff needed to allege more than the fact that the officer spread rumors that plaintiff was a "snitch" and a homosexual; plaintiff needed to allege facts establishing that the officer intended to incite an assault or knowingly disregarded that he had created an environment that generated a significant risk of harm).[FN16] A comment that plaintiff needed to be taught the rules of the prison, as he was being transported to the SHU because of a disciplinary charge, is subject to a completely benign interpretation. Plaintiff's bare allegation that defendant Gardner made that statement does not establish a viable cause of action that Gardner induced

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3785771 (N.D.N.Y.)
**(Cite as: 2010 WL 3785771 (N.D.N.Y.))**

the other defendants to commit assault.

> **FN16.** It should be noted that verbal abuse, whether threatening, vulgar, or racial in nature, does not, by itself, rise to the level of a constitutional violation. See, e.g., *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996).

**2. The "Assault" on June 24, 2006**

Plaintiff alleges that, during a cell search on June 24, 2006, defendant Reardon pulled plaintiff's arm back at almost a 90 degree angle while holding him up against a wall. Plaintiff asserts that defendant Reardon was talking "tough stuff" during the incident and was either trying to break plaintiff's arm or cause him pain. (Dep. at 64). Plaintiff claims that he suffered a tear to the tendon under his left arm, which caused lasting limitations in function. (Pl.'s Memo. of Law at 24–25, Dkt. No. 124–1; Dep. at 80). Some months later, PA Tichenor diagnosed plaintiff with a left shoulder sprain and then tendinitis of the left pectoralis major tendon. (Tichenor Decl. ¶ 10; Medical Records at 27, 31). When plaintiff was examined by a prison doctor in April 2008, he detected a slight defect in plaintiff's "left bicep [?] tendon" that was, by that time, "functionally insignificant." (Medical Records at 11; Dep. at 80).

Officer Reardon admittedly interacted with plaintiff on June 24th, when he issued a misbehavior report to him, but denies that he applied any physical force. (Reardon Decl. ¶¶ 10–14). Defense counsel argues that plaintiff failed to mention the alleged assault on June 24th during a subsequent disciplinary hearing on a prior charge defendant Reardon filed on June 20th, indicating that the incident never happened. However, as noted, plaintiff filed a grievance on June 25th describing the assault. His allegations, although largely unsupported, are sufficient to create an issue of fact regarding what force, if any, defendant Reardon applied during the incident on June 24th.

**\*9** Defendants also argue that any use of force on plaintiff on June 24th was *de minimis* and not sufficient to support an Eighth Amendment claim. The alleged use of force described by plaintiff exceeded what was reasonable and necessary under the circumstances—a cell inspection with no suggestion that plaintiff physically resisted or posed any threat to the safety of the officers.[FN17] While the alleged use of force on plaintiff's left arm was brief, plaintiff has alleged that it was intense and caused a significant and lasting injury, for which he has provided some, albeit marginal, supporting medical documentation.[FN18]

> **FN17.** Defense counsel construes a comment during plaintiff's deposition as an admission that he "came off the wall" during the cell search. (Def. Memo. of Law at 19–20, Dkt. No. 110–6). This court interprets plaintiff's testimony (Dep. at 62–63) as speculation that multiple guards were present during the cell search in case he came off the wall or otherwise resisted. Defendant Reardon's declaration about his interaction with plaintiff on June 24th, and the misbehavior report issued against plaintiff, do not suggest that plaintiff did anything to necessitate the use of force. (Reardon Decl. ¶¶ 10–14 & Ex. D, Dkt. No. 110–13 at 32).

> **FN18.** Medical records from January 2007 indicate that plaintiff complained of new injuries to his left arm allegedly caused by an unrelated incident during which a correction officer allegedly pulled that arm through the slot in his cell door. (Medical Records at 24). So the extent to which the left arm injuries detected by the doctor in 2008 were caused by the alleged assaults in June 2006 is unclear.

Plaintiff's allegations regarding defendant Rear-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3785771 (N.D.N.Y.)
**(Cite as: 2010 WL 3785771 (N.D.N.Y.))**

don's state of mind are fairly conclusory; however, he does claim that the defendant was talking "tough" under circumstances which could provoke a malicious use of force.[FN19] While plaintiff's claim of excessive force against defendant Reardon is very thin, this court finds that there are genuine and material issues of fact that require credibility assessments, which should not be made in the context of a summary judgment motion. *See, e.g., Mitchell v. Keane,* 974 F.Supp. 332, 340–41 (S.D.N.Y.1997) (allegation that officers twisted baton in the chain of the inmate's shackles, causing considerable pain, when inmate was not resisting and had been subdued, were sufficient to meet objective and subjective elements of Hudson test, so as to preclude dismissal); *Rivera v. Goord,* 119 F.Supp.2d 327, 342 (S.D.N.Y.2000) (finding plaintiff's allegations that defendants "pinned him against a wall, face-first, twisted his arms behind his back, and banged his face against the wall" sufficient to state a claim for excessive force); *Reyes v. McGinnis,* 00–CV–6352, 2003 WL 23101781, at *1, 6 (W.D.N .Y. Apr. 10, 2003) (denying summary judgment motion on excessive force claim against correction officer who, *inter alia,* allegedly applied handcuffs too tightly, and lifted plaintiff from the floor by his handcuffs, causing nerve damage in his wrists and a possible ganglion cyst). *Cf. Robison v. Via,* 821 F.2d 913, 924–25 (2d Cir.1987) (sustaining excessive force claim where the arresting officer twisted the plaintiff's arm, "yanked" her, and threw her up against a car, causing only bruising).

> **FN19.** During his deposition, plaintiff acknowledged that he was being uncooperative with the guards following his confinement in the SHU—*e.g.,* by refusing meals brought by the officers and acting like a "knucklehead." (Dep. at 63, 65).

## IV. *Due Process*

Plaintiff claims that defendant Demars violated his due process rights in presiding over the disciplinary hearing on the charges initiated by defendant Johnson. For the reasons set forth below, this court finds that the due process claim is not viable and that, in any event, defendant Demars would be protected by qualified immunity for his conduct as a hearing officer.

### A. Applicable Law

To prevail on a procedural due process claim under section 1983, a plaintiff must show that he possessed a protected property or liberty interest and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000) (liberty interest); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). Due process generally requires that a state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003). Defendants apparently concede that the disposition of the most serious disciplinary charge against plaintiff, which resulted in a sentence of nine months in the SHU, implicated a liberty interest, the deprivation of which required due process safeguards.[FN20]

> **FN20.** In *Sandin v. Conner,* 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." The Second Circuit has explicitly avoided a bright line rule that a certain period of SHU confinement automatically give rise to due process protection. *See Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir.2000). Instead, cases in this circuit have created guidelines for use by

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64–66 (2d Cir.2004). A confinement longer than an intermediate one, and under "normal SHU conditions is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under Sandin." *Colon,* 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305–day confinement). Although shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest, SHU confinements of fewer than 101 days may constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions. *Palmer v. Richards,* 364 F.3d at 65. In the absence of a detailed factual record, cases in this circuit typically affirm dismissal of due process claims in cases where the period of time spent in SHU was short—e.g., 30 days—and there was no indication that the plaintiff endured unusual SHU conditions. *Id.* at 65–66 (collecting cases).

**\*10** In *Wolff v. McDonnell,* 418 U.S. 539, 563–64 (1974), the Supreme Court held that due process requires advance notice of the charges against the inmate, and a written statement of reasons for the disposition. The inmate should also have the ability to call witnesses and present documentary evidence, subject to legitimate safety and correctional goals of the institution. *Id.* at 566. Finally, the inmate is entitled to a fair and impartial hearing officer, and the hearing disposition must be supported by "some" or "a modicum" of evidence. *Superintendent v. Hill,* 472 U.S. 445, 455 (1985) (some evidence standard); *McCann v. Coughlin,* 698 F.2d 112, 121–22 (2d Cir.1983) (fair and impartial hearing officer). Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See Young v. County of*

*Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred); *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (state law violation does not necessarily rise to the level of a constitutional violation).[FN21]

> FN21. "While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation." *Samuels v. Selsky,* 01CIV.8235, 2002 WL 31040370, at *13 n. 21 (S.D.N.Y. Sept. 12, 2002) (citing *Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978).

An inmate's right to assistance with his disciplinary hearing is limited. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993). An assistant has been held to be constitutionally necessary in cases in which a plaintiff is confined in SHU, illiterate, or unable to grasp the complexity of the issues, and therefore, unable to marshal evidence and present a defense. *Id.* (citation omitted). In those cases, the assistant must do what the plaintiff would have done if he were able, but need not go beyond the inmate's instructions. *Id.*

**B. Application**

In his amended complaint and Memorandum of Law, plaintiff sets forth several ways in which he alleges that defendant Demars, the hearing officer determining whether plaintiff wrote several anonymous threatening letters, denied him due process in conducting the hearing.[FN22] Plaintiff alleges first that there was no evidence to support the allegations on which defendant Demars found him guilty. (AC ¶ 19). Plaintiff argues further that the hearing officer failed to make an independent assessment of the handwriting comparison evidence, which was the basis on which his guilty disposition was eventually overturned by DOCS. (Pl.'s Memo. of Law at 32; Pl.'s Decl., Ex. B, Dkt. No. 124–4 at 13). Finally plaintiff claims that his right to assistance in handling his disciplinary hearing

Not Reported in F.Supp.2d, 2010 WL 3785771 (N.D.N.Y.)
**(Cite as: 2010 WL 3785771 (N.D.N.Y.))**

was violated in several ways, in part because the hearing officer, not another DOCS employee or inmate, provided the assistance. (Pl.'s Memo. of Law at 30).[FN23]

> **FN22.** Plaintiff claims that he was illegally confined in the SHU from June 19, 2006, when Lt. Johnson's disciplinary charge was filed, until the disciplinary hearing was completed on July 5th. (Pl.'s Memo. of Law at 31, 33). This period of administrative detention in the SHU does not trigger due process protection because it was of such a short duration. *See, e.g., Brown v. Secore,* 9:08–CV–085, 2010 WL 980233, at *5 (N.D.N.Y. March 15, 2010) (The district courts in the Second Circuit, applying *Sandin,* have been consistent in holding that terms of SHU or 'keeplock' of approximately 30 days or less, and the related loss of privileges, do not implicate a liberty interest protected by the Due Process clause, even in the absence of detailed factual development regarding the conditions of confinement.) (collecting cases).

> **FN23.** Plaintiff claims that defendant Demars violated New York state regulations when he started the hearing on the same day that plaintiff indicated that he wanted assistance in handling the proceeding, without giving plaintiff additional time to prepare. (Pl.'s Memo of Law at 32; DOCS Directive 4932, Part 254.6(a)(1), Dkt. No. 110–8 at 28). However, after defendant Demars ascertained what assistance plaintiff needed on the first day of the hearing (June 22, 2006), he adjourned the hearing for several days (until June 30th) while he made arrangements to procure the documents and witnesses plaintiff requested. (Disc. Hearing Transcript at 6–9). Even if there was a technical violation of the DOCS directive, plaintiff waived any

objection on June 22nd (*Id.* at 6–7), and clearly suffered no due process violation because he was given ample time to prepare for the continuation of the hearing.

**1. "Some" Evidence**

In finding plaintiff guilty of two charges relating to the anonymous, threatening letters, defendant Demars stated that he relied primarily upon the inmate misbehavior report and Lt. Johnson's testimony regarding the similarities that he observed in the handwriting of several of the threat letters and known samples of plaintiff's writing. (Disc. Hearing Transcript at 66).[FN24] The anonymous letters, which were exhibits at the hearing, threatened physical retaliation against the corrections staff if there was another beating of an inmate, following an alleged assault of an inmate by officers in G-dorm at Franklin. (Johnson Decl., Ex. B, Dkt. No. 110–8 at 8–14). Defendant Johnson's misbehavior report noted that plaintiff had expressed "similar concerns" to the Superintendent two days before the threat letters were received. (Johnson Decl., Ex. B, Dkt. No. 110–8 at 6). During his testimony at the disciplinary hearing, Lt. Johnson set forth his prior experience in handwriting comparison and explained, in some detail, the similarities he observed between the threat letters and the samples of plaintiff's writing from his guidance folder, which were also exhibits. (Disc. Hearing Transcript at 21–22).

> **FN24.** Lt. Johnson also noted that he considered the testimony of plaintiff and the other hearing witnesses in reaching his conclusions. (*Id.*) Capt. Phelix, when called and questioned by plaintiff, corroborated Lt. Johnson's opinion that there were numerous similarities between plaintiff's handwriting and the writing on some of the threat letters. (Disc. Hearing Transcript at 32–33).

**\*11** While meager, the proof relied upon by defendant Demars constituted "some evidence" suffi-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3785771 (N.D.N.Y.)
**(Cite as: 2010 WL 3785771 (N.D.N.Y.))**

cient to satisfy the requirements of due process applicable to prison disciplinary hearings. *See, e .g., Monier v. Holt,* 4:CV–05–2062, 2005 WL 3531369, at *2 (M.D.Pa. Dec. 21, 2005), *aff'd,* 259 Fed. Appx. 518 (3d Cir.2007) (testimony of officer that the threatening note was comparable to a sample of petitioner's handwriting constituted "some evidence" sufficient for due process); *Brown v. Dotson,* 1:07CV114–03, 2007 WL 1033359, at *3 (W.D.N.C. Apr. 2, 2007), *aff'd,* 242 Fed. Appx. 19 (4th Cir.2007), *cert. denied,* ––– U.S. ––––, 128 S.Ct. 2960 (2008) (testimony regarding handwriting comparison by investigating officer constituted "some evidence" for due process purposes even though a copy of the inappropriate letter he was accused of writing was not made available to him); *Pettus v. McGinnis,* 533 F.Supp.2d 337, 341 n. 3 (W.D.N.Y.2008) (fact that a harassing letter appeared to be in plaintiff's handwriting, and that he had handed a copy to a correction officer, constituted "some evidence" supporting the disciplinary charge); *Bennett v. Jackson,* 2:06CV019, 2006 WL 618124, at *2 (E.D.Ark. Mar. 9, 2006) (testimony by officer that handwriting on the threatening letter was comparable to a sample of plaintiff's writing satisfied due process standards). While DOCS ultimately determined, as a matter of equity or state law, that the hearing examiner should have made an independent handwriting comparison, his apparent failure to do so did not violate the federal due process rights of the plaintiff. *See, e.g ., Monier v. Holt,* 2005 WL 3531369, at *2 (hearing officer did not violate due process by accepting the officer's testimony regarding his handwriting comparison); *Bennett v. Jackson,* 2006 WL 618124, at *2 (hearing officer who accepted officer's testimony regarding handwriting comparison without requiring expert analysis satisfied due process standards); *Brown v. Dotson,* 2007 WL 1033359, at *3 (testimony regarding handwriting comparison by investigating officer was not corroborated because the inappropriate letter plaintiff was accused of writing, which was tainted with bodily fluids, was destroyed).[FN25]

FN25. In limited circumstances, the Second

Circuit has required that a hearing examiner make an independent assessment of the credibility of certain sources of evidence at a prison disciplinary hearing. *See, e.g., Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001) (a finding based on information from a confidential informant will satisfy due process requirements only when there has been some examination of the factors relevant to the informant's credibility); *Luna v. Pico,* 356 F.3d 481, 489–90 (2d Cir.2004) (a bare accusation from a non-testifying victim is insufficient to support a disciplinary finding unless the examiner has engaged in some examination of the factors bearing on the victim's credibility). However, the Second Circuit cases have not engrafted, on the "some evidence" standard of *Superintendent v. Hill,* a general requirement that officers at prison disciplinary hearings independently assess the reliability of other sources of evidence. *See Luna v. Pico,* 356 F.3d at 491 (noting that the holding of *Taylor v. Rodriguez* regarding confidential informants provides some guidance, but is not controlling, with respect to other sources of evidence). This court concludes that *Taylor* and *Luna* do not impose a due process requirement that a hearing officer perform independent analysis of lay handwriting comparisons of a witness who testifies at a prison disciplinary hearing and is subject to crossexamination. If Second Circuit or Supreme Court authority is subsequently construed to require such independent analysis in the context of this case, defendant Demars would be entitled to qualified immunity because it would not have been clear to him, in 2006, that his conduct of the hearing violated plaintiff's due process rights.

**2. Adequacy of Assistance at the Hearing**

Because he was transferred to the SHU after dis-

Not Reported in F.Supp.2d, 2010 WL 3785771 (N.D.N.Y.)
**(Cite as: 2010 WL 3785771 (N.D.N.Y.))**

ciplinary charges relating to the threatening notes were filed against him, plaintiff was clearly entitled to assistance in preparing for his hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (citing *Eng v. Coughlin,* 858 F.2d 889, 898 (2d Cir.1988). On the first day of the hearing, defendant Demars noted that plaintiff had not signed the form served on him with the formal charges by which he could request assistance in connection with the hearing. (Disc. Hearing Transcript at 1).[FN26] Dep. Sup. Demars offered assistance to plaintiff in securing witnesses and documents for the hearing, and plaintiff accepted. Plaintiff explained what help he needed and, before the hearing was adjourned for several days, stated that he was satisfied with the assistance that the hearing officer provided. (Disc. Hearing Transcript at 1–7).

> FN26. Plaintiff completed the form requesting independent assistance in connection with another disciplinary hearing that was proceeding in June 2006, so he clearly was aware of his right to assistance and the related DOCS procedures. (Secore Decl., Ex. C, Dkt. No. 110–11 at 28). Plaintiff formally waived his right to any assistance in connection with another hearing that month. (Reardon Decl., Ex. B, Dkt. No. 110–13 at 10).

**\*12** Ultimately, defendant Demars arranged for the testimony of all of the witnesses that plaintiff deemed critical, including the Superintendent of Franklin, although Dep. Sup. Demars was dubious about why plaintiff needed the Superintendent. (Disc. Hearing Transcript at 10–19, 25–29, 39, 41–42, 44–45, 53, 61). The hearing officer procured copies of most of the documents that plaintiff requested, although the facility was unable to locate one "pass" which plaintiff requested. Defendant Demars turned down plaintiff's request for DNA testing of the anonymous, threatening letters that prompted the charges. (Disc. Hearing Transcript at 9–10, 29). While plaintiff raised numerous "objections" at the end of the

hearing, he did not object to any deficiencies in the assistance he received from defendant Demars. (Disc. Hearing Transcript at 64–65) .[FN27]

> FN27. Plaintiff did object that defendant Demars was biased because he was a "Dep.," (presumably referring to his position as a Deputy Superintendent at Franklin); he stated, at the end of the hearing, that "Albany" (presumably DOCS headquarters) should have appointed a hearing officer. (Disc. Hearing Transcript at 65). *See Chavis v. Flagler,* 01–CV–0510, 2005 WL 563055, at *4 (W.D.N.Y. Mar. 8, 2005) (in due process analysis, prison disciplinary hearing officer are not held to the same standards regarding neutrality and conflicts of interests as judges or adjudicators in other contexts, although they may not prejudice the evidence).

Plaintiff cites a 1995 opinion of then-District Judge Sotomayor for the proposition that a hearing examiner who purports to provide assistance to the charged inmate cannot be "impartial" and violates the due process rights of the accused *per se. Lee v. Coughlin,* 902 F.Supp. 424, 433–34 (S.D.N.Y.1995). However, the plaintiff in *Lee* specifically requested assistance from individuals other than the hearing officer. In this case, plaintiff waived any objection to having the hearing officer also provide him assistance in procuring documents and witnesses, by his failure to complete and submit the form requesting assistance from another source, and his statement expressing his satisfaction with the alternative arrangement offered by defendant Demars. *Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (the courts in this circuit have established that an inmate's silence can constitute waiver of his right to assistance at a disciplinary hearing) (citing, *inter alia, Murray v. Dixon,* 107 F.3d 3 (table), 1997 WL 73152, at *2 (2d Cir.1997) (affirming hearing officer's determination that inmate waived his right to assistance because the inmate "admits that he refused to sign the required

Not Reported in F.Supp.2d, 2010 WL 3785771 (N.D.N.Y.)
**(Cite as: 2010 WL 3785771 (N.D.N.Y.))**

request for employee assistance presented to him when he was served with the misbehavior report, and he does not allege that he requested assistance between his refusal and the hearing")).

Moreover, the *Lee* court found that the hearing officer, in fact, provided assistance that was deficient in several substantial respects. *Id.* In a 1998 decision, the Second Circuit held that, when an inmate agrees to accept assistance from a hearing officer who thereafter does nothing to assist, the inmate's due process rights are violated. *Ayers v. Ryan,* 152 F.3d at 81. While the Second Circuit characterized it as possibly "odd or irregular" for a hearing officer to offer to serve as an assistant and for the inmate to accept that offer, it did not characterize this arrangement as a *per se* due process violation. *Id.* At least one subsequent district court in this circuit has held that, where the hearing officer actually provided adequate assistance to an inmate, the fact that the hearing officer also served as the assistant does not violate due process. *Clyde v. Bellnier,* 9:08–CV–909, 2010 WL 1489897, at *6 (N.D.N.Y. April 13, 2010) (Singleton, J.).

**\*13** As discussed above, defendant Demars actually provided reasonable and adequate assistance to plaintiff in connection with his disciplinary hearing. *See, e.g., Jackson v. Johnson,* 30 F.Supp.2d at 619 (a hearing assistant's role is not to act as legal advisor or advocate, but to serve as a surrogate, performing functions, such as contacting witnesses, which the charged inmate could not do because he is not among the general population) (collecting cases); *Clyde v. Bellnier,* 2010 WL 1489897, at *6 (no due process violation arose when the hearing officer/assistant failed to provide documents that did not exist or that were not relevant to the defense) [FN28]; *Brown v. Dotson,* 2007 WL 1033359, at *3 (inmate facing disciplinary charges for writing a threatening note was not constitutionally entitled to DNA tests in connection with the hearing). This court concludes that, based on the Second Circuit's holding in *Ayers v. Ryan,* defendant Demars did not violate plaintiff's due process

rights in connection with his rendering of assistance in connection with the hearing. In any event, Dep. Sup. Demars would be entitled to qualified immunity because he could not have reasonably understood, based on the uncertain controlling law in 2006, that his role in providing reasonable and adequate assistance to plaintiff, while serving as the hearing officer, violated plaintiff's due process rights.

> FN28. *See also Clark v. Dannheim,* 590 F.Supp.2d 426, 429–31 (W . D.N.Y.2008) (to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing) (collecting cases).

## V. *Alleged Mail Tampering*

The First and Fourteenth Amendments to the U.S. Constitution are implicated when a prisoner's legal mail is obstructed, but a plaintiff must allege that the defendants' actions hindered the prisoner's "efforts to pursue a legal claim." *See Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) (citing *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d. Cir.1997). In order to establish a claim that a prisoner's right of access to the courts has been abrogated, actual injury must be shown. *See Lewis v. Casey,* 518 U.S. 343, 351–52 (1996).

Prior to the Supreme Court's decision in *Lewis,* the Second Circuit had held that "an isolated instance" of interference with an inmate's legal mail delivery was insufficient to state a First Amendment claim, either with respect to the mail itself or with respect to access to courts, where "the infraction was not in accordance with official policy or practice and where no showing had been made that the inmate's right to access to courts was chilled .... " *Washington v. James,* 782 F.2d 1134, 1139 (2d. Cir.1986) (citation omitted). *Lewis* also suggests that the actual harm must be to direct or collateral attacks on the inmate's conviction, or to a challenge to the conditions of confinement. 518

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3785771 (N.D.N.Y.)
**(Cite as: 2010 WL 3785771 (N.D.N.Y.))**

U.S. at 355. "Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " *Davis v. Goord,* 320 F.3d at 352 (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995)).

**\*14** Although the amended complaint alleges generally that plaintiff's mail was obstructed while he was in Franklin and Upstate,[FN29] his only focused claim of tampering with legal mail relates to an incident at Upstate in January 2007 involving defendants McCasland and Hoffnagle. (AC ¶¶ 29–33). During his deposition, plaintiff acknowledged that only two pieces of legal mail were opened outside of his presence, and that they may well have been opened by mistake or accident. (Dep. at 67, 74). Although the incident left Plaintiff "a little upset," he did not articulate how the opening and eventual loss [FN30] of the two items interfered with any pending legal matter. (Dep. at 71–75). Even accepting plaintiff's allegations as true, which the defendants dispute (McCasland Decl., Hoffnagle Decl.), the claim relating to the opening and possible destruction of two items of legal mail, without any showing of how plaintiff was prejudiced in a legal proceeding, does not support a viable First Amendment claim. *See, e.g., Morgan v. Montanye,* 516 F.2d 1367, 1370–71 (2d Cir.1975) (inmate's showing of only a single instance where clearly marked legal mail was opened out of his presence, in absence of any indication that the incident affected the correspondence between the inmate and his attorney concerning prisoner's criminal appeal or any other legal matter, was insufficient to survive summary judgment).

FN29. The conclusory and general allegations of mail tampering are insufficient to overcome summary judgment, and do not identify particular defendants who were personally involved in the alleged violations. *See, e.g., Gilliam v. Quinlan,* 608 F.Supp. 823, 838 (S.D.N.Y.1985) (conclusory allegations of mail tampering insufficient to

withstand summary judgment).

FN30. Plaintiff refused to accept the "opened" mail twice and then tried to recover it. By that time, the two items could not be located by DOCS, the post office, or the senders of the mail. Plaintiff alleges that defendant Hoffnagle and DOCS failed to return the mail to the sender pursuant to DOCS procedures. After an investigation, DOCS could not document what happened to the mail, but concluded that was no malfeasance on the part of the staff at Upstate. (Pl.'s Decl. ¶¶ 26–32, Ex. D, Dkt. No. 124–5 at 43–61).

## VI. *Retaliation Claims*

Plaintiff alleges that, in retaliation for his filing of a letter complaining of an assault of another inmate by correction officers, defendant Johnson filed a false misbehavior report against plaintiff, and defendant Gardner made inflammatory statements regarding plaintiff to other staff, prompting further acts of retaliation. Plaintiff characterizes, as retaliation, the subsequent "assaults" involving defendants Secore, Favro, Norcross, and Reardon; the conduct of the disciplinary hearing by defendant Demars; and the alleged mail tampering by defendants McCasland and Hoffnagle. For the reasons set forth below, this court will recommend that plaintiff's retaliation claims be dismissed, either on the merits or on qualified-immunity grounds.

### A. Applicable Law

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). Third, the plaintiff must establish a causal connection between

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3785771 (N.D.N.Y.)
**(Cite as: 2010 WL 3785771 (N.D.N.Y.))**

the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds, *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002)).

**\*15** The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), superseded by 2003 U.S.App. LEXIS 13030 (2d Cir. Feb. 10, 2003)) (omission in the original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations. *Bennett,* 343 F.3d at 137 (citing *Dawes,* 239 F.3d at 491). Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.*

A prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, if a defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights are implicated even if the plaintiff did receive, full procedural due process. *Franco v. Kelly,* 854 F.2d 584, 588–89 (2d Cir.1988). Any adverse action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Id.*

**B. Application**

**1. First Amendment Protection**

The plaintiff alleges that various acts of retaliation resulted from a letter he wrote and signed, complaining about the assault of another inmate by correction officers. It is unclear, under Second Circuit authority, whether an inmate's complaints about the treatment of another inmate are protected by the First Amendment and, thus, whether they could be the basis of a retaliation claim. *See, e.g., Smith v. Greene,* 9:06–CV–0505, 2010 WL 985388, at *3 (N.D.N.Y. Mar. 16, 2010) (it is far from certain whether the First Amendment protected an inmate's letter to the New York State Inspector General complaining about the use of force against a fellow inmate) (citing *Nevares v. Morrisey,* 95–CV–1135, 1991 WL 760231, at *6 (S.D.N.Y. Sept. 27, 1999) (complaining aloud to correction officers about the treatment of another inmate is not constitutionally protected activity under the First Amendment)); *Pettus v. McGinnis,* 533 F.Supp.2d 337, 339 (W.D.N.Y.2008) (it is unclear whether the First Amendment protected inmate from retaliation for testifying, at a disciplinary hearing of another inmate, that a correction officer assaulted the other inmate); *Rodriguez v. Phillips,* 66 F.3d 470, 478–79 (2d Cir.1995) (an inmate has no clearly established First Amendment right to approach and complain to an officer about how he is disciplining another inmate). We will assume, for sake of argument, that plaintiff's complaint letter in this case was protected by the First Amendment. However, as discussed below, the defendants who allegedly took adverse actions against plaintiff based on this letter would be protected by qualified immunity because it was not clear under controlling law, in 2006 and 2007, that such conduct would violate plaintiff's First Amendment rights.

**2. Connection Between "Speech" and Alleged Ad-**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3785771 (N.D.N.Y.)
(Cite as: 2010 WL 3785771 (N.D.N.Y.))

verse Actions

**\*16** Plaintiff has alleged that the actions of nine different defendants between June 19, 2006 and January 2007 were carried out in retaliation for his letter of June 15, 2006. With two possible exceptions, plaintiff provides no support for the conclusory claim that these defendants were even aware of his letter when they allegedly took adverse action against the plaintiff. It is unlikely that defendants Gardner, Secore, Favro, and Norcross, who were merely involved in plaintiff's move to the Franklin SHU on June 19th, were aware of plaintiff's letter, which was not received in the administrative office at Franklin until the following day. (Pl.'s Decl., Ex. A; Disc. Hearing at 52–53). To the extent these defendants were motivated to take some adverse action [FN31] against plaintiff, which they deny, the fact that plaintiff was just charged with creating some of the anonymous letters threatening the Franklin staff, would be a much more likely trigger.

FN31. Defendant Gardner's alleged statement on June 19th that plaintiff "needed to be taught the policies and procedures" of the facility "because plaintiff likes to make threats at correctional staff," would not support a retaliation claim because they would not deter an inmate of ordinary firmness in exercising his constitutional rights. *See, e.g, Davis v. Goord,* 320 F.3d at 353 (insulting, disrespectful, sarcastic, or hostile comments directed at an inmate generally do not rise to the level of adverse action) (citing, *inter alia, Dawes v. Walker,* 239 F.3d at 492 (calling inmate a "rat" not a constitutional violation). As noted above, this court rejected plaintiff's conclusory claim that this comment was an actionable incitement of defendants Secore and Favro to assault the plaintiff.

Plaintiff provides no support for the suggestion that defendant Reardon was aware of or motivated by plaintiff's June 15th letter when he allegedly used excessive force on June 24th. In fact, plaintiff provides a more plausible explanation for why defendant Reardon and the other SHU officers might be inclined to "assault" him on June 24th—plaintiff was refusing meals and generally acting like a "knucklehead" toward the staff. (Dep. at 63, 65). There is certainly no indication that defendants McCasland and Hoffnagle, correction officers at Upstate who allegedly tampered with plaintiff's mail in January 2007, knew of or were influenced by plaintiff's June 15, 2006 letter to officials at Franklin.

When he filed the disciplinary action against plaintiff on the afternoon of June 19th, defendant Johnson may not have seen plaintiff's letter, which was not received by the administrative office until the following day. However, Lt. Johnson's inmate misbehavior report confirms that he was advised about plaintiff's prior contact with the Superintendent on June 17th, so there is some corroboration he was aware of at least the general contents of plaintiff's letter. Defendant Demars, the hearing officer at plaintiff's disciplinary hearing, was clearly aware of the June 15th letter, because plaintiff asked that it be made an exhibit.

However, plaintiff provides no information other than the temporal proximity between his June 15th letter and the conduct of defendants Johnson and Demars to suggest that the letter substantially motivated the alleged adverse actions by the prison officials. There is no indication of any contact between plaintiff and Lt. Johnson before the disciplinary charges were filed, and no evidence of any statements or prior conduct suggesting a retaliatory animosity on the part of either defendant. (Dep. at 19; Johnson Decl. ¶ 4). It is clear that plaintiff was identified as a possible suspect in the investigation of the anonymous threat letters because he expressed "similar concerns" to the Superintendent and in his June 15th letter. However, the disciplinary hearing transcript indicates that defendants Johnson and Demars were motivated

Not Reported in F.Supp.2d, 2010 WL 3785771 (N.D.N.Y.)
**(Cite as: 2010 WL 3785771 (N.D.N.Y.))**

by the goal of determining if plaintiff generated some of the anonymous threat letters, not the desire to retaliate against plaintiff for drafting and signing the June 15th letter (which contained complaints, but no threats). Given the record developed in connection with the pending summary judgment motion, plaintiff's conclusory allegations are not sufficient to establish that any of the nine defendants were substantially motivated by his June 15, 2006 letter in taking the actions they took. *See, e.g., Ayers v. Stewart,* 101 F.3d 687 (table), 1996 WL 346049, at *1 (2d Cir.1996) (given the weakness of his retaliation claim, plaintiff's reliance on circumstantial evidence of retaliation-namely, the proximity of the disciplinary action to his complaint where no misbehavior reports were previously filed against him-does not suffice to defeat summary judgment); *Crenshaw v. Herbert,* 445 F.Supp.2d 301, 305 (W.D.N.Y.2006) (because plaintiff offers nothing more than speculation that the moving defendants did what they did because he had filed a grievance, the temporal proximity between the protected activity and the adverse action is not enough to give rise to a genuine issue of material fact); *Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000) (although the temporal proximity of the filing of the grievance and the issuance of the misbehavior report is circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment).

**VII.** *Deliberate Indifference to Medical Needs*

**A. Legal Standards**

**\*17** In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the depriva-

tion, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184.

**1. Objective Element**

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (citing *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer,* 511 U.S. at 844–47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id* . If the "unreasonable care" consists of a failure to provide *any* treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003)). However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the plaintiff is receiving ongoing treatment, and the issue is an unreasonable delay or interruption of the treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith,* 316 F.3d at 185). Thus, the court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**2. Subjective Element**

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 300 (1991)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (citing *Farmer,* 511 U.S. at 835–37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* Deliberate indifference is equivalent to subjective recklessness. *Id.* (citing *Farmer,* 511 U.S. at 839–40).

**\*18** In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. (citing *inter alia Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin,* 467 F.3d at 281.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

**B. Application**

**1. "Seriousness" of Plaintiff's Medical Condition and any Alleged Deprivation**

Plaintiff claims that, as a result of the alleged assaults on June 19 and 24, 2006, he suffered a "possible" fractured rib cage, dislocated jaw, and a torn tendon in his left armpit. (AC ¶¶ 14, 23). At his deposition in June 2009, plaintiff complained of continuing physical limitations because of a "torn ligament" in his armpit, as well as discomfort from a lump on his rib cage and a prior injury to his jaw. (Dep. at 80–81).

The record of the medical examinations of plaintiff by several health care providers over the days and weeks following the alleged assaults did not document the injuries claimed by plaintiff. (Secore Decl., Ex. B, Dkt. No. 110–11 at 8, 15, 18–19, 22–25; Medical Records at 25–36). In September and October 2006, PA Tichenor evaluated plaintiff's claims of back, shoulder, and knee pain, and diagnosed plaintiff with a left shoulder sprain and then tendinitis of the left

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3785771 (N.D.N.Y.)
**(Cite as: 2010 WL 3785771 (N.D.N.Y.))**

pectoralis major tendon. (Tichenor Decl. ¶¶ 8–10; Medical Records at 27, 31). When plaintiff was examined by a prison doctor in April 2008 regarding complaints of problems with his knees, feet, and arm, [FN32] the physician detected a slight defect in plaintiff's "left bicep [?] tendon" that was "functionally insignificant" and did not effect his range of motion or strength. (Medical Records at 11; Dep. at 80). Medical records from January 2007 indicate that plaintiff complained of new injuries to his left arm caused by an unrelated incident during which a correction officer allegedly pulled that arm through the slit in a cell door. (Medical Records at 24). Hence, it is unclear whether the doctor's observations relating to the left arm in 2008 are related to the alleged assaults in June 2006 or the later incident.

> FN32. Even plaintiff does not relate medical problems beyond his jaw, rib cage, and left arm to the alleged assaults in June 2006 and related claims of deliberate indifference to those injuries. (Pl.'s Memo. of Law at 10–11; Dep. at 80–81). So, plaintiff's later claims of problems with his back, knees, and feet are not relevant to the evaluation of whether plaintiff had a "serious" medical condition to which the defendants were deliberately indifferent.

**\*19** A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; or (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03. Plaintiff's medical issues in June and July 2006 do not meet the objective

standards of a "serious" medical condition. *See, e.g., Ninortey v. Shova,* 05 Civ. 542, 2008 WL 4067107, at \*5, 16 (S.D.N.Y. Sept. 2, 2008) (inmates's complaints of bruises, cuts, a twisted ankle, shoulder pain, a bloody mouth and cracked teeth following an alleged assault, much of which was not confirmed by records of frequent medical examinations and treatment, did not constitute a "serious medical condition"); *Evering v. Rielly,* 98 CIV. 6718, 2001 WL 1150318, at \*9 (S.D.N.Y. Sept. 28, 2001) (bruises, redness, soreness, a knot on the back, and a cut on the forearm are superficial injuries that require time to heal, but do not satisfy the objective component of the deliberate indifference standard); *Rodriguez v. Mercado,* 00 CIV. 8588, 2002 WL 1997885, at \*8 (S.D.N.Y. Aug. 28, 2002) (plaintiff who claimed to sustain bruises to his head, back, and wrist following an excessive force incident did not have a "sufficiently serious" medical condition); *Tafari v. McCarthy,* 2010 WL 2044705, at \*20 (bruises and superficial lacerations resulting from an alleged assault did not satisfy the "serious medical condition" test).

Plaintiff complained that prison medical officials refused to examine or treat him for the injuries relating to the alleged assaults, particularly in June and July 2006. He alleges that, in the days following the assaults, his face and jaw were swollen and he was having difficulty breathing as a result of his rib cage; but does not claim he had more serious injuries or substantial, persistent pain. (AC ¶¶ 14, 17). Plaintiff denied any injuries on June 19th. (Davenport Decl., Exs. A & B). The prison medical records document that he was examined on several occasions by different providers in two facilities who found little evidence of the medical problems about which plaintiff complained. [FN33] Based on the defendants' declarations and the corroborating medical records, plaintiff's conclusory allegations about his denials of medical care would not, in this court's view, create an issue of fact. *See, e.g., Brown v. White,* 9:08–CV–200, 2010 WL 985184, at \*8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse

Not Reported in F.Supp.2d, 2010 WL 3785771 (N.D.N.Y.)
**(Cite as: 2010 WL 3785771 (N.D.N.Y.))**

completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record.); *Benitez v. Pecenco,* 92 Civ. 7670, 1995 WL 444352 at n. 5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) (*citing Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")).[FN34]

> FN33. The defendants' Memorandum of Law competently summarizes the conflict between plaintiff's claims and the declarations of the defendants and their contemporaneous medical records. (Defs.' Memo. of Law at 4–10, Dkt. No. 110–6).

> FN34. *See also Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account." (citation omitted)).

**\*20** However, plaintiff challenges the prison medical records that contradict his claims of injury and denied treatment, making conclusory allegations that various medical records were falsified and/or that his medical problems were mis-diagnosed. (AC ¶ 15; Pl .'s Memo. of Law at 3–13). It should be noted that

the defendants' declarations and supporting medical records indicate that the plaintiff tried to manipulate care providers to document alleged injuries that the nurses did not detect.[FN35] Plaintiff's conclusory allegation that multiple medical professionals in two different prisons fabricated plaintiff's medical records to suppress evidence of his alleged injuries is highly suspect and would, in this court's view, be insufficient to sway any rational fact finder. *See, e.g., Benitez v. Mailloux,* No. 9:05–CV–1160, 2009 WL 1953847, at \*8 (N.D.N.Y. Mar. 25, 2009) (Treece, MJ) (plaintiff's conclusory contention that defendant falsified his ambulatory health care record is not enough to withstand summary judgment on his deliberate indifference claim), *report-recommendation rejected, in part, on other grounds,* 2009 WL 1953752 (N.D.N.Y. July 2, 2009) (Mordue, DJ); *Liner v. Goord,* 115 F.Supp.2d 432, 435 (S.D.N.Y.2000) (dismissing conclusory claims that defendants conspired to tamper with and destroy plaintiff's medical records).[FN36]

> FN35. Defendant Chesbrough states that he saw plaintiff on nurse's sick call at Upstate on July 13, 2006. "At that time the plaintiff stated he was injured on June 19th at Franklin and that he was not seen by a nurse. I asked him why he would waiting until now to report it. He stated, 'None of your business, just document it.' I again reviewed the medical record which indicated that the plaintiff was seen by an RN on 6/19/06." (Chesbrough Decl. ¶ 9; Medical Records at 32).

> FN36. *But see Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) (The records maintained by the prison officials and hospital do substantiate the conclusion that appellees provided Archer with comprehensive, if not doting, health care. Nonetheless, Archer's affidavit in opposition to the motion for summary judgment does raise material factual disputes, for example by alleging that

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3785771 (N.D.N.Y.)
**(Cite as: 2010 WL 3785771 (N.D.N.Y.))**

defendants delayed her access to medical care at a time she was in extreme pain.); *Baumann v. Walsh,* 36 F.Supp.2d 508, 512–13 (N.D.N.Y.1999) (although records maintained by prison officials lend credence to [Defendant]'s version of events in that they show Plaintiff was provided with substantial medical care and treatment, Plaintiff's affidavits in support of summary judgment nonetheless raise material factual disputes, regardless of their likely resolution).

Even if plaintiff's conclusory attacks on the reliability of his medical records are not rejected, this court concludes that he did not suffer from a sufficiently "serious" medical condition or suffer a "serious" deprivation of medical care under Eighth Amendment standards. Plaintiff does admit that he received medical attention on several occasions in the months following the alleged assaults in June 2006. (Dep. at 48–57). He does not take issue with the conservative treatment prescribed by PA Tichenor in the Fall of 2006. (Pl.'s Memo. of Law at 11; Tichenor Decl. ¶¶ 9–10). Even crediting only the medical evidence that plaintiff does not claim is fabricated,[FN37] there is no indication that alleged delays in his examination or treatment resulted in any substantial harm or required a dramatic change in the course of his treatment. *See, e. g., Evans v. Manos,* 336 F.Supp.2d 255, 261–62 (W.D.N.Y.2004) (delay in treatment of prisoner who claimed "extreme" back pain, which did not result in substantial harm to plaintiff or significantly change the course of his eventual treatment, was not a "serious" disruption of his medical care). *See also Smith v. Carpenter,* 316 F.3d 178, 188 (2d Cir.2003) (although demonstrable adverse medical effects may not be required under to establish an Eighth Amendment medical-care claim, the absence of subsequent physical injury will often be probative in assessing the risk of delaying treatment in the past).

> FN37. Plaintiff credits, for example, the findings of the prison doctor in April 2008. (Dep. at 44–45, 80–81; Pl.'s Sur–Reply, Dkt. No. 129 at 7). As noted, the only injury that the doctor detected that could be related to the assaults in June 2006 was a possible defect in a tendon that was "functionally insignificant" and did not effect plaintiff's range of motion or strength. (Medical Records at 11). The doctor documented no residual evidence of the jaw and rib cage injuries that plaintiff still claimed to be suffering from as of the time of his deposition in June 2009. (Medical Records at 11; Dep. at 80–81). PA Tichenor, who examined plaintiff in 2006, also makes no notation of jaw or rib case issues. With respect to plaintiff's shoulder issues, defendant Tichenor found, in September 2006, that plaintiff's gait, range or motion, strength, and sensation were all normal. (Tichenor Decl. ¶¶ 8–11, Medical Records at 31). When PA Tichenor diagnosed plaintiff with tendinitis in his left arm in October 2006, he found the tendon was "tender but intact." (Medical Records at 27).

The record does not indicate that plaintiff was suffering from a serious medical condition which, even if completely ignored in June and July 2006, would have created a serious risk to his health. Nor does plaintiff's subsequent medical history reveal that the alleged delay or denial of medical treatment had any adverse impact on plaintiff. Accordingly, this court concludes that summary judgment should be granted with respect to the plaintiff's medical care claims because no rational juror would find that plaintiff suffered a sufficiently serious medical condition or deprivation.

### 2. "Deliberate Indifference"

**\*21** The declarations of defendants Davenport, Volpe, Walsh, Chesbrough, and Tichenor, and the supporting medical records, also undercut plaintiff's conclusory allegations that they were deliberately

Not Reported in F.Supp.2d, 2010 WL 3785771 (N.D.N.Y.)
**(Cite as: 2010 WL 3785771 (N.D.N.Y.))**

indifferent to his medical needs. Based on the above analysis of plaintiff's medical condition in June and July 2006, plaintiff can not establish that the defendants recognized a serious risk to his health and deliberately ignored it. Given the court's finding that plaintiff has not established the objective elements of an Eighth Amendment medical care claim, a detailed analysis of the subjective element is not necessary. However, a few specific observations about two defendants are appropriate.

The only allegation against nurse Walsh in the amended complaint is that she refused to examine plaintiff on the day he was transferred to Upstate–July 12, 2006. (AC ¶ 23). The medical records indicate that nurse Chesbrough conducted plaintiff's intake examination of plaintiff on July 12th and saw him in sick call on July 13th. (Chesbrough Decl. ¶¶ 7–9; Medical Records at 32–34). [FN38] Even if defendant Walsh "refused" to examine plaintiff on July 12th, she apparently did so with the knowledge that he would be seen that day by another nurse. Such a claim cannot support a viable cause of action for deliberate indifference.[FN39]

> FN38. The plaintiff may be mistaken in his recollection of which nurse performed his intake examination at Upstate on July 12, 2009. (Dep. at 51–53).

> FN39. Even plaintiff's more pointed claims that defendants Davenport, Volpe, and Chesbrough refused to examine or treat him on one or more occasions (Dep. at 41–42, 47, 49–50, 51–53) would not support a claim of deliberate indifference. *See, e.g., Savage v. Brue,* 9:05–CV–857, 2007 WL 3047110 at *9 (N.D.N.Y. Oct. 18, 2007) (nurse refused pain medication to an inmate confined in a special housing unit for 48 hours with no mattress who complained of "extreme" back and neck pain due to a recent injury, and advised the inmate that he would need to "ad-

just to it"; while the nurse may have been negligent in her care, she was not reckless or deliberately indifferent); *Evans v. Manos,* 336 F.Supp.2d at 261–62, 263 (terminating and postponing, for two more weeks, the medical appointment of a prisoner who claimed "extreme" back pain because he complained about his care did not constitute deliberate indifference where the doctor had no intention of doing the inmate harm).

Finally, plaintiff's Eighth Amendment claim against PA Tichenor is that he failed to detect or that he mis-diagnosed plaintiff's alleged injuries. (AC ¶ 25; Dep. at 44–45, 56–57, 80–81).[FN40] Based on the authority cited above, even if defendant Tichenor negligently mis-diagnosed plaintiff, that would not constitute "deliberate indifference."

> FN40. Plaintiff does dispute the number of times defendant Tichenor treated him, but does acknowledge he saw the physician assistant several times in 2006 and 2007. (Pl.'s Memo. of Law at 10–11).

**VIII.** *Qualified Immunity*

Defendants argue that they are entitled to qualified immunity with respect to all of plaintiff's claims. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). However, even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citing *Magnotti v.. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990).

In determining whether qualified immunity ap-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3785771 (N.D.N.Y.)
**(Cite as: 2010 WL 3785771 (N.D.N.Y.))**

plies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201(2001), modified by *Pearson v. Callahan,* —— U.S. ——, 129 S.Ct. 808, 811 (2009) (holding that, "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory in all cases"). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201. This court need not address qualified immunity with respect to plaintiff's Eighth Amendment claims against defendants Gardner, Davenport, Volpe, Walsh, Chesbrough, and Tichenor because, as discussed above, he has not established those alleged violations of his constitutional rights.

**\*22** Defendant Demars is entitled to qualified immunity with respect to the due process claim relating to his conduct of plaintiff's disciplinary hearing. As discussed above, the Second Circuit's decisions in *Taylor v. Rodriguez,* 238 F.3d at 194 and *Luna v. Pico,* 356 F.3d at 489–90 did not clearly impose a due process requirement that a hearing officer at a prison disciplinary hearing perform independent analysis of lay handwriting comparisons made by a testifying witness. If the controlling authority were subsequently construed to require such independent analysis in the context of this case, this court finds it would not have been clear to defendant Demars in 2006 that his reliance on the witness' handwriting comparisons violated plaintiff's due process rights. [FN41] Similarly, the court concluded that the controlling authority in this circuit did not clearly prohibit a hearing officer at a prison disciplinary proceeding from also providing required assistance to the charged inmate. *Ayers v. Ryan,* 152 F.3d at 81. Because defendant Demars could not have reasonably understood that he could be violating plaintiff's due process rights by effectively providing assistance at the hearing over which he presided, he is entitled to qualified immunity with respect to that claim.

FN41. *Cf. Luna v. Pico,* 356 F.3d at 491 (defendant is protected by qualified immunity because a reasonable hearing officer would not have clearly understood from *Taylor* and other then-existing law that an independent review of the credibility of a non-testifying victim was required by due process).

To the extent a higher court were to determine that any defendant who took adverse action against plaintiff was substantially motivated by plaintiff's June 15, 2006 letter complaining about the beating of another inmate, that defendant would be protected by qualified immunity with respect to a retaliation claim. As of 2006 and early 2007, the controlling authority in this circuit did not clearly provide First Amendment protection to complaints by one inmate about the alleged mistreatment of another inmate. *See, e.g .,* *Pettus v. McGinnis,* 533 F.Supp.2d at 339 (defendant is entitled to qualified immunity because of the uncertainty as to whether the First Amendment protected inmate from retaliation for testifying, at a disciplinary hearing of another inmate, that a correction officer assaulted the other inmate); *Rodriguez v. Phillips,* 66 F.3d at 479.

As to plaintiff's excessive force and failure to intervene claims against defendants Secore, Favro, Norcross, and Reardon, it was clearly established, as of the time of the alleged incidents in June 2006, that inmates had an Eighth Amendment right to be free from excessive force and a failure to intervene. *See, e.g., Hudson,* 503 U.S. at 9–10. Thus, accepting all of plaintiff's allegations about the two incidents on that day as true, qualified immunity cannot be granted to those defendants, because a reasonable person in their position at the time would or should have known that the use of excessive force was a constitutional violation. *See, e.g., Dallio v. Sanatamore,* 2010 WL 125774, at \*14.

Not Reported in F.Supp.2d, 2010 WL 3785771 (N.D.N.Y.)
**(Cite as: 2010 WL 3785771 (N.D.N.Y.))**

   **WHEREFORE,** based on the findings above, it is

   **RECOMMENDED,** that defendants' summary judgment motion be **DENIED IN PART,** as to (1) plaintiff's Eighth Amendment claims based on excessive force and/or failure to intervene against defendants Secore, Favro, and Norcross and (2) the Eighth Amendment claims based on excessive force against defendant Reardon. And, it is further

   **\*23 RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 110) be **GRANTED IN PART,** and that the complaint be dismissed in its entirety as to the remaining claims against all defendants.

   Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2010.
Lewis v. Johnson
Not Reported in F.Supp.2d, 2010 WL 3785771 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 3729362 (N.D.N.Y.)
**(Cite as: 2014 WL 3729362 (N.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Marc LEWIS, Plaintiff,
v.
MURPHY, Captain, Coxsackie Correctional Facility;
J. Lewis, Corrections Counselor, Coxsackie Correctional Facility; Matthews, Deputy Superintendent for Administration, Coxsackie Correctional Facility; Christopher Miller, Deputy Superintendent for Security, Coxsackie Correctional Facility; Eric G. Gutwein, Commissioner Hearing Officer, N.Y.S., D.O.C.C.S., Defendants.

No. 9:12–CV–00268 (NAM/CFH).
Signed July 24, 2014.
Filed July 25, 2014.

Marc Lewis, Attica, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Joshua E. McMahon, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

### ORDER

NORMAN A. MORDUE, Senior District Judge.

**\*1** The above matter comes to me following a Report–Recommendation by Magistrate Judge Christian F. Hummel, duly filed on the 27th day of June 2014. Following fourteen (14) days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report–Recommendation, and no objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in its entirety.

2. The defendants' motion for summary judgment (Dkt. No. 46) is granted and the Clerk shall enter judgment accordingly.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION AND ORDER[FN1]

> FN1. This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* Marc Lewis ("Lewis"), an inmate currently in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, five DOCCS employees, violated his rights under the Fourteenth Amendment. Compl. (Dkt. No. 1). Presently pending is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. Dkt. No. 46. Lewis opposes and defendants replied. Dkt. Nos. 57, 61. For the following reasons, it is recommended that defendants' motion be granted.

### I. Background

The specific facts of the case are set forth in the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Report–Recommendation and Order filed February 28, 2012, familiarity with which is assumed. *See* Dkt. No. 39 (Report–Recommendation); Dkt. No. 43 (Memorandum–Decision and Order). The facts are related herein in the light most favorable to Lewis as the non-moving party. At all relevant times, Lewis was an inmate at Coxsackie Correctional Facility ("Coxsackie").

### A. November 5, 2011 Letter

On November 5, 2011, Lewis was watching television when non-party Correctional Officer Whit ("Whit") changed the channel on the television that Lewis was watching. Dkt. No. 46–9 at 2. Lewis wrote a letter to non-party Superintendent Martuscello ("Martuscello") complaining about the incident and stated that Whit harassed and intimidated him. Compl. ¶ 1. Lewis indicated that he would "blow the whistle on a lot of other wrong doings in this facility if need be." Dkt. No. 46–9 at 4. Lewis further indicated that he feared correctional officers would retaliate against him because he filed this complaint. *Id.* at 3. Lewis sent a copy of this letter to non-party Commissioner Fisher. Lewis Dep. # 1 (Dkt. No. 46–6) at 43:8–14. On November 7, 2011, Lewis was taken from his cell and told by non-party Sergeant Martin that he was being placed under keeplock [FN2] status for threats Lewis made against someone in the administration building. *Id.* at 27:14–22. At that time, Lewis had yet to receive a copy of the misbehavior report. *Id.* at 28:11–15. Based on the content of the November 5, 2011 letter, Lewis was charged with making threats and attempting to bribe and extort personnel. Dkt. No. 46–9 at 1.

> FN2. "Keeplock" is a form of disciplinary confinement where an inmate is confined in his cell for the duration of the disciplinary sanction. *Gittens v. Lefevre*, 891 F.2d 38, 39 (2d Cir.1989) (citing N.Y. COMP.CODES R. & REGS. tit. 7, § 251–1.6 (2012)).

### B. Tier III Disciplinary Hearing

**\*2** On November 10, 2011, Lewis was escorted by non-party Correctional Officer Stevenson ("Stevenson") to attend his disciplinary hearing before defendant Captain Murphy ("Murphy"). Lewis Dep. # 1 at 34:8–12, 35:12–13. Murphy started the recording, explained the hearing process, and took Lewis's plea. *Id.* at 35:17–22. Lewis advised Murphy that he had not been served with a copy of the misbehavior report and had not yet been provided inmate assistance. Compl. ¶ 4; Murphy Decl. (Dkt. No. 46–22) ¶ 8. Murphy attested that he immediately stopped the hearing and directed Stevenson to provide Lewis with a copy of the misbehavior report and to arrange for the plaintiff to receive inmate assistance. Murphy Decl. ¶¶ 8, 11. Lewis also objected to Murphy being the officer who reviewed the misbehavior report and authorized Lewis to be placed in keeplock pending a disciplinary hearing, and the hearing officer. *Id.* ¶ 9. According to DOCCS Directive 4932, 251–2.2(f) Murphy could not serve as both the reviewing and hearing officer on the same misbehavior report. Dkt. No. 46–12 at 4. Lewis was then brought back to his cell to review the misbehavior report and receive inmate assistance. Compl. ¶ 5.

#### 1. Inmate Assistance

Defendant Corrections Counselor Jackie Lewis ("Counselor Lewis") was assigned as Lewis's employee assistant. Lewis Decl. (Dkt. No. 46–14) ¶ 4. On November 10, 2011, Counselor Lewis arrived at Lewis's cell to help prepare a defense for his hearing. *Id.* ¶ 7. During the meeting, Lewis requested that Martuscello and Fischer be called as witnesses and asked for the name of the review officer who authorized his keeplock confinement. *Id.* ¶ 8; Lewis Dep. # 1 at 40:8–16. Counselor Lewis indicated that Murphy was the reviewing officer and took note of the witnesses whom Lewis wanted to question. Lewis Dep. # 1 at 40:15–17; Dkt. No. 46–15. Lewis also stated that he requested an explanation of the charges but Counselor Lewis said she was not going to do that because she was trying to go home. Compl. ¶¶ 7–8. Since Counselor Lewis did not meet Lewis's standards for assistance, Lewis did not sign the inmate assistance

Slip Copy, 2014 WL 3729362 (N.D.N.Y.)
**(Cite as: 2014 WL 3729362 (N.D.N.Y.))**

form and Counselor Lewis left the cell at that time. *Id.* ¶ 8. Counselor Lewis maintains that Lewis never asked her for definitions or an explanation of the charges. Lewis Decl. ¶ 9.

### 2. Hearing Extension

On November 10, 2011, a request for an extension of the Tier III disciplinary hearing was filed because Lewis was going to be in court from November 14, 2011 to November 18, 2011 and no staff was available to conduct the hearing before that time. Dkt. No. 46–17; Compl. ¶ 10. The request indicated that defendant Commissioner's Hearing Officer Gutwein ("Gutwein") was the hearing officer and that the hearing had not commenced. Dkt. No. 46–17. Lewis contends that defendant Deputy Superintendent for Administration Matthews ("Matthews") had filed the request. Compl. ¶ 10. Lewis believes that the request contained false information because Murphy began the hearing on November 10, 2011 and Lewis was only in court from November 14, 2011 to November 16, 2011. *Id.* Matthews attested that Lewis is mistaken about who wrote the report. Matthews Decl. (Dkt. No. 46–16) ¶¶ 8–10. Matthews explained that although the request indicates "Matthew" as the contact person, extension requests are filed by clerical staff in Coxsackie's Discipline Office; thus the reference to "Matthew" refers to someone in that office, and not Matthews. *Id.*

**\*3** Later on November 10, 2011, Lewis wrote a letter to Martuscello explaining his November 5, 2011 letter and objecting to Murphy being the hearing officer. Dkt. No. 46–19. Martuscello directed defendant Deputy Superintendent Miller ("Miller") to respond to the letter. Miller Decl. (Dkt. No. 46–18) ¶ 7. By letter dated November 15, 2011, Miller informed Lewis that Gutwein was assigned as the hearing officer. *Id.;* Dkt. No. 46–20.

### 3. Hearing on November 21, 2011

On November 17, 2011, a second request to extend the date of the disciplinary hearing to November 21, 2011 was filed because no hearing officer was available to conduct the hearing before that time. Dkt. No. 46–13. On November 21, 2011, Gutwein conducted the disciplinary hearing for Lewis. Hr'g Tr. (Dkt. No. 46–10) at 2.[FN3] Lewis pleaded not guilty to the charges against him. *Id.* at 3. Lewis objected to: (1) Murphy commencing a disciplinary hearing concerning the same misbehavior report on November 10, 2011; (2) Murphy being both the reviewing and hearing officer; (3) Gutwein commencing the hearing more than seven days after placement in keeplock; and (4) Counselor Lewis providing inadequate assistance because she did not fulfill his requests. *Id.* at 4.

> FN3. The page numbers following "Hr'g Tr." refer to the pagination of the header numbers generated by CM/ECF, not the individual transcripts.

Lewis requested that Counselor Lewis, Murphy, Stevenson, Fischer, Martin, and Martuscello be called as witnesses. Hr'g Tr. at 8. Lewis also requested that the November 5, 2011 letter be produced as evidence. *Id.* Gutwein noted for the record that the November 5, 2011, letter was placed in the hearing packet and denied Lewis's request to have the log books produced as evidence. *Id.* at 8, 19. Gutwein denied Lewis's request to call Murphy, Stevenson, and Counselor Lewis as witnesses on relevance grounds as Lewis wanted them to testify to the defects of the disciplinary hearing. Gutwein Decl. (Dkt. No. 46–8) ¶ 28; Hr'g Tr. at 19, 20. Since Gutwein called Martin to testify to the misbehavior report, Gutwein declined to call Martuscello and Fischer as witnesses for their testimonies would have been duplicative. Hr'g Tr. at 8, 19, 20.

Gutwein produced Martin and asked him questions concerning the grounds for authoring the misbehavior report. Hr'g Tr. at 9. Martin explained that Lewis's November 5, 2011 letter contained statements threatening actions if certain demands were not met and Lewis would "blow the whistle if need be." *Id.* Lewis was afforded an opportunity to direct questions

Slip Copy, 2014 WL 3729362 (N.D.N.Y.)
**(Cite as: 2014 WL 3729362 (N.D.N.Y.))**

at Martin through Gutwein. *Id.* Gutwein denied Lewis's request to have the definitions of bribery, extortion, and threats because the definitions would be irrelevant to the incident in the report. *Id* . at 19.

Gutwein then made a written disposition and found Lewis guilty of the charges based on: (1) the misbehavior report, which stated that Lewis would retaliate if his demands were not met; (2) review of the November 5, 2011 letter stating that Lewis will retaliate by "blowing the whistle on the wrong doings by staff"; (3) Martin's testimony stating that the letters contained an ultimatum; (4) Lewis's Testimony stating that the hearing was commenced previously in an improper and untimely manner; and (5) Lewis's disciplinary history. Hr'g Tr. at 20. Gutwein sentenced Lewis to seven months in the Special Housing Unit ("SHU"),[FN4] along with seven months without packages, commissary privileges, phone privileges, and loss of good time credits. *Id.* Gutwein's determination and sentence was made to impress upon Lewis that it is a serious violation to threaten employees, which would not be tolerated at the correctional facility and that Lewis should modify his behavior in the future. Gutwein Decl. ¶ 12.

> FN4. SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. COMP.CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

### C. SHU conditions

**\*4** On November 30, 2011, Lewis received a letter indicating that he had been unsatisfactorily discharged from the Aggression Replacement Training ("ART") Program because he was going to be in SHU for seven months. Compl. ¶ 39. Nevertheless, Lewis was able to complete this program after his release from SHU. Lewis Dep. # 1 (Dkt. No. 46–6) at 69:7–14.

Since Lewis had his telephone privileges taken away, he was unable to call his sister who was in need of a kidney transplant. Lewis Dep. # 2 (Dkt. No. 46–7) at 12:6–11. Lewis also stated he was in the process of filing paperwork to donate a kidney to his sister but being in SHU prevented him from finishing it. *Id.* at 12:3–5, 13:2–3. By the time Lewis was released from SHU, his sister had received a transplant. *Id.* at 13:4–7.

Lewis was also unable to interact with other inmates by attending group activities such as congregational prayer or group chow during his time in SHU. Compl. ¶ 46. Lewis contends that he was "restrained from practicing the prerequisite [rituals] associated with performing his [religious] prayers" while in SHU because the cells were unsanitary, he had to share a cell, the correctional officers gave him showers whenever they wanted, and he was not given a shower three times a week. Dkt. No. 57 at 15–16. Lewis claims he was prevented from practicing Islam because Muslims must be "in a state of purification in order to pray" and Islamic law states that men must not expose their body from the navel to the knee. Therefore he was restrained from doing "wudu," a ritual where one must wash their whole body in preparation for prayer. *Id.* at 16.

### D. Appeal of the Hearing Disposition

Lewis filed an appeal of the hearing disposition. Compl. ¶ 34. Miller reviewed the appeal and found "the hearing to be without procedural error and the resulting sanctions appropriate." Dkt. No. 46–21. Lewis appealed to non-party Albert Prack, the director of the Special Housing/Inmate disciplinary program, who reversed the guilty determination on the ground that "the evidence used fails to provide enough information to support the charges." Dkt. No. 57 at 49. Therefore, after sixty-nine days, Lewis was released

Slip Copy, 2014 WL 3729362 (N.D.N.Y.)
**(Cite as: 2014 WL 3729362 (N.D.N.Y.))**

from the SHU. Compl. ¶ 45.

## II. Discussion

Lewis contends that (1) all defendants deprived him of his Fourteenth Amendment rights by denying him procedural due process in connection with the disciplinary hearings at issue and (2) defendants Miller, Matthews, Murphy, and Gutwein conspired against him to cover up Murphy's improper commencement of the hearing.

Defendants seek summary judgment dismissing the complaint in its entirety. Defs.' Mem. of Law (Dkt. No. 46–2) at 3. Defendants specifically move for summary judgment on the grounds that: (1) Lewis failed to establish a due process claim; (2) Lewis failed to establish an actionable conspiracy claim; and (3) defendants are entitled to qualified immunity. *Id.* Additionally, Matthews moves for summary judgment for lack of personal involvement. *Id.*

### A. Legal Standard

**\*5** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by *pro se* litigants," ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law...."

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 3729362 (N.D.N.Y.)
**(Cite as: 2014 WL 3729362 (N.D.N.Y.))**

### B. Personal Involvement

**\*6** "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).[FN5] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g., Brown v. Artus,* 647 F.Supp.2d 190, 200 (N.D.N.Y.2009).

FN5. Various courts in the Second Circuit have postulated how, if at all, the *Iqbal* decision affected the five *Colon* factors which

were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated *Iqbal* 's impact on the five *Colon* factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N.Y.2010) (holding that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that *Iqbal* eliminated *Colon* 's personal involvement standard).

Lewis has failed to establish the personal involvement of defendant Matthews in allegedly depriving him of his Fourteenth Amendment due process rights by filing a Tier III hearing extension request. Lewis contends that Matthews filed a Tier III hearing extension form that falsely indicated Gutwein as the hearing officer, the hearing had not yet commenced, and the dates for which Lewis would be out of the facility for an unrelated trial. Compl. ¶ 10. Matthews attested that the notation "Contact: Matthew" on the extension request did not refer to him. Rather, the extension requests are submitted by members of Coxsackie's Discipline Office; hence, it can be inferred that the notation refers to a clerical staff member in the Discipline Office. Therefore, Matthews did not participate directly in the alleged constitutional violation. Matthews Decl. (Dkt. No. 46–16) ¶ 10; Dkt. No. 46–17. Furthermore, Matthews attested that he was not even aware of Lewis's disciplinary hearing or the extension request until after the lawsuit was filed. Matthews Decl. (Dkt. No. 46–16) ¶ 11. Accordingly, Matthews could not have failed to remedy any wrong after he was informed of the violation through a report or appeal, since he was never informed of any violation.

In addition, Matthews did not exhibit deliberate

Slip Copy, 2014 WL 3729362 (N.D.N.Y.)
**(Cite as: 2014 WL 3729362 (N.D.N.Y.))**

indifference to Lewis's rights by failing to act on in-formation indicating that unconstitutional acts were occurring because Matthews had no information in-dicating that any wrong was occurring. Matthews also attested that he had no supervisory role over Cox-sackie's inmate disciplinary program; consequently, Matthews could not have created or allowed the con-tinuation of a policy or custom under which uncon-stitutional practices occurred. Matthews Decl. ¶ 2. Lastly, since Matthews held no supervisory authority over the inmate disciplinary program, he could not have been grossly negligent in supervising subordi-nates who committed the allegedly wrongful acts. *Id.* Lewis points to no evidence in the record to substan-tiate his assertions that Matthews created the exten-sion request. Moreover, Lewis testified in his deposi-tion and indicated in his response papers that he vol-untarily withdraws his claims against Matthews. Lewis Dep. # 2 (Dkt. No. 46–7) at 28; Resp. (Dkt. No. 57) at 9. It is fair to conclude that a rational finder of fact would determine that these assertions are merely speculative and therefore, Lewis cannot establish the personal involvement of Matthews in the alleged unconstitutional actions.

**\*7** Accordingly, defendants' motion on this ground should be granted.

### C. Fourteenth Amendment

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall ... deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV § 1. It is important to emphasize that due process "does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished without due process of law." *Baker v. McCollan,* 443 U.S. 137, 145 (1979) (internal quotation and citations omitted). "A liberty interest may arise from the Con-stitution itself, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (citations omit-ted). An inmate retains a protected liberty interest in

remaining free from segregated confinement if the prisoner can satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995).

### 1. Liberty Interest

To state a claim for procedural due process, there must first be a liberty interest which requires protec-tion. *See generally Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) ("[Procedural] due process ques-tions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that depriva-tion were constitutionally sufficient.") (citing *Ken-tucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the pris-oner's segregated confinement relative to the condi-tions of the general prison population" are to be con-sidered. *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998). This standard requires a prisoner to establish that the confinement or condition was atyp-ical and significant in relation to ordinary prison life. *See Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (citations omitted). The Sec-ond Circuit has not established "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (citations omitted). Instead, the Second Circuit has provided guidelines that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the condi-tions of confinement relative to ordinary prison con-ditions is required." *Id.* at 64–65 (citing *Colon,* 215 F.3d at 232). In the absence of a dispute about the conditions of confinement, summary judgment may

be issued "as a matter of law." *Id.* at 65 (citations omitted). Conversely, where an inmate is confined under normal SHU conditions for a duration in excess of an intermediate disposition, the length of the confinement itself is sufficient to establish atypicality. *Id.* (citing *Colon,* 215 F.3d at 231–32). Also, "[i]n the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short—e.g. 30 days—and there was no indication [of] ... unusual conditions." *Harvey v. Harder,* No. 09–CV–154 (TJM/ATB), 2012 WL 4093792, at *6 (N.D.N.Y. July 31, 2012) (citing *inter alia Palmer,* 364 F.3d at 65–66).[FN6]

> **FN6.** All unpublished opinions cited to by the Court in this Report–Recommendation are, unless otherwise noted, attached to this Recommendation.

**\*8** Defendants contend that Lewis has failed to demonstrate that he suffered from atypical and significant confinement and therefore cannot establish a protected liberty interest. The Court considers factors such as the length of time the prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" to determine whether the prisoner can establish a liberty interest in remaining free from segregated confinement. *Palmer,* 364 F.3d at 64–65. The length of time in which Lewis spent in confinement was sixty-nine days, which is less than an intermediate amount of time. As such, the length of time itself cannot determine that the confinement was atypical and significant. Therefore, the Court determines if the confinement is atypical and significant by looking at the conditions of the segregated confinement compared to ordinary prison conditions.

Lewis contends that his confinement was atypical and significant because he was deprived of: (1) communications with the outside world; (2) an op-

portunity to possibly donate a kidney to his sister; (3) religious practices due to the unsanitary conditions of his confinement; (4) participation in the ART program; and (5) interaction with other inmates during activities like group chow and congressional prayer.[FN7] Dkt. No. 57 at 12–14. In New York, under "normal SHU conditions" an inmate is:

> **FN7.** Lewis may be attempting to raise First Amendment claims based on the denial of attendance to congregated services and sanitary conditions of his SHU cell. However, these claims were not specifically pled in the original complaint. Moreover, Lewis made no attempt to amend his complaint to include these claims. Therefore, the Court addresses these issues as arguments for establishing a liberty interest for purposes of a Fourteenth Amendment claim.

placed in a solitary confinement cell, kept in his cell for twenty-three hours a day, permitted to exercise in the prison yard for one hour a day, limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors were permitted but the frequency and duration was less than in general population. The number of books allowed in the cell was also limited.

*Colon,* 215 F.3d at 230; *see also* N.Y. COMP.CODES R. & REGS. tit. 7, §§ 304.1–.14, 305.1–.6 (setting forth minimum conditions of SHU confinement). Lewis's confinement was of a similar kind, with twenty-three hours a day of isolation, an hour of recreation, and denial of telephone and commissary privileges. Such a claim falls short of establishing a liberty interest as Lewis fails to allege any particular condition or further deprivation outside of those generally applicable to the incidents of prison life in SHU confinement. *Vasquez,* 2 F.Supp.2d at 259; *Frazier,* 81 F.3d at 317 (explaining that while prisoners in SHU may be de-

Slip Copy, 2014 WL 3729362 (N.D.N.Y.)
**(Cite as: 2014 WL 3729362 (N.D.N.Y.))**

prived of "certain privileges that prisoners in the general population enjoy," there exists no liberty interest in remaining a part of the general prison population); *see also Alvarado v. Halle Hous. Assoc.,* 152 F.Supp.2d 355, 355 (S.D.N.Y.2001) (finding restrictions such as loss of phone privileges, one hour of exercise a day, and three showers per week, fail to meet *Sandin* requirements).

**\*9** Lewis's inability to communicate with the outside world through phone or post for the purpose of transplanting his kidney to his sister or otherwise is not considered atypical because loss of telephone privileges is an aspect of SHU confinement in New York and courts have held that this would not violate an inmate's constitutional rights. *See Long v. Crowley,* No. 09–CV–456(F), 2012 WL 1202181, at \*11 (W.D.N.Y. March 22, 2012) (sixty days in keeplock with loss of telephone and commissary privileges is not a protected liberty interest); *Borsock v. Early,* No. 03–CV–395 (GLS/RFT), 2007 WL 2454196, at \*9 (N.D.N.Y. Aug. 22, 2007) (GLS/RFT) (finding that a ninety-day confinement in SHU with a ninety-day loss of packages, commissary and telephone privileges is insufficient to raise a liberty interest).

Lewis has failed to show that his unsatisfactory discharge from his ART programming due to his placement in SHU posed an atypical and significant hardship. Compl. ¶ 46; *Thompson v. LaClair,* No. 08–CV–37 (FJS/DEP), 2009 WL 2762164, at \*8 (N.D.N.Y. Jan. 30, 2009) (plaintiff's inability to participate in ASAT, ART, and MAWP programs not atypical and significant hardship); *Deutsch v. U.S.,* 943 F.Supp. 276, 280 (W.D.N.Y.1996) (holding that prisoners do not have a protected liberty interest in rehabilitative programs). Moreover, Lewis was able to complete this program after his release from SHU. Lewis Dep. # 1 at 69:7–14.

Lewis's claim that his exclusion from group activities posed an atypical and significant hardship is also unfounded because SHU confinement usually segregates the inmate from the rest of the prison and therefore, the inmate would be unable to participate in group activities. *Sealey v. Coughlin,* 997 F.Supp. 316, 321 (N.D.N.Y.1998) ("plaintiff's administrative segregation in SHU was not an atypical and significant hardship"); *Edmonson v. Coughlin,* 21 F.Supp.2d 242, 249, 250 (W.D.N.Y.1998) (plaintiff's inability to participate in congregate activities such as group counseling, and religious services during his eight months of administrative segregation is not a protected liberty interest).

Lastly, in his opposition papers to the instant motion, Lewis claims that the unsanitary conditions of his cell posed an atypical and significant hardship. Lewis contends that he was "restrained from practicing the prerequisite [rituals] associated with performing his prayers" while in SHU because the cells were unsanitary, he had to share a cell, the correctional officers gave him showers at their choosing, and he was not given a shower three times a week. Dkt. No. 57 at 15–16. Lewis contends that his cell always accumulated dirt and dust, was cleaned once a week with a dirty sponge without any germicidal cleaning agents, and the water used was "black from prior use of 20 or more cells." *Id.*

Courts have found that the denial of a clean cell and personal hygiene items, as well as double-celling in SHU, do not constitute an atypical and significant hardship. *See Davidson v. Murray,* 371 F.Supp.2d 361, 364, 369 (W.D.N.Y.2005) (concluding that the denial of hygiene items and cleaning materials is not an atypical and significant hardship); *McNatt v. Unit Manager Parker,* No. 99–CV–1397 (AHN), 2000 WL 307000, at \*4, \*8 (D.Conn. Jan. 18, 2000) (finding stained, smelly mattresses, unclean cell, no cleaning supplies for toiletries for six days, no shower shoes, and dirty showers during SHU confinement do not constitute a constitutional violation of due process); *Bolton v. Goord,* 922 F.Supp. 604, 630 (S.D.N.Y.1998) (finding double-celling of inmates is not considered an atypical and substantial hardship).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 3729362 (N.D.N.Y.)
**(Cite as: 2014 WL 3729362 (N.D.N.Y.))**

Nevertheless, a finder of fact may conclude that Lewis's cell conditions in conjunction with the denial of three showers a week to constitute an atypical and significant hardship that amount to a protected liberty interest. *See, e.g., Welch v. Bartlett,* 196 F.3d 389, 393 (2d Cir.1999) (stating that allegations of "inadequate amounts of toilet paper, soap and cleaning materials, a filthy mattress, and infrequent changes of clothes" may be a constitutional violation). Drawing every inference in Lewis's favor, these conditions were present during the entirety of Lewis's SHU confinement. Moreover, defendants do not specifically address these allegations with argument or evidence. Therefore the Court will proceed as though Lewis has established a protected liberty interest.

### 2. Procedural Due Process

**\*10** Defendants argue that Lewis was afforded ample due process. While inmates are not given "the full panoply of [due process] rights," they are still afforded procedural due process. *Wolff v.. McDonnell,* 418 U.S. 539, 556 (1974). A prisoner is "entitled to advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira v.. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citations omitted).

### a. Written Notice

In this case, Lewis received proper written notice. An inmate must be provided advance written notice of the charges against him at least twenty-four hours before the disciplinary hearing commences. *Wolff,* 418 U.S. at 563–64. Notice must be written "in order to inform [the inmate] of the charges and to enable him to marshal the facts and prepare a defense." *Id.* at 564. When Lewis was brought to the hearing by Murphy on November 10, 2011, Lewis had not yet received written notice of the charges. Murphy attested that once Lewis stated he did not receive a copy of the misbehavior report or inmate assistance, Murphy stopped the hearing immediately. Murphy attested that no testimony was taken, he did not review any documentary evidence other than the misbehavior report, and did not discuss the statements in the misbehavior report with Lewis. Murphy Decl. ¶ 16. Lewis was then provided a copy of the misbehavior report and inmate assistance on the same day. On November 21, 2011, Gutwein took over Lewis's Tier III disciplinary hearing. Even assuming Murphy had commenced the hearing, the ultimate penalty imposed on Lewis was by Gutwein based on the evidence presented on November 21, 2011. Lewis received a copy of the misbehavior report on November 10, 2011, well in advance of the November 21, 2011 hearing date. As such, Lewis received advanced written notice of the charges against him.

Accordingly, defendants' motion on this ground should be granted.

### b. Opportunity to Call Witnesses and Present Documentary Evidence

Lewis contends that he was deprived of an opportunity to call all his requested witnesses and present some documentary evidence. However, "[i]t is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] ... on the basis of irrelevance or lack of necessity." *Scott v. Kelly,* 962 F.2d 145, 146–47 (2d Cir.1992). With respect to documentary evidence, Lewis requested the admission of the logbooks as evidence to show that he had already been taken for a disciplinary hearing regarding the same misbehavior report. Hr'g Tr. at 19. Gutwein correctly denied this request because they were irrelevant to the charges in the misbehavior report and would not have aided in Lewis's defense to such charges. Gutwein Decl. ¶¶ 33–34. As for the November 5, 2011 letter, Gutwein allowed for a copy of it to be placed in the hearing packet as evidence. Hr'g Tr. at 8.

**\*11** As for witnesses, Gutwein permitted Martin

Slip Copy, 2014 WL 3729362 (N.D.N.Y.)
**(Cite as: 2014 WL 3729362 (N.D.N.Y.))**

to testify at Lewis's disciplinary hearing but denied the request for Murphy, Stevenson, and J. Lewis on relevance grounds because their testimonies would have concerned the alleged defects in the disciplinary hearing rather than the charges giving rise to the hearing. Gutwein Decl. ¶ 28. Furthermore, since Martin was to testify to the content of the November 5, 2011 letter, Gutwein denied testimonies from Martuscello and Fischer on the grounds that they would be unnecessary and duplicative. *Id.* ¶ 32.

Lewis was provided with an opportunity to question Martin through Gutwein. "While inmates do have the right to question witnesses at their disciplinary hearings, that right is not unlimited and its contours are under the discretion of prison officials." *Rivera v.. Wohlrab,* 232 F.Supp.2d 117, 125 (S.D.N.Y.2002). Thus, Gutwein retained the authority to administer the questioning in a manner he saw fit. Gutwein did not permit Lewis to ask every question, but Gutwein offered reasoning for the denial of certain questions that Lewis wanted to ask. Hr'g Tr. at 9–18. A review of the hearing transcript shows that Lewis was permitted to question Martin rather extensively until Lewis was finished. *Id.* As such, Lewis was provided an opportunity to call witnesses and present documentary evidence. *Sira,* 380 F.3d at 69.

Accordingly, defendants' motion on this ground should be granted.

### c. Fair and Impartial Hearing Officer

Lewis contends that Gutwein was not an impartial hearing officer because Gutwein had not allowed Lewis to call his requested witnesses and denied him the standard and legal definitions of bribery, extortion, and threats. Prisoners have a constitutional right to a fair and impartial hearing officer. *See, e.g., Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). However, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges ... [as i]t is well recognized that prison disciplinary hearing officers are not held to the same

standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citations omitted). The Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] .." and the Second Circuit has held that the test is whether there was " 'reliable evidence' of the inmate's guilt." *Luna v. Pico,* 356 F.3d 481, 487–88 (2d Cir.2004); *see also Superintendent, Mass. Corr. Inst. v. Hill,* 472 U.S. 445, 455 (1985).

As discussed *supra,* "[i]t is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] ... on the basis of irrelevance or lack of necessity." *Scott v. Kelly,* 962 F.2d 145, 146–47 (2d Cir.1992). Therefore, Gutwein was within his discretion to deny the calling of certain witnesses and the admission of certain evidence.

**\*12** Even though Lewis's guilty determination was reversed, it is not clear evidence that Gutwein was not a fair and impartial hearing officer. The determination was reversed on the grounds that there was insufficient evidence to support the charges, not on any procedural defects. Dkt. No. 57 at 49. The record shows no indication that Gutwein was biased and failed to serve a fair and impartial hearing officer. It is unclear to the Court how the denial of the requested definitions served as evidence of bias on Gutwein's part. Rather, it is clear from the hearing transcript that Gutwein allowed Lewis to state all of his objections for the record and question Martin as much as he needed to. *See generally* Hr'g Tr.

Gutwein had reliable evidence of Lewis's guilt, which is presented in his statement of the evidence relied upon. Gutwein relied on the statements in the November 5, 2011 letter that stated Lewis would 'blow the whistle' on wrongdoings in the facility and Martin's testimony regarding the ultimatums made by Lewis. Hr'g Tr. at 20–21. Lewis had admitted to writing the November 5, 2011 letter. *Id.* at 6. Gutwein's determination was made to impress upon Lewis

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 3729362 (N.D.N.Y.)
**(Cite as: 2014 WL 3729362 (N.D.N.Y.))**

that it is a serious violation to threaten employees, which would not be tolerated at the correctional facility and that he should modify his behavior in the future. Lewis points to no evidence in the record to show that Gutwein came to his determination improperly. As such, despite Lewis's contentions of bias, the record is clear that there is no question of material fact regarding the process that Lewis was provided.

Accordingly, defendants' motion on this ground should be granted.

### d. Written Statement of Disposition

It is undisputed that Lewis received a written statement of the hearing disposition. On November 21, 2011, Lewis was present when Gutwein rendered his decision on the misbehavior report. Hr'g Tr. at 20–21. The record indicates that Lewis received a written statement of the evidence relied upon and the reasons for the disciplinary action. *Id.;* Dkt. No. 46–11 at 9. Thus, Lewis was provided with a written statement of the Tier III disciplinary hearing disposition. *Sira,* 380 F.3d at 69.

Accordingly, defendants' motion on this ground should be granted.

### e. Inmate Assistance

"An inmate's right to assistance with his disciplinary hearing is limited." *Neree v. O'Hara,* No. 09–CV–802 (MAD/ATB), 2011 WL 3841551, at *13 (N.D.N.Y. July 20, 2011) ( *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993)). This Circuit has held that an assistant is constitutionally necessary when the plaintiff is confined in SHU and unable to marshal evidence and present a defense. *Id.* (citation omitted). In such a case, the assistant need only perform what the plaintiff would have done but need not go beyond the inmate's instructions. *Lewis v. Johnson,* No. 08–CV–482 (TJM/ATB), 2010 WL 3785771, at *10 (N.D.N.Y. Aug. 5.2010) (citing *Silva,* 992 F.2d at 22). Furthermore, "any violations of this qualified right are re-

viewed for 'harmless error.' " *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437 (W.D.N.Y.2010) (citing *Pilgrim v. Luther,* 571 F.3d 201, 206 (2d Cir.2009)). Lewis was confined in SHU from November 7, 2011, onward and thus was entitled to an inmate assistant. Dkt. No. 46–12 at 5; N.Y. COMP.CODES R. & REGS. tit. 7 § 251–4.1(a)(4).

**\*13** Lewis alleges that he was deprived of adequate inmate assistance. Lewis first met with his inmate assistant, Counselor Lewis, on November 10, 2011. According to Lewis, Counselor Lewis refused to give him definitions of the charges against him and interview potential witnesses. Counselor Lewis denies that she was asked to give explanations of the charges and notes that the alleged request is not indicated on the assistant form. Lewis Decl. ¶ 9; Dkt. No. 46–17. Gutwein had also denied Lewis's request for the definitions of threats, bribery, and extortion during the hearing on relevance grounds.

Taking Lewis's version of events as true, even if Counselor Lewis failed to provide such definitions of the charges, Lewis does not demonstrate that he was somehow prejudiced as a result of this error, and does not show that he was unable to present a defense or that the outcome of the hearing would have been different had Counselor Lewis provided such definitions. *Clark v. Dannheim,* 590 F.Supp.2d 426, 429–31 (W.D.N.Y.2008) ("To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing." (citation omitted)).

Furthermore, Lewis was able to present a defense and pose questions to Martin that evinced an understanding of the charges. *See generally* Hr'g Tr. at 5–18. For example, Lewis asked Martin whether the November 5, 2011 letter contained any threats of harm, which suggests that Lewis had some understanding of what constitutes "threat." *Id.* at 9. Lewis

Slip Copy, 2014 WL 3729362 (N.D.N.Y.)
**(Cite as: 2014 WL 3729362 (N.D.N.Y.))**

then asked "did I—anything of value to or from—Martuscello, yourself or anyone," which shows that Lewis understood the nature of the extortion charge. *Id.* at 10. Lastly, Lewis asked "did I give or attempt to give—money, gifts,—or anything worth—value ... to ... Superintendent Martuscello and—or—administrator ...." This demonstrates that Lewis had an understanding of what bribery meant. *Id.* at 11.

Lewis also alleged that Counselor Lewis failed to interview Martuscello or Fischer but does not show how this would have changed the outcome of the hearing or how this failure prejudiced him as a result. Therefore, any shortcomings in the assistance rendered by Counselor Lewis was harmless error and does not rise to the level of a due process violation. *Hernandez v. Selsky,* 572 F.Supp.2d 446, 455 (S.D.N.Y.2008) (plaintiff failed to show how outcome of hearing would have been different had employee assistant interviewed witnesses, and thus any alleged inadequate assistance was harmless error not warranting denial of summary judgment). Additionally, even though Gutwein failed to provide an explanation of the charges, Lewis was not prejudiced as a result because Gutwein described in his hearing disposition the evidence he relied upon to determine that Lewis was guilty. An explanation of these charges to Lewis would not have changed the evidence which Gutwein had relied upon. As such, Lewis's due process claim based on inadequate inmate assistance must fail.

**\*14** Accordingly, defendants' motion for on this ground should be granted.

### f. Timeliness

Lewis contends that the Tier III disciplinary hearing concerning the November 7, 2011 misbehavior report was not commenced in a timely manner because his hearing did not begin until November 21, 2011. Where an inmate is confined pending a disciplinary hearing, the hearing must commence within seven days of his initial confinement and conclude

within fourteen days of the writing of the misbehavior report. N.Y. COMP.CODES R. & REGS. tit. 7 § 251–5.1(a)(b); [FN8] Dkt. No. 46–12 at 5–6. The Commissioner of Correctional Services or his designee must authorize any delay beyond those time limits. N.Y. COMP.CODES R. & REGS. tit. 7 § 251–5.1(a)(b); Dkt. No. 46–12 at 5–6.

FN8. Section 251–5.1, states that

(a) Where an inmate is confined pending a disciplinary hearing or superintendent's hearing, the hearing must be commenced as soon as is reasonably practicable following the inmate's initial confinement pending said disciplinary hearing or superintendent's hearing, but, in no event may it be commenced beyond seven days of said confinement without authorization of the commissioner or his designee.

(b) The disciplinary hearing or superintendent's hearing must be completed within 14 days following the writing of the misbehavior report unless otherwise authorized by the commissioner or his designee. Where a delay is authorized, the record of the hearing should reflect the reasons for any delay or adjournment, and an inmate should ordinarily be made aware of these reasons unless to do so would jeopardize institutional safety or correctional goals.

(c) Violation hearings must be completed within seven days of the writing of the misbehavior report.

N.Y. COMP.CODES R. & REGS. tit. 7 § 251–5.1.

Lewis's Tier III hearing was timely commenced.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 3729362 (N.D.N.Y.)
**(Cite as: 2014 WL 3729362 (N.D.N.Y.))**

Although Lewis's hearing was initially required to commence by November 14, 2011, an extension was granted until November 18, 2011 because Lewis was scheduled to be out of the facility from November 14, 2011 through November 18, 2011, and no staff was available to conduct the hearing before that time period. Gutwein Decl. ¶ 21; Dkt. No. 46–13. A second request was made on November 17, 2011 because no hearing officer was available to conduct plaintiff's hearing until November 21, 2011. Gutwein Decl. ¶ 22; Dkt. No. 46–13. DOCCS Central Office Special Housing Unit granted the facility permission to commence Lewis's hearing by November 21, 2011 and the hearing commenced on that date. Dkt. No. 46–13. Therefore, the hearing was commenced in a timely manner in accordance with the pertinent New York regulations.

Accordingly, defendants' motion on this ground should be granted.

### D. Conspiracy

Lewis claims that defendants Murphy, Miller, and Gutwein conspired to deny him procedural due process. To establish a claim under Section 1985(3), a plaintiff must allege that (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff, and (2) an overt act was committed in furtherance of that goal. *Ciambriello v. Cnty. of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002). Conclusory, vague, and general allegations are insufficient to support a conspiracy claim. *Ciambriello,* 292 F.3d at 325. Therefore, the plaintiff must provide some details of the time, place, and the alleged affects of the conspiracy, which would include facts to demonstrate that there was an agreement between the defendants to achieve some unlawful goal. *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted).

In this case, defendants all deny conspiring to cover up the hearing that was allegedly commenced by Murphy. Lewis Dep. # 2 at 1–8; Gutwein Decl. ¶ 39;

Miller Decl. ¶ 17; Matthews Decl. ¶ 12; Murphy Decl. ¶ 11. Lewis points to no evidence in the record to show that there was an agreement between the defendants to deprive him of his constitutional rights. Lewis alleges that the defendants conspired to cover up Murphy's attempt to start the Tier III disciplinary hearing because Murphy could not have served as the hearing officer. Murphy stated that he stopped the hearing once he realized that Lewis had not received a copy of the misbehavior report. Lewis was provided a copy and the hearing commenced on November 21, 2011 with Gutwein as the hearing officer. Therefore, there was no wrongdoing on Murphy's part for the defendants to cover up.

**\*15** Lewis alleges that there must have been an agreement to conspire against him because of the alleged discrepancies and false statements in the extension requests, Miller's letter ruling on the appeal, and other prison forms. These allegations are conclusory and do not provide any evidence that the defendants made an actual agreement to deprive Lewis of his constitutional rights. Furthermore, as discussed *supra,* there was no deprivation of Lewis's constitutional rights and therefore there can be no valid conspiracy claim.

Moreover, Lewis's conspiracy claim fails on the grounds that it is barred by the intra-corporate conspiracy doctrine. The doctrine states that "officers, agents and employees of a single corporate entity are legally incapable of conspiring together." *Nassau Cnty. Employee "L" v. Cnty. of Nassau,* 345 F.Supp.2d 293, 304 (E.D.N.Y.2004) (internal citations and quotation marks omitted). The doctrine applies when officers and officials are working in the scope of their official duties. *Id.* Although the doctrine began in cases involving corporations, the doctrine has been extended where there are allegations of conspiracy between a public entity and its employees. *Id.; see also Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 76 (E.D.N.Y.2002) (collecting cases). This doctrine would therefore exclude conspiracy

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 3729362 (N.D.N.Y.)
**(Cite as: 2014 WL 3729362 (N.D.N.Y.))**

claims against employees of DOCCS working within the scope of their employment. *Hartline v. Gallo,* 546 F.3d 95, 99, n. 3 (2d Cir.2008) (citations omitted); *Little v. City of New York,* 487 F.Supp. 426, 441–42 (S.D.N.Y.2007) (citations omitted). There is an exception to the doctrine when the individuals of the conspiracy are "pursuing personal interests that are separate and apart from the entity." *Nassau Cnty. Employee "L",* 345 F.Supp.2d at 304. Furthermore, personal bias is not considered a personal interest and is not within the exception to the intra-corporate conspiracy doctrine. *Everson,* 216 F.Supp.2d at 76 (citations omitted).

In this case, Lewis's allegations of conspiracy are against defendants who were all employees of DOCCS, which is one public entity, who were acting within the scope of their employment when they filed extension requests and other prison forms. Therefore, they are legally incapable of conspiring against each other. Lewis makes no allegation that the defendants were pursuing personal interest apart from their official duties. As such, Lewis's conspiracy claim fails as a matter of law.

Accordingly, defendants' motion on this ground should be granted.

### E. Qualified Immunity

Defendants contend that even if Lewis's § 1983 Fourteenth Amendment and conspiracy claims are substantiated, they are nevertheless entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 F. App'x 146 (2d Cir.2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity

might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230.

**\*16** Here, the second prong of the inquiry need not be addressed with respect to Lewis's Fourteenth Amendment and conspiracy claims against the defendants because, as discussed *supra,* it has not been shown that defendants violated Lewis's Fourteenth Amendment rights or conspired against Lewis to violate his Fourteenth Amendment rights.

Accordingly, defendants' motion on this ground should be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 46) is **GRANTED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 3729362 (N.D.N.Y.)
**(Cite as: 2014 WL 3729362 (N.D.N.Y.))**

    Dated: June 27, 2014.

N.D.N.Y.,2014.
Lewis v. Murphy
Slip Copy, 2014 WL 3729362 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
**(Cite as: 2007 WL 1500382 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Detroy LIVINGSTON, Plaintiff,
v.
P. GRIFFIN, Correction Captain, State of New York
Correctional Services (DOCS); Donald Selsky, Di-
rector of Special Housing for DOCS; R. Lee, Correc-
tion Officer (C.O.); S. Hurteau, C.O.; S. Gawlicky
C.O.; LeFrance, Sergeant of DOCS; M. Foster, C.O.;
D. Abair, C.O.; S. Salls, Sergeant of DOCS; J.
Bouyea, C.O., Defendants.

No. 9:04-cv-00607-JKS.
May 21, 2007.

Detroy Livingston, Elmira, NY, pro se.

Bridget Erin Holohan, New York State Attorney
General, the Capitol Albany, NY, for Defendants.

MEMORANDUM DECISION and ORDER
JAMES K. SINGLETON, JR., United States District
Judge.

### I. MOTION PRESENTED

**\*1** At Docket No. 56 defendants P. Griffin, Don-
ald Selsky, R. Lee, Scott Hurteau, S. Gawlicky, G.
LeFrance,[FN1] M. Foster, D. Abair, S. Salls and J.
Bouyea have moved for summary judgment in their
favor under FED.R.CIV.P. 56. At Docket No. 62
Plaintiff Detroy Livingston has opposed the motion to
which Defendants replied at Docket No. 66. After
reviewing the moving and opposing papers the Court
has determined that the issues are fully briefed and
oral argument would not assist the Court in ruling on
the motion. The matter is decided on the moving and
opposing papers.

FN1. In various documents filed with the
Court, "LeFrance" is spelled "LaFrance." For
purposes of consistency the Court will use
the LeFrance spelling in this memorandum
decision and order.

### II. BACKGROUND/JURISDICTION

Plaintiff Detroy Livingston ("Livingston") is an
inmate in the custody of the New York Department of
Correctional Services ("DOCS") incarcerated at the
Coxsackie Correctional Facility, Coxsackie, New
York. Defendants P. Griffin ("Griffin"), Donald
Selsky ("Selsky"), R. Lee ("Lee"), Scott Hurteau
("Hurteau"), S. Gawlicky ("Gawlicky"), G. LeFrance
("LeFrance"), M. Foster ("Foster"), D. Abair
("Abair"), S. Salls ("Salls") and J. Bouyea ("Bouyea")
are all employees of DOCS in various capacities.
Livingston, appearing *pro se,* has sued all the de-
fendants in their individual capacities under 42 U.S.C.
§ 1983 alleging various violations of his civil rights
under the Constitution and laws of the United States in
17 causes of action. These causes of action are divided
into seven separate claims at three separate correc-
tional facilities.

In his first count, Livingston sets forth his first
four causes of action alleging that Griffin denied him
due process of law under the Sixth and Fourteenth
Amendments arising out of a disciplinary hearing.
Livingston's fifth cause of action, contained in his
second count, alleges that Selsky in reviewing and
modifying the disposition of the disciplinary action
also violated his due process rights under the Sixth and
Fourteenth Amendments. The third count contains the
sixth and seventh causes of action alleging that Lee
inflicted cruel and unusual punishment on him in
violation of the Eighth and Fourteenth Amendments
as well as violated New York law by feeding him

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
**(Cite as: 2007 WL 1500382 (N.D.N.Y.))**

foods mixed with unknown drugs. Livingston's fourth count contains Livingston's eighth and ninth causes of action alleging that Hurteau inflicted cruel and unusual punishment on him in violation of the Eighth and Fourteenth Amendments as well as violated New York law by feeding him foods mixed with unknown drugs. In his fifth count Livingston sets forth his tenth, eleventh, and twelfth causes of action alleging that Gawlicky fabricated a misbehavior report subjecting him to cruel and unusual punishment in violation of Fifth, Eighth and Fourteenth Amendments and provided false testimony that resulted in a violation of the Sixth and Fourteenth Amendments. In the sixth count, Livingston's thirteenth cause of action alleges that LeFrance tried to force him to be chained to a transsexual/homosexual contrary to Livingston's religious beliefs in violation of First and Fourteenth Amendments and the fourteenth cause of action alleges that Foster fabricated a misbehavior report arising out of his refusal to be transported while chained to a transsexual/homosexual in violation of his First and Fourteenth Amendments. Livingston's seventh count contain Livingston's fifteenth, sixteenth, and seventeenth causes of action alleging that Abair, Salls, and Bouyea, respectively, denied him religious meals in violation of the First, Eighth, and Fourteenth amendments.

**\*2** This Court has jurisdiction over the federal constitutional claims under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

### III. ISSUES PRESENTED

Defendants' Motion raises essentially two issues: (1) that there is insufficient evidence to support any of the claims made and (2) defendants Griffin, Selsky, Foster, LeFrance, Salls, Abair, and Bouyea are entitled to qualified immunity.

The claims under Count One and the Second Count raise the issue of the due process requirements in prisoner disciplinary actions to (1) compulsory

production of witness; (2) the extent to which documentary evidence used by the hearing officer in making his decision must be provided to the prisoner; and (3) whether a recording of the proceedings is constitutionally mandated.

The claims under the Third and Fourth Counts raise the issues of (1) whether expert testimony is required to establish a claim that food fed to an inmate was drugged and (2) whether a private cause of action exists for a violation of the New York penal Code.

The Fifth Count deals with the issue of whether temporal proximity between the filing of a complaint against a correctional officer and an adverse action (issuance of a misbehavior report), standing alone, is sufficient evidence to survive a summary judgment motion on a retaliation claim.

The Sixth Count presents the issue of whether a sincerely held religious belief that homosexuality is an abomination justifies a refusal to be shackled to or be compelled to sit next to a transsexual/homosexual individual.

The Seventh Count presents an issue of whether a prisoner's dietary restrictions must be central to his religious beliefs.

### IV. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if, when viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment in its favor as a matter of law. FED.R.CIV.P. 56(c); *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.2000). Support and opposition to a motion for summary judgment is made by affidavit made on personal knowledge of the affiant, depositions, answers to interrogatories, setting forth such facts as may be admissible in evidence. FED.R.CIV.P. 56(e). "A verified complaint is to be

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
**(Cite as: 2007 WL 1500382 (N.D.N.Y.))**

treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit under Rule 56(e)." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995); *see also* 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FED. PRAC. AND PROC. CIV. (3rd) § 1339 (noting that a verified pleading may serve as an affidavit only if it contains facts known to be true in the affiant's own knowledge and if it has a certain level of factual specificity).

In response to a properly supported motion for summary judgment, the opposing party must come forth with evidence that would be sufficient to support a jury verdict in his favor at trial. *Colon v. Coughlin, supra; Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995).[FN2] The issue of material fact required to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial. In order to show that a genuine issue of material fact exists a nonmoving plaintiff must introduce probative evidence that establishes the elements of the complaint. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49 (1986). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment." *Id., at 255.* All reasonable inferences are drawn in favor of the non-moving party and the moving party bears the burden of both production and persuasion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986). There is no genuine issue of fact if, on the record taken as a whole, a rational trier of fact could not find in favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Additionally, *pro se* litigants should generally be afforded "special solicitude"

regarding motions for summary judgment. *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir .1988).[FN3]

> FN2. The Court notes that in their motion Defendants offer DOCS records that although authenticated by counsel are not properly authenticated by the custodian of records. However, Plaintiff has not objected to their use and their admissibility at trial is not subject to dispute. Consequently, the Court will consider the records. *See H. Sand & Co. v. Airtemp Corp.,* 934 F.2d 450, 454-55 (2d Cir.1991).

> FN3. The Court need not, however, accept conclusory statements or allegations. *Davis v. New York,* 316 F.3d 93, 100 (2d Cir.2004).

### V. DISCUSSION

**A. Denial of Due Process Claims (Count One-Griffin; Second Count-Selsky).**

**\*3** The basic facts underlying these claims is not disputed. On November 27, 2001, Livingston was issued a misbehavior report charging him with violating prison rules 100.11 (assault on staff) and 106.10 (direct order). Griffin conducted a disciplinary hearing on November 30, December 5, and December 8, 2001. Livingston's defense was that the C.O. assaulted him by pushing him down the stairs.[FN4] Eight witnesses testified at the hearing, one inmate witness refused to testify, and Griffin denied Livingston's request to call the facility doctor as a witness. Livingston was provided a copy of the denial of witness form. Livingston was furnished and submitted a redacted copy of the unusual incident report and the officers' "To/From" forms, which comprise the report. Following the hearing, Livingston was found guilty and sentenced to 36 months in the special housing unit ("SHU"). Livingston appealed the guilty disposition and sentence to Selsky, Director of Special Housing/Inmate Disciplinary Program. Selsky affirmed the guilty disposition, but modified the sentence imposed to 12 months in the SHU.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
**(Cite as: 2007 WL 1500382 (N.D.N.Y.))**

**FN4.** The C.O. who filed the complaint against Livingston, T. Notobartolo, is not a party to this lawsuit.

Livingston alleges that Griffin violated his Sixth and Fourteenth due process rights by: (1) failing to call witnesses; (2) taking testimony off the record; (3) denying Livingston documentary evidence; (4) failing to personally ascertain whether an inmate witness in fact refused to testify and failing to provide him with the refusal to testify form; and (5) knowingly used a defective tape recorder. With respect to Selsky, Livingston alleges that, notwithstanding the reduction in the sentence to the SHU, in affirming the finding of guilt notwithstanding the due process violations, Selsky also violated Livingston's Sixth and Fourteenth Amendment due process rights.

In his complaint Livingston alleges:

20. On November 30, 2001 Plaintiff informed defendant P. Griffin that he wanted to call all the c.o.'s as witnesses that responded to the incident because he did not know their names.

21. Defendant P. Griffin failed to call but four of the c.o.'s that responded to the incident.

22. There was over ten c.o's that responded to the November 26, 2001 incident.

23. C.O. Keller witnessed part of the incident and he gave defendant P. Griffin the name of another C.O. that responded to the incident during a off-the-record testimony which Plaintiff over heard.

24. When Plaintiff requested the C.O. whose name c.o. Keller gave to defendant P. Griffin to be call as a witness he refused to call him or disclose the name.

25. Defendant P. Griffin's off-the-record testimony violated Title 7 NYCRR § 254.6(b).

26. Defendant P. Griffin denied Plaintiff the injury report of C .O. T. Notobartolo concerning the November 26, 2001 incident.

27. Defendant P. Griffin denied Plaintiff the institution doctor as a witness at the hearing.

28. Defendant P. Griffin did not personally ascertain whether inmate Shabazz in fact refused to testify at the hearing, and place his findings on the record.

**\*4** 29. Defendant P. Griffin did not furnish Plaintiff with any of the forms to explain the refusal of witnesses, refusal to testify, nor denial of documentary evidence.

30. Defendant P. Griffin refused Plaintiff the Unusual incident report, and accident reports even though he promised that he will.

31. Defendant P. Griffin knowningly [*sic* ] used a defective tape recorder which did not clearly record Plaintiff's objections and conclusions.

The minimum due process requirements for prison disciplinary proceedings were laid down by the United States Supreme Court more than 30 years ago in *Wolff v. McDonnell,* 418 U.S. 539, 563-71 (1974). Summarized, these include: (1) written notice of the charges; (2) sufficient time to marshal the facts and prepare a defense; (3) a limited or restricted right to call witnesses and present documentary evidence; and (4) a written statement by the fact finder as to the evidence relied upon and the reasons for the disciplinary action. Prison officials have the discretion to keep to keep a disciplinary hearing within limits and refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as limit the

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
**(Cite as: 2007 WL 1500382 (N.D.N.Y.))**

access to other inmates to collect statements or compile documentary evidence. Although not prescribed, it is useful for the reason for refusal to call a witness to be stated. Confrontation and cross-examination are not constitutionally required. Nor does the inmate have a right to counsel; however, where an illiterate inmate is involved or the complexity of the issues render it unlikely the that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case, he should be free to seek the aid of a fellow inmate, or if that is forbidden, to have adequate substitute aid in the form of help from the staff or from a sufficiently competent inmate designated by the staff.

Once a court has decided that the procedural due process requirements have been met, its function is to determine whether there is some evidence that supports the decision to impose discipline on the inmate. Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board. *Superintendent, Mass. Correctional Inst. v. Hill,* 472 U.S. 445, 454-55 (1985).

The ordinary disciplinary procedures of the New York prison system comport with the appropriate due process standards outlined in *Wolff. See Walker v. Bates,* 23 F.3d 652, 656 (2d Cir.1994). In a § 1983 civil rights action, the only relevant inquiry is whether the constitutional minimal requirement for imposing disciplinary punishment was met, not whether state procedures were followed. *Shakur v. Selsky,* 391 F.3d 106, 118-19 (2d Cir.2004). The record in this case clearly establishes that Plaintiff's constitutional due process rights were satisfied. Of the rights recognized in *Wolff* only the right of right to call witnesses and present documentary evidence is implicated in this case.

**\*5** The Court notes initially that, with respect to the disciplinary charge, only Plaintiff and C.O. T. Notobartolo were present during the altercation on the stairs. At the disciplinary hearing the two gave diametrically opposed versions of what occurred. According to the testimony of Notobartolo while he was escorting Livingston down the stairs Livingston turned and punched him in the side of the face. Notobartolo then grabbed Livingston in a bear hug in an upper body hold and the two tumbled down the stairs. After scrapping for a while, Notobartolo gained control of Livingston, rolled him over face forward, put his knee on Livingston's buttocks and held him while two other officers applied mechanical restraints. Livingston testified that Notobartolo pushed him down the stairs and that, while holding him down, Notobartolo mouthed to an unidentified officers to hit him (Notobartolo) in the face, which the unidentified officer did.

The two inmate witnesses testified as to what they observed prior to the time Notobartolo and Livingston entered the stairwell but did not observe what occurred in the stairwell. None of the other four correctional officers who testified, all of whom arrived on the scene after Notobartolo had regained control of Livingston in the stairwell, corroborated Livingston's testimony concerning the officer who allegedly was requested to and did hit Notobartolo.

Turning first to the unidentified C.O. who was not called (¶¶ 23 and 24). A review of the transcript and Livingston's statement of facts simply do not support the speculative and conclusory allegation that Griffin Keller identified the C.O. Livingston believes was present. Livingston was permitted to call every C.O. identified either by testimony or in a report submitted. Keller testified that he, Sgt. Shanley, C.O. Kukla, and an unidentified C.O. responded to the scene. C.O. Kukla testified that he, C.O. Keller, and C.O. Notobartolo were present and that C.O. Hemeon came later. Sgt. Shanley testified that he came on the scene after Livingston was under control. Griffin explained

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
**(Cite as: 2007 WL 1500382 (N.D.N.Y.))**

that he was unable to learn the identity of the C.O., which is clearly a valid reason for not calling the witness. Livingston's position in this case would go further and require Griffin to prove that he was unable to learn the identity. This, the Court may not do. *See Freeman v. Rideout,* 808 F.2d 949, 954 (2d Cir.1986) citing *Ponte v. Real,* 471 U.S. 491, 497 (1985). Moreover, while due process requires that an inmate be permitted to call witnesses in his defense, there is no authority for the proposition that due process requires the hearing officer to identify and locate witnesses for the inmate.

With respect to the recording allegations (¶¶ 25 and 31) due process does not require that the proceedings be recorded. Accordingly, while it may be contrary to New York law, the failure to record a part of the proceeding or use a defective recorder that does not accurately record the entire proceeding does not violate constitutional due process.

**\*6** As the hearing officer (Griffin) explained in denying access to C .O. Notobartolo's injury report (¶ 26), those records are confidential. Their relevance to the disputed issues is, at best, tangential. The extent of the injuries Notobartolo may have suffered was not at issue. Livingston does not cite and the Court's independent research does not reveal any authority for the proposition that, in the context of the disputed issues involved in this case, Livingston was entitled to see that report. Griffin also adequately and properly explained his denial of Livingston's request to call the institution doctor (¶ 27), *i.e.,* that testimony of the doctor, who was not at the scene and did not witness the incident, was irrelevant. All the institutional doctor could have testified to was the extent of Livingston's injuries, not how he incurred them. The Court notes that the injuries Livingston suffered were, by his own admission, as a result of falling down the stairs. Whether he was pushed, as Livingston alleges, or was grabbed and fell in the grasp of Notobartolo as Notobartolo alleges, is not a matter to which the doctor could competently testify. Since the refusal to call the

doctor was based upon irrelevance, that refusal was justified and did not violate constitutional due process. *Kingsley v. Bureau of Prisons,* 962 F.2d 145, 146-47 (2d Cir.1992).

With respect to the testimony of Shabazz (¶ 28), the hearing transcript shows that Griffin received the refusal form signed by Shabazz that he would not testify and heard the testimony of the C.O. who obtained and witnessed the signed refusal to testify form. Due process does not require, as Livingston suggests, that the hearing officer personally ascertain that a witness refuses to testify.

Finally, turning to Griffin's refusal to furnish the forms and denial of documentary evidence,[FN5] the unusual incident, and accident reports (¶¶ 29 and 30).[FN6] Livingston complains he was not furnished the refusal to testify form signed by Shabazz and an unredacted copy of the unusual incident report. The material redacted from the unusual incident report was a portion of a sentence that described the injuries received by Notobartolo. That was properly withheld from Livingston for the same reason as was the injury report. As for the refusal to testify form is concerned, as noted above, the hearing officer received the form and heard testimony concerning how it was obtained and signed. Even assuming that not giving it to Livingston (the transcript does not indicate that he requested a copy or to examine it) constituted a denial of due process, it was harmless. Livingston merely complains that he was not provided a copy of the refusal form but does not contend that Shabazz did not refuse or even make any offer as to what the testimony of Shabazz might be or what disputed issue of fact to which it might related.

FN5. Livingston does not identify what other documentary evidence he was denied.

FN6. The accident report is the injury report referred to in ¶ 26 and disposed of above.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
**(Cite as: 2007 WL 1500382 (N.D.N.Y.))**

Livingston's constitutional due process rights were not violated by either the Tier III hearing by Griffin or its review by Selsky. Moreover, with respect to Selsky, Livingston has failed to provide facts that even hint at, let alone establish, Selsky had a personal involvement in the alleged denial of his constitutional due process rights. See *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). Although he alleges that the complaint by the C.O. was "fabricated," the record contains ample evidence to support the finding that Livingston was guilty of the infractions of which he was charged. Griffin is entitled to judgment in his favor on Count One (First, Second, Third, and Fourth Causes of Action) and Selsky is entitled to judgment in his favor on the Second Count (Fifth Cause of Action).

**B. Cruel and Unusual Punishment-Food Drugging (Third Count-Lee; Fourth Count-Hurteau).**

**\*7** Livingston contends that on various dates in July 2002 Lee and Hurteau knowingly, intentionally, and deliberately served him food trays laced with unknown drugs. As a result each time Livingston ate the food he became dizzy, light headed, disoriented, sleepy and rendered unconscious. Livingston also contends that he had to file a felony complaint before the poisoning of his food ceased. In his Affidavit, Livingston states:

14. Defendant R. Lee knowingly gave Plaintiff food trays with some kind of drugs mixed into the food. Plaintiff was poisoned by defendant Lee on July 15, 16, 17, 21 and 29, 2002. Each time Plaintiff ate the food defendant Lee gave him the drug made him dizzy, lightheaded, disorientated, sleepy and rendered unconscious. That is how Plaintiff realized that defendant Lee was poisoning him through the food tray.

15. The poisoning of Plaintiffs food started after he wrote some complaints and grievances on defendant Lee. The first grievance Plaintiff wrote on defendant

Lee was that he refused to pick up his mail, and the next was in regard to him not giving Plaintiff his law library request. Plaintiff did not have any problem with defendant Lee before these instances. Nor was Plaintiffs food poisoned until after he wrote the grievances and complaints against defendant Lee. The poisoning of Plaintiffs was done in retaliation for writing grievances and complaints against defendant Lee.

16. When defendant Lee gave Plaintiff his food tray he would make sarcastic remarks about the food like, "don't forget to eat your vegetables, it's good for you", and "I put something good for you in there." Plaintiff did not really know what defendant Lee meant by these remarks until after he ate the food, and felt the effects of the poison.

17. Plaintiff complaint numerous times about defendant Lee poisoning his food. Plaintiff went as far as filing a felony complaint against defendant Lee in an attempt to stop him from poisoning his food.

18. Plaintiff also tried to get medical tests performed to figure out what was causing the dizziness, disorientation and unconsciousness after he ate the food. Nurse Gomez did not have any medical tests done when Plaintiff requested them, and complained about the effects of the poisoned food to him.

19. Defendant S. Hurteau also knowingly and deliberately gave Plaintiff poisoned food. On July 23, and September 4, 2002 defendant Hurteau deliberately gave Plaintiff food trays in which unknown drugs were mixed into the food. Each time Plaintiff ate the food defendant Hurteau gave him the drugs made him dizzy, lightheaded, disorientated, sleepy and rendered unconscious.

20. Plaintiff was being poisoned by defendant Hurteau, because of the grievances he wrote on him. Plaintiff had written a couple of grievances on de-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
**(Cite as: 2007 WL 1500382 (N.D.N.Y.))**

fendant Hurteau for breaking the cell headphones and then writing him a misbehavior report for breaking the headphones.

21. At no time did Plaintiff consent to have drugs planted in his food by defendant Hurteau, or anyone else. Nor did a medical doctor authorize drugs to be put in Plaintiff's food by defendant Hurteau, or anyone else. Plaintiff was taking medication for a chronic illness at the time that his food was being poisoned by defendant Hurteau, but the medication did not cause any vertigo, unconsciousness, or dizziness. It was the unknown drugs that were in the food that cause these effects in Plaintiff.

**\*8** 22. Plaintiff had to resort to filing a felony complaint on defendant Hurteau for poisoning his food for the violation to stop.

23. Plaintiff told the other prisoners in his area that sometimes when he ate the food he felt the effects of being drugged. Some of these prisoners also told Plaintiff that they also felt drugged up after eating the food.

24. Plaintiff loss 50 pounds because defendants Lee and Hurteau were poisoning his food and he was in fear of eating the food.

In his deposition with respect to Lee, Livingston testified:

Q How do you know Defendant Lee put drugs in your food?

A Because sometime he will say something to the effect of eat-don't forget to eat your vegetables, and it's good for you, and I put something good for you in there and stuff like that.

Q Did he tell you he put drugs in your food?

A Not, not like that. He didn't come outright and say there's drugs in your food poisoning you. He would say some sarcastic things like I put something good in there, and don't forget to eat your vegetables and stuff like that.

Q What made you think that those comments reflected that Defendant Lee put drugs in your food?

A At first I didn't-when he said it, I didn't think-you know, he was just talking. But after eating it, then I feel the effect of the drugs, then I knew what he's doing-what he meant by what he said.

Q And what effects are you referring to?

A I would get lethargic, sleepy, dizzy, and I would sometimes fall out-go to sleep.

Q Why would Defendant Lee put drugs in your food?

A Retaliation.

Q For what?

A For writing him up.

Q When did you write him up?

A While I was there. I don't remember the dates, but I wrote him up about not. giving me my law library and stuff like that.

Q Are you referring to formal grievances that you wrote?

A Formal grievances and complaints that the Superintendent was provided.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
**(Cite as: 2007 WL 1500382 (N.D.N.Y.))**

With respect to Hurteau, Livingston testified:

Q And how do you know Defendant Hurteu put drugs in your food?

A Because he was the one that was giving me that food, that specific tray right there, and he had an ax to grind or something to retaliate against me for writing him up and ...

Q And how do you know those two trays had drugs in it?

A After eating it, I felt the effects of the poison.

Lee and Hurteau do not contradict the facts asserted by Livingston. Instead they rely on the perceived weaknesses in his case. Contrary to the arguments of Lee and Hurteau, Livingston's medical records for July 24, 2002, reflect: "When I been eating food in the last month I've been feeling dizzy, light headiness, sleep, I want to take [illegible writing] see why this is happening" and the notation under "Plan" " : Thinks it the food-Discuss [medical symbol for with] PA." Although Livingston's medical records show several visits with medical personnel in the month following his initial complaint, the record does indicate any further investigation of Livingston's complaints was undertaken. Lee and Hurteau also argue that because Livingston has no expert medical testimony to establish a causal connection between his alleged health ailments and the alleged drugs in his food and the cause of the injury is not within common knowledge of a layperson, his claim must fail, citing *Wills v. Amerada Hess Corp.,* 379 F.3d 32, 46 (2d Cir.2004) and *Barnes v. Anderson,* 202 F.3d 150, 159 (2d Cir.1999).

**\*9** Neither *Wills* nor *Barnes* is apposite to this case. In *Wills* the issue presented was the causal connection between squamous cell carcinoma and exposure to benzene or PAHs. *Barnes* presented the issue of the causal connection between a miscarriage and an incident that was alleged to have caused substantial emotional stress. This case, on the other hand, involves a situation in which it is uncontested that Livingston ingested food provided him by Lee and Hurteau and after ingesting the food became dizzy, lightheaded, disoriented, sleepy and rendered unconscious. No medical or laboratory tests were run on Livingston. Under these circumstances it is impossible to determine from direct objective evidence what, if any, foreign substance adulterated the food he ingested. Without this critical information it would not be possible for a medical expert to testify with any reasonable degree of medical certainty the cause of the symptoms exhibited by Livingston. At best, a medical expert could only provide the trier of fact with a list of those substances that, when added to food, (1) would not necessarily be readily detectable while it was being eaten and (2) would cause similar symptoms to occur. The facts in this case are more akin to an ordinary food poisoning case. It is within common knowledge that when one eats contaminated food and suffers food poisoning one becomes ill. The severity of the illness may be dependent upon the exact nature of the contaminant but irrespective of the contaminant the person who ingests contaminated food suffers to some degree from food poisoning. In this case, if the jury accepts Livingston's claim that Lee and Hurteau drugged or poisoned the food he was served, the causality nexus between that and the ensuing symptoms may be logically inferred from temporal proximity.

A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect. *See, e.g., Hudson v. McMillian,* 503 U.S. 1, 7-8 (1992); *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). The subjective component of the claim requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' " in

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
**(Cite as: 2007 WL 1500382 (N.D.N.Y.))**

light of the particular circumstances surrounding the challenged conduct. *Blyden v. Mancusi,* 186 F.3d at 262 (quoting *Wilson v. Seiter,* 501 U.S. 294, 299 (1991)); *see, e.g., Davidson v. Flynn,* 32 F.3d 27, 30 & n. 2 (2d Cir.1994).

Administering a harmful foreign substance through food causes bodily injury just as does the use of excessive force. In an excessive-force case, whether conduct was "wanton" turns on whether force was applied in a good-faith effort to further a legitimate penal objective, or maliciously and sadistically to cause harm. *Hudson,* 503 U.S. at 7; *see also Blyden v. Mancusi,* 186 F.3d at 262-63. Applying that principle to the uncontested facts of this case, the deliberate adulteration of food without any connection whatso-ever to a legitimate penological objective, a rational jury could reasonably find that the actions of Lee and Hurteau were wanton.

**\*10** The objective component of a cru-el-and-unusual-punishment claim focuses on the harm done; but the amount of harm that must be shown depends on the nature of the claim. *See, e.g., Hudson,* 503 U.S. at 8. This objective component is "contextual and responsive to contemporary standards of decen-cy," *id.* (internal quotation marks omitted), and there are significant differences between the harm that must be shown to support a claim based on prison condi-tions and the harm that will suffice to support a claimed use of excessive force. No showing of ex-treme injury is required when the claim is that prison officials used excessive force:

In the excessive force context, society's expecta-tions are different. When prison officials mali-ciously and sadistically use force to cause harm, contemporary standards of decency always are vi-olated.... This is true whether or not significant in-jury is evident.

*Hudson,* 503 U.S. at 9. Applying that principle to the facts in the case before the Court, a rational jury could reasonably find that the deliberate inclusion of a harmful substance in food and serving it to a prisoner was done maliciously and sadistically intending to cause harm, thereby violating contemporary standards of decency. In that case, irrespective of whether Lee and Hurteau, or either of them, intended to cause Livingston serious bodily harm or death and only to make him ill, they subjected him to cruel and unusual punishment.

Based on the undisputed facts in the record before it the Court can not say that a rational jury could not reasonably find in favor of Plaintiff. The Court agrees that there is no direct objective evidence corroborating Livingston and the circumstantial evidence is weak.[FN7] Nonetheless, a jury could find, based upon the uncontradicted testimony of Livingston that he ingested food and became ill shortly thereafter, in the absence of any other plausible cause, more likely than not he became ill because of some harm substance added to the food. The jury could also find that Lee and Hurteau had both the opportunity (as the persons who delivered the food) and the motive (retaliation) to place a harmful substance in the food.[FN8]

FN7. In the context of a summary judgment motion, not only must the Court accept as true the factual assertions of the non-moving party, but in this case neither Lee nor Hurteau have denied under oath Livingston's factual statements that they served him drugged, poisoned, or otherwise contaminated or adulterated food.

FN8. To the extent that Livingston asserts a retaliatory animus claim based on temporal proximity to previously filed grievances against Lee and Hurteau, strength of tem-poral proximity weighs greater than that of the claim against Gawlicky discussed below. The issuance of an inmate misbehavior report is a normal function of a correctional officer

entitled to a presumption of regularity. On the other hand, spiking an inmate's food with drugs, poison, or another harmful substance is most decidedly not. Moreover, unlike the claim against Gawlicky, Lee and Hurteau have as yet presented no evidence to counter its weight.

In his Seventh and Ninth Causes of Action Livingston alleges that the acts of Lee and Hurteau violated N.Y. PEN. LAW § 120.05(5) (Assault in the second degree). Defendants argue that Livingston lacks standing to bring the claim citing *Leeke v. Timmerman,* 454 U.S. 83, 91 (1981). While the Court agrees that Livingston lacks standing to bring a criminal action, that is not the issue. The issue, as it relates to N.Y. PEN. LAW 120.05(5), is whether it gives rise to a principle cause of action under New York law. Defendants have not cited any case that no private cause of action lies for a violation of that provision and independent research by the Court has not found any such authority. It is clear that New York recognizes the existence of a private cause of action for violations of its Penal Law. *Burns Jackson Miller Summit & Spitzer v. Lindner,* 451 N.E.2d 459, 463 (N.Y.1983). Under New York law, as applied by the New York Court of Appeals, unless the legislature specifically provides that the provisions of the penal law are exclusive and private litigants are not intended to have a cause of action for its violation, it is for the courts to determine, in light of statutory provisions, particularly those relating to sanctions and enforcement, and their legislative history, and of existing common-law and statutory remedies, whether legislature intended private litigants to have cause of action for violation of provisions. *Id.* Whether a private cause of action was intended under a penal statute turns in the first instance on whether Livingston is one of the class for whose especial benefit statute was enacted. However, inquiry does not end there, rather, factors include what indications there are in statute or its legislative history of intent to create or deny such remedy and, most importantly, consistency of doing

so with purposes of underlying legislative scheme. *Id.* Although they have the burden of establishing entitlement to judgment as a matter of law, Lee and Hurteau have not briefed this critical issue.

**\*11** Additionally, it appears that New York would recognize a civil tort cause of action under the facts of this case. *Cf. McCrory v. State,* 721 N.Y.S.2d 712, 713 (N.Y.A.D.2001) (dismissing food poisoning claim for failure to prosecute); *Hakeem v. Wong,* 636 N .Y.S.2d 440, 441 (N.Y.A.D.1996) (dismissing a prisoner's claim that prison officials deliberately poisoned foods purchased from a vending machine for failure to exhaust administrative remedies). In addition, the Second Circuit has indicated that a civil battery claim lies under N.Y. PEN. LAW § 35.30. *See Nimely v. City of New York,* 414 F.3d 381, 391 (2d Cir.2005). This Court perceives no principled reason to assume that a civil battery claim may not be asserted under § 120.05(5).

Having failed to establish that they are entitled to judgment in their favor as a matter of law, Lee and Hurteau are not entitled to judgment on Count Six (Sixth, Seventh, Eighth, and Ninth Causes of Action).

## C. False Misbehavior Report (Fifth Count-Gawlicky)

The basic facts of the events and sequence in this case are undisputed. Livingston lodged complaints with the Superintendent against Gawlicky on March 17 and April 6, 2003. On April 11, 2003, Gawlicky issued a misbehavior report against Livingston charging him with making threats against her and disobeying a direct order. Following a hearing, Livingston was found guilty of making of the threat charge and not guilty of violating a direct order and sentenced to four months punitive confinement, with loss of privileges.

Livingston contends that the report was false and Gawlicky fabricated it in retaliation for Livingston

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
**(Cite as: 2007 WL 1500382 (N.D.N.Y.))**

having filed the complaints against her and that she falsely testified that she feared Livingston might reach through the cell bars to assault her so that he would be placed in a plexiglass cell.

Because they involve questions of intent and are easily fabricated and pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, courts must approach prisoner claims of retaliatory action with skepticism and care. *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). To sustain a First Amendment retaliation claim Plaintiff must show that: (1) the speech or conduct at issue was protected; (2) the defendant took an action adverse to him; and (3) a causal connection between the protected speech or activity and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004); *Dawes v. Walker,* 239 F.3d at 492. Defendant concedes that the complaints filed by Livingston constituted a protected activity and it appears beyond cavil that the filing of a misbehavior report that results in disciplinary action is adverse. *See, e.g., Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). This leaves as the only open issue the causal connection between the two.

The only evidence that Livingston offers for his retaliation claim is the temporal proximity between his complaints against Gawlicky and the filing of the disciplinary charges against him. This is circumstantial evidence of retaliation. *See Gayle v. Gonyea,* 313 F.3d 677, 683 (2d Cir.2002); *Colon v. Coughlin, supra,* 58 F.3d at 872. The question becomes whether this, standing alone, is sufficient to defeat summary judgment. In *Colon* the Second Circuit suggested that if this were the sum and total of plaintiff's case, it might be inclined to affirm the grant of summary judgment to the defendants based upon the weakness of plaintiff's case. 58 F.3d at 873. In this case, unlike *Colon,* Livingston offers no direct evidence of a retaliatory motive. Other circumstantial evidence that might lend support to his case, *e.g.,* his disciplinary

record and the nature of the more recent disciplinary violations, *see Flaherty v. Coughlin,* 713 F.2d 10, 14 (2d Cir.1983), in reality undercut Livingston's claim. The record shows that between December 1989 and April 2003 Livingston was the subject of more than 100 disciplinary actions, several of which involved assaults on or threats made to staff. In *Gayle,* unlike this case, the misbehavior report was not only temporally close but arose from statements made in a protected activity (discussion of a grievance) and the conviction was reversed on appeal.

**\*12** The Court, balancing the principles of the special solicitude to be given to *pro se* plaintiffs and the general rule against weighing the evidence against the skepticism with which it must view retaliation claims, is of the opinion that, based on the evidence in this case, no rational trier of fact could reasonably find in favor of Livingston. Gawlicky is entitled to summary judgment in her favor on the Count Five (Tenth, Eleventh, and Twelfth Causes of Action).

**D. Interference with Religious Beliefs (Count Six-LeFrance and Foster; Count Seven-Abair, Salls, and Bouyea).**

Both Count Six and Count Seven appear to be predicated upon an alleged infringement of Plaintiff's religious beliefs as a Rastafarian. In his complaint, Livingston alleges that LeFrance tried to force him to be handcuffed or sit next to a person who was clearly a transsexual/homosexual and that because of this Foster fabricated a misbehavior report that Livingston disobeyed a direct order. He further alleges that Abair, Salls and Bouyea refused to serve him alternative religious meals, *i.e.,* substitute meals when red meat was served. Livingston's claim of religious belief is clouded by certain undisputed facts. Livingston admits to having been raised as a Seventh Day Adventist. In approximately 1984 he became a Muslim. At some subsequent date that does not appear in the record, Livingston converted to Rastafarianism. However, irrespective of the date of his conversion, Livingston did not inform prison officials of this conversion

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
**(Cite as: 2007 WL 1500382 (N.D.N.Y.))**

until on or after August 21, 2004, after the dates that the events of which Livingston complains occurred.

1. *LeFrance and Foster.*

In his affidavit, Livingston testified:

38. On July 21, 2003 when Plaintiff was being transferred out of Upstate C.F. SHU, defendant LaFrance tried to force him to be shackled with an inmate that was clearly a transsexual/homosexual. Due to Plaintiffs religious belief he refused to be shackled with the transsexual/homosexual inmate.

39. When Plaintiff was called to the pen gate to be shackled, and he saw the inmate whom was to be shackled with him Plaintiff calmly asked defendant LaFrance, "is this person going to be handcuffed to me". Defendant LaFrance answered "yes". That is when Plaintiff clearly, calmly and respectfully told defendants LaFrance, M. Foster, and the other c.o.'s in the area that it's against his religion to be in such a close proximity with a transsexual/homosexual person, and could he be shackled to somebody else. The defendants said "no". Plaintiff then sat beck [*sic*] down.

40. Plaintiff was again asked to be shackled to the transsexual/homosexual inmate. Plaintiff again refused to be shackled to that inmate, and again stating his religious concerns.

41. Defendant LaFrance then got on the telephone and spoke to someone about Plaintiff and the situation. While on the telephone defendant LaFrance suggested an alternative solution to the situation. The alternative was that Plaintiff would not be shackled to this person, but he still had to be seated next to the same person, Plaintiff agreed to not being shackled to this person, but questioned the logic of being forced to being seated next to this person still. Defendant LaFrance then told the person on the telephone that Plaintiff still refused to get on the

bus. If Plaintiff were not shackled to this person it would be no need for him to be seated next to this person for the long bus ride. Sitting next to the transsexual/homosexual person was the same as being shackled to him.

**\*13** 42. Plaintiff would have been force to be seated next to the transsexual/homosexual person for six to eight uncomfortable hours. Plaintiff did not want to violate his religious belief, and be stressed out for not adhering to his religious dogma.

43. Plaintiffs religious belief comes from the Holy Bible, and the way his mother raised him. In the book of Leviticus chapter 18 verse 22 through 26 states that, "you shall not lie with a male as with a woman; it is an abomination ..." There are many other verses in the Bible such as this one that forbid homosexual acts and association. Jamaican parents who were strict with the teachings of the Bible raised plaintiff. Also, the Jamaican people when Plaintiff was growing up took anti-homosexual stance very serious, because of what the Holy Bible states regarding any homosexual activities. God did destroy Sodom and Gomorrah, because of the abundance of homosexual abomination that was occurring in these two cities.

44. Plaintiff stated his religious concerns to both defendants LaFrance and Foster, but they were hell bent on violating Plaintiffs religious beliefs.

45. Plaintiff was escorted back to SHU, and the next day, July 22, 2003 was issued a bogus fabricated misbehavior report written by defendant M. Foster.

46. Defendant Foster fabricated that Plaintiff stated that he "wasn't gonna be shackled to any Homo". And also said, "You guys might be Homo's, but I'm not and you ain't putting me with that Homo". Plaintiff never said any of these alleged quotes. At all time during the incident Plaintiff calmly, clearly

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
(Cite as: 2007 WL 1500382 (N.D.N.Y.))

and respectfully expressed his religious position to defendants LaFrance and Foster regarding his religious belief and the reason why he did not want to be shackled to the transsexual/homosexual person. At no time did Plaintiff verbally harass or abuse anyone. These defendants asked Plaintiff to be shackled to get on the bus; they did not give a direct order. Either way Plaintiff would have still stand on his religious rights and beliefs to not be shackled to the transsexual/homosexual person.

47. There were other inmates that were associating with the transsexual/homosexual while in the pen that would have been willing to be shackled to this person.

48. Plaintiff was found guilty at the disciplinary hearing by the H.O., and sentenced to four (4) months SHU with loss of all privileges, and sixty (60) days was suspended and deferred.

49. Plaintiff submitted an administrative appeal. The hearing disposition was reversed and expunged on administrative appeal after Plaintiff completed his SHU sentence. In all Plaintiff did sixty-one (61) days in SHU due to the fabricated misbehavior report written by defendant Foster and endorsed by defendant LaFrance.

In his Deposition, Livingston testified:

Q Okay. I'm going to turn now to the events that you've included in this Complaint that occurred on the date of July 21 st, 2003, at Upstate Correctional Facility.

*14 Could you please describe what. happened on July 21 st, 2003?

A Well, I got-I was escorted to the receiving room to be processed to be released from S.H.U. Upstate, and at one point I saw that the Sergeant wanted me

to be handcuffed to this inmate that was, say-he was a transsexual. Like-I don't know. He had-he had fake breasts or whatever you want to call it, and he made himself up to look like a girl-female or whatever. And I told the Sergeant I don't want to be handcuffed to this dude right here, and I told him the reason why, and he tried to force me to still. I told him, no, I'm not going to. And he-after going back and forth, I still told him I refused, and he got on the phone. He spoke to somebody. And he came with an alternative way to be-to be placed on the bus, but it was still something to do with being handcuffed to the dude. And I told him no. So he said well, you know, you get put back in your cell. I said: If that's how it's going to be, that's how it was going to be. It's my religious right not to be forced to be hand-cuffed to this person. That's what I told him. So they put my back in my cell and wrote me a force ticket saying this and that happened, when none of that happened in the ticket. And I went to a hearing. They found me guilty. And I appealed it, and they found in my favor.

Q So the ticket was ultimately reversed?

A Yes.

Q Who first gave you the order to be handcuffed to this transsexual inmate?

A. I think it was LeFrance 'cause I turned to him after I saw what was-what was taking place, I turned to him and said: I'm not gonna be handcuffed to this person right here.

Q And what did LeFrance do?

A He said if you want-he said-he said something like if you want to get on the bus you are. And I said I'm not, and we went back and forth with it. And I told him the reason why, and he still didn't care. And I told him, well, I refused. And he made a phone call

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
**(Cite as: 2007 WL 1500382 (N.D.N.Y.))**

to somebody.

Q Did LeFrance give you a direct order to be handcuffed to the transsexual inmate?

A You could probably say it was an order, but I still wasn't going to.

Q And you refused the direct order?

A If it was an order, I refused it.

Q And you refused to obey the direct order on religious grounds

A Yes.

Q And what are those religious grounds

A Not to be in close proximity and interactive with persons of that persuasion.

Q And is that part of your Rastafarian beliefs?

A It's my belief. It comes out of the Bible. I think I sited [*sic* ] the place in the Bible where it states Leviticon-Leviticus.

Q In Paragraph 71 of your Complaint you correctly note that you cite Leviticus 18[:]22 through verse 26. Do you know what that verse states?

A Not verbatim.

Q Could you summarize it for me?

A Basically what I just said about, yon know, being associated, proximity, interaction, you know, with persons like that person was.

Q And did you cite this verse to Sergeant LeFrance?

**\*15** A No. But I told him that's my religious belief not to be handcuffed to this person like that.

Q Were you actually ever handcuffed to this other inmate?

A No.

Q So the only injury suffered as a result of the events of July 21 st, 2003, is the ticket that was issued to you?

A I had to do 61 days, and my religious belief was compromised.

Q How was your religious belief compromised?

A Because they wanted me-to handcuff me to the person-this person knowing that. And since I refused, they gave me 61 days because of my religious belief.

Q So the injuries suffered was the 61 days in S.H.U.?

A And my religious beliefs.

Q In Paragraph 74 of your Complaint you say: Defendant M. Foster fabricated a misbehavior report stating that Plaintiff disobeyed a direct order, verbal harassment, and staff direction for movement.

Why was the ticket fabricated?

A Because in the description of the incident, none of that happened. He said I start-I don't remember what he wrote, but he's saying that I start yelling, screaming, and causing a scene and all kinds of stuff. But I never did that. All I stated was my reli-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
**(Cite as: 2007 WL 1500382 (N.D.N.Y.))**

gious belief and my reason for refusing to be handcuffed to this person. But he just made up lies, fabrication, and said all kind of stuff happened beside, you know, that really happened.

Q A hearing was conducted on this incident?

A Yes.

Q What was your defense at the hearing?

A That because of my religious belief I didn't want to be handcuffed to this person and none of the description of the incident was true.

Q Did Defendant Foster give you a direct order?

A Not that I remember. All I kept speaking to was the Sergeant because he was the one in charge. So all my verbal comments was directed to him.

A little later he further testified.
Q Were you ever given an order to get onto the bus?

A I guess so if-'cause that's what they was trying to do. It might not have been an order-order, but it was, you know, they wanted me to get on the bus.

Q And did you refuse because of your religious beliefs?

A Yes

Four facts emerge from Livingston's testimony. First, he refused to be shackled or, alternatively, sit unshackled next to a person he described as being a transsexual or homosexual for transport between two prison facilities. Second, his refusal was based upon his professed religious beliefs. Third, his refusal to be shackled resulted in his not being transported and was,

at the very least, the functional equivalent of refusing to obey a direct order. Fourth, Livingston was subjected to disciplinary action for his failure to obey the order.

Livingston has the threshold burden of establishing that the action of which he complains substantially burdened his sincerely held religious belief. *Salahuddin v. Goord,* 467 F.3d 263, 274-75 (2d Cir.2006). Once Livingston has met this burden, the burden shifts to the Defendants to identify the legitimate penological purpose justifying impingement upon that right and that the burden is reasonable. *Id.* In making the reasonableness determination, this Court must evaluate four factors: (1) whether the action had a valid, rational connection to a legitimate governmental objective; (2) whether Plaintiff had an alternative means of exercising the burdened right; (3) the impact on guards, inmates, and prison resources of accommodating the right; and (4) the existence of alternative means of facilitating Plaintiff's exercise of the right that have only a *de minimis* adverse effect on valid penological interests. *Id.,* citing *Turner v. Safley,* 482 U.S. 78, 90-91 (1987).

**\*16** The question is twofold: what was believed and how was it burdened? Livingston's belief in this case is that homosexuality is an abomination and that he should "not be in close proximity and interactive with persons of that persuasion." [FN9] By his own admission Livingston was not handcuffed nor was he forced to ride seated next to the homosexual/transsexual. The burden he alleges imposed was that Foster issued him a fabricated misbehavior report and he was subjected to disciplinary action for refusing to be handcuffed to a homosexual/transsexual.

FN9. In addressing Plaintiff's threshold burden, this Court starts with the assumption that Plaintiff's religious belief is sincerely held. *See Ford v. McGinnis,* 352 F.3d 582, 590 n. 8 (2d Cir.2003).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
**(Cite as: 2007 WL 1500382 (N.D.N.Y.))**

The fatal infirmity in Livingston's case against LeFrance is that there is no factual support for a finding that LeFrance infringed upon any religious belief. He admits that he does not know and is only guessing that LeFrance ordered Foster to issue the ticket. Other than to order him to be handcuffed to the homosexual/transsexual person and board a transport bus, which order Livingston admittedly refused to obey, LeFrance had no further direct or personal involvement in the incident. While perhaps showing that LeFrance *attempted* to burden Livingston's religious beliefs, Livingston falls far short of establishing that LeFrance burdened them. Moreover, even assuming LeFrance ordered the misbehavior report be issued, as discussed further below, it does not establish his liability. LeFrance is entitled to judgment in his favor on the Thirteenth Cause of Action.

Livingston's action against Foster suffers from several infirmities. The misbehavior report charged Livingston with disobeying a direct order, verbal harassment, and staff direction for movement. Livingston claims the misbehavior report was fabricated. The fabrication claimed by Livingston was in the description of his behavior, *e.g.,* "yelling, screaming, and causing a scene and all kinds of stuff." What Livingston fails to contend is that he did not disobey an order or staff direction for movement. Quite to the contrary, Livingston admits he refused to be handcuffed or sit next to the transsexual/homosexual for movement and as a consequence missed the movement. Even accepting as true Livingston's conclusory allegation that the description was false, having admitted he refused to be handcuffed and board the bus, Livingston's conclusory assertion that the infraction of the rules with which he was charged was fabricated lacks factual foundation.[FN10]

> FN10. The Court is not unmindful of the fact that Defendant's conviction of this charge was later reversed on appeal. Not only is no reason shown for the reversal, but the fact

that Livingston may have been exonerated on appeal does not render the misbehavior report "bogus" or "fabricated" in a case where he admits the facts that underlie the charges in the misbehavior report to be true.

Plaintiff's only defense to the misbehavior report was the exercise of his religious beliefs was being infringed. The question becomes whether being handcuffed or, alternatively, forced to sit next to a homosexual/transsexual on a bus would substantially burden Plaintiff's religious beliefs. It would not. According to Plaintiff, being forced to sit next to a homosexual/transsexual for six to eight hours would have been uncomfortable and he would have been stressed out for not adhering to his religious dogma. This case does not rise to level of those cases in which a substantial burden on religious tenets was found to exist. Plaintiff was not denied the right to participate in congregate services ( *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); right to participate in a religious ceremony of his choice (separate Shia and Sunni services during Ramadan) (*Salahuddin v. Goord, supra* ); denied a religious meal ( *Ford v. McGinnis,* 352 F.3d 582, 594 (2d Cir.2003)); or forced to swear on a bible in church ( *Doe v. Phillips,* 81 F.3d 1204, 1211-12 (2d Cir.1996)). Plaintiff was simply going to be uncomfortable sitting next a person whom he believed to be a moral abomination. This fits within those cases in which it can comfortably be said that is so peripheral to Plaintiff's religion that the burden is constitutionally *de minimis. See Ford v. McGinnis, supra,* 352 F.3d at 593. Moreover, nowhere has it been clearly established that no matter how strongly or sincerely held his religious beliefs may be, a prison inmate has the right to be free from being in the proximity of or interactive with another person because of that person's sexual orientation. Indeed, such a rule, just as one founded upon color, creed, religious beliefs, gender, or national origin, would be repugnant to the strong public policy of this country and this Court declines to adopt such a rule.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
**(Cite as: 2007 WL 1500382 (N.D.N.Y.))**

**\*17** Defendants argue that, assuming that the misbehavior report constituted an impermissible burden on his religious beliefs, Livingston is not entitled to recover because LeFrance and Foster have qualified immunity. Under the doctrine of qualified immunity, *i.e.,* freedom from being sued, the court follows a two-step process: first was there a violation of a constitutional right and second was the right clearly established at the time of the violation. *Clubside, Inc. v. Valentin,* 468 F.3d 144, 152 (2d Cir.2006) citing *Saucier v. Katz,* 533 U.S. 194, 201 (2001). "The relevant dispositive in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct is unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. at 202. If the facts establish a violation, the inquiry becomes whether the evidence, when viewed in the light most favorable to plaintiff and all permissible inferences drawn in his favor, is such that no rational jury could fail to conclude that it was objectively reasonable for the defendant to believe that he was acting in a fashion that did not violate a clearly established right. *Salahuddin v. Goord,* 467 F.3d at 273.

While a general right of a prisoner to freely exercise his religious beliefs, although subject to some restriction, was clearly established in 2003, the question is whether that right extended to Livingston's conduct. *See, e.g.,* *Shabazz v. Coughlin,* 852 F.2d 697, 700-701 (2d Cir.1988) (holding that while the right to attend religious services in general was clearly established, the right to group prayer and prayer in the yard was not). As noted above, no such right as that claimed by Livingston in this case has been clearly established and defendants are entitled to qualified immunity.

LeFrance and Foster are entitled to judgment in their favor on the Sixth Count (Thirteenth and Fourteenth Causes of Action).

2. *Abair, Salls, and Bouyea.*
    In his affidavit Livingston testified:

50. On August 5, 2003 defendant D. Abair started denying Plaintiff his alternative/religious meals while in Upstate C.F. Plaintiff notified sergeant Trim, but nothing was done about this problem. Plaintiff had to go hungry for the last two chows (lunch & dinner). Plaintiff told defendant Abair that he have been getting the religious/alternative since he arrived in Upstate C.F. on May 2, 2003. Defendant Abair still refused to give Plaintiff his meal.

51. On August 6, 2003 again Plaintiff did not get his religious/alternative meals. Plaintiff spoke to defendant S. Salls on the 7 to 3 shift about the problem. Plaintiff had to go hungry because his meal was not given to him, and he did not eat meat for religious reasons. When the 3 to 11 shift came on Plaintiff spoke to Sgt. Bass about the problem, but nothing changed Plaintiff still had to go hungry.

52. On August 7, 2003 during the 7 to 3 shift Plaintiff again spoke to defendant Salls twice. Defendant Salls told Plaintiff he wouldn't be getting the religious/alternative meal until September 1,2003.

**\*18** 53. Plaintiff even spoke to the Muslim Iman [*sic*] Dr. Ali on August 7, 2003 about him being denied his religious/alternative meal. Dr. Ali said he would tell somebody about the problem. Plaintiff still did not get his meals.

54. On August 11, 2003 defendant J. Bouyea came back to work on A-gallery in 8-Building, for which he was the steady C.O. Plaintiff spoke to defendant Bouyea about the problem of him not getting his religious/alternative meal. Defendant Bouyea wrote the sign back on the door indicating that Plaintiff was to get a religious/alternative meal. Defendant Bouyea told Plaintiff that he must have "pissed off somebody for them to change his alternative meal to regular." Plaintiff started getting his reli-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
(Cite as: 2007 WL 1500382 (N.D.N.Y.))

gious/alternative meal then.

55. On August 13, 2003 defendant Salls came to Plaintiff cell during feed-up time and made defendant Bouyea change the religious/alternative meal tag on the cell door to regular meal. Defendant Salls told Plaintiff he "will make sure you don't get your religious meal." Plaintiff did not get his meal and he went hungry again.

56. On August 14,2003 defendant Salls came to Plaintiff on the pretense of investigating him not get his allotted cell property. Defendant Salls tried to make a mockery of Plaintiff situation. At one point defendant Salls told Plaintiff "you just don't understand you are not getting anything."

57. On August 14, 2003 defendant Bouyea refused to give Plaintiff his religious/alternative meal during the lunch feed-up. Defendant Bouyea told Plaintiff that defendant Salls said, "you not alternative, so you not getting it." It was reported to the console that Plaintiff refused chow. Plaintiff still was not getting his meals.

58. On August 17, 2003 Plaintiff was not feed [*sic* ] at all because there was no religious/alternative meals on the food cart for him. This was not reported to the console to be recorded in the logbook.

59. On August 20,2003 Plaintiff spoke to Correction Lieutenant D. Phelix about his meal being changed from religious/alternative to regular without him requesting the change. He said he would check into the situation. Plaintiff did this when he was moved from 8-B-2cell to 8-A17cell.

60. On August 22, 2003 Plaintiff spoke to Correction Captain Bezio regarding him not getting his religious/alternative meal. He told Plaintiff that defendant Salls investigated the matter. Defendant Salls never investigated Plaintiff about the food af-

ter August 7,2003. In fact, it was defendant Salls whom had Plaintiff [*sic* ] meal changed without consent or a request after the problem was corrected on August 13, 2003 Plaintiff told this to Capt. Bezio.

61. On August 28, 2003 Plaintiff told Correction Captain Racette about the problem he was having regarding not getting his religious/alternative meals, and it being changed to regular meals without his request. Capt. Racette saw for himself that the alternative meal sign on the cell door was scratched off with a black marker and regular was written on the place card.

**\*19** 62. All of the discrepancies about Plaintiff's religious/alternative meals started after he refused to be shackled to the transsexual/homosexua1 inmate on July 21, 2003. Which was a deliberate attempt to violate Plaintiff's religious beliefs.

63. The denial of Plaintiff [*sic* ] religious/alternative meals was once again an attempt to violate his religious beliefs. Because of Plaintiff's religious beliefs he do not eat red meat, pork, crustaceans or fishes without scales. Plaintiff went hungry when red meat was served.

In his Deposition Livingston testified in part:

Q What are your religious dietary restrictions under Rastafarianism?

A I don't eat any red meat and stuff like that.

Q You're going to need to elaborate on what "stuff like that" is?

A Just red meat and you know ...

Q Do you eat other forms of meat?

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
**(Cite as: 2007 WL 1500382 (N.D.N.Y.))**

A. Yes.

Q Chicken?

A Yes, I eat chicken.

Q Fish?

A Fish.

Q So it's basically just no red meat like-

A Yes.

Q -beef?

A Yes. And I don't eat shrimps, crabs, oysters, and those things without scales and stuff like that.

Q So no seafood?

A No. I eat seafood but certain seafood like un- scaled seafood. Like, you know, certain-it's ba- sically what the Bible said not to eat. The Bible said not to eat unscaled fish and basically that's what I-I don't eat shrimps, crabs and lobsters.

Q I can't imagine that the Department of Correc- tional Services serves lobster too often.

A They never do. But you can buy it, though.

Q Really?

A Yeah.

Q Hmm. And the dietary restriction of red meat and no unscaled seafood, is that a basic tenant of Ras- tafarianism?

A That's how I grew up from my mother. My mother never cooked pork and stuff like that. That's one other thing. Unscaled fish, she never cooked those.

Q And is your mother a Rastafarian?

A. No, she's Seven [*sic*] Day Adventist. But she followed-she just followed the Bible strict, like, you know, as far as dietary things.

Q So even though you converted to Rastafarianism, you kept the dietary restriction of a Seven [*sic*] Day Adventist?

A Basically. It's basically the same thing, but they just follow the Old Testament, you know, Torah and all that other stuff.

Q Now, it was my understanding that Rastifarians are complete vegetarians; is that true?

A Some. Some.

Q Why have you chosen not to be a complete veg- etarian?

A Because I think I need some-some of that, you know, protein and things.

Q Now, in August of 2003, were you serving a S.H.U. sentence?

A Yes, I think so. I think-yeah, 2003.

Q When you came into DOCS custody, did you inform them of your no red meat dietary restriction?

A At one point.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
**(Cite as: 2007 WL 1500382 (N.D.N.Y.))**

Q When?

A Every time that I went to the box or S.H.U. I informed them that, you know, I'd like the alternative meal-the religious meal.

Q Now, how do you go about telling them that you want the alternative meal?

**\*20** A You know, each facility prison, you know, verify how they want to be told. Some make you sign a paper-documents that all you want is the alternative meal, and others they just ask you when you come in what kind of food you want and you tell them.

Q How does Upstate do it?

A When I first went there in '01, I think it was I went there-or '02 I told-I signed a piece of paper before. But when I returned the most-last one-recent one-the most recent one I just told them. They just put it up on the door of the cell that, you know, he eats alternative.

Q And how about in '03, what was the process at Upstate?

A '03, that's the most recent one. I think I told-that's why I told them. I told them-the first time I went there, I had to sign a document saying I wanted the religious meal. The last time I went there, they just put it on the door after I told them I only eat alternative meal.

Q. And how do they put it on the door?

A. They write it on a piece of paper and they have some magnets like, you know, you might use on your refrigerator to stick it up there on the metal door.

Q And what's the difference between the regular meal and the religious alternative meal?

A They don't serve meat. Soy beans and-

Q So the religious alternative meal is completely vegetarian?

A Yes. And fish.

Q It includes fish, though?

A Yes.

Q And when you were in S.H.U., your meals are delivered to you?

A Yes.

Q And how many times a day are meals delivered to S.H.U. inmates?

A Three times.

Q And generally what would be in your breakfast?

A Everybody get the same breakfast generally. I can't-it varies everyday; toast and hot cereal, cold cereal, coffee cake and jelly, milk, coffee if you drink coffee, juice.

Q Is there ever any meat products in the breakfast?

A If you consider eggs or they have some, I think, turkey sausages/links.

Q And do you eat eggs under your religious dietary restriction?

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
**(Cite as: 2007 WL 1500382 (N.D.N.Y.))**

A Yes, I eat eggs.

Q And do you eat turkey sausage as part of your religious-

A I eat turkey.

Q So any breakfast that was delivered to you would have complied with your religious dietary needs?

A. Yes.

Q What generally is in a lunch that was delivered to you in S.H.U.?

A Non-meat. Alternative-on the alternative meal it's non-meat, that's all. But it varies from meal to meal.

Q What about in the general-the non-alternative meal, what would be included in that?

A It varies too, but they have meat in theirs, most likely.

Q Would there be non-meat products included in the lunch?

A Like potatoes, and rice, and stuff like that?

Q Yeah.

A Mm-hmm. Vegetables. But the main course would be something with meat, most likely. They also get chicken and fish, turkey.

Q And for dinner on the non-alternative meal, what was generally served?

A Basically the same thing; meat biproducts [*sic* ]

and carbohydrates, bread.

**\*21** Q So the main entree would have either chicken, fish or beef-

A Right.

Q -and then there would be two sides-

A Two sides.

Q-like a serving of vegetables?

A Yeah.

Q And then maybe a serving of potatoes and rice?

A Yeah, dessert. Mm-hmm.

Q And bread?

A Yes.

Q You allege in your Complaint that from August 5th to August 11th, 2003, you had to go hungry when red meat was served. How many times was red meat served to you in S.H.U. from August 5th to August 11th, 2003?

A I didn't count but basically every day red meat is served. Sometime it be mixed into it where you can't even, you know, separate and eat what's not red meat like potatoes or rice.

Q What do you mean "every day red meat was served"?

A Some kind of red meat was served-I wouldn't say every day, but most days it would be red meat. You know, beef, chopped beef, Salisbury steak, stuff like

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
**(Cite as: 2007 WL 1500382 (N.D.N.Y.))**

that.

Q And which meal of the day, breakfast, lunch or dinner, could you not eat because it had red meat?

A Probably the last two lunch and dinner.

Q So you were always able to eat your breakfast?

A Yes.

Q And were there days when both lunch and dinner on the same day included red meat?

A Yes.

Q How many days was that?

A I didn't count them, so I couldn't really give you a specific answer on that.

Q Were there ever consecutive days in which both lunch and dinner included red meat?

A Yes.

Q How many?

A I couldn't say.

Q When you arrived at Upstate, who did you tell about your dietary restriction?

A Officer on the gallery.

Q Do you remember his name?

A No.

Q And when did you first arrive in S.H.U. at Upstate

in 2003?

A I think I got there May.

Q And from May to August of 2003, you had no problems receiving your alternative meal?

A No. I think it was from May to July 'cause I was gonna get out in July on the 21 st. And then when I told them I didn't want to be handcuffed to that other inmate and they put me back into the cell, that's when all the problems started about my meal.

\* \* \* \*

Q But your only complaint was when the meal contained read meat?

A My complaint is them not wanting to comply with my request for religious meal because that's what I was getting and they knew it. And they just outright refused me because, I think, in retaliation of what they-what I did when I said I didn't want to be handcuffed to that-to that person.

\* \* \* \*

Q Did you ever complain to Officer Abair that he was denying you your religious meal?

A Yes, I did.

Q. When did you have this conversation?

A At the time he denied it.

Q And what did he say to you?

A What did he say? Basically you're not getting it. You're not getting an alternative meal. We went back and forth. I told him: I been getting it. He said: You're not getting it now. I said: Why not? He didn't give me no reason.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
**(Cite as: 2007 WL 1500382 (N.D.N.Y.))**

Q What are your claims again Defendant Bouyea?

**\*22** A Yeah. He started not giving me my alternative meal, also.

Q When?

A Shortly after that incident. Shortly after Abair started that and he knew. 'Cause when Abair started that, not giving me my alternative meal, he wasn't on. He was the steady officer. And when he came back, he knew I was there for a while on that gallery, and he put the alternative tag back on my cell. Because he knew, you know, since I been there I was getting the alternative meal. And then about a week or so after, Sergeant Salls, S-A-L-L-S-

Q Mmhmm.

A-Salls told him to take it off right in front of me. Take it off. Take that off the door, he's not getting it. So he start not giving me my alternative meal.

Q So who's the officer who was in charge of the gallery at Upstate S.H.U. that you were housed at in August and September 2003?

A August? That's when they moved me from one side to the other. So I don't really know who was the officer that was in charge. But on the gallery, on B Gallery where I was before where this-where it started, he-that other officer who you said his name, he was the steady officer and he knew my dietary requirements.

Q So in July of 2003, where were you housed?

A In 8 Building, B Block, in Two Cell.

Q And when you were going to be transferred out of

Upstate in July of 2003, you had an incident with Officer LeFrance and Officer Foster, so you were not transferred out of Upstate; correct?

A Yeah, I was-yep, they sent me back to my cell. That cell right there.

Q So they sent you to the 8 Building, B Block?

A No. They sent me right back to the same cell, 8 Building, B Block, Two Cell.

Q And was this the cell you were in from August 5th to August 11th, 2003?

A August 5th to August 11th, 2003. I might have the dates mixed up, but at one point they had moved me from A Building, B Gallery, Two Cell to A Block-A Building, A Block-A Gallery, 19 cell or something, if I'm not mistaken.

Q And this is where you were denied your religious meals?

A Most of the time. But it was happening on the other gallery, too, before I got moved.

Q And was it Officer Bouyea who was in charge of 8 Building,

A Block-A B Block.

Q B Block?

A No, B Gallery. It's 8 Building, B Gallery and the cell. Yeah, he was the officer-he was the main officer that was on. Him and another officer.

Q And just so I'm getting this straight, he was the officer in charge of the 8 Building or the A Building?

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
**(Cite as: 2007 WL 1500382 (N.D.N.Y.))**

A Eight. Eight. The number eight.

Q Who was in charge of A Building?

A I don't know.

Q Did you see Officer Bouyea from August 5th, 2003, to August 11th, 2003?

A Did I see him? Occasionally, yeah. Mm-hmm.

Q And did you complain to him that you weren't getting your religious meals?

A He knew I wasn't getting my religious meals after that Sergeant told him to take the religious alternative meal that was posted on my door down. That's when I stopped getting it again.

**\*23** Q Right. And that's on August 13th, 2003. But prior to that, from August 5th to August 11th, 2003, did you complain to Officer Bouyea that you weren't getting your religious meals?

A Yeah. Because when he came back to work. 'Cause before that-before that, he wasn't on. But when he came back to work I was like-I was telling him they stopped giving my religious meal, and I told him: You knew I 1was getting that before. And he said: Yeah. And then he put it back up. He post it back on the door, and I start getting it again. And then that's when Salls-a Sergeant Salls told him to take it down and not to give me no more-give me the trays of the alternative meal anymore.

Q How do you know Sergeant Salls told Officer Bouyea to take the sign off of your door?

A Did it right in front of me.

Q What did Sergeant Salls say?

A He told him to take it down and don't give him no more alternative meal.

Q Why did Sergeant Salls tell him to do that?

A I don't know.

Q So what are your claims again Officer Bouyea?

A That he took-he stopped giving me my alternative meal when he know that I was supposed to be getting it.

Q Why do you think Sergeant Salls stopped giving you your alternative meals?

A I think it came out of that incident that happened when I was getting transferred. 'Cause after that happened then, that's when all the things about my food started. Before that incident, it was no problem getting my trays-my food tray-alternative food trays. But after that incident, just all kinds of problems about that.

* * * *

Q Now, after the sign was taken off of your door on August 13th, 2003, how long did you go without your alternative meals?

A From then on I never got it until sometime in September.

Q What happened in September?

A After complaining to everybody that walked past, even writing complaints to the Superintendent and others, and they came up with an idea that I had to sign a request form for that kind of a meal, which I did, and they started giving me my meal-the alter-

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
**(Cite as: 2007 WL 1500382 (N.D.N.Y.))**

native meal again.

Q Now, from August 13th to September 1 st, 2003, the breakfast that was served always complied with your religious dietary restrictions?

A I was able to eat, yeah.

Q From August 13th to September 1 st, 2003, how many lunches could you not eat because it had red meat?

A I didn't count it.

Q More than one?

A Yes.

Q More than five?

A Probably.

Q More than ten?

A Probably.

Q. More than 15?

A Probably.

Q More than 20?

A Probably.

Q Sir, how many lunches were severed to you from August 13th to September 1st?

A I don't know. I didn't count.

Q You get one lunch a day; correct?

A Yep. I still didn't count them.

Q How many dinners were served to you from August 13th to September 1st, 2003?

A I don't know. I didn't count them.

Q Well, you get one dinner a day; correct?

A Right. If you want to do math, probably could figure it out.

**\*24** Q And how many dinners had red meat?

A I don't know. Probably the majority of them had red meat, though. Sometimes there was fish and turkey, depending on the meal or the menu.

Defendants' argument is essentially twofold. First, Defendants argue that Livingston's dietary restrictions are not central to his Rastafarian religion but are based upon his having been raised as a Seventh Day Adventist. Therefore, Defendants argue his religious beliefs are not sincere. Second, that Livingston did not inform the DOCS officials of his conversion to Rastafarianism until approximately one year after the incidents forming the basis for his claims. For the reasons that follow, the Court rejects those arguments.

Defendants' first argument is contrary to controlling authority. In determining whether a prisoner's particular religious beliefs are entitled to free exercise protection, the relevant inquiry is not whether, as an objective matter, the belief is accurate or logical, but whether the beliefs professed by a claimant are sincerely held and whether they are, in his own scheme of things, religious; a claimant need not be a member of a particular organized religious denomination to show sincerity of belief. *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999). In the very case cited by Defend-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
**(Cite as: 2007 WL 1500382 (N.D.N.Y.))**

ants in support of their argument, *Ford v. McGinnis, supra,* the Second Circuit rejected a narrow reading of *Jackson.* Instead, following *Frazee v. Illinois Department of Employment Security,* 489 U.S. 829, 832-33 (1989) (free exercise of religious beliefs does not turn on a membership in a particular sect or a particular tenet of the sect involved), *Ford* rejected any objective test in determining the sincerity of religious beliefs. 352 F.3d at 588-91; *see also Jolly v. Coughlin,* 76 F.3d 468, 476 (2d Cir.1996); *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir .1984) ("differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud"). At best, Defendants' argument raises a triable issue of fact as to Livingston's sincerity.

Defendants' second argument rings hollow. First, there is no indication in the record that Livingston was denied alternative religious meals because of his failure to formally advise DOCS of his conversion to Rastafarianism until approximately a year later. Second, the testimony of Livingston that he advised the Defendants of his religious preferences is uncontradicted and there is no evidence that Defendants made any investigation into his claim. Third, and perhaps more importantly, the uncontradicted testimony of Livingston that, notwithstanding the lack of formal notification of conversion to Rastafarianism, he had received alternative religious meals prior to August 2003 eviscerates any suggestion that such formal notification was required. Moreover, even by his official stated religious belief as a Muslim, Livingston was entitled to receive alternative religious meal.

**\*25** Abair, Salls, and Bouyea contend that they are entitled to qualified immunity. The Court disagrees. Not only have they failed to adequately develop that issue but they lose on the merits as well. As noted above, qualified immunity does not exist where there is a clearly established right and no reasonable officer could not be aware that his conduct violated that right. It was clearly established law in 2003 that prison

inmates have a right to a diet consistent with the prisoner's religious scruples. *See Kahane v. Carlson,* 527 F.2d 492, 495-96 (2d Cir.1975).

Defendants have not advanced any legitimate penological justification for denying Livingston alternative religious meals and none appears from the record before this Court. Consequently, this Court rejects the qualified immunity argument of Abair, Salls, and Bouyea for the same reason as did the Second Circuit in *Ford,* 352 F.3d at 597 ("prior cases make it sufficiently clear that absent a legitimate penological justification, which for present purposes we must assume defendants were without, prison officials' conduct in denying [Plaintiff a meal consistent with his religious tenets] was unlawful."). *See also Salahuddin v. Goord,* 467 F.3d at 275.[FN11]

> **FN11.** Put another way, if the actions of Abair, Salls, and Bouyea did not infringe on Livingston's First Amendment free exercise right, there is no liability in any event and the Court need not reach the issue of qualified immunity. On the other hand, if those actions did, in fact, constitute violation of a clearly established First Amendment free exercise right, in the absence a legitimate penological justification Abair, Salls, and Bouyea are not entitled to qualified immunity.

Abair, Salls, and Bouyea are not entitled to judgment as a matter of law on the Seventh Count.[FN12]

> **FN12.** The Court notes that, as it appears he was following the orders of a superior, the liability of Bouyea is questionable. However, that argument has not been presented to the Court for consideration.

## VI. CONCLUSION

Based upon the foregoing, Defendants' Motion for Summary Judgment at Docket No. 56 is

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
**(Cite as: 2007 WL 1500382 (N.D.N.Y.))**

GRANTED in part and DENIED in part.

IT IS ORDERED THAT the First, Second, Third, Fourth, Fifth, Tenth, Eleventh, Twelfth, Thirteenth, and Fourteenth Causes of Action are hereby DISMISSED, with prejudice.

IT IS FURTHER ORDERED THAT this action is DISMISSED, with prejudice in its entirety, as against Defendants P. Griffin, Donald Selsky, S. Gawlicky, G. LeFrance, and M. Foster.

N.D.N.Y.,2007.
Livingston v. Griffin
Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4676569 (N.D.N.Y.)
**(Cite as: 2014 WL 4676569 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James O. MURRAY, III, Plaintiff,
v.
T. ARQUITT, Correction Officer, Upstate Correc-
tional Facility; Norman Bezio, Director Special
Housing, Inmate Disciplinary Programs, New York
State Department of Correctional Services; B. Bogett,
Correction Officer, Upstate Correctional Facility; B.
Clark, Correction Officer, Upstate Correctional Fa-
cility; B. Fischer, Commissioner, New York State
Department of Correctional Services; B. Grant, Cor-
rection Officer, Upstate Correctional Facility; J.
Herbert, Sergeant, Upstate Correctional Facility; J.
Laramay, Lieutenant, Upstate Correctional Facility; F.
Manley; J. McGaw, Correction Officer, Upstate Cor-
rectional Facility; Albert Prack, Acting Director Spe-
cial Housing, Inmate Disciplinary Program, New
York State Department of Correctional Services; T.
Ramsdell, Correction Officer, Upstate Correctional
Facility; D. Rock, Superintendent, Upstate Correc-
tional Facility; C. Rowe, Correction Officer, Upstate
Correctional Facility; Stanley Tulip, Correction Of-
ficer, Upstate Correctional Facility; Uhler, Deputy
Supt. of Sec. Serv., all in their Individual and Official
Capacities, Defendants.

No. 9:10–CV–1440 (NAM/CFH).
Signed Sept. 17, 2014.
Filed Sept. 18, 2014.

James O. Murray, III, Malone, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Colleen D. Galligan, Esq., Assis-
tant Attorney General, Albany, NY, for Defendants.

## MEMORANDUM–DECISION AND ORDER
Hon. NORMAN A. MORDUE, Senior District Judge.
### INTRODUCTION
**\*1** Plaintiff, an inmate in the custody of the New
York State Department of Corrections and Commu-
nity Supervision ("DOCCS"), brought this *pro se*
action under 42 U.S.C. § 1983. Defendants' motion
for partial summary judgment (Dkt. No. 103) was referred
to United States Magistrate Judge Christian F. Hum-
mell for a report and recommendation pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c). In his
Report–Recommendation and Order (Dkt. No. 117)
Magistrate Judge Hummel recommends that the mo-
tion be granted.

Plaintiff has filed objections to the Re-
port–Recommendation and Order (Dkt. No. 124).
Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court re-
views *de novo* those parts of a report and recommen-
dation to which a party specifically objects. Where a
party interposes only general objections to a report and
recommendation, the Court reviews for clear error or
manifest injustice. *See Davis v. Chapple,* 2010 WL
145298, \*2 (N.D.N.Y. Jan. 8, 2010), *Brown v. Peters,*
1997 WL 599355,\*2–\* 3 (N.D.N.Y.), *aff'd without
op.,* 175 F.3d 1007 (2d Cir.1999). As set forth below,
the Court accepts the Report–Recommendation and
Order and grants the motion.

### STANDARD ON SUMMARY JUDGMENT MO-
TION
Summary judgment is appropriate when there is
no genuine issue with regard to any material fact, and
the moving party is entitled to judgment as a matter of
law. *See Celotex Corp. v.Catrett,* 477 U.S. 317, 322
(1986). Stated otherwise, summary judgment is ap-
propriate "[w]here the record taken as a whole could
not lead a rational trier of fact to find for the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4676569 (N.D.N.Y.)
**(Cite as: 2014 WL 4676569 (N.D.N.Y.))**

non-moving party [.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). When deciding a summary judgment motion, the Court must "resolve all ambiguities and draw all factual inferences in favor of the party opposing the motion." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999). Where, as here, the nonmovant is proceeding pro se, the Court must read that party's papers liberally and interpret them "to raise the strongest arguments that they suggest." *Id.* (citation omitted).

### DISCUSSION

Plaintiff raises two objections to the Report–Recommendation and Order. First, he objects to dismissal of the Eighth Amendment claims against Corrections Officer T. Ramsdell on the ground of lack of personal involvement. Officer Ramsdell testified at the Tier III hearing that when he arrived at the scene of the altercation in the infirmary, the use of force was over and all he did was "relieve the officers that were holding [plaintiff]." Officer Ramsdell further stated that plaintiff was then placed in a cell with no additional use of force. Officer Ramsdell's testimony is consistent with that of other corrections officers and the various reports of the incident. The Court agrees with Magistrate Judge Hummel that plaintiff's single conclusory statement at the Tier III hearing that at some point during the incident he saw Officer Ramsdell is insufficient under all the circumstances to raise a question of fact on excessive force or failure to intervene, particularly in light of plaintiff's deposition testimony that he named Officer Ramsdell as a defendant solely because his name appeared on the use of force report. Plaintiff's objection cites to no other evidence supporting his claim against Officer Ramsdell. On *de novo* review, reading plaintiff's papers liberally, interpreting them to raise the strongest arguments that they suggest, and resolving all ambiguities and drawing all factual inferences in plaintiff's favor, the Court grants summary judgment dismissing the Eighth Amendment claims against Officer Ramsdell for lack of personal involvement.

**\*2** Plaintiff's second specific objection to the Report–Recommendation and Order concerns the recommendation that summary judgment be granted dismissing the due process claims against the following defendants: Deputy Superintendent Uhler, who conducted the Tier III hearing; Director of Special Housing/Inmate Discipline Bezio; Acting Director of Special Housing/Inmate Discipline Albert Prack; Superintendent Rock; and Commissioner Brian Fischer. In his objection, plaintiff argues that his due process rights were violated at the Tier III hearing because Deputy Superintendent Uhler should have considered a videotape of plaintiff's medical examination on the day following the alleged incident, and because the following people should have been called as witnesses: Lt. Laramy; Corrections Officers Ramsdell, Manley, and Bogett; Dr. Weisman; Inmates Robertson and Gillard. On *de novo* review, after reading the transcript of the Tier III hearing and reviewing the record, and giving plaintiff all the deference to which he is entitled as a *pro se* litigant, the Court finds as a matter of law that plaintiff was afforded due process at the Tier III hearing. Further, there is no basis to find personal involvement in any infringement of plaintiff's rights on the part of Director Prack, Superintendent Rock, or Commissioner Fischer.

In addition to the two above-discussed objections, plaintiff merely states that he "objects to the Report–Recommendation and Order in its entirety." In response to this general objection, the Court reviews the remaining issues for clear error or manifest injustice. There is no error or manifest injustice, and the Report–Recommendation and Order is accepted in its entirety.

It is therefore

ORDERED that the Report–Recommendation and Order (Dkt. No. 117) is accepted; and it is further

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4676569 (N.D.N.Y.)
**(Cite as: 2014 WL 4676569 (N.D.N.Y.))**

ORDERED that defendants' motion for partial summary judgment (Dkt. No. 103) is granted; and it is further

ORDERED that summary judgment is granted dismissing all claims against the following defendants: Corrections Officer T. Ramsdell; Director Norman Bezio; Commissioner Fischer; Director Albert Prack; Superintendent Rock; and Deputy Superintendent Uhler; and it is further

ORDERED that summary judgment is granted dismissing the claims against Officer Tulip and Sergeant Herbert for allegedly filing false misbehavior reports against plaintiff; and it is further

ORDERED that all claims against all defendants in their official capacities are dismissed; and it is further

ORDERED that the Clerk of the Court is directed to serve copies of this MemorandumDecision and Order in accordance with the Local Rules of the Northern District of New York.

IT IS SO ORDERED.

JAMES O. MURRAY, III,

Plaintiff,

v.

T. ARQUITT, Correction Officer, Upstate Correctional Facility; NORMAN BEZIO, Director Special Housing, Inmate Disciplinary Programs, New York State Department of Correctional Services; B. BOGETT, Correction Officer, Upstate Correctional Facility; B. CLARK, Correction Officer, Upstate Correctional Facility; B. FISCHER, Commissioner, New York State Department of Correctional Services;

B. GRANT, Correction Officer, Upstate Correctional Facility; J. HERBERT, Sergeant, Upstate Correctional Facility; J. LARAMAY, Lieutenant, Upstate Correctional Facility; F. MANLEY; J. McGAW, Correction Officer, Upstate Correctional Facility; ALBERT PRACK, Acting Director Special Housing, Inmate Disciplinary Program, New York State Department of Correctional Services; T. RAMSDELL, Correction Officer, Upstate Correctional Facility; D. ROCK, Superintendent, Upstate Correctional Facility; C. ROWE, Correction Officer, Upstate Correctional Facility; STANLEY TULIP, Correction Officer, Upstate Correctional Facility; UHLER, Deputy Supt. of Sec. Serv., all in their Individual and Official Capacities,

**\*3** Defendants.[FN1]

> FN1. In his acknowledgment of receipt of summons and complaint, defendant"Herbert" spelled his name as "Hebert." Dkt. No. 22. The Court notes the discrepancy as mere error on Murray's part and proceeds with the latter spelling in this Report–Recommendation.

### REPORT–RECOMMENDATION AND ORDER[FN2]

> FN2. This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* James O. Murray, III ("Murray"), an inmate currently in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, sixteen DOCCS employees, violated his rights under the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4676569 (N.D.N.Y.)
**(Cite as: 2014 WL 4676569 (N.D.N.Y.))**

Eighth and Fourteenth Amendments. Compl. (Dkt. No. 1). Presently pending is defendants' motion for partial summary judgment pursuant to Fed.R.Civ.P. 56. Dkt. No. 103. Murray opposes. Dkt. No. 116. For the following reasons, it is recommended that defendants' motion be granted.

## I. Background

The facts are related herein in the light most favorable to Murray as the non-moving party. *See* subsection II(A) *infra.* At all relevant times, Murray was an inmate at the Upstate Correctional Facility ("Upstate").

### A. Assault—Plaintiff's Account

On December 3, 2009, Murray was experiencing chest pains and requested emergency call out. Murray Dep. (Dkt. No. 103–15) at 12–13. Non-party Nurse Travers brought Murray to the infirmary for an EKG. Murray Dep. at 14–18; Dkt. No. 103–11 at 15–16. At the infirmary, medical personnel gave Murray an EKG and concluded that Murray's symptoms resulted from indigestion. Murray Dep. at 24–25; Dkt. No. 103–11 at 20. Non-party Dr. Weissman examined Murray and concluded that there was nothing wrong with Murray. Murray Dep. at 32.

Defendants and Corrections Officers Arquitt and Tulip escorted Murray back to the cellblock. Murray Dep. at 32–33. Murray was handcuffed in the front and had on a waist chain. *Id.* at 23; Dkt. No. 103–11 at 28; *see* Compl. §§ 1–2. Tulip walked behind Murray and Arquitt walked in front of Murray. Dkt. No. 103–11 at 63, 72; *see* Dkt. No. 103–11 at 21. Murray contends that while Arquitt was opening a door, Tulip hit him on the back the head. Murray Dep. at 34–35; *see* Compl. §§ 1–2. Murray believes Tulip then tackled him. Murray Dep. at 53. Murray thought to go through the door because that area was visible to a video camera. *Id.* at 35, 55; Dkt. No. 103–11 at 21. Several corrections officers arrived and proceeded to assault Murray. Murray Dep. at 36. Specifically, Arquitt twisted Murray's ankle. Dkt. No. 103–11 at 21.

Murray was then escorted to the infirmary holding pen. Murray Dep. at 53–54. Murray alleged that, while still in a waist chain and handcuffed, defendants assaulted him in the holding pen. *Id.* at 51–52, 55; Dkt. No. 103–11 at 22. Specifically, Grant pressed down on Murray to the point that Murray could not breathe. Murray Dep. at 52–53. Murray reacted by trying to bite Grant's hand. *Id.* at 66. The officers stood Murray up against a wall. Dkt. No. 103–11 at 23. An unidentified officer ran a finger down Murray's back, hit Murray in the kidney area, spun Murray around, and attempted to hit Murray with his knee. Murray Dep. at 57, 59–60. Murray brought his own knee upward to block his groin area. *Id.* at 60. The officer attempted to hit Murray a few times before Murray fell to the ground. *Id.* at 60–61. The officers proceeded to kick and hit Murray on the floor while calling Murray racial slurs. *Id.* at 63. Defendant Laramay told the officers to knock out Murray's teeth because of Murray's grievance activities. *Id.* at 67. The officers then sat Murray on a bench. *Id.* at 64. Defendant and Sergeant Hebert arrived, called Murray racial and religious slurs, stated "we'll kill you," and complained about the lawsuits and grievances that Murray had filed. *Id.* Hebert did not use force against Murray. *Id.* at 65.

**\*4** On December 4, 2009, Murray requested sick call. Murray Dep. at 72–73. On December 8, 2009, Murray was taken to the Alice Hyde Medical Center ("Alice Hyde") for medical treatment. *Id.* at 73. Murray alleged that at Alice Hyde, he received surgery, had a tube inserted into him to "suck[ ] the blood out," was prescribed pain medication, and was admitted for three to four days. *Id.* at 73–74. As a result of the assaults, Murray alleges that he sustained broken ribs, a collapsed lung, cuts, bruises, swelling, extreme pain in the back, neck, hip, shoulder, head, mental distress, fear of death, nightmares, flashbacks, sleeping problems, and depression.[FN3] Compl. ¶¶ 5–6.

FN3. In his deposition, Murray generally

contends that defendants used excessive force against him as part of a conspiracy to retaliate against him for his filing of grievances and lawsuits against them. *See, e.g.,* Murray Dep. at 38–39, 44–46, 50–52. Retaliation and conspiracy claims were neither alleged in Murray's complaint nor response to defendants' motion for summary judgment. In any event, Murray's attempt to allege either claim has failed.

To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (internal quotation marks and citation omitted); *Tafari v. McCarthy,* 714 F.Supp.2d 317, 347 (N.D.N.Y.2010). Here, Murray proffers only conclusory testimony that defendants had violated his constitutional rights in retaliation for the filing of grievances and lawsuits. Murray proffers nothing more going to when and against whom he filed such grievances and lawsuits, the results of the grievances and lawsuits, or his prior disciplinary history. *Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007) (citations omitted) ("Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives."). As such Murray has failed to assert a potential First Amendment retaliation claim against the defendants.

In order to support a claim for conspiracy under §§ 1983 or 1985, there must be "(1) an agreement ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v.. Cnty. of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 468 (N.D.N.Y.2009). An agreement must be proven with specificity as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action is insufficient. *See Iqbal v. Hasty,* 490 F.3d 143,177 (2d Cir.2007); *see also Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999). Thus, plaintiffs must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted). Here, Murray fails to provide evidence sufficient to support a viable conspiracy claim among the defendants. There is nothing in the record to establish that defendants had any type of agreement between them. There were no allegations outlining with specificity when, why, or how an alleged conspiracy occurred. *Warren,* 33 F.Supp.2d at 177. Murray fails to provide any plausible information which would lend credence to a claim of an explicit or implicit agreement between any or all of the defendants. *Anilao v. Spota,* 774 F.Supp.2d 457, 512–13 (E.D.N.Y.2011) (citations omitted). As such, Murray has failed to allege any potential conspiracy claims in this action.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4676569 (N.D.N.Y.)
**(Cite as: 2014 WL 4676569 (N.D.N.Y.))**

Accordingly, Murray's potential conspiracy and retaliation claims must fail.

### B. Assault—Defendants' Account

Defendants proffer a different account of the use of force incidents. Arquitt and Tulip were escorting Murray from the infirmary and as they approached the fire door, Murray turned around and kicked Tulip in the groin area. Dkt. Nos. 103–7 at 7 (misbehavior report), 8 (unusual incident report), 11 (use of force report), 20, 103–11 at 55, 75. Arquitt had turned his head slightly and saw Murray kicking Tulip. Dkt. No. 103–11 at 75. Murray continued kicking and the three men fell through the door and onto the ground. Dkt. No. 103–7 at 20. Tulip fell onto Murray in an attempt to control Murray's feet but became "incapacitated" and rolled on the ground. Dkt. No. 103–7 at 17; *see* Dkt. No. 103–11 at 55, 65–66. Murray attempted to bite Arquitt, who was at that point positioned around Murray's head and shoulder area. Dkt. No. 103–11 at 76.

Arquitt, along with defendants and Corrections Officers Bogett, Clark, and Grant, forced Murray to the floor using body holds. Dkt. No. 103–7 at 8, 11. Arquitt held down Murray's head with his left hand and applied pressure to Murray's left shoulder with his right hand. *Id.* at 8, 11, 20. Bogett controlled Murray's waist chain with his left hand and placed his left knee on Murray's back. *Id.* at 8, 11, 15. Clark bent Murray's left leg across the back side of the right leg then bent the right leg up into a figure four leg hold. *Id.* at 8, 11, 17.

Hebert arrived and ordered the officers to carry Murray into the infirmary holding pen because Murray was non-complaint. Dkt. No. 103–7 at 8, 11. Bogett grabbed Murray's shirt with his left hand and controlled Murray's right arm with his right hand. *Id.* at 8, 11, 15. Grant took control of Murray's left arm with both hands to carry him while Arquitt took Murray's legs in his left arms. *Id.* at 8, 11, 20–21. Clark attended to Tulip. *Id.* at 17.

Hebert was in the infirmary holding pen with Murray. Dkt. No. 103–7 at 6 (misbehavior report). Murray refused to comply with staff and attempted to bite and kick Grant. Dkt. Nos. 103–7 at 6, 8, 11, 21, 103–11 at 114. Hebert gave several direct orders to Murray but Murray refused to comply. Dkt. No. 103–7 at 6. Hebert ordered Bogett and Grant to take Murray to the ground and Grant pushed on Murray's upper body while Bogett held onto Murray's legs. Dkt. Nos. 103–7 at 11, 21, 103–11 at 97. Once Murray became complaint, Hebert ordered non-party Corrections Officer McGaw to videotape Murray in the holding pen. Dkt. Nos. 103–7 at 11, 103–11 at 106–07.

**\*5** Defendants and Corrections Officers Manley and Ramsdell responded to the incident, relieved Bogett and Grant, and escorted Murray to see medical personnel. Dkt. No. 103–7 at 18–19. Murray refused to remove his clothing. *Id.* at 8. Medical personnel examined Murray fully-clothed, and noted discoloration at the base of Murray's neck and minor lacerations over the right clavicular area, on and above the bridge of the nose and left eye, to the mid-lower lip, above and below the left eye, and on the anterior of the left ear. *Id.* at 8, 12–13. Defendant and Sergeant Rowe supervised Manley and Ramsdell escorting Murray to his cell block. *Id.* at 14, 18–19. Photographs were taken of Murray's injuries on December 3 and 4, 2009. Dkt. Nos. 103–7 at 8, 14, 27–29, 103–10. [FN4]

> FN4. Photos taken by non-party Corrections Officer Gettman on December 4, 2009 of Murray indicate that Murray had red marks on his shoulder blades and neck and cuts between his eyebrows and on his nose. Dkt. No. 103–10 at 2–13.

Grant and Tulip were transported to Alice Hyde. Dkt. No. 103–7 at 8, 103–9 at 19. Tulip had an injury to the groin and Grant had swelling in the left hand. Dkt. No. 103–7 at 8. Grant and Tulip were out of work

Slip Copy, 2014 WL 4676569 (N.D.N.Y.)
**(Cite as: 2014 WL 4676569 (N.D.N.Y.))**

for four days. Dkt. Nos. 103–7 at 14, 103–11 at 56. Tulip considered his injury was moderate to severe. Dkt. No. 103–11 at 56. Arquitt had pain in the middle finger and remained on duty. Dkt. Nos. 103–7 at 14, 103–9 at 18.

**C. Tier III Disciplinary Hearing and Appeals**

On December 4, 2009, Murray received misbehavior reports from Hebert and Tulip. Compl. ¶ 8. Hebert charged Murray with violent conduct, interference with employee, and refusing direct orders. Dkt. No. 103–7 at 3. Tulip charged Murray with violent conduct, assault on staff, and interference with employee.[FN5] *Id.*

> FN5. The DOCCS "IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response; and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted). On December 6, 2009, Murray filed a grievance claiming the defendant corrections officers used excessive force against him while also failing to intervene on his behalf. Dkt. No. 103–13 at 6. On January 25, 2010, non-party Deputy Superintendent Otis denied Murray's grievance. *Id.* at 2. On March 10, 2010, CORC affirmed the superintendent's decision. *Id.* at 1.

Murray was provided with non-party Corrections Officer Fish as an inmate assistant. Dkt. No. 103–7 at 5, 66. Fish met Murray on December 7, 2009. Dkt. No. 103–11 at 4. Fish denied Murray the videotape of the holding pen area for December 4, 2009. Dkt. No. 103–7 at 5. Murray's witness request list included:

non-party Inmate Bonaparte; non-party Inmate Robertson; Arquitt; Clark; Grant; Hebert; Tulip; non-party Nurse Administrator Smith; and Travers. *Id.*

On December 17, 2009, defendant Captain Uhler commenced a Tier III disciplinary hearing that concluded on December 30, 2009. Dkt. Nos. 103–11 at 2, 103–12 at 88. Uhler stated that all documents generated from the use of force incidents were provided to Murray. Dkt. No. 103–11 at 9. Such documents included: unusual incident reports; use of force reports; to-and-from memoranda; log book entries; watch commander's log; and misbehavior reports. *Id.*

On December 21, 2009, Murray submitted a written complaint to Uhler. Dkt. No. 103–7 at 33–51. Murray asserts that he received inadequate inmate assistance, was denied the opportunity to present documentary evidence, and Uhler should not have conducted the hearing because Uhler had issued a restraint order against Murray and conducted the investigation. *Id.* at 33; Murray Dep. at 77. Uhler stated that he was not involved in the investigation of the charges. Dkt. No. 103–12 at 87.

**i. Documentary Evidence**

**\*6** At the disciplinary hearing's inception, Murray asked for a copy of Directive # 4940, which provides that when an anticipated use of force incident occurs, a video camera would be dispatched to record the incident. Dkt. No. 103–11 at 6. Uhler explained that despite language in the Directive, the area sergeant was first obligated to secure and move Murray to an area that did not jeopardize the safety and security of the facility. *Id.* at 7.

Uhler explained that he would use his discretion in producing any grievances, complaints, and lawsuit correspondences that Murray had filed with respect to the assault incidents as well as medical reports of corrections personnel. Dkt. No. 103–11 at 4–6. Uhler stated there was a video recording of the area outside

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

the infirmary but no recording of the area inside the door. *Id.* at 6. There was handheld camera footage of the escort to the holding pen then back to the prison block, which could be introduced. *Id.*

Uhler stated that the non-audio video recording of the infirmary shows a door abruptly opening with Tulip at one side of the door, bent over on his hands and knees. Dkt. No. 103–11 at 23–24. An officer assisted Tulip. *Id.* at 24. Four staff members tried to force Murray to the ground. *Id.* at 25. Uhler watched the video several times with Murray. *Id.;* Dkt. No. 103–12 at 73–74. Murray contends that Tulip was not in pain before coming out of that door. Dkt. No. 103–11 at 24. It is undisputed that the officers used force against Murray in the hallway but Uhler did not see anyone kicking or punching Murray. *Id.* at 25, 27. This incident lasted approximately one minute. *Id.* at 27–28.

Uhler denied Murray's videotape request of a medical exam that took place on December 4, 2009 because the videotape contained no evidence of the December 3, 2009 incidents. Dkt. No. 103–7 at 59.

**ii. Witnesses**

Uhler proceeded to allow ten witnesses to testify. Arquitt, Grant, Hebert, and Smith testified. Dkt. Nos. 103–11 at 71, 96, 103–12 at 5–6, 65.

Bogett testified that he was walking to the infirmary area when he witnessed Murray kicking Tulip. Dkt. No. 103–12 at 43. Murray was on the ground when Bogett responded and Bogett assisted in controlling Murray by holding the waist chain. *Id.* Murray was removed from the area because it was not secure. *Id.* at 44. Bogett assisted in moving Murray to the holding pen and stood him up against a wall. *Id.* at 44–45. Murray attempted to bite Grant and struggled. *Id.* at 45. Hebert ordered Bogett to take down Murray and shortly thereafter Bogett was relieved. *Id.* at 45.

Bonaparte testified that before the December 3, 2009 incidents, he heard Gettman and other nurses talk to Murray, insinuating that Murray would be assaulted. Dkt. No. 103–12 at 48–50.

Clark testified that when he responded to the scene, Murray and other officers were on the ground, Murray was kicking his feet, and an officer was lying across Murray's legs. Dkt. No. 103–12 at 28. Clark did not carry Murray to the holding pen. *Id.* at 29. Clark testified that Murray was removed from that area, which was considered unsecured. *Id.* at 31, 35.

**\*7** Ramsdell testified that he did not use force on Murray. Dkt. No. 103–12 at 81. When Ramsdell arrived at the scene, the use of force incident was completed and he relieved the officers who held Murray. *Id.* at 82. Ramsdell did not witness the incident itself. *Id.*

Nurse Travers testified that based on Murray's complaints and symptoms on December 3, 2009, she ordered an EKG for Murray. Dkt. No. 103–11 at 39. Travers advised Murray that the nurse at the infirmary would give him an EKG and take a full set of his vital signs. *Id.* at 42. Travers did not speak with Tulip in the infirmary. *Id.* Tulip testified that he did not have a conversation with Travers in the infirmary where Travers stated, "I'd like to get a car started for this [Murray]." *Id.* at 53.

Uhler denied Murray's witness request for: (1) Laramay because he only responded to the first incident and assisted Tulip, was not present during the use of force incident, and did not give any orders to staff; (2) Manley because he was not present at either incident and was only directed to escort Murray following the incidents; (3) Dr. Weissman because she had retired, attempts to contact her were futile, and she was not present during the incidents; (4) Robertson because he was on parole and stated that he did not want to testify; (5) non-party Inmate Gillard because he was

Slip Copy, 2014 WL 4676569 (N.D.N.Y.)
**(Cite as: 2014 WL 4676569 (N.D.N.Y.))**

contacted and declined to testify. [FN6] Dkt. Nos. 103–7 at 12, 14, 56–58, 103–12 at 58, 62–64. Uhler indicated he would allow Murray's request to question Rowe; however, Rowe was not produced. Dkt. No. 103–12 at 61–62.

> **FN6.** Uhler stated that he would conduct a secondary inquiry into the reason behind Gillard's refusal. Dkt. No. 103–11 at 14.

### iii. Warnings

At the disciplinary hearing's inception, Murray asked to call his lawyer as a witness and Uhler denied that request, warning that "[o]utbursts and continued outbursts by yourself are going to result in me giving you a final warning and the next step will be I will remove you from this hearing." Dkt. No. 103–11 at 7–8. However, Uhler stated that his intent was not to remove Murray from the hearing. *Id.* at 8.

At one point, because Murray was having difficulty asking cogent questions, Uhler offered Murray additional time to formulate questions. Dkt. No. 103–11 at 68. Uhler explained that Murray "needed to prepare a defense" as Murray was "badgering" witnesses. *Id.* However, Murray declined the offer. *Id.* at 69–70. At another point, Uhler stated,

> I warned you on all three days that, do not state policy that's not true. And you expect me to ask the witness about a policy that doesn't exist. I'm not going to discredit staff, and belittle staff based on some makeup believe policy that you believe exists when I ruled on it already telling you it doesn't exist.

> Dkt. No. 103–12 at 39.

During the inception of Bogett's testimony, Uhler ejected Murray, stating, "I am not going to continue you to stare down and try to intimate the witnesses of this hearing. I've explained this to you in detail, in detail, alright? So I'll have you removed from this

hearing at this time." Dkt. No. 103–12 at 40. After Bogett's testimony, Uhler spoke with Murray and returned Murray to the hearing. *Id.* at 46.

### iv. Disposition and Appeals

**\*8** On December 30, 2009, Uhler issued a hearing disposition. Dkt. No. 103–7 at 4. Uhler relied on: reports written by Hebert and Tulip; review of two unusual incident reports; testimony from eight staff members and one inmate; and a video tape of the infirmary door area showing staff tackling Murray to the floor. *Id.* Uhler concluded that all staff testimony was consistent with each other and the video evidence. *Id.* Uhler considered Tulip's testimony that he had moderate to serious injuries from Murray's kicking and was out of work for four days per a doctor's order. *Id.* at 4, 14. Grant was out of work for four days as well. *Id.* at 14. Travers and Smith testified that care given was appropriate. *Id.* at 4. Further, Uhler considered testimonies that Murray had attacked staff. *Id.* Uhler wrote, "[t]his type of behavior will not be allowed. Inmate caused serious harm to staff and placed many others in grave danger." *Id.* A copy of the disposition was given to Murray. *Id.* Uhler ordered that Murray be placed in the Special Housing Unit ("SHU") [FN7] for sixty months. Compl. ¶ 9; Dkt. Nos. 103–7 at 3, 103–12 at 90–91. Uhler also gave Murray sixty months loss of privileges for packages, commissary, phone, and good time credits. Dkt. Nos. 103–7 at 3, 103–12 at 90–91.

> **FN7.** SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. COMP. CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

On March 8, 2010, defendant Director of

Slip Copy, 2014 WL 4676569 (N.D.N.Y.)
**(Cite as: 2014 WL 4676569 (N.D.N.Y.))**

SHU/Inmate Discipline Bezio modified Murray's sentence to twenty-four months in SHU, to begin on June 28, 2014. Dkt. No. 103–6 at 2–3; Murray Dep. at 12.[FN8] By letter dated June 3, 2010, Murray's attorney at Prisoners' Legal Services sought reconsideration of the disciplinary hearing disposition. Dkt. No. 103–14 at 9–12. By letter dated August 18, 2010, defendant Acting Director of SHU/Inmate Disciplinary Programs Prack denied reconsideration. *Id.* at 13.

> FN8. Defendant Bezio also reduced the punishment to twenty-four months of other privileges and good time credits to begin on April 22, 2011. Dkt. No. 103–6 at 2–3.

As of February 17, 2012, Murray has approximately seventeen years of prison time left to serve in SHU from other misbehavior reports. Murray Dep. at 11. Murray alleges that SHU confinement causes him mental distress. Compl. ¶ 15; Murray Dep. at 76. Murray does not seek reinstatement of good time credits. Compl. ¶ 16.

## II. Discussion

Murray alleges that his Eighth Amendment rights were violated when: (1) defendants Arquitt, Bogett, Clark, Grant, Hebert, Laramay, Manley, McGaw, Ramsdell, Rowe, and Tulip either used excessive force against him and failed to intervene on his behalf; (2) defendants Bezio and Prack exhibited deliberate indifference to his safety in denying his appeals; and (3) defendants Fischer and Rock exhibited deliberate indifference in failing to train subordinates. Compl. ¶¶ 2–7, at 27. Murray further alleges that his Fourteenth Amendment rights were violated when: (1) defendants Hebert and Tulip issued false misbehavior reports against him; (2) defendants Bezio, Prack, and Rock denied his appeals and failed to remedy the alleged constitutional violations; and (3) defendant Uhler failed to provide him with due process. *Id.* ¶¶ 8–13, 17, at 27. Murray seeks monetary damages and injunctive and declaratory relief. *Id.* at 28.

*9 Defendants seek summary judgment of certain claims, contending that Murray's: (1) claims against them in their official capacities for monetary damages are barred by the Eleventh Amendment; (2) Eighth Amendment claims against Ramsdell and Fourteenth Amendment claims against defendants Fischer, Prack, and Rock must fail because they were not personally involved in the alleged constitutional violations; (3) Fourteenth Amendment procedural due process claim against defendants Bezio, Fischer, Prack, Rock, and Uhler must fail because Murray received all process that was due; (4) Fourteenth Amendment claims against defendants Hebert and Tulip based on the filing of false misbehavior reports must fail; and (5) defendants Bezio, Fischer, Prack, Rock, and Uhler are entitled to qualified immunity. Defs.' Mem. of Law (Dkt. No. 103–16) at 4–5.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could

Slip Copy, 2014 WL 4676569 (N.D.N.Y.)
**(Cite as: 2014 WL 4676569 (N.D.N.Y.))**

find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by *pro se* litigants," ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law ...."

**\*10** *Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

### B. Eleventh Amendment

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be con-

strued to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State ." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). Here, because Murray seeks monetary damages against defendants for acts occurring within the scope of their duties, the Eleventh Amendment bar applies and serves to prohibit claims for monetary damages against them in their official capacity.

Accordingly, defendants' motion on this ground should be granted.

### C. Personal Involvement

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." ' *Wright v. Smith,* 21

Slip Copy, 2014 WL 4676569 (N.D.N.Y.)
**(Cite as: 2014 WL 4676569 (N.D.N.Y.))**

F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

**\*11** (1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).[FN9]

> **FN9.** Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five *Colon* factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact

on the five *Colon* factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N.Y.2010) (holding that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that *Iqbal* eliminated *Colon's* personal involvement standard).

### 1. Ramsdell

Murray has failed to establish the personal involvement of Ramsdell for the claims of excessive force and failure to protect. Murray believes that Ramsdell was present and assaulted him during the second incident on December 3, 2009 but does not know if Ramsdell had struck him. Contrary to Murray's assertion, Ramsdell testified that his involvement did not commence until he arrived at the scene after Bogett and Grant used force on Murray. Further, Ramsdell only escorted Murray to seek medical attention. Ramsdell's version of the events is consistent with use of force reports, unusual incident reports, and internal memoranda. *See* Dkt. Nos. 103–7 at 14, 18–19, 103–8, 103–9 at 1–5.

While "an [inmate']s 'inability to positively identify those who allegedly violated his rights is not *per se* fatal to his claims" Murray does not point to any record evidence establishing that Ramsdell was at scene of Murray's assault either before or during the time of the alleged use of excessive force. *De Michele v. City of New York,* No. 09–CV–9334 (PGG), 2012 WL 4354763, at \*16 (S.D.N.Y. Sept. 24, 2012) (citations omitted).[FN10] Despite Murray's conclusory and speculative assertions, it is fair to conclude that a rational factfinder could not find in favor of Murray as the record is devoid of any evidence indicating that Ramsdell was present at either assault. *See, e.g., Coleman v. Hauck,* No. 09–CV–1391 (GTS)(GHL), 2012 WL 4480684, at \*9 (N.D.N.Y. Sept. 26, 2012) (granting summary judgment for certain defendants on personal involvement grounds where plaintiff argued that "[a]ll named Defendants responded to the scene

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

where Plaintiff was repeatedly struck and kicked in the face" but failed to point to record evidence establishing that those defendants arrived at the scene before the use of force was applied).

> FN10. All unpublished opinions cited to by the Court in this Report–Recommendation are, unless otherwise noted, attached to this Recommendation.

Furthermore, Murray failed to proffer any evidence showing that Ramsdell had "a realistic opportunity to intervene to prevent the harm from occurring." *De Michele,* 2012 WL 4354763, at *17 (citing *inter alia Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994)) (internal quotation marks omitted). As Murray does not provide even a scintilla of evidence that Ramsdell was present at the time of the alleged assaults, Murray cannot show that Ramsdell had directly participated in the assaults or failed to intervene in the misconduct. Moreover, Murray does not allege, and the record does not reflect the contrary, that Ramsdell had created a policy or custom under which unconstitutional practices occurred or was grossly negligent in his supervision. *Colon,* 58 F.3d at 873. Therefore, Murray cannot establish the personal involvement of Ramsdell in the alleged unconstitutional actions.

**\*12** Accordingly, defendants' motion on this ground should be granted.

### 2. Fischer

Murray claims that Commissioner Fischer was negligent in managing his subordinates. The gravamen of Fischer's complaints against Fischer is that he was in a position of power, thus always involved with anything occurring in conjunction with Murray's incarceration. However, attempts to establish personal involvement based upon the supervisory role this defendant occupied is inappropriate. *Wright,* 21 F.3d at 501 (holding that a position in a hierarchical chain

of command, without more, is insufficient to support a showing of personal involvement).

Drawing every favorable inference in Murray's favor, Murray contends that he notified Fischer of the alleged constitutional violations through letters and grievances. However, merely writing letters and grievances to a defendant is insufficient to establish notice and personal involvement. *Smart v. Goord,* 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) ("Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] ...."). Similarly, receipt of a letter or grievance, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement. *See, e.g., Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009) (citing cases); *Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability ... [p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.").

The only correspondence which referenced any involvement by Fischer was a letter addressed to Fischer from Murray for an extension to appeal the Tier III hearing disposition. Dkt. No. 103–14 at 4–5. A letter from Bezio explained to Murray that the letter was received and Murray's letter request satisfied the thirty-day time period for submitting an appeal. *Id.* at 3. Here, it is within the purview of a superior officer to delegate responsibility to others. *See Vega v. Artus,* 610 F.Supp.2d 185, 198 (N.D.N.Y.2009) (finding no personal involvement where "the only involvement of the supervisory official was to refer the inmate's complaint to the appropriate staff for investigation.") (citing *Ortiz–Rodriguez v. N.Y. State Dep't of Corr. Servs.,* 491 F.Supp.2d 342, 347 (W.D.N.Y.2007)). Moreover, conclusory allegations about negligent supervision and a failure to train are insufficient to establish personal involvement.

Slip Copy, 2014 WL 4676569 (N.D.N.Y.)
**(Cite as: 2014 WL 4676569 (N.D.N.Y.))**

Accordingly, defendants' motion on this ground should be granted.

### 3. Prack

Murray claims that Prack violated his Fourteenth Amendment rights by denying his appeals and failing to remedy the alleged constitutional violations. The only correspondence referencing Prack's involvement is a letter denying reconsideration of Bezio's reduced penalty for the disciplinary hearing. The affirmation of an allegedly unconstitutional disciplinary hearing appears to establish personal involvement. *See Thomas v. Calero,* 824 F.Supp.2d 488, 505–11 (S.D.N.Y.2011) (discussing cases and concluding that affirming or modifying, as opposed to vacating and remedying, an allegedly constitutionally infirm disciplinary proceeding can satisfy various prongs of *Colon* and, regardless of *Iqbal's* impact on the *Colon* factors, results in a constitutional violation of which the defendant had knowledge, failed to remedy, and allowed to continue). However, as discussed *infra,* Murray's disciplinary hearing passes constitutional muster. As such, Murray cannot establish Fourteenth Amendment due process claims against Prack based on the affirmance of a constitutional disciplinary hearing.

**\*13** Accordingly, defendants' motion on this ground should be granted.

### 4. Rock

Lastly, Murray contends that Superintendent Rock violated his Fourteenth Amendment by denying his appeals, failing to remedy the alleged constitutional violations, and failing to train subordinates. The record is devoid of any reference to Rock's personal involvement. Before the Court is a superintendent decision dated January 25, 2010 that denied Murray's grievance. Nevertheless, that decision was signed by Deputy Superintendent Otis, not Superintendent Rock. As previously discussed, it is within the pur-

view of a superior officer to delegate responsibility to others. *See Vega,* 610 F.Supp.2d at 198 (citation omitted). As such, Murray has failed to establish Rock's personal involvement in the alleged due process violations. *Colon,* 58 F.3d at 873.

Accordingly, defendants' motion on this ground should be granted.

### D. Fourteenth Amendment

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall ... deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV § 1. It is important to emphasize that due process "does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished without due process of the law." *Baker v. McCollan,* 443 U.S. 137, 145 (1979) (internal quotation and citations omitted). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (citations omitted). An inmate retains a protected liberty interest to remain free from segregated confinement if the prisoner can satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995).

### 1. Procedural Due Process

To state a claim for procedural due process, there must first be a liberty interest which requires protection. *See generally Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) ("[P]rocedural due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the condi-

Slip Copy, 2014 WL 4676569 (N.D.N.Y.)
**(Cite as: 2014 WL 4676569 (N.D.N.Y.))**

tions of the general prison population" are to be considered. *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998). This standard requires a prisoner to establish that the confinement or condition was atypical and significant in relation to ordinary prison life. *See Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

**\*14** While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (citations omitted). The Second Circuit has not established "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (citations omitted). Instead, the Second Circuit has provided guidelines that "[w]here the plaintiff was confined for an intermediate duration-between 101 and 305 days-development of a detailed record of the conditions of confinement relative to ordinary prison conditions is required." *Id.* at 64–65 (citing *Colon,* 215 F.3d at 232). In the absence of a dispute about the conditions of confinement, summary judgment may be issued "as a matter of law." *Id.* at 65 (citations omitted). Conversely, where an inmate is confined under normal SHU conditions for a duration in excess of an intermediate disposition, the length of the confinement itself is sufficient to establish atypicality. *Id.* (citing *Colon,* 215 F.3d at 231–32). Also, "[i]n the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short-e.g. 30 days-and there was no indication [of] ... unusual conditions." *Harvey v. Harder,* No. 09–CV–154 (TJM/ATB), 2012 WL 4093792, at \*6 (N.D.N.Y. July 31, 2012) (citing *inter alia Palmer,* 364 F .3d at 65–66).

Defendants contend that Murray has failed to show the deprivation of a liberty interest because he has yet to serve the assigned SHU time. Courts in this District have held that where the plaintiff had not yet served the sentence imposed at the time he filed his complaint, the Court is unable to determine whether the confinement conditions of SHU were atypical or significant. *See, e.g., Chavis v. Kienert,* No. 03–CV–0039 (FJS/RFT), 2005 WL 2452150, at \*12 (N.D .N.Y. Sept. 30, 2005). However, Murray was sentenced to twenty-four months of SHU confinement, which amounts to 730 days. This length of confinement is sufficient to establish atypicality. *Palmer,* 364 F.3d at 64. Even though Murray has yet to serve the penalty, he is scheduled to serve it on June 28, 2014, and there is no evidence before the Court indicating otherwise. Given the length of the sentence and the imminent date for commencement of that sentence, the Court is not persuaded that Murray has failed to establish a liberty interest for purposes of his procedural due process claims. *Cf. Benitez v. Mailloux,* No. 05–CV–1160, 2009 WL 1953847, at \*10–11 (N.D.N.Y. Mar. 25, 2005), *report and recommendation adopted in part, rejected in part on other grounds,* No. 05–CV–1160 (NAM/RFT), 2009 WL 1953752 (N.D.N.Y. July 2, 2009) (concluding no liberty interest in 2009 when sentence was to be served in 2012). As such, the Court proceeds with the understanding that Murray has in fact established a liberty interest.

**\*15** Defendants alternatively argue that Murray's procedural due process claims against defendants Bezio, Fischer, Prack, Rock, and Uhler should be dismissed because Murray was given all process that was due. While inmates are not given "the full panoply of [due process] rights," they are still afforded procedural process. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). A prisoner is "entitled to advance written notice ...; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira v.. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citations omitted).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4676569 (N.D.N.Y.)
**(Cite as: 2014 WL 4676569 (N.D.N.Y.))**

### a. Written Notice

In this case, the issue of a written notice is undisputed. An inmate must be provided advance written notice at least twenty-four hours before the hearing commences. *Wolff,* 418 U.S. at 563–64. Murray was provided with a written notice of the Tier III disciplinary hearing. On December 4, 2009, Murray received the misbehavior reports authored by Hebert and Tulip. Those reports charged Murray with violent conduct, interference with employee, and refusing direct order, and assault on staff for the December 3, 2009 incidents. The disciplinary hearing commenced on December 17, 2009. As such, Murray was provided with written advance notice. *Sira,* 380 F.3d at 69.

### b. Opportunity to Call Witnesses and Present Documentary Evidence

Murray contends that he was deprived of an opportunity to call all witnesses and present certain documentary evidence. However, "[i]t is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] ... on the basis of irrelevance or lack of necessity." *Scott v. Kelly,* 962 F.2d 145, 146–47 (2d Cir.1992) (internal quotations and citations omitted). Uhler permitted ten individuals to testify at Murray's disciplinary hearing. Gillard and Robertson did not testify because they declined to do so and Murray has not alleged, and the record does not reflect the contrary, that intimidation by prison officials resulted in the witnesses' refusals. *Webb v. Selsky,* No. 01–CV–149S, 2008 WL 796179, at *6 (W.D.N.Y. Mar. 24, 2008) ("A failure to summon the testimony of a witness who has refused to testify, in the absence of evidence that the refusal was linked to intimidation on the part of prison officials, does not violate due process because calling a witness who refuses to speak upon questioning would be futile.") (citing *Johnson v. Doling,* No. 05–CV–376 (TJM/RFT), 2007 WL 3046701, at *7 (N.D.N.Y.Oct.17, 2007)). There is nothing in the record indicating that either Gillard or Robertson would have provided evidence favorable to Murray beyond what was given by Bonaparte. *Livingston v.*

*Kelly,* 423 F. App'x 37, 40 (2d Cir.2011) (citation omitted). Furthermore, while Laramay, Manley, Weissman, and Rowe did not testify, they did not observe what transpired during the use of force incidents on December 3, 2009. Thus, their testimonies would not assist Uhler in arriving at a decision regarding the appropriateness of the misbehavior reports.

**\*16** The same is true for the evidence which was denied. Uhler denied Murray's request to watch footage of Murray on December 4, 2009 because it was irrelevant to the events on December 3, 2009. Further, Murray was provided all documents generated from the use of force incidents as well as review of a video recording showing what occurred after Arquitt, Murray, and Tulip fell through the door. Moreover, Uhler ultimately granted Murray the opportunity to watch handheld footage of his escort from the examination room to his cell. "Courts have long recognized ... that the right to know evidence supporting prison disciplinary rulings is not absolute." *Sira,* 380 F.3d at 74 (citations omitted). Accordingly, in light of all documentary evidence that was provided to Murray, discovery of irrelevant documents regarding medical records and video surveillance would be of no value in determining the validity of the disciplinary tickets.

Murray was provided with an opportunity to extensively question his witnesses through Uhler. "While inmate do have the right to question witnesses at their disciplinary hearings, that right is not unlimited and its contours are under the discretion of prison officials." *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 125 (S.D.N .Y.2002). Thus, Uhler retained the authority and discretion to administer the questioning in a manner he saw fit. While Uhler did not permit Murray to ask every question, a review of the hearing transcript shows that he did permit Murray to question the witnesses rather extensively. Moreover, when Uhler denied Murray's questions he provided reasoning regarding the denial, such as the lack of relevance to the ultimate issue of the validity of the misbehavior

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4676569 (N.D.N.Y.)
**(Cite as: 2014 WL 4676569 (N.D.N.Y.))**

report.

Accordingly, Murray was provided with an op-
portunity to call witnesses and present documentary
evidence. *Sira,* 380 F.3d at 69.

### c. Fair and Impartial Hearing Officer

Murray contends that Ulher was not an impartial
hearing officer because Uhler had personally investi-
gated the matter, already decided on the credibility of
witnesses, and ejected Murray from the hearing during
Bogett's testimony. Prisoners have a constitutional
right to a fair and impartial hearing officer. *See, e.g.,*
*Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). How-
ever, "[t]he degree of impartiality required of prison
officials does not rise to the level of that required of
judges ... [as i]t is well recognized that prison disci-
plinary hearing officers are not held to the same
standard of neutrality as adjudicators in other con-
texts." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d
Cir.1996) (citations omitted). The Supreme Court held
"that the requirements of due process are satisfied if
some evidence supports the decision by the [hearing
officer]." and the Second Circuit has held that the test
is whether there was " 'reliable evidence' of the in-
mate's guilt." *Luna v. Pico,* 356 F.3d 481, 487–88 (2d
Cir.2004); *see also Superintendent, Mass. Corr. Inst.*
*v. Hill,* 472 U.S. 445, 455 (1985).

**\*17** It was clear that Uhler was objective and
carefully listened to the testimony and arguments
presented by Murray as Uhler reversed his prior deci-
sion about allowing Bonaparte to testify as well as
offering Murray an opportunity to adjourn the hearing
so that Murray may formulate more cogent questions
to support and present his defense. Throughout the
hearing, Uhler reiterated that he had yet to determine
whether Murray was guilty of the prison violations
charged. *See, e.g.,* Dkt. No. 103–12 at 83. Moreover,
Uhler offered to make personal inquiries as to certain
witnesses to confirm their intention to decline ap-
pearing at the disciplinary hearing.

Murray specifically claims that Uhler had stated
Traver's credibility was not at issue. However, this
assertion is misplaced. In context, Uhler stated, "[h]er
credibility is not on[,] here's the problem[,] it is my job
to determine the credibility of any witness whether it
is employee or inmate is good or bad at this hearing."
Dkt. No. 103–11 at 45. Uhler continued, explaining
that in order to show a witness was providing false
allegations, Murray should submit evidence to sub-
stantiate his position. *Id.* at 49.

Murray asserts that Uhler should not have con-
ducted the hearing because Uhler had investigated the
charges against him and issued a restraint order for
Murray after the alleged assault on staff. These con-
clusory assertions remain unsubstantiated. Uhler
stated that he did not investigate the incidents. In fact,
Uhler further explained,

> you've stated that you were assaulted[.] I can tell
> you as the Dep. of Security at this facility[,] I am
> aware of those complaints prior to coming down
> here today to do this hearing. I am aware that you
> have made allegations of abuse. I have not been part
> of the investigation that is being done by someone
> else at this point ... and that's outside of this hearing
> room.

Dkt. No. 103–11 at 35. Moreover, Uhler ex-
plained that he had only signed a recommendation
from a sergeant, which was recommended by the
watch commander for full restraints based on allega-
tions against Murray. Dkt. No. 1–3–12 at 87. There is
no record evidence showing the contrary; thus, Mur-
ray's contention on this point is unsubstantiated and
without merit.

Murray also asserts that Uhler violated his due
process rights when Uhler removed him from the
hearing during Bogett's testimony. However, "inmates
do not possess a constitutional right to be present

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4676569 (N.D.N.Y.)
**(Cite as: 2014 WL 4676569 (N.D.N.Y.))**

during the testimony of witnesses during a disciplinary proceeding." *Harmon v. Escrow,* No. 08–CV–6381 (CJS), 2012 WL 3560812, at *4 (W.D.N.Y. Aug. 16, 2012) (citing *Francis v. Coughlin,* 891 F.2d 43, 48 (2d Cir.1989), *Hidalgo v. Hopin,* No. 01–CV–0057(Sr), 2009 WL 4803689 (W.D.N.Y. Dec. 9, 2009) (stating inmates do not have "a constitutional right to confront or cross-examine witnesses in prison disciplinary hearings)). As such, Murray's due process rights were not violated when Uhler took Bogett's testimony in Murray's absence.

**\*18** Lastly, it is clear that Murray's disciplinary disposition was based on reliable evidence of his guilt. Arquitt and Tulip testified that they were escorting Murray from the infirmary when Murray turned around and kicked Tulip in the groin area. In response, Arquitt and Tulip tackled Murray to the ground and in doing so, fell through a door. Tulip denied having hit Murray in the head prior to being kicked. Hebert testified that after Murray was placed in the holding pen, Murray continued to struggle with Bogett and attempted to bite Grant. Clark was working in the infirmary and responded a loud noise in the entrance where he found Murray on the ground with officers attempting to restrain him. Clark assisted Tulip, who appeared injured. These officers' testimonies are consistent with each others' account of the events, a video tape of the infirmary's entrance way, and are supported by internal memoranda and the use of force and usual incident reports. As for Bonaparte's testimony regarding Travers and other prison staff, these individuals are not parties to this action. Uhler carefully considered the competing evidence, namely the testimonies, reports, video recording, and injuries suffered by Tulip and Grant, with Murray's contention that he did not provoke the use of force incidents. Ultimately, Uhler reasoned that Murray's behavior caused harm to staff, and given the environment of prisons, such behavior should and would not be tolerated.

Accordingly, despite Murray's conclusory and

unsupported contentions of bias, the record is clear that there is no question of material fact surrounding the process Murray was provided. As such, defendants' motion should be granted on this ground.

### d. Written Statement of Disposition

It is undisputed that Murray received a written statement of the hearing disposition. On December 30, 2009, Murray voluntarily left his disciplinary hearing before Uhler rendered his decision on the two misbehavior reports. Dkt. No. 103–12 at 88–89. The record indicates that Murray received a written statement of the evidence relied upon and reasons for the disciplinary action. Thus, Murray was provided with a written statement of the Tier III disciplinary hearing disposition. *Sira,* 380 F.3d at 69.

Accordingly, defendants' motion on this ground should be granted.

### e. Inmate Assistance

"An inmate's right to assistance with his disciplinary hearing is limited." *Neree v. O'Hara,* No. 09–CV–802 (MAD/ATB), 2011 WL 3841551, at *13 (N.D.N.Y. July 20, 2011) ( *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993)). This Circuit has held that an assistant is constitutionally necessary when the plaintiff is confined in SHU and unable to marshal evidence and present a defense. *Id.* (citation omitted). In such a case, the assistant need only perform what the plaintiff would have done but need not go beyond the inmate's instructions. *Lewis v. Johnson,* No. 08–CV–482 (TJM/ATB), 2010 WL 3785771, at *10 (N.D.N.Y. Aug. 5.2010) (citing *Silva,* 992 F.2d at 22). Furthermore, "any violations of this qualified right are reviewed for 'harmless error.' " *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437 (W.D.N.Y.2010) (citing *Pilgrim v. Luther,* 571 F.3d 201, 206 (2d Cir.2009)).

**\*19** Here, Murray was confined in SHU from December 3, 2009 onward and thus is entitled to an inmate assistant. Dkt. No. 103–5 at 3; *see also Murray*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4676569 (N.D.N.Y.)
**(Cite as: 2014 WL 4676569 (N.D.N.Y.))**

*v. Goord,* 668 F.Supp.2d 344, 350 (N.D.N.Y.2009) ("Upstate ... [is] a maximum security prison comprised of special housing unit ("SHU") cells in which inmates are confined ....") (citation omitted). Murray alleges that he was generally deprived of adequate inmate assistance. Murray first met with his Inmate Assistant Fish on December 7, 2009. Fish assisted Murray with completing the assistant form to identify witnesses and documentary evidence. Fish also assisted Murray with contacting potential witnesses to testify at the disciplinary hearing. Dkt. No. 103–11 at 5, 14. Fish denied Murray any complaints or legal correspondence with respect to Murray being assaulted in the infirmary area. Dkt. No. 103–11 at 5. However, Uhler stated at the disciplinary hearing that he may produce such records if during the hearing, he determines that those records are relevant. *Id.* As for video footage of what occurred on December 3, 2009 inside the door, Uhler explained that such footage did not exist. *Id.* Further, Uhler denied Murray video footage of him on December 4, 2009 because it was irrelevant to the December 3, 2009 incidents.

Even assuming Fish had provided inadequate assistance, such a deprivation was rendered harmless and a factfinder could not conclude that Murray was prejudiced as a result. *Gallo,* 22 F.3d at 1223–24. The record shows that Uhler took steps to provide Murray with the requested evidence. Uhler also offered Murray more time to prepare for the hearing, which Murray declined. There is no indication that the result of Murray's hearing would be different had Fish provided Murray with all requested evidence. *See Chavis v. vonHagn,* No. 02–CV–0119 (Sr), 2009 WL 236060, at *53 (W.D.N.Y. Jan. 30, 2009) (finding due process claim based on denied employee assistant to prepare for disciplinary hearings was without merit because the record showed that "plaintiff was indeed able to present evidence (and often did), both oral and documentary, in his own defense) (citation omitted). As such, Murray's due process claim based on inmate assistance must fail.

Accordingly, defendants' motion on this ground should be granted.

### 2. False Misbehavior Report

An inmate has a right not to be deprived of a liberty interest without due process. However, a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). "There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988)). Even so, a due process claim predicated upon a false misbehavior report issued in retaliation against an inmate still fails to state a claim if the inmate received all the procedural process protections that was due to him. *Livingston,* 423 F. App'x at 40 (citing *inter* alia *Freeman,* 808 F.2d at 952). Here, Murray alleges that defendants Hebert and Tulip filed false misbehavior reports against him in retaliation for Murray lodging grievances and complaints. *Boddie,* 105 F.3d at 862; *see* Murray Dep. 38–39. However, as discussed above, Murray received all the procedural process protections that he was due.

**\*20** Moreover, to allege a claim based on the issuance of false misbehavior reports as retaliatory conduct, a prisoner must establish by a preponderance of the evidence that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (internal quotation marks and citation omitted); *Tafari v. McCarthy,* 714 F.Supp.2d 317, 347 (N.D.N.Y.2010). Murray does not allege any facts going to establishing a causal connection. Murray does not proffer any information with regard to grievances or complaints he filed against either Hebert or Tulip. Murray further testified that he believes Tulip retaliated against him because he insulted Tulip.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4676569 (N.D.N.Y.)
**(Cite as: 2014 WL 4676569 (N.D.N.Y.))**

Murray Dep. at 41. However, such insults do not constitute protected speech. *Doe v. Selsky,* No. 08–CV–6199L, 2013 WL 5311221, at *3 (W.D.N.Y. Sept. 20, 2013) (citing *Lockett v. Suardini,* 526 F.3d 866, 874 (6th Cir.2008) (finding inmate's insulting comments to a disciplinary hearing officer was not protected speech), *Chevalier v. Schmidt,* No. 11–CV–788(JTC), 2012 WL 6690313, at *3 (W.D.N.Y. Dec. 21, 2012) ("Vulgar, insulting, and threatening statements have been found not to be protected speech for purposes of the First Amendment")). As such, Murray has failed to allege a due process claim based on the issuance of false misbehavior reports as retaliatory conduct.

Accordingly, defendants' motion on this ground should be granted.

### E. Qualified Immunity

Defendants Bezio, Fischer, Prack, Rock, and Uhler contend that even if Murray's Fourteenth Amendment claims are substantiated, they are nevertheless entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 F. App'x 146 (2d Cir.2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court

proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be addressed with respect to Murray's Fourteenth Amendment claims against these defendants because, as discussed *supra,* it has not been shown that defendants violated Murray's Fourteenth Amendment rights.

**\*21** Accordingly, defendants' motion on this ground should be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for partial summary judgment (Dkt. No. 103) is **GRANTED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Filed April 22, 2014.

N.D.N.Y.,2014.
Murray v. Arquitt
Slip Copy, 2014 WL 4676569 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Kenneth J. PHELAN, Plaintiff,
v.
HERSH, C.O., Mt. McGregor Corr. Facility; M. Scott,
C.O., Mt. McGregor Corr. Facility; Pam Ramond,
Civilian Library Clerk, Mt. McGregor Corr. Facility;
Goodman, Lieutenant, Mt. McGregor Corr. Facility;
Fletcher, Civilian Employee, Mt. McGregor Corr.
Facility; J. Micheals, Sergeant, Mt. McGregor Corr.
Facility; Cambell, Sergeant, Mt. McGregor Corr.
Facility; W. Haggett, Superintendent, Mt. McGregor
Corr. Facility; Gregory Kadien, Superintendent,
Gowanda Corr. Facility; P.Millson, Mental Health
Director, Gowanda Corr. Facility; Brian Fischer,
Commissioner of Department of Corr.; James Mor-
gan, Associate Director of the Office of Mental
Health; R. Regan, Corr. Officer, Gowanda Corr. Fa-
cility; Acosta–Ortiz, Corr. Officer, Gowanda Corr.
Facility; B. Pawelczak, Civilian Hearing Officer,
Gowanda Corr. Facility; Stachewiez, Lieutenant,
Gowanda Corr. Facility; Thompson, Deputy Super-
intendent, Collins Corr. Facility; R. Thomas, Corr.
Officer, Mt. McGregor Corr. Facility, a/k/a "Fat Boy",
Defendants.

Civ. No. 9:10–CV–0011 (GLS/RFT).
Sept. 13, 2011.

Kenneth J. Phelan, Comstock, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney
General, Department of Law, The Capitol, Adrienne J.
Kerwin, Esq., Assistant Attorney General, of Counsel,
Albany, NY, for Defendants.

ORDER
RANDOLPH F. TREECE, United States Magistrate
Judge.

**\*1** Kenneth J. Phelan, a New York state prison
inmate proceeding *pro se* and *in forma pauperis,*
commenced this action pursuant to 42 U.S.C. § 1983,
alleging, *inter alia,* in forty-three causes of action, that
Defendants retaliated against him for filing grievanc-
es, denied him due process of the law, denied him
adequate mental health treatment in deliberate indif-
ference to his medical needs, subjected him to cruel
and unusual punishment, and generally harassed and
discriminated against him on account of his disability.
Dkt. No. 1, Compl. Defendants now move for dis-
missal of the Complaint pursuant to Federal Rule of
Civil Procedure 12(b)(6). Dkt. No. 55. Plaintiff op-
poses the Motion. Dkt. No. 60. For the reasons that
follow, we recommend that Defendants' Motion be
**granted** in part and **denied** in part.

## I. BACKGROUND
### A. Facts

The following facts are derived from the Com-
plaint, which, in accordance with the standard of re-
view on a motion to dismiss, must be taken as true. *See
infra* Part II.A.

On or about March 25, 2009, Plaintiff, while
housed at Mt. McGregor Correctional Facility, re-
quested mental health treatment from "sick call,"
where a nurse told him he would be notified when
treatment becomes available. Compl. at ¶ 6. On April
2, 2009, Plaintiff asked Defendant Hersh if he could
go to the "grievance building" to file an administrative
grievance complaining about the lack of mental health
treatment, to which Hersh replied that he could. *Id.* at ¶
7. At the grievance building, Defendant Scott "im-
mediately started yelling at [Plaintiff] and demanded
to know why [he] wanted to file [a grievance]." *Id.*

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

Scott called Plaintiff a "fucking retard" and that "[w]e don't allow fucking inmates to file grievances. If you got a problem we'll just beat the shit out of you. You really got a problem?" *Id.* Plaintiff feared for his life, and responded "no, ma['a]m" and returned to his housing unit without filing a grievance. *Id.* at ¶ 8. Twenty minutes after returning, Defendant Thomas, Defendant Hersh, and an unidentified Correctional Officer searched Plaintiff's cell, throwing his "neatly folded and ironed laundry ... on the floor shaking them out." *Id.* at ¶ 9. Defendant Thomas also read Plaintiff's legal mail and "stomped on his legal papers and mail," while Hersh told him they "don't allowed retards to file grievances" and threatened to fight him. *Id.* Thomas told Plaintiff that "[t]his is how we deal with grievances here retard." *Id.* Plaintiff received two disciplinary "write ups" from the incident, alleging, among other things, that Plaintiff refused direct orders and had gang material in his locker. *Id.* at ¶¶ 10–11.

On or about April 7, 2009, Plaintiff requested mental health treatment from Correctional Officer Collins, who is not a named Defendant in this action and who arranged for "a nurse at medical" to speak with Plaintiff. *Id.* at ¶ 12. The nurse told Plaintiff that someone from mental health would be coming in a few days and asked if Plaintiff wanted to go to the infirmary until mental health assistance arrived, to which Plaintiff said no, because "that won't solve anything." *Id.*

**\*2** On April 14, 2009, Plaintiff went to the law library, where the clerk, Defendant Raymond, told Plaintiff, "[o]h, you are that retard the C/Os told me about.... I can do whatever I want to you retard.... Get the hell out of my library retard." *Id.* at ¶ 13. Plaintiff received a disciplinary ticket for this incident. *Id.* When he returned to his housing, Plaintiff was confronted by Defendants Cambell and Micheals, who yelled at Plaintiff, saying "[y]ou are a fucking retard and a scumbag, you know that[?] ... Stop l[y]ing about a disability and take your fucking medicine like a man;" they then asked Plaintiff for his "side of the

story" regarding the incident in the library. *Id.* at ¶ 15. Apparently not satisfied with Plaintiff's synopsis, Defendant Micheals "came up beside [Plaintiff] and hit[ ] [Plaintiff] in the head several times, aggravating [his] Tra[u]matic Brain Injury." *Id.*

In April 2009, three disciplinary hearings for Plaintiff commenced. Two of the hearings, which started on April 9 and April 17, addressed disciplinary tickets Plaintiff received from Defendant Thomas and Defendant Ramond, respectively, and were presided over by Defendant Fletcher. *Id.* at ¶¶ 16 & 19. The other disciplinary hearing, presided over by Defendant Goodman, regarded a ticket from Defendant Scott and commenced on April 14. *Id.* at ¶ 17. Both Defendants Fletcher and Goodman stayed their hearings to undertake mental health assessments after Plaintiff told the hearing officers he had a mental disability. *Id.* at ¶¶ 16–17. Plaintiff claims that the proceedings restarted with no mental health assessment ever being undertaken. *Id.* at ¶¶ 18–21. Plaintiff complains that in Defendant Fletcher's disciplinary hearings, Fletcher interviewed witnesses outside Plaintiff's presence and investigated witnesses suitability for the hearing without Plaintiff's involvement, which "was b[ia]sed." *Id.* at ¶¶ 19 & 21.

Pursuant to the disciplinary ticket issued by Defendant Thomas, Plaintiff plead not guilty "to the gangs charge" and guilty to the other charges, wherefore Defendant Fletcher found Plaintiff guilty of all charges and sentenced him three months in a Special Housing Unit ("SHU"), three months loss of packages, commissary, and phone privileges, and a five-dollar surcharge. *Id.* at ¶ 18. Defendant Fletcher also sentenced Plaintiff to the same punishment with regard to the disciplinary ticket from Defendant Ramond. *Id.* at ¶ 21.[FN1] Defendant Goodman sentenced Plaintiff to thirty days "keepblock, suspended 30 days and deferred for 90 days," a five-dollar surcharge, and took away Plaintiff's yard, packages, commissary, and phone privileges for thirty days. *Id.* at ¶ 20. Plaintiff appealed the disciplinary hearing determinations from

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

Defendants Thomas's and Ramond's tickets; all convictions were affirmed except "the gang charge," which was reversed on May 26, 2009 "by the Commissioner." *Id.* at ¶¶ 22–23.

> FN1. It is unclear by Plaintiff's Complaint whether these two sentences were to run concurrently or consecutively.

**\*3** On or about May 14, 2009, Plaintiff was transferred to Downstate Correctional Facility for an overnight stay. *Id.* at ¶ 24. Plaintiff was "sha[c]kled and cuffed to waist chains for about 4 hours, even though [he has] a mental illness." *Id.* The next day, Plaintiff was strip-searched and handcuffed and restrained again in order to be transferred to Lakeview Shock Correctional Facility, which was "about a 12 hour drive;" the drive made Plaintiff's shoulder muscles "very sore." *Id.* Plaintiff was not given a hot meal that day, but "was only given another dry boloney sandwich." *Id.* Plaintiff does not attribute these acts to any specific Defendants. Around July 19, 2009, Plaintiff was transferred to Gowanda Correctional Facility. *Id.* at ¶ 25.

On or about July 21, 2009, Plaintiff had a medical doctor appointment with Dr. Bangsil,[FN2] who was concerned with Plaintiff's history of suicide attempts and put in a referral for Plaintiff "to see someone in mental health." *Id.* at ¶ 26. However, Plaintiff did not see someone from mental health until September 8, 2009; in the interim, he placed upwards of seven requests to "see M.H." *Id.* at ¶¶ 27–34 & 37. He also received a disciplinary ticket from Defendant Regan for smoking—"even though Plaintiff is a non-smoker and allergic to cigarette smoke—and Regan told him that, "I heard about you retard, you want treatment, I will throw you in the SHU." *Id.* at ¶¶ 35–36. When Plaintiff saw Defendant Millson, a psychologist from mental health who reviewed Plaintiff's medical history, Millson denied Plaintiff's specific request to see a psychiatrist. *Id.* at ¶¶ 32, 34, & 37.

> FN2. Dr. Bangsil is not a named Defendant in this action.

On September 15, 2009, Plaintiff's hearing for the smoking disciplinary ticket commenced, presided over by Lieutenant Kolpack,[FN3] where Plaintiff again "was not allowed to see a psychiatrist." *Id.* at ¶ 38. On September 14, Plaintiff had a doctor appointment with Dr. Bangsil and Nurse Amborlosi,[FN4] who both called the Plaintiff "retard" and told him to "get out of here," to which Plaintiff responded he would "see them in court." *Id.* at ¶ 39. Plaintiff was then written up on September 16 by Defendant Acosta–Ortiz, who called Plaintiff "pea brain," "retard," and "scumbag." *Id.* at ¶ 40. Plaintiff's disciplinary hearing for this ticket occurred on September 21, where hearing officer Defendant Pawelczak "force[d] Plaintiff to enter a plea" even though "[Plaintiff has] M.H. issues and can't proceed;" at the hearing Plaintiff claimed that Defendant Millson's evaluation of Plaintiff's mental health should be disregarded because he "is not competent to evaluate Plaintiff's M.H. condition because he is not a psychiatrist." *Id.* at ¶ 41. Plaintiff had another disciplinary hearing before Defendant Stachewiez, who Plaintiff claimed did not interview employee witnesses on the record. *Id.* at ¶ 43. Plaintiff was found guilty at all the above-mentioned hearings and lost all appeals, at least some of which were denied by Defendants Kadien and Fischer. *Id.* at ¶¶ 38 & 41–43.

> FN3. Lieutenant Kolpack is not a named Defendant in this action.

> FN4. Nurse Amborlosi is not a named Defendant in this action.

**\*4** Plaintiff characterizes himself as someone suffering from Traumatic Brain Injury, who is slow to process information and has outbursts of temper and impulsive behavior. *Id.* at ¶ 46. He outlines his claims

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

against the multiple Defendants in forty-three various causes of action. *See id.* at ¶ 47 [hereinafter "Causes of Action"]. He is currently housed at Collins Correctional Facility. *Id.* at ¶ 2.

**B. Procedural History**

Plaintiff filed his civil rights Complaint on January 5, 2010, along with a Motion to Proceed *In Forma Pauperis* ("IFP"). Dkt. Nos. 1 & 2. On January 20, 2010, the Honorable Gary L. Sharpe, United States District Judge, reviewed those filings and granted Plaintiff permission to proceed with this mater IFP. Dkt. No. 5. However, citing various inadequacies with Plaintiff's pleading, Judge Sharpe dismissed Defendants R. Regan and Pam Ramond from this action, dismissed all of Plaintiff's claims of "harassment," and denied Plaintiff's motion for injunctive relief. *See generally id.*

On February 2, 2010, Plaintiff filed a Motion for Reconsideration of Judge Sharpe's Decision and Order. Dkt. 10. In an almost identical filing on the same day, Plaintiff also brought a Notice of Appeal to the Second Circuit Court of Appeals from the January Order. Dkt. 11. In a Decision and Order issued on July 20, 2010,[FN5] Judge Sharpe re-instated Defendants Pam Ramond and R. Regan and denied Plaintiff's request to be appointed counsel. Dkt. No. 22. Finally, pursuant to Plaintiff's representations that he wished to "waive [his] challenge to loss of good time," *see* Dkt. No. 23, Judge Sharpe dismissed all claims set forth in the Complaint relating to the loss of good time credits in disciplinary hearings, as well as directed the Clerk of the Court to strike Plaintiff's submitted Amended Complaint as duplicative. Dkt. No. 27. [FN6]

FN5. "[I]f a notice of appeal is filed after a motion for reconsideration, the district court retains jurisdiction over the motion for reconsideration." *Rich v. Associated Brands, Inc.,* 2009 WL 236055, at *1 (W.D.N.Y. Jan.30, 2009) (citing *Basciano v. Lindsay,* 2008 WL 1700442, at *1 (E.D.N.Y. April 9,

2008)).

FN6. Judge Sharpe noted that the only difference between Plaintiff's Complaint and his proposed Amended Complaint was an additional claim against Defendant Haggett related to the conditions of Plaintiff's confinement. This exact same claim is asserted in another action now pending in this District. *See Phelan v. Durniak,* 9:10–cv–666 (FJS/RFT). This Court also notes that Plaintiff has filed a virtually identical complaint to this instant action in this District, with the exact same factual assertions, but bringing claims against the defendants pursuant to the Americans with Disabilities Act ("ADA"). *See Phelan v. Thomas et al.,* 9:10–cv–012 (DNH/RFT). Because of the existence of this pending action, we will not address any claims Plaintiff makes in his instant Complaint seeking relief from Defendants under the ADA. *See, e.g., Curtis v. Citibank, N.A.,* 226 F.3d 133, 138 (2d Cir.2000) ("As a part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of another federal court suit.").

**II. DISCUSSION**
**A. Standard of Review**

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The trial court's function "is merely to assess the legal feasability of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (*overruled on other grounds by Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at *2 (N.D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] solely *relies and which is* integral to the complaint' may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (emphasis in original) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)).

**\*5** The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Schermerhorn,* 373 U.S. 746, 754 n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963); *see also Arar v. Ashcroft,* 532 F.3d 157, 168 (2d Cir.2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. at 1960, 173 L.Ed.2d 868 (citing *Twombly* ).[FN7] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. at 1949, 173 L.Ed.2d 868. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. at 1950–51, 173 L.Ed.2d 868.

> FN7. By its opinion in *Bell Atl. Corp. v. Twombly* and then again in *Ashcroft v. Iqbal,* the Supreme Court abrogated the often-cited language of *Conley v. Gibson* "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bell Atl. Corp. v. Twombly,* 550 U.S. 561 (2007) (quoting *Conley,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In so doing, the Court found that *Conley* "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Id.* at 563.

**B. Deference Given to *Pro Se* Litigants**

Plaintiff herein is proceeding with this action *pro se.* "[A] pro se complaint, 'however inartfully pleaded,' must be held to 'less stringent standards than formal pleadings drafted by lawyers.' " *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

251 (1976) (citing, *inter alia, Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 30 L.Ed.2d 652) (other internal citations and quotation marks omitted). However, the Second Circuit has stated that there are circumstances where an overly litigious inmate, "who is quite familiar with the legal system and with pleading requirements," may not be afforded such special solicitude. *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994) (declining to afford an "extremely litigious inmate" the benefit of lenient treatment normally afforded *pro se* litigants and thus denying the opportunity to amend a claim where he failed to properly plead a cause of action); *see also Davidson v. Dean,* 204 F.R.D. 251, 257 (S.D.N.Y.2001) (citing *Davidson v. Flynn,* 32 F.3d at 31, and refusing to accord deference to same plaintiff); *Santiago v. C.O. Campisi Shield No. 4592,* 92 F.Supp.2d 665, 670 (S.D.N.Y.2000) (applying *Davison v. Flynn* to *pro se* plaintiff who had ten suits pending in district); *Brown v. McClellan,* 1996 WL 328209, at *1 n. 3 (W.D.N.Y. Jun.11, 1996) (stating that plaintiff's "litigious nature," notwithstanding his *pro se* status, "weighs somewhat against the leniency that is normally accorded"); *Brown v. Selsky,* 1995 WL 13263, at *8 n. 1 (W.D.N.Y. Jan.10, 1995) (denying special solicitude to *pro se* plaintiff who had seven cases pending in district).

**\*6** It is patently clear that Kenneth J. Phelan, the instant Plaintiff, is no stranger to the courts.[FN8] In light of Plaintiff's experience in federal court, we find that the special solicitude afforded *pro se* litigants shall not be accorded herein.

> FN8. Since June 2010, Phelan has filed nineteen (19) lawsuits in this district alone:

> (1) *Phelan v. Sullivan et al.,* 10–cv–724 (DNH/ATB) (currently pending)

> (2) *Phelan v. Thomas et al.,* 10–cv–011 (GLS/RFT) (currently pending; the instant

case herein)

> (3) *Phelan v. Thomas et al.,* 10–cv–012 (DNH/RFT) (currently stayed pending appeal)

> (4) *Phelan v. Eckert et al.,* 10–cv–325 (TJM/GHL) (transferred to W.D.N.Y. on Apr. 8, 2010)

> (5) *Phelan v. Cambell et al.,* 10–cv–540 (NAM/RFT) (currently pending)

> (6) *Phelan v. Chin et al.,* 10–cv–601 (DNH/RFT) (transferred to W.D.N.Y. on June 23, 2010)

> (7) *Phelan v. Durniak et al.,* 10–cv–666 (FJS/RFT) (currently pending)

> (8) *Phelan v. Wolczye et al.,* 10–cv–1061 (GTS/DEP) (currently pending)

> (9) *Phelan v. Lempke,* 10–cv–1108 (GTS) (closed on Sept. 28, 2010—habeas corpus petition dismissed without prejudice to Petitioner filing an action pursuant to 42 U.S.C. § 1983)

> (10) *Phelan v. Zenzen et al.,* 10–cv–1178 (LEK/DEP) (transferred to W.D.N.Y. on Dec. 17, 2010)

> (11) *Phelan v. Lempke,* 10–cv–1324 (TJM) (transferred to W.D.N.Y. on Nov. 4, 2010)

> (12) *Phelan v. Bezio,* 11–cv–272 (GTS/GHL) (transferred to W.D.N.Y. on Mar. 15, 2011)

> (13) *Phelan v. Bezio,* 11–cv–288 (DNH

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

(currently pending)

(14) *Phelan v. Fischer et al.,* 11–cv–289 (TJM/ATB) (currently pending)

(15) *Phelan v. Delnegro,* 11–cv–313 (GTS/DRH) (currently pending)

(16) *Phelan v. Quinn et al.,* 11–cv–314 (DNH/DRH) (currently pending)

(17) *Phelan v. Lichva et al.,* 11–cv–315 (GLS/GHL) (currently pending)

(18) *Phelan v. Bezio,* 11–cv–416 (GLS) (currently pending)

(19) *Phelan v. Karandy et al.,* 11–cv–636 (NAM/RFT) (currently pending).

### C. First Amendment Claims

#### 1. Retaliation

Plaintiff claims that Defendants Thomas, Hersh, and Scott retaliated against him for attempting to file grievances. *See* Compl. at Causes of Action 3, 4, & 5.

In order to state a valid retaliation claim, a plaintiff must allege that "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir.2009) (quoting *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004)). The required causal connection means, "in other words, that the protected conduct was a 'substantial or motivating factor' in the defendants' decision to take action against the plaintiff." *Tafari v. McCarthy,* 714 F.Supp.2d 317, 347 (N.D.N.Y.2010) (quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

Plaintiff alleges that Correctional Officers Thomas and Hersh searched Plaintiff's self and cell on April 2, 2009, seemingly in retaliation for Plaintiff attempting to file a grievance earlier that day about not getting appropriate mental health treatment. *See* Compl. at ¶¶ 8–9. Further, Plaintiff alleges the Defendants Thomas and Scott "wrote [Plaintiff] up" for various infractions relating to that cell search, such as refusing a direct order, and having "gang material"—all of which Plaintiff claims were fabricated and done in retaliation for his filing of a grievance. *Id.* at ¶¶ 10–11.

The Second Circuit has made clear that an inmate has a right not to be subjected to retaliation for the exercise of a constitutional right, such as petitioning the government for redress of grievances as guaranteed under the First and Fourteenth Amendments. *See, e.g .,* *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) (cited in *Dorsey v. Fisher,* 2010 WL 2008966, at *12 (N.D.N.Y. May 19, 2010)); *see also* *Colon v. Coughlin,* 58 F.3d 865, 972 (2d Cir.1995) ("Prisoners, like non-prisoners, have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right."). Thus, there is no question that Plaintiff's conduct, filing a grievance, is protected by the Constitution and satisfies the first prong of a retaliation claim.

Plaintiff's allegations—again, taken as true for the purposes of this Motion—also establish that the Defendants took "adverse action" sufficient to state a valid retaliation claim under section 1983. Initially, we note that while many of the District Courts in this Circuit have found that a "search of an inmate's cell, even if performed with a retaliatory motive, does not give rise to a constitutional claim for retaliation," *see, e.g.,* *Keesh v. Goord,* 2007 WL 2903682, at *8 (W.D.N.Y. Oct.1, 2007) (citing *Hudson v. Palmer,* 468 U.S. 517, 527, 104 S.Ct. 3194, 82 L.Ed.2d 393

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

(1984)),[FN9] the Second Circuit is silent on this matter. We decline to similarly draw such a hard-nosed line, and find that cell searches, if accompanied by more, can implicate a retaliation claim under section 1983. *See Shariff v. Poole,* 689 F.Supp.2d 470, 481 (W.D.N.Y.2010) ("Although a cell search is not considered to be actionable under § 1983, regardless of any retaliatory motives, there exists here a suggestive chronology of grievances, threats, and cell searches, the combination of which would likely 'chill a person of ordinary firmness from continuing to engage' in the protected activity at issue here—the filing of grievances.") (internal quotation omitted). Plaintiff states that Defendants Hersh and Thomas did more than just search his cell, but rather "tore up" his cell and locker, manipulated and damaged his legal papers, and threatened to fight Plaintiff. Finally, there was a causal connection between this cell search and the protected conduct of filing grievances. The search happened only twenty minutes after Plaintiff attempted to file a grievance, and Defendant Thomas explicitly told Plaintiff that "[t]his is how we deal with grievances here retard. Next time it will be worse." Compl. at ¶ 9. Therefore, Plaintiff's assertions are enough to state a valid retaliation claim.

> FN9. That an inmate has no constitutionally protected right of privacy in their prison cells, and that a search of that cell cannot give rise to a retaliation claim, has been found in all four District Courts of New York. *See Bumpus v. Canfield,* 495 F.Supp.2d 316, 327 (W.D.N.Y.2007) ("It is well settled ... that plaintiff cannot base a retaliation claim ... based on a cell search."); *Battice v. Phillip,* 2006 WL 2190565, at *7 (E.D.N.Y. Aug.2, 2006) (noting that "a prisoner has no reasonable expectation of privacy in his or her prison cell; therefore, a search of an inmate's cell, even for retaliatory reasons, therefore does not implicate a constitutional right"); *Gadson v. Goord,* 1997 WL 714878, at *7 (S.D.N.Y. Nov.17, 1997) (holding that

"searches of cells implicate no protected constitutional rights, even if the search is arbitrary or retaliatory in nature"); *Payne v. Axelrod,* 871 F.Supp. 1551, 1556 (N.D.N.Y.1995) ("*Hudson v. Palmer* [ ] permits even arbitrary cell searches in prison."). The cases cited herein that find these types of retaliation claims untenable collect their support in the case law noting that an inmate has no expectation of privacy in his cell, and therefore a cell search by itself is not actionable under the Fourth Amendment. Here, however, Plaintiff's claims and underlying facts allege more than a mere cell search under the Fourth Amendment, but rather state a claim of retaliation for exercising other protected constitutional rights.

**\*7** Furthermore, Plaintiff claims that he was unjustly written up by Defendants Thomas and Scott, in connection with the cell search. Plaintiff states that Defendants Thomas issued a report against Plaintiff for having gang material, harassment, and for "violating messhall proce[ ]dures," and that Defendant Scott issued one for "harassment, refusing a direct order, and [for being] out of place." Compl. at ¶¶ 10–11.

While a "prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report," *see Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997), a misbehavior report issued in retaliation to the exercise of a constitutional right constitutes an "adverse action." *See Reid v. Bezio,* 2011 WL 1577761, at *4 (N.D.N.Y. Mar.30, 2011) ("[T]here is little doubt that a misbehavior report would constitute an adverse action.") (internal quotations omitted); *Lewis v. Blazejewski,* 2007 WL 542117, at *5 (W.D.N.Y. Feb.16, 2007) ("An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under § 1983.") (quoting *Gayle v.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

*Gonyea,* 313 F.3d 677 (2d Cir.2002)). This Court is keenly aware that "retaliation claims by prisoners are 'prone to abuse' since prisoners can claim retaliation for every decision they dislike." *Williams v. Hupkowicz,* 2004 WL 1197354, at *3 (W.D.N.Y. June 1, 2004) (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("Because we recognize both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated, we examine prisoner's claims of retaliation with skepticism and particular care.")). However, these purportedly fabricated misbehavior reports clearly were in the same chain of events as the cell search, and thus, taking Plaintiff's claims as true, are likewise causally connected to Plaintiff's attempt to file a grievance.[FN10]

FN10. Implicit through the Plaintiff's narrative, though not always stated, is that the alleged retaliation was a result of his attempt to file grievances. *See* Compl. at ¶ 9. This is supported in his statements in his Causes of Action section. *See id.* at ¶ 47 ("Causes of Action" 4) ("Defendants C/O Thomas and C/O Scott retaliated against Plaintiff for trying to file a grievance ..."). Accordingly, we interpreted Plaintiff's constitutionally protected speech or conduct to be his attempt to file grievances. Plaintiff makes numerous claims, however, scattered variously throughout his forty-one-page Complaint, that Defendants violated his rights because of his disability. It is thus no surprise to see him also claim that the misbehavior reports were issued in retaliation "against [his] disability." *See id.* at ¶ 11; *see also id.* at Causes of Action 4 & 5. However, having a mental handicap or disability clearly is not protected "speech or conduct." When possible, this Court interprets any claims of such to be claims of retaliation against Plaintiff's attempt to file a grievance.

Accordingly, Plaintiff's allegations relating to Defendants Thomas and Hersh's cell search and his allegations that he received false misbehavior reports from Defendants Thomas and Scott, all in retaliation to his attempt to file a grievance, states a claim sufficient to survive Defendants' Motion to Dismiss.[FN11]

FN11. Plaintiff also seems to indicate something akin to a retaliation claim regarding Defendant Regan, who gave Plaintiff "a write up (ticket) for smoking, even though Plaintiff is a non-smoker and allergic to cigarette smoke." Compl. at ¶¶ 35 & 36. However, Plaintiff's Complaint alleges, if anything, that this misbehavior report was premised on harassing Plaintiff because of his mental handicap alone. These allegations of harassment and discrimination based on Plaintiff's disability are examined later in this Court's Report and Recommendation, *see infra* Part III.F, but, again, adverse action for having a mental disability alone does not state a valid First Amendment retaliation claim. *See supra* Note 11.

### 2. Access to the Courts

Phelan asserts that Defendant Ramond prevented him from using the law library on April 14, 2009, that Defendant Thomas damaged his legal work during a cell search, and that Defendant Thompson prevented him from making copies on October 15 and December 18, both in 2009. Compl. at ¶¶ 9, 13, & 47. We interpret these facts to allege a violation of his right to access the courts.

The Supreme Court has held that the constitutional right of access to courts entitles plaintiffs to "adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). To establish a *Bounds* violation, a plaintiff must show

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

"actual injury," as *"Bounds* did not create an abstract, freestanding right to a law library or legal assistance." *Lewis v. Casey,* 518 U.S. 343, 349 & 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Thus, to establish a claim of inadequate access to the courts under *Bounds,* a plaintiff must show " 'that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim'—for example, by demonstrating that he has been unable to file a complaint or has had a complaint dismissed for failure to observe a technicality." *Benjamin v. Fraser,* 264 F.3d 175, 184 (2d Cir.2001) (citing *Lewis v. Casey,* 518 U.S. at 351).

**\*8** Plaintiff fails to allege any prejudice or injury from Defendants' actions, and we find none in what has been presented to the Court. Without a demonstration that a "nonfrivolous legal claim had been frustrated or was being impeded," there is no basis to conclude Plaintiff's First Amendment right of access to the courts has been violated. *Lewis v. Casey,* 518 U.S. at 353. We recommend that this claim be **dismissed.**

### D. Due Process Claims

Plaintiff asserts in no fewer than eleven different claims that his Due Process rights were violated due to various deficiencies in his administrative disciplinary hearings and appeals thereto. Specifically, Plaintiff claims that the officers presiding over his disciplinary proceedings did not properly account for his mental disabilities; either interviewed witnesses outside Plaintiff's presence or did not interview them; and that his due process rights were violated because other Defendants denied his appeal. Compl. at ¶¶ 16–23 & Causes of Action 11, 12, 16, 21, 22, 31, 32, 33, 34, 38 & 39. We address these due process claims in turn.

As an initial matter, in order to state a due process claim under § 1983, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). Plaintiff brings his due process claims against four separate hearing officers who presided over separate misbehavior report hearings. Plaintiff states that he received a punishment of at least three months of confinement in the SHU and three months loss of privileges, such as packages and phones, from the hearings Defendant Fletcher presided over. Compl. at ¶¶ 18 & 21. He states that he also received thirty days "keepblock, suspended 30 days and deferred for 90 days," and a loss of yard, packages, commissary, and phone privilege for thirty days from the hearing Defendant Goodman presided over. *Id.* at ¶ 20. However, Plaintiff fails to allege any liberty interest that was at stake from the hearings related to Defendants Pawelczak or Stachewiez. *See id.* at ¶¶ 42 & 43. Thus, because Plaintiff does not allege any liberty interest by which he was entitled to some measure of due process before being deprived therewith, his due process claims against Defendants Pawelczak and Stachewiez should be **dismissed.** *See Sandin v. Connor,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (noting that a prisoner is not entitled to due process protections unless the resulting restricting confinement subjected the prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life").

Turning back to Defendants Fletcher and Goodman, a prisoner asserting that he was denied due process in connection with segregated confinement or a loss of privileges must make a threshold showing that the deprivation of which he complains imposed the requisite atypical and significant hardship. Whether the conditions of the segregation amounted to atypical and significant hardship "turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker,* 139 F.3d at 336 (citations omitted). However, the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the above-stated *Sandin* standard. *Jenkins v. Haubert,* 179

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

F.3d 19, 28 (2d Cir.1999); *see also Ayers v. Ryan,* 152 F.3d 77, 83 (2d Cir.1998) ("Whether or not a period of disciplinary confinement amounts to an atypical and significant hardship is a factintensive inquiry[.]"). The Second Circuit has suggested that confinement for a period of less than 101 days would not constitute an atypical and significant hardship. *See Colon v. Howard,* 215 F.3d 227, 231–32 (2d Cir.2000). Comparatively, the segregative sentences of 125–288 days are deemed to be "relatively long" and therefore necessitate "specific articulation of fact findings before the district court could properly term the confinement atypical or insignificant." *Sims v. Artuz,* 230 F.3d 14, 22 (2d Cir.2000). In reviewing the duration and conditions of Phelan's special confinement as a result of the misbehavior hearings at issue, we do not find his confinement alone to be atypical and significant. In any event, we find that even if Plaintiff identified a valid liberty interest, he failed to allege facts supporting the notion that he was denied due process in his misbehavior hearings. Plaintiff states that Defendants Fletcher and Goodman each failed to adequately consider his mental disability in their respective disciplinary proceedings. Compl. at ¶¶ 16–19 & Causes of Action 11, 12, 18, & 19. While rules exist that govern the procedure hearing officers must follow when an inmate's mental health is an issue, *see* N.Y. COMP.CODES R. & REGS. tit. 7, § 254.6(b), there are no allegations in the Complaint that allege sufficient facts to state a claim that Plaintiff's constitutional rights were violated. For example, it appears from Plaintiff's Complaint that both Fletcher and Goodman stopped the proceedings to consider Plaintiff's mental health. Compl. at ¶¶ 16–17. In fact, with the same breath that Plaintiff claims his mental disability was not adequately considered in these disciplinary hearings, he claims Goodman "discriminated against Plaintiff's disability ... by unlawfully asking Plaintiff what his disability is and to describe [it] in detail." *Id.* at Causes of Action 17. Plaintiff's allegations that the disciplinary hearings were eventually continued and not excused altogether, without more, does not state a constitutional violation. Thus, Plaintiff's complaint

that his disciplinary hearings proceeded despite his mental handicap fails to state a claim and should be **dismissed.**

**\*9** Plaintiff also claims his due process rights were violated by Defendant Fletcher when he failed to interview witnesses in Plaintiff's presence on the record and investigated witnesses on his own; Plaintiff further asserts that Defendant Fletcher "was biased." *Id.* at ¶¶ 19, 21 & Causes of Action 12, 16, & 21. The Supreme Court has held that due process entitles inmates to call witnesses and present documentary evidence, subject to legitimate safety and correctional goals of the institution. *Wolff v. McDonnell,* 418 U.S. 539, 566, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *see also McCann v. Coughlin,* 698 F.2d 112, 121–22 (2d Cir.1983). However, "it is not a violation of due process at a disciplinary hearing to take the testimony of a witness outside the presence of an inmate." *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999) (internal citations omitted); *see also Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993) (noting an inmate does not have a constitutional right of confrontation in disciplinary hearings). Additionally, "the mere involvement of a hearing officer in related investigations or proceedings does not evidence bias." *Rodriguez v. Selsky,* 2011 WL 1086001, at \* 11 (N.D.N.Y. Jan.25, 2011) (citing *Vega v. Artus,* 610 F.Supp.2d 185, 200 (N.D.N.Y.2009). Defendant Fletcher's investigation into the witnesses Plaintiff wanted to call does not make him biased in his role as a hearing officer.[FN12] Rather, an impartial hearing officer is one who "does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990). Plaintiff's unsupported and conclusory allegation of bias does not plausibly state a claim upon which relief can be granted, and thus, his due process complaints against Defendant Fletcher should be **denied.**

> FN12. Though not explicit in the Complaint, to the extent Plaintiff may be complaining

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

that Defendant Fletcher did not call witnesses Plaintiff requested be called, "a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony." *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999).

Lastly, Plaintiff claims his due process rights were violated because his appeals of the determinations of his disciplinary hearings were denied. Compl. at ¶¶ 23 & Cause of Action 22. This conclusory statement clearly does not state a due process violation—Plaintiff sets forth no facts that the determinations of his disciplinary hearings deserved reversal, let alone that a failure to reverse the results of the hearings would constitute a due process violation. Therefore, this claim should be summarily **denied.**

Because Plaintiff states no valid due process violations upon which relief may be granted, this Court recommends that his due process claims be **dismissed** in their entirety.

### E. Eighth Amendment Claims

In his expansive and lengthy Complaint, Plaintiff alleges two distinct Eighth Amendment claims: deliberate indifference to his serious medical needs and cruel and unusual punishment. We address these allegations *seriatim.*

#### 1. Deliberate Indifference to Serious Medical Needs

Plaintiff claims that he was denied mental health treatment and services, specifically naming Defendants P. Millson, James Morgan, Gregory Kadien, W. Hagget, Cambell, and J. Michaels as the culprits. Compl. at ¶¶ 7, 26–34, 37, 39, 40, 44, & 45.[FN13] To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the

conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06).

FN13. Though discussed in multiple occasions in his forty-one-page Complaint, Plaintiff does not name Dr. Bangsil nor Nurse Amborlosi as Defendants in this action. They are named, however, in his almost identical complaint brought in this District under the ADA. *See supra* Note 3.

**\*10** The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin ("Hathaway I" ),* 37 F.3d 63, 66 (2d Cir.1994). Under the objective prong, the alleged medical need must be "sufficiently serious." *Id.; Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong,* 143 F.3d at 702 (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individuals daily activities; or the existence of chronic and substantial pain." *Id.* (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir.1992)). Under the subjective component, the plaintiff must demonstrate that the defendant acted with "a sufficiently culpable state of mind." *Hathaway I,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

In his Complaint, Phelan claims that he suffers from a traumatic brain injury dating back to when he

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)**
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

was an infant, resulting in him being "slower to process information," and having "impulsive behavior." Compl. at ¶ 46(A) & (B). He also claims to suffer from attention deficit disorder and depression. *Id.* at ¶ 46(C). He states that despite his consistent requests, he did not receive adequate mental health care in prison, and as such, Plaintiff "adjusted poorly and received a lot of write ups, and spent more time in SHU th[a]n in general population." *See generally id.; see* Compl. at ¶ 46(F).

Here, Plaintiff does not provide facts by which this Court could assess the objective seriousness of his medical needs, other than injecting conclusory statements that his mental handicap, if left untreated, leads him to act out and receive misbehavior reports. Furthermore, Plaintiff does not sufficiently aver that Defendants acted with the requisite culpable state of mind. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan,* 511 U.S. 825, 836, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citing *Farmer* ). Plaintiff states that, pursuant to his requests for a mental health examination, Defendant P. Millson received Plaintiff's mental health history and met with and examined Plaintiff in person. Compl. at ¶¶ 32 & 37. In that meeting, Defendant Millson, who is a psychologist, did not grant Plaintiff permission to see a psychiatrist, saying "we don't have to let you see one." *Id.* at ¶ 37. These facts do not support a finding that this Defendant was subjectively deliberately indifferent to Plaintiff's medical needs, or that Defendant Millson bore Plaintiff any ill will at all. Mere disagreement over the prescribed course of treatment does not evidence deliberate indifference. *See Brown v. Eagen,* 2009 WL 815724, at *9 (N.D.N.Y. Mar.26, 2009) (stating that the prison officials have broad discretion to determine the nature and character of the medical

treatment afforded to inmates, as "[a]n inmate does not have the right to treatment of his choice") (citing, *inter alia, Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)).[FN14] Likewise, Plaintiff's allegation against Defendant Morgan—that he wrote a letter in response to Plaintiff's requests for mental health care, stating that he is denying that request—without more, fails to allege the requisite culpable state of mind needed to state a claim for deliberate indifference.

> FN14. Additionally, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Hathaway v. Coughlin* (*"Hathaway II"* ), 99 F.3d 550, 553 (2d Cir.1996)); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citations omitted).

**\*11** Lastly, Plaintiff's conclusory statements that Defendants Gregory Kadien and W. Hagget "are responsible for and required by law to provide mental health care by a psychiatrist on a full time basis [and] failed to do this," as well as his claims that Cambell and J. Michaels yelled at him and told him to "stop l[y]ing about a disability and [to] take your fucking medicine like a man [,]" do not allege any facts by which this Court could engage in an Eighth Amendment examination or which would meet the *Iqbal* standard. *See* Compl. at ¶¶ 15 & 45. Plaintiff further does not allege personal involvement by Defendants Kadien and Hagget, who are the Superintendents at Gowanda and Mt. McGregor correctional facilities, respectively. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (providing the test for personal involvement of a supervisory defendant); *see also Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996) (stating that a defendant may not be liable for damages simply by virtue of holding a supervisory position).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

Therefore, Plaintiff does not allege a valid Eighth Amendment claim that the Defendants were deliberately indifferent to his serious medical needs. Rather, as stated in his Complaint, Plaintiff was seen by medical personnel at Mt. McGregor upon his request on March 25, 2009, and then again on April 7, 2009, where he was offered the option of staying in the infirmary until someone from the mental health division could check on Plaintiff, but he refused, saying "that won't solve anything, so no." *Id.* at ¶¶ 6 & 12. He also appears to have had an appointment with Doctor Bangsil and Nurse Amborlosi to discuss his medical issues, but these appointments apparently did not end well and Plaintiff told them "he would see them in court." *Id.* at ¶ 39. Considering all of the above allegations, we recommend that Plaintiff's claims of deliberate indifference be **dismissed** for failure to state a claim.

### 2. Cruel and Unusual Punishment

The Eighth Amendment also prohibits the infliction of cruel and unusual punishment. *Robinson v. California,* 370 U.S. 660, 666–67, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (cited in *Tramell v. Keane,* 338 F.3d 155, 161 (2d Cir.2003)). Plaintiff appears to bring three claims under this umbrella: that the punishments he received from hearing officers concerning misbehavior reports were cruel and unusual; that he was subject to excessive physical force; and that he suffered cruel and unusual punishment resulting from his general conditions of confinement.

First, Plaintiff complains that punishments he received from disciplinary hearings, assigned from Defendants Fletcher and Goodman, violated his rights because they are cruel and unusual considering his mental illness. "Restraints on an inmate do not violate the [Eighth] [A]mendment unless they are 'totally without penological justification,' 'grossly disproportionate,' or 'involve the unnecessary and wanton infliction of pain.'" *Smith v. Coughlin,* 748 F.2d 783, 787 (2d Cir.1984) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Plaintiff provides no facts by which this Court could evaluate this claim. Sentencing an inmate with diminished mental capacity to special or solitary confinement does not constitute a *per se* violation of the Eighth Amendment. *See Horne v. Coughlin,* 155 F.3d 26, 31 (2d Cir.1998). Plaintiff's claim accordingly should be **denied.**

**\*12** Secondly, to determine whether an Eighth Amendment violation occurred where "prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (quoted in *Davidson v. Flynn,* 32 F.3d 27, 29 (2d Cir.1994)). To validly assert an Eighth Amendment violation through the use of excessive force, an inmate must prove (1) objectively, that the defendant's actions violated "contemporary standards of decency," and (2) subjectively, that the defendant acted wantonly and in bad faith. *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotations and citations omitted).

Plaintiff asserts that on May 14, 2009, when he was transferred "to a S-block [in] Downstate Correction Facility," he was handcuffed and shackled for "about [four] hours, even though [he has] a mental illness." Compl. at ¶ 24. The next day, Plaintiff was "strip[ ] searched again and shackled and cuffed with waist chains again to be transfer[re]d to Lakeview Shock Correctional Facility.... This was about a [twelve] hour drive." *Id.* He alleges this made his "shoulder muscles very sore." Plaintiff seems to associate this blame to Defendant Fischer, the Commissioner of DOCCS, but this fact is not made clear in Plaintiff's Complaint. *See* Cause of Action 23. Regardless of the assured lack of personal involvement, these facts do not give rise to a claim of cruel and unusual punishment. The facts fail to state that the use

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

of handcuffs and shackles during transport was not done "in a good-faith effort to maintain or restore discipline," but rather as a form of punishment or to constitute a wanton infliction of pain. Therefore, Plaintiff's claim that he suffered excessive force relating to his transports should be **denied.**

Plaintiff also states that Defendant Micheals struck him in the head several times while asking Plaintiff questions in connection to the disciplinary ticket he received from his incident in the library. *See* Compl. at ¶ 13 & 15. While Plaintiff does not explicitly raise an accusation of excessive force against Micheals in his forty-three causes of action, Plaintiff's statement of facts clearly indicates the Eighth Amendment. Here, though Plaintiff provides sparse details of the incident, his claim suggests that Defendants Micheals hit him maliciously, multiple times, and without the good-faith effort to maintain discipline. This is enough to validly state an excessive force claim, and, accordingly, we recommend that this claim against Defendant Micheals survive Defendants' Motion to Dismiss.

Lastly, to the extent that Plaintiff claims his conditions of confinement constituted an Eighth Amendment violation—specifically, because he did not receive a hot meal for one day, when he was being transported to another correctional facility, but instead received a "dry boloney sandwich"—this complaint does not state a cause of action. There is no constitutional right to have a hot meal every day, but only that inmates be provided nutritionally adequate food prepared under safe conditions. *See Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (cited in *Quintana v. McCoy,* 2006 WL 2827673, at *6 (N.D.N.Y. Sept.29, 2006)). Furthermore, Plaintiff does not allocate personal involvement by any Defendant in this matter. Thus, Plaintiff does not state a valid Eighth Amendment claim here, and his allegation of such should be **denied.**

**F. Other Claims**

**\*13** Throughout Plaintiff's Complaint, he accuses the majority of the Defendants of harassing him, chiefly through name-calling, specifically "retard." *See generally* Compl. As Judge Sharpe ruled in his January Order, allegations of verbal harassment are insufficient to support a § 1983 claim. *See* Dkt. No. 5 at pp. 5–6 (citing *Johnson v. Eggersdorf,* 8 Fed. Appx. 140, 143 (2d Cir.2001) ("allegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged") (citing *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986))). In accord with that Order and the law of the case doctrine,[FN15] Plaintiff's claims of harassment should be **dismissed.**

> FN15. The law of the case doctrine " 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.' " *Pescatore v. Pan Am. World Airways, Inc.,* 97 F.3d 1, 7–8 (2d Cir.1996) (quoting *Dilaura v. Power Auth.,* 982 F.2d 73, 76 (2d Cir.1992)).

Also throughout the Complaint, Plaintiff makes wholly-conclusory allegations that Defendants either discriminated against, harassed, or otherwise treated Plaintiff poorly because of Plaintiff's mental disability. While this issue of "whether disability discrimination gives rise to a section 1983 claim 'is not a settled question of law in this circuit,' " *Petrosky v. New York State Dept. of Motor Vehicles,* 72 F.Supp.2d 39, 61 (N.D.N.Y.1999) (citing *Campbell v. City Univ. Constr. Fund,* 1999 WL 435132, at *5 (S.D.N.Y. June 25, 1999)), the courts who use the Equal Protection Clause of the Fourteenth Amendment alone as the vehicle by which to seek relief note that "[t]he basic command of the Equal Protection Clause is that similarly situated persons be treated equally," *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). To establish an Equal Protection violation, plaintiff must show purposeful discrimination directed to an identifiable class. *Giano v. Senkowski,* 54 F.3d 1050, 1057

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

(2d Cir.1995) (cited in *Greco v. County of Nassau,* 146 F.Supp.2d 232, 248 (E.D.N.Y.2001)). Plaintiff fails to alert this Court to any specific fact by which we could conclude that Plaintiff was treated differently because of his mental illness; instead, he merely repeats conclusory statements that he was "discriminated against." These statements cannot withstand the required pleading standard set out in *Iqbal,* and thus, this Court recommends that the claims Plaintiff brings pursuant to the Equal Protection Clause be **dismissed.** To the extent Plaintiff is stating a claim of disability discrimination under Title II of the ADA, we refer the reader to Plaintiff's identical complaint brought in this District pursuant to the ADA. *See supra* note 3.

Lastly, Plaintiff complains that Defendants Hersh, Scott, and Thomas did not allow Plaintiff to file a grievance. *See* Compl. at Causes of Action 2. To the extent this claim overlaps with Plaintiff's retaliation claims, we refer to our above disposition of that issue. *See supra* Part III.C.i. We pause to note that although Plaintiff "has a constitutional right to access the courts, participation in an inmate grievance process is not a constitutionally protected right." *Davis v. Buffardi,* 2005 WL 1174088, at *3 (N.D.N.Y. May 4, 2005) (internal citations omitted); *see also Rhodes v. Hoy,* 2007 WL 1343649, at *2 n. 2 (N.D.N.Y. May 5, 2007) (citing cases, including *Shell v. Brzezniak,* 365 F.Supp.2d 362, 369–70 (W.D.N.Y.2005) (holding that "inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does [sic] not give rise to a cognizable § 1983 claim")). Notwithstanding, Plaintiff states no sufficient facts for us to find that Defendant Hersh, who allowed Plaintiff to go to the "grievance building" when Plaintiff requested, *see* Compl. at ¶ 7, or Defendant Thomas are liable for preventing Plaintiff from filing grievances; thus, this claim must be **dismissed** in its entirety for failing to state a claim.[FN16]

FN16. We note that a plaintiff's lack of exhaustion of administrative remedies, as pre-

scribed by the Prison Litigation Reform Act ("PLRA"), is an affirmative defense, but one that is not raised by Defendants in this action. *See Arce v. Keane,* 2004 WL 439428, at *2–3 (S.D.N.Y. Mar.9, 2004) (describing PLRA's exhaustion requirement).

### III. CONCLUSION

**\*14** For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion to Dismiss (Dkt No. 55) be **granted in part and denied in part** as follows:

1. To the extent asserted, retaliation claims against Defendants Hersh and Thomas, relating to their cell search on April 2, 2009, and Defendants Thomas and Scott, relating to misbehavior reports issued pursuant to that cell search, should survive Defendants' Motion and proceed to discovery;

2. To the extent asserted, Eighth Amendment excessive force claims against Defendant Micheals, relating to striking Plaintiff in the head several times, should survive Defendants' Motion and proceed to discovery;

3. All other asserted claims against Defendants be **dismissed** for failure to state a claim; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

*Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also*
28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).


N.D.N.Y.,2011.
Phelan v. Hersh
Not Reported in F.Supp.2d, 2011 WL 6031940
(N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2015 WL 3447743 (N.D.N.Y.)
**(Cite as: 2015 WL 3447743 (N.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Benji D. REED, Plaintiff,
v.
G. TERBUSH, et al., Defendants.

No. 9:10–cv–1449 (LEK/RFT).
Signed May 28, 2015.

Benji D. Reed, Pine City, NY, pro se.

Hon. Eric Schneiderman, Attorney General of the State of New York, Rachel M. Kish, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

### ORDER

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a Report–Recommendation filed on April 8, 2015, by the Honorable Randolph F. Treece, U.S. Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3. Dkt. No. 125 ("Report–Recommendation"). *Pro se* Plaintiff Benji Reed ("Plaintiff") timely filed Objections.[FN1] Dkt. No. 126 ("Objections").

> FN1. Although Plaintiff's Objections were not received until April 27, 2015, they are dated April 22, 2015. *See* Objs. Under the prison mailbox rule, the Court considers Plaintiff's Objections timely filed. *See Tracy v. Freshwater,* No. 01–CV–0500, 2008 WL 850594, at \*1 (N.D.N.Y. Mar. 28, 2008).

Within fourteen days after a party has been served with a copy of a magistrate judge's reportrecommen-

dation, the party "may serve and file specific, written objections to the proposed findings and recommendations." FED. R. CIV. P. 72(b); L.R. 72.1(c). If no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error. *Barnes v. Prack,* No. 11–CV–0857, 2013 WL 1121353, at \*1 (N.D.N.Y. Mar. 18, 2013); *Farid v. Bouey,* 554 F.Supp.2d 301, 306–07 & n. 2 (N.D.N.Y.2008); see also *Machicote v. Ercole,* No. 06 Civ. 13320, 2011 WL 3809920, at \*2 (S.D.N.Y. Aug. 25, 2011) ("[E]ven a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument."). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b).

In his Objections, Plaintiff asserts in a conclusory fashion that certain material facts are in dispute and therefore preclude summary judgment. *See* Objs. at 2–3.[FN2] The facts Plaintiff recites, however, merely reiterate issues addressed in the Report–Recommendation. *See id.* Plaintiff also states in a wholly conclusory fashion that the Magistrate Judge "overlooked" facts. *Id.* at 3. Accordingly, the Court reviews the Report–Recommendation for clear error and finds none.

> FN2. The pagination corresponds to the page numbers assigned by ECF.

Accordingly, it is hereby:

**ORDERED,** that Report–Recommendation (Dkt. No. 125) is **APPROVED and ADOPTED in its**

Slip Copy, 2015 WL 3447743 (N.D.N.Y.)
**(Cite as: 2015 WL 3447743 (N.D.N.Y.))**

entirety; and it is further

**ORDERED,** that Defendants' Motion (Dkt. No. 98) for summary judgment is **GRANTED** and the case is **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

BENJI D. REED,

Plaintiff,

-v-

G. TERBUSH; [FN1] GRIFFIN; M. HETCHER; D. VENETTOZZI,

> FN1. The correct spelling of Defendant's last name is Ter Bush. The Court will use the correct spelling of Defendant's last name throughout this opinion.

Defendants.

**REPORT–RECOMMENDATION and ORDER**
RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Benji D. Reed, while incarcerated at Eastern Correctional Facility, filed this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that his constitutional rights were violated under the First and Fourteenth Amendments. *See generally* Dkt. No. 14, First Am. Compl. On September 11, 2014, Plaintiff filed his Third Amended Complaint, the operative pleading in this action. Dkt. No. 82. On November 21, 2014, Defendants moved for summary judgment. Dkt. No. 98. On December 15, 2014, Plaintiff submitted a number of filings in response to Defendants' Motion for Summary Judgment. Dkt. Nos. 104, 104–1, 104–2, 104–3, 104–4, 104–5, 104–6, & 104–7.[FN2] On December 29, 2014, Plaintiff additionally filed a Supplemental Response in opposition. [FN3] Dkt. No. 108.

> FN2. Prior to these filings, Plaintiff filed a Response, Dkt. No. 103, which differed ever so slightly from the submissions noted above. Consequently, the Court issued a Text Order striking Dkt. No. 103 from the Docket. Dkt. No. 106 Text Order, dated Dec. 16, 2014.

> FN3. Defendants did not file a Reply.

**I. DISCUSSION**
**A. Summary Judgment Standard**
*2 Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 3447743 (N.D.N.Y.)
**(Cite as: 2015 WL 3447743 (N.D.N.Y.))**

by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ( "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issuefinding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

**B. Material Facts**

**\*3** There are no issues of material fact. Plaintiff is an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), and at all times relevant to this action he was housed at Eastern Correctional Facility.

On October 19, 2010, during a routine cell search, a number of unauthorized items were discovered in Plaintiff's cell. Dkt. No. 98–5, Ex. C at p. 6, Inmate Misbehavior Report, dated Oct. 19, 2010. As a result, an inmate misbehavior report was issued and Plaintiff was charged with possessing Uniform Commercial Code ("UCC") materials, contraband, altered items, and stolen state property. *Id.* That same day, Plaintiff was placed in pre-hearing confinement in the Special Housing Unit ("SHU"). Dkt 98–5, Ex. C at p. 3, Superintendent Hr'g Disposition Rendered, dated Nov. 3, 2010. The next day, October 20, 2010, at 9:03 a.m., Plaintiff was served with a copy of the misbehavior report, which outlined the formal charges that were pending against him and a "Description of the Incident" that stated, in part, that "the following items of contraband were recovered: 1 large stack of Uniform Commercial Code materials ... UCC Financing statements and financing statement addendums.... All of the Contraband was placed in the West Wing Court Office." Dkt 98–6, Ex. D, Tier III Hr'g Tr., dated Aug. 28, 2012, at pp. 1–2; Dkt. No. 104, Benji Reed Deck, dated Dec. 7, 2014, at ¶ 18; Dkt. No. 98–5, Ex. C at p. 6, Inmate Misbehavior Report.

Defendant Michael Hetcher is employed by DOCCS as a Correctional Officer at Eastern and his responsibilities include conducting an "unpack" of inmate property when an inmate is transferred to SHU for disciplinary reasons. Dkt. No. 98–15, Michael Hetcher Decl., dated Nov. 6, 2014, at ¶¶ 1 & 9. On October 20, 2010 and October 21, 2010, during a SHU unpack, Defendant Hetcher and three other DOCCS employees conducted a search of Plaintiff's personal property and seized 210 pages of UCC material, which

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 3447743 (N.D.N.Y.)
**(Cite as: 2015 WL 3447743 (N.D.N.Y.))**

were turned over to Captain Ramirez. [FN4] *Id.* at ¶¶ 10–11. Plaintiff received an undated contraband receipt signed by Defendant Hetcher, which stated that "approx 210 pages of UCC Material" had been confiscated from his cell on "10–20 to 10–21." Dkt. No. 98–8, Ex. F, Contraband Receipt.

> FN4. Captain Ramirez is not a defendant in this action.

Correctional Officer Myer [FN5] was assigned to assist Plaintiff with his pending Tier III disciplinary hearing and, on October 20, 2010, provided him with the various documents he had requested. Dkt. No. 98–5, Ex. C at p. 8, Assistant Form, dated Oct. 20, 2010. Plaintiff did not ask Meyer to produce any witnesses on his behalf. *Id.*

> FN5. Officer Meyer is not a defendant in this action.

Defendant Gary Ter Bush was Eastern's Assistant Deputy Superintendent of Programs and regularly conducted Tier III disciplinary hearings at the Facility, and presided over Plaintiff's disciplinary hearing. Dkt. No. 98–16, Gary Ter Bush Deck, dated Nov. 18, 2014, at ¶¶ 2 & 4; Dkt. No. 98–6, Ex. D, Tier III Hr'g Tr. at pp. 1 & 14.

**\*4** Plaintiff's Tier III disciplinary hearing commenced on October 22, 2010, and resumed on November 3, 2010. Dkt. No. 98–6, Ex. D, Tier III Hr'g Tr. at pp. 1 & 14. On October 22, 2010, Plaintiff stated on the record that he would like to call on Correctional Officer Miller as a witness, the correctional officer who issued the misbehavior report, and present documentary evidence "[d]ealing with the charge of possession of UCC materials." *Id.* at p. 3. Plaintiff also advised Defendant Ter Bush that he was using the UCC materials to draft legal documents that he planned on filing to vacate his underlying criminal convictions on the basis of lack of personal jurisdic-

tion.[FN6] *See id.* at pp. 8 & 10–11. Defendant Ter Bush adjourned the hearing to secure Correctional Officer Miller as a witness for Plaintiff. *Id.* at p. 14.

> FN6. According to Plaintiff, because he is "not a corporate entity" and his "rights derive from the international treaty," "[t]he whole [criminal] court system.... It's illegitimate as applied to [him]." Dkt. No. 98–6, Ex. D, Tier III Hr'g Tr' dated Aug. 28, 2012, at pp. 8 & 11. However, Plaintiff was born in Utica, New York and spent the "majority" of his life in the United States. *Id.* at p. 9.

On November 3, 2010, Plaintiff's Tier III disciplinary hearing resumed and Miller appeared *via* telephone; but, Plaintiff declined to introduce Miller as a witness or ask that any questions be posed to him. *Id.* at pp. 15–19. Plaintiff, however, introduced one "page of People versus Benji D. Reed" as evidence and asked Ter Bush to read an excerpt from the opinion where he challenged the jurisdiction of the criminal trial court. *Id.* at p. 17. Before closing the hearing, Ter Bush asked Plaintiff if he had any further testimony or documentation that he wished to submit. *Id.* at p. 18. Plaintiff replied, "No I just ... object to the hearing because ... you don't know the law or what I'm saying as far as like my constitutional rights[.]" *Id.* Defendant Ter Bush asked if he had "any other procedural objections [.]" Plaintiff replied, "No sir." *Id.* Upon concluding the hearing, Defendant Ter Bush found Plaintiff guilty of all the charges and sentenced him to six months in SHU, which was set to expire on May 3, 2011. *Id.* at p. 20; Dkt. No. 98–5, Ex. C at p. 3, Superintendent Hr'g Disposition Rendered. Up to that point, Plaintiff had completed sixteen days of pre-hearing confinement in SHU. Dkt. No. 98–6, Ex. D, Tier III Hr'g Tr. at p. 20. Plaintiff received Ter Bush's written disposition, which stated that Ter Bush was relying on the October 19, 2010 inmate misbehavior report and Reed's testimony as evidence of his misconduct, *id.;* Dkt. No. 98–5, Ex. C at pp. 3–4, Superintendent Hr'g Disposition Rendered.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 3447743 (N.D.N.Y.)
**(Cite as: 2015 WL 3447743 (N.D.N.Y.))**

Plaintiff appealed Ter Bush's disposition to DOCCS Commissioner.[FN7] Dkt. No. 98–17, Donald Venettozzi Decl., dated Nov. 10, 2014, at ¶ 14. On December 31, 2010, on the Commissioner's behalf, Defendant Venettozzi [FN8] affirmed Defendant Ter Bush's determination, concluding that "the charging officer's conclusions were supported by substantial evidence and that the hearing officer had conducted a proper review of the evidence presented at the hearing, asked appropriate questions, and considered all evidence presented to him, including plaintiff's testimony." *Id.* at ¶ 17; Dkt. No. 98–5, Ex. C at p. 2, Review of Superintendent's Hr'g, dated Dec. 31, 2010.

> FN7. DOCCS Commissioner is not a defendant in this action.

> FN8. Defendant Donald Venettozzi is employ by DOCCS in the Special Housing/Inmate Disciplinary Program. Dkt. No. 98–17, Donald Venettozzi Decl., dated Nov. 10, 2014, at ¶¶ 1–2.

### C. Due Process

**\*5** The Due Process Clause of the Fourteenth Amendment protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner[.]" *Sandin v. Conner,* 515 U.S. 472, 484 (1995). To state a due process claim under § 1983, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). However, because the Defendants do not address whether Plaintiff has a protected liberty interest, the Court turns to the crux of Plaintiff's due process claim: whether Plaintiff was provided with a fair and impartial hearing officer at his Tier III disciplinary hearing.

An inmate at a prison disciplinary hearing is entitled to the following: (1) advanced written notice of the charges—at least twenty-four hours prior to the hearing; (2) the opportunity to appear at the hearing, to call witnesses, and to present rebuttal evidence; and (3) a written statement as to the evidence relied upon and the reasons for the disciplinary action. *Wolff v. McDonnell,* 418 U.S. 539, 564–66 (1974); *see also Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986).

Here, Plaintiff does not allege that he had inadequate notice of his disciplinary hearing nor was unable to appear at the hearing, present witnesses, or submit favorable evidence. But Plaintiff does contend that he was deprived of a fair and impartial hearing officer. Third Am. Compl. at ¶¶ 52 & 114.

### 1. Fair and Impartial Hearing Officer

While an inmate is *not* entitled to a hearing officer with the same level of impartiality required by judges, he is entitled to a hearing untainted by arbitrary or predetermined findings of guilt. *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989). Nonetheless, a hearing officer's limited impartiality requirements are satisfied where the record contains "some evidence" to support the officer's findings. *Superintendent v. Hill,* 472 U.S. 445, 455 (1985). "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached[.]" *Id.* at 455–56 (citations omitted). A written misbehavior report can satisfy the "some evidence" standard. *Creech v. Schoellkoph,* 688 F.Supp.2d 205, 214 (W.D.N.Y.2010) (citing *Foster v. Coughlin,* 76 N.Y.2d 964, 966 (1990), for the proposition that "[a] written misbehavior report can constitute substantial evidence of an inmate's misconduct"). That being said, only " 'reliable' evidence can constitute 'some evidence.' " *Sira v. Morton,* 380 F.3d 57, 76 (2d Cir.2004) (citing *Luna v. Pico,* 356 F.3d 481, 488 (2d Cir.2004)).

Here, the inmate misbehavior report was written

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 3447743 (N.D.N.Y.)
**(Cite as: 2015 WL 3447743 (N.D.N.Y.))**

by the officer personally involved in the October 19, 2010 cell search, and is based on that officer's firsthand observation; and, there is no evidence of any motive for that officer to falsely accuse Plaintiff of storing contraband in his cell, nor is there a reason for Defendant Ter Bush to doubt the veracity of the inmate misbehavior report. Furthermore, Ter Bush also relied on Plaintiff's testimony in which Plaintiff attempted to justify his possession of the unauthorized documents. Thus, Ter Bush relied on "some evidence" to support his findings and he provided Plaintiff with a written disposition, which stated that he was relying on the inmate misbehavior report and Reed's testimony as evidence of Plaintiff's misconduct. Therefore, the Court recommends **dismissing** Plaintiff's claim that he was denied procedural due process at his Tier III disciplinary hearing.

### D. Pre–Confinement SHU

**\*6** Plaintiff also claims that Defendant Ter Bush's failure to "subtract [ ]" the days he spent in pre-hearing confinement from his six month SHU sentence was a "[ ]violation of due process of law[.]" [FN9] Third Am. Compl. at ¶ 112. The Second Circuit has held that "administrative confinement of a prison inmate is not restricted by the Fourteenth Amendment's Due Process Clause unless the state has created a liberty interest from such confinement." *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (citing *Gittens v. LeFevre,* 891 F.2d 38, 40 (2d Cir.1989). However, "New York law does not require pre-hearing administrative time served to be credited to a disciplinary sentence." *Nowlin v. Selsky,* 1992 WL 196782, at \*3 (S.D.N.Y. Aug. 5, 1992); *Mastropietro v. New York State Dep't of Corr.,* 862 N.Y.S.2d 131 (App. Div.3d Dep't 2008) ("[T]here is no authority for petitioner's assertion that he should have received credit toward his administrative penalty for time spent in confinement before the to hearing.") (citation omitted). Because state law does not compel prison officials to deduct the time spent in pre-hearing confinement from a plaintiff's SHU sentence, Plaintiff does not have a cognizable claim for relief. Thus, the

Court recommends **dismissing** this claim.

> **FN9.** The Court finds it unnecessary to address Defendants' other legal arguments as we find that Plaintiff is not raising a due process challenge to his placement in pre-hearing SHU confinement, and he acknowledges that Tier III penalties for inmate infractions do not have a maximum outer limit. Dkt. No. 82, Third Am. Compl., af ¶ 111; Dkt. No. 98–4, Ex. B, Benji Reed Dep., dated May 5, 2014, at p. 38.

### E. Denial of Access to the Courts[FN10]

> **FN10.** It should be noted that Plaintiff's claim that Defendant Hetcher intentionally destroyed or lost his legal papers was previously dismissed with prejudice as New York has an adequate post-deprivation remedy for the loss of personal property. Dkt. No. 18, Mem.-Dec. & Order, dated Apr. 10, 2012, at p. 6. Inasmuch as this constitutes law of the case. Plaintiff's Third and Fifth Count are recommended to be dismissed.

It is well established that "prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821 (1977). That right "is infringed when prison officials interfere with a prisoner's preparation of legal documents." *Thomas v. Egan,* 1 F. App'x 52, 54 (2d Cir.2001) (citing *Lewis v. Casey,* 518 U.S. 343, 350 (1996). In order to state a claim for denial of access to the courts, the plaintiff must allege that the defendant caused actual injury, *i.e.,* the defendant took or was responsible for actions that hindered plaintiff's efforts to pursue a non-frivolous, meritorious legal claim. *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) (citing *Lewis v. Casey,* 518 U.S. at 351); *Webster v. Fischer,* 694 F.Supp.2d 163, 193 (N.D.N.Y.) *aff'd,* 398 F. App'x 683 (2d Cir.2010). A plaintiff must also "demonstrat[e] that defendants

Slip Copy, 2015 WL 3447743 (N.D.N.Y.)
**(Cite as: 2015 WL 3447743 (N.D.N.Y.))**

deliberately and maliciously interfered with his access to the courts, and that such conduct materially prejudiced a legal action he sought to pursue." *Smith v. O'Connor,* 901 F.Supp. 644, 649 (S.D.N.Y.1995); *see also Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987).

Here, Plaintiff fails to demonstrate that he suffered an actual injury from the confiscation of UCC materials, and possibly drafts of legal documents, from his cell. Plaintiff does not outline how a legitimate, non-frivolous legal claim was frustrated; but, more significantly, Plaintiff's legal claim is frivolous. For instance, Plaintiff argues that the criminal trial court judge lacked personal jurisdiction over him, and thus had no authority to sentence him, because "he never forfeited or contracted any of his right to republican form of government. It was never established that the Plaintiff personally participated in nor contributed to the American experiment in democracy [.]" Reed Decl. at ¶ 80. As such arguments are patently frivolous, the Court recommends **granting** Defendants' Motion for Summary Judgment with respect to Plaintiff's First Amendment denial of access to courts claim.

### F. Equal Protection

**\*7** The Equal Protection Clause of the Fourteenth Amendment states that no person shall be denied "the equal protection of the laws" U.S. Const. amend. XIV, § 1. The Equal Protection Clause mandates state actors to treat similarly situated people alike. *See Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985) (cited in *Verdal v. Frantz,* 2002 WL 31309175, at \*3 n. 5 (N.D.N.Y. July 31, 2002)). To state an equal to protection claim, a claimant "must prove purposeful discrimination ... directed at an identifiable or suspect class." *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (quoted in *Verdal v. Frantz* ). To do so, it is imperative that a plaintiff demonstrate that similarly situated persons have been treated ly. *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 193 (2d Cir.1994) (citing *Cleburne v. Cleburne Living*

*Ctr.*).

On the other hand, a "class of one" equal protection claim requires the claimant to demonstrate that they share an "extremely high degree of similarity" with the "persons to whom they compare themselves." *Clubside, Inc. v. Valentin,* 468 F.3d l44, 159 (2d Cir.2006) (citations omitted). Further, the claimant must show that:

(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and

(ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.

*Neilson v. D'Angelis,* 409 F.3d 100, 105 (2d Cir.2005) (citations omitted) (partially abrogated on other grounds by *Engquist v. Or. Dep't of Agric.,* 553 U.S. 591 (2008)).

Here, Plaintiff fails to allege or provide any facts indicating that he had been treated differently from any other person or group during his confinement at Eastern. Thus, the Court recommends **dismissing** Plaintiff's equal protection claim.

Because the Court finds that no cause of action has been stated within the Third Amended Complaint, the Court need not address Defendants' qualified immunity or Eleventh Amendment Immunity defense.

### II. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 98) be **GRANTED in its entirety** and the case be **DISMISSED;** and it is

Slip Copy, 2015 WL 3447743 (N.D.N.Y.)
**(Cite as: 2015 WL 3447743 (N.D.N.Y.))**

further

 **ORDERED,** that the Clerk of the Court serve a copy of this ReportRecommendation and Order upon the parties to this action.

 Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE AP-PELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

 **\*8** Filed April 8, 2015.

N.D.N.Y.,2015.
Reed v. Terbush
Slip Copy, 2015 WL 3447743 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1086001 (N.D.N.Y.)
**(Cite as: 2011 WL 1086001 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Nelson RODRIGUEZ, Plaintiff,
v.
Donald SELSKY, Defendant.

Civil Action No. 9:07–CV–0432 (LEK/DEP).
Jan. 25, 2011.

Nelson Rodriguez, Attica, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, Aaron M. Baldwin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for the Defendant.

*REPORT AND RECOMMENDATION*
DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Nelson Rodriguez, a New York state prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights. In his complaint, as amended, Rodriguez alleges that prison officials at the facility in which he was confined at the relevant times issued him two fabricated misbehavior reports ("MBRs") falsely accusing him of violating prison rules and denied him procedural due process during the course of the ensuing disciplinary hearing.[FN1] Plaintiff attributes those actions to retaliation for his having filed a civil action against a corrections employee who was not named as a defendant in his complaint.

> FN1. As originally constituted, plaintiff's complaint recited other purportedly unlawful

conduct, alleging that he was subjected to ongoing harassment, retaliation, and interference with his access to the courts. As a result of a series of court interventions the claims in this action, which was commenced elsewhere but later transferred to this district, have been significantly narrowed.

The sole remaining claim in this action is asserted against defendant Donald Selsky, the former Director of Special Housing and Inmate Disciplinary Programs for the New York State Department of Correctional Services ("DOCS"), alleging deprivation of procedural due process arising out of plaintiff's disciplinary hearing and defendant Selky's review of the resulting determination.

Currently pending before the court is defendant's motion for summary judgment dismissing plaintiff's amended complaint. In his motion, defendant argues that 1) he was not sufficiently involved in the constitutional deprivation alleged to support a finding of liability; 2) plaintiff was afforded procedural due process in connection with the disciplinary proceedings at issue, and 3) in any event he is entitled to qualified immunity from suit. For the reasons set forth below, I recommend a finding that plaintiff was not deprived of procedural due process, and that his complaint therefore be dismissed.

I. *BACKGROUND*[FN2]

> FN2. In light of the procedural posture of the case the following recitation is derived from the record now before the court with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1086001 (N.D.N.Y.)
**(Cite as: 2011 WL 1086001 (N.D.N.Y.))**

Plaintiff is a prison inmate entrusted to the custody of the DOCS; at the times relevant to his due process claim plaintiff was housed at the Shawangunk Correctional Facility ("Shawangunk"), located in Wallkill, New York. Amended Complaint (Dkt. No. 7) ¶ 3; Selsky Decl. (Dkt. No. 62–3) ¶ 15.

As a result of an incident involving another inmate occurring on December 30, 2003, plaintiff was issued two MBRs. Amended Complaint (Dkt. No. 7) ¶¶ 12–15. Selsky Decl. (Dkt. No. 62–3) ¶ 16. The first, issued on December 30, 2003 and authored by Corrections Officer Goosby, charged Rodriguez with fighting and refusal to obey a direct order. Selsky Decl. (Dkt. No. 62–3) ¶ 17 and Exh. A (Dkt. No. 62–4). The second, issued on January 2, 2004 by Corrections Lieutenant Wright, addressed the same incident and accused Rodriguez of fighting, engaging in violent conduct, and participating in a demonstration detrimental to the order of the facility. Selksy Decl. (Dkt. No. 62–3) ¶ 18 and Exh. A (Dkt. No. 62–4).

The parties differ as to when the two MBRs were served upon Rodriguez. Plaintiff and defendant appear to be in agreement that the second MBR was served upon him on January 2, 2004. Selsky Decl. (Dkt. No. 62–3) ¶ 19 and Exh. A (Dkt. No. 62–4); Plaintiff's Local Rule 7.1(a)(3) Statement (Dkt. No. 68) ¶ 16. While defendant asserts that both MBRs were served on January 2, 2004, *see* Selsky Decl. (Dkt. No. 62–3) ¶ 19 and Exh. A (Dkt. No. 62–4), plaintiff denies that he received the December 30, 2003 MBR until the commencement of his disciplinary hearing.[FN3] Plaintiff's Local Rule 7.1(a)(3) Statement (Dkt. No. 68) ¶ 16.

FN3. As will be seen I have assumed, as I must at this juncture, that plaintiff's version of the facts is correct. *See* pp. 31–32, *post.*

**\*2** The two MBRs were consolidated, over plaintiff's objection, and a Tier III disciplinary hearing was conducted, beginning on January 7, 2004, to address the charges set forth within them.[FN4,FN5] Amended Complaint (Dkt. No. 7) ¶ 15; Selsky Decl. (Dkt. No. 62–3) ¶ 21 and Exhs. A (Dkt. No. 62–4) and B (Dkt. Nos. 62–5 and 62–6). In advance of the hearing plaintiff was given the opportunity to express his preferences for an assistant, and based upon his selection Corrections Counselor Roddy was assigned to assist him. Selsky Decl. (Dkt.62–3) ¶ 20 and Exh. A (Dkt. No. 62–4).

FN4. The DOCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3. Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions and can result in penalties which include confinement for a period of time in the Special Housing Unit ("SHU"). Tier III hearings concern the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

FN5. Plaintiff's disciplinary hearing was originally scheduled to start on January 5, 2004, in order to meet the requirements of a state regulation mandating that a disciplinary hearing commence within seven days of a prisoner's confinement in a facility's SHU, 7 N.Y.C.R.R. § 251–5.1(a) (1983). Selsky Decl., Exh. B (Dkt. No. 62–5) pp. 18–19. While plaintiff assigns significance to the failure of prison officials to meeting the seven-day requirement, the record reveals that an extension was granted because plaintiff's assistant was unable to meet with him prior to January 5, 2004. *Id.* In any event, the violation of state regulations is not cogniza-

Not Reported in F.Supp.2d, 2011 WL 1086001 (N.D.N.Y.)
**(Cite as: 2011 WL 1086001 (N.D.N.Y.))**

ble under 42 U.S.C. § 1983. *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009) (Suddaby, J.) (collecting cases). Plaintiff's claim of undue delay is instead subject to constitutional standards, which require only that the hearing be held within a "reasonable time" and not within any prescribed number of days. *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990) ("Federal constitutional standards rather than state law define the requirements of procedural due process."); *Donato v. Phillips,* No. 9:04–CV–1160, 2007 WL 168238, at *6 (N.D.N.Y. Jan. 18, 2007) (McAvoy, J.) (hearing that started nine days after plaintiff's confinement in the SHU was reasonable).

Following its commencement on January 7, 2004, the hearing officer twice adjourned the hearing, initially to January 8, 2004, and again from January 8, 2004 to January 13, 2004, to allow the plaintiff an opportunity to prepare his defense. Selsky Decl. (Dkt. No. 62–3) and Exh. B (Dkt. No. 62–5) pp. 4–20, 20–58. During the course of the hearing plaintiff was permitted to call at least eleven witnesses to testify on his behalf, and also to introduce documentary evidence in his defense Selsky Decl. (Dkt. No. 62–3) ¶ 44 and Exh. A (Dkt. No. 62–4); Exh. B (Dkt. No. 62–5) at pp. 60–86, 94–115, 136–83, 185–209, and Exh. B (Part 2) (Dkt. No. 62–6) at pp. 2–12, 30–43, 59–71, 72–78, 76–83, 105–111, 111–117, 117–21,122–26, 128–39. Two inmate witnesses listed by the plaintiff declined to testify, and executed refusal forms stating that they did not wish to be involved in the matter. Selsky Decl. (Dkt. No. 62–3) ¶ 42 and Exh. A (Dkt. No. 62–4). The hearing officer rejected plaintiff's request that he be permitted to adduce testimony from two other witnesses, his wife and his attorney, concluding that the testimony would not be relevant to the issues involved in the hearing. Selsky Decl., Exh. B (Part 2) (Dkt. No. 62–6) pp. 98–99.

At the conclusion of hearing, plaintiff was found guilty of fighting (one count), refusing to obey a direct order, engaging in violent conduct, and participating in a demonstration, but was acquitted on the second count of fighting. Selsky Decl. (Dkt. No. 62–3) ¶ 22 and Exh. A (Dkt. No. 62–4). Based upon his findings, which were both noted in writing and stated orally at the hearing, the hearing officer imposed a penalty that included twenty-four months of disciplinary SHU confinement and a corresponding loss of package, commissary and telephone privileges. Selsky Decl. (Dkt. No. 62–3) ¶ 23; *see also* Exh. A (Dkt. No. 62–4) and Exh. B (Part 2) (Dkt. No. 62–6) pp. 156–58.

On February 11, 2004, plaintiff appealed the disciplinary determination to defendant Selsky's office. *See* Amended Complaint (Dkt. No. 7) ¶ 21; Selsky Decl. (Dkt. No. 62–3) ¶ 26 and Exh. C (Dkt. No. 62–7). Plaintiff also submitted a supplemental appeal on or about March 12, 2004. Selsky Decl. (Dkt. No. 62–3) ¶¶ 26–27, Exhs. C (Dkt. No. 62–7) and D (Dkt. No. 62–8). Defendant Selsky issued a determination on behalf of the DOCS Commissioner on April 8, 2004, modifying the results of the hearing by dismissing the charge of engaging in a demonstration and reducing the penalty imposed to twelve months of SHU confinement with a corresponding loss of privileges.[FN6] Selsky Decl. (Dkt. No. 62–3) ¶ 28 and Exh. E (Dkt. No. 62–9). That determination was based upon defendant Selsky's finding that the nature of the incidents giving rise to the MBRs did not warrant the full extent of the penalty imposed and that the charge of engaging in a demonstration was not substantiated. *Id.* at ¶ 28 and Exh. E (Dkt. No. 62–9). Based upon his review, however, Selsky concluded that plaintiff received all of the procedural due process mandated under the Fourteenth Amendment and that there was evidence in the record substantiating the charges for which Rodriguez was found guilty. *Id.* at ¶ 29.

> FN6. Plaintiff's SHU term of disciplinary confinement and corresponding loss of privileges was further reduced to eighth months and nine days, ending on September 9, 2004,

Not Reported in F.Supp.2d, 2011 WL 1086001 (N.D.N.Y.)
**(Cite as: 2011 WL 1086001 (N.D.N.Y.))**

as a result of a discretionary time cut on or about July 14, 2004, occurring while plaintiff was housed at the Southport Correctional Facility. Selsky Decl. (Dkt. No. 62–3) ¶ 53.

## II. *PROCEDURAL HISTORY*

**\*3** This action was commenced on April 11, 2007 in the Southern District of New York, but was subsequently transferred to this district by order issued by Chief District Judge Kimba M. Wood on April 11, 2007.[FN7] Dkt. Nos. 1, 3. Plaintiff's original complaint challenged not only the MBRs issued and the disciplinary action that ensued, but also chronicled alleged continued harassment and acts of retaliation that he experienced following his transfer into the Attica Correctional Facility, naming as defendants several DOCS employees including Donald Selsky. *See* Complaint (Dkt. No. 1).

> FN7. While plaintiff's complaint was not filed in the Southern District until April 11, 2007, the transfer order issued by Chief Judge Wood noted that the complaint was received in that district on February 26, 2007. *See* Dkt. No. 3, n. 1.

Upon transfer of the case to this district and the court's initial review of plaintiff's complaint and accompanying request for leave to proceed *in forma pauperis* ("IFP"), by order dated May 17, 2007, Senior District Judge Lawrence E. Kahn granted plaintiff IFP status but directed that he file an amended complaint, noting several deficiencies in the original pleading including, *inter alia,* the apparent untimeliness of certain of his claims. Dkt. No. 5. In accordance with the court's directive, plaintiff filed an amended complaint on June 26, 2007. Dkt. No. 7. Upon review of that pleading District Judge Kahn issued an order on July 19, 2007 accepting the amended complaint for filing, but dismissing plaintiff's claims against the majority of the defendants as time-barred and further directing dismissal of plaintiff's claims against a newly-added defendant, Corrections Sergeant

Corcran, without prejudice to plaintiff's right to file a separate action against that defendant in the Western District of New York.[FN8] As a result, Donald Selsky was left as the sole remaining defendant in the action.

> FN8. District Judge Kahn explained that "[s]ince the alleged wrongdoing by Defendant Corcran occurred in the Western District of New York, and Plaintiff's claims against Defendant Corcran are very recent, and thus not in jeopardy of being time-barred at this time, the Court will dismiss Defendant Corcran from the action, without prejudice to Plaintiff filing his claims against Defendant Corcran in the Western District of New York." Decision and Order (Dkt. No. 8) at p. 3.

After filing an answer generally denying plaintiff's allegations against him and asserting various affirmative defenses, *see* Dkt. No. 10, defendant Selsky moved pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings, urging dismissal of plaintiff's amended complaint on the ground that it failed to allege the requisite degree of his personal involvement in any wrongdoing to support a finding of liability. Dkt. No. 47. The motion resulted in my issuance of a report on February 25, 2010 recommending that the motion be denied. Dkt. No. 54. That recommendation was adopted by District Judge Lawrence E. Kahn by order issued on September 13, 2010. Dkt. No. 67.

On June 18, 2010, defendant again moved, this time for summary judgment dismissing plaintiff's complaint. Dkt. No. 62. In his motion defendant reiterates his claim of lack of personal involvement and, additionally asserts that in any event plaintiff's due process claim lacks merit since the plaintiff was afforded all of the procedural safeguards required under the Fourteenth Amendment, and further that he is entitled to qualified immunity from suit. *Id.* Plaintiff has since responded in opposition to defendant's mo-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1086001 (N.D.N.Y.)
**(Cite as: 2011 WL 1086001 (N.D.N.Y.))**

tion, Dkt. No. 68, and defendant has submitted a reply memorandum addressing plaintiff's arguments and further supporting his motion. Dkt. No. 74.

**\*4** Defendant's motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

### III. *DISCUSSION*

#### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.

*Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

#### B. *Personal Involvement*

**\*5** In his motion defendant Selsky renews an argument previously made and rejected—that his limited involvement in reviewing the disciplinary determination in question based upon plaintiff's appeal of that decision is insufficient to support a finding of liability for any procedural due process violation which may have occurred in the context of that hearing. In response, plaintiff counters that the record reveals facts from which a reasonable factfinder could conclude that the defendant personally participated in the due process violation, including by conducting an

Not Reported in F.Supp.2d, 2011 WL 1086001 (N.D.N.Y.)
**(Cite as: 2011 WL 1086001 (N.D.N.Y.))**

inadequate review of the disciplinary hearing record.

It seems clear, particularly in light of the Supreme Court's relatively recent decision in *Ashcroft v. Iqbal,* —— U.S. —— 129 S.Ct. 1937, 1948–49 (2009), that to be held accountable for a constitutional deprivation under section 1983 a defendant must have had personal involvement in the conduct giving rise to the deprivation. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (*citing Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978); *Scott v. Fischer,* 616 F.3d 100, 110 (2d Cir.2010) ("In this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.") (quoting *McKinnon* ). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

As was noted in my prior report and recommendation, the question of whether defendant Selsky's review of an allegedly infirm disciplinary hearing provides grounds for establishing his personal involvement is one that has divided the courts. Some courts have found the mere allegation that Selsky has reviewed and affirmed a hearing determination that was the product of a due process deprivation is insufficient to establish liability for the underlying violation. *See, e.g., Abdur–Raheem v. Selsky,* 598 F.Supp.2d 367, 370 (W.D.N.Y.2009) ("The only allegation concerning Selsky in the case at bar is that he affirmed the disposition of plaintiff's administrative segregation hearing, pursuant to which plaintiff was confined to SHU.... That is not enough to establish Selsky's personal involvement."); *Ramsey v. Goord,* No. 05–CV–47A, 2005 WL 2000144, at *6 (W.D.N.Y. Aug. 13, 2005) ("[t]he fact that Commissioner Goord and SHU Director Selsky, as officials in the DOCS 'chain of command,' affirmed defendant

Ryerson's determination on appeal is not enough to establish personal involvement of their part."); [FN9] *see also Odom v. Calero,* No. 06 Civ. 15527, 2008 WL 2735868, at *7 (S.D.N.Y. Jul. 10, 2008) (concluding that a due process violation is complete upon the hearing officer rendering a decision, even when the liberty interest deprivation persists, and therefore is not "ongoing" when an appeal is taken to Donald Selsky).

> FN9. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

**\*6** On the other hand, other courts have found that the act of reviewing and affirming a determination on appeal can provide a sufficient basis to find the necessary personal involvement of a supervisory employee like defendant Selsky. *See, e.g., Bennett v. Fischer,* No. 9:09–CV–1236, 2010 WL 5525368 (N.D.N.Y. Aug 17, 2010) (Peebles, M.J.) (finding questions of fact regarding Commissioner Fischer's personal involvement in disciplinary precluding summary judgment), *Report and Recommendation Adopted,* 2011 WL 13826 (N.D .N.Y. Jan. 4, 2011) (Scullin, S. J.); *Baez v. Harris,* No. 9:01–CV–807, 2007 WL 446015, at *2 (N.D.N.Y. Feb. 7, 2007) (Mordue, C.J.) (fact that defendant Selsky responds personally to all disciplinary appeals by inmates found sufficient to withstand summary judgment motion based on lack of personal involvement); *Cepeda v. Coughlin,* 785 F.Supp. 385, 391 (S.D.N.Y.1992) ("The Complaint alleges that '[t]he Commissioner and/or his designee entertained plaintiff[']s appeal and also affirmed.' ... [T]he allegation that supervisory personnel learned of alleged misconduct on appeal yet failed to correct it constitutes an allegation of personal participation. Assuming that this allegation is true, as this court must on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) ..., Cepeda has pleaded personal involvement by Commissioner Coughlin sufficiently to withstand this motion.") (citations omitted); *Johnson v. Coombe,* 156 F.Supp.2d 273, 278

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1086001 (N.D.N.Y.)
**(Cite as: 2011 WL 1086001 (N.D.N.Y.))**

(S.D.N.Y.2001) (finding that plaintiff's complaint had sufficiently alleged personal involvement of Superintendent and Commissioner to withstand motion to dismiss because plaintiff alleged that both defendants had actual or constructive notice of the defect in the underlying hearing); *Ciaprazi v. Goord,* No. 9:02–CV–0915, Report–Recommendation, 2005 WL 3531464, at *16 (N.D.N.Y. Mar. 14, 2004) (Peebles, M.J.) (recommending that Selsky's motion for summary judgment for lack of personal involvement be denied because Selsky's review of plaintiff's disciplinary hearing appeal "sufficiently establishes his personal involvement in any alleged due process violations based upon his being positioned to discern and remedy the ongoing effects of any such violations."), *adopted,* 2005 WL 3531464, at *1–2 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J.).

In support of his argument regarding personal involvement defendant cites *Tafari v. McCarthy,* 714 F.Supp.2d 317 (N.D.N.Y. My 24, 2010), in which another magistrate judge of this court, in a report and recommendation adopted by the assigned district judge, wrote that "[t]he affirming of a disciplinary conviction does not constitute personal involvement in a constitutional violation." *Tafari,* 714 F.Supp.2d at 383. (citing *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002)). I respectfully disagree with my esteemed colleague and maintain that the cases holding that Selsky's affirmance, or that of someone in his corresponding position, of a constitutionally defective disciplinary determination at a time when the inmate is still serving his or her disciplinary sentence, and the violation can therefore be abated, falls within the *Colon* factors articulated in the Second Circuit for informing the supervisory liability analysis. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). In any event, this case is distinguishable from *Tafari* since here plaintiff has alleged that through his own conduct in inadequately reviewing the underlying determination defendant Selsky committed a due process violation, *see* Amended Complaint (Dkt. No. 7) ¶ 21, thereby satisfying the Supreme Court's admonition

that a defendant can only be held liable for his or own conduct for purposes of a civil rights violation. *Iqbal,* 129 S.Ct. at 1948.

**\*7** As I noted in my prior report, I believe that those cases concluding that a plaintiff's allegation that defendant Selsky reviewed and upheld an allegedly constitutionally-suspect disciplinary determination is enough to show his personal involvement in the alleged violation appear to be both better reasoned and more consonant with the Second Circuit's position regarding personal involvement. *See Black v. Coughlin,* 76 F.3d 72, 75 (2d Cir.1996) (criticizing a district court's denial of leave to amend to add Donald Selsky as a defendant in a due process setting and appearing to assume that Selsky's role in reviewing and affirming a disciplinary determination is sufficient to establish his personal involvement). While it may be true that the due process violations cited by Rodriguez occurred and were no longer ongoing when his appeal was taken to defendant Selsky, because it appears that the sentence imposed was still being served at the time of his review, the liberty interest deprivation allegedly effectuated without due process was therefore ongoing, and defendant Selsky was in a position to remedy the violation, at least in part, at a time when his intervention would still have been meaningful.

### C. *Merits of Plaintiff's Due Process Claim*

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000) (citations omitted); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996). Defendant concedes that plaintiff's eight months of SHU disciplinary confinement "at least arguably" impacted a protected liberty interest, *see* Defendant's Memorandum (Dkt. No. 62–14) at p. 3, and I agree. *See Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (finding that disciplinary confine-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ment for a period of 305 days is "a sufficient departure from the ordinary incidents of prison life to require procedurally due process protections."). Plaintiff's claim, then, boils down to whether he was provided the procedural safeguards guaranteed under the Fourteenth Amendment prior to that deprivation.[FN10]

> FN10. It should be noted that in this case plaintiff goes beyond merely alleging defendant Selsky's failure to rectify a past due process violation. In his complaint plaintiff also alleges that defendant Selsky participated in or furthered the violation by failing to conduct an appropriate review. Amended Complaint (Dkt. No. 7) ¶ 21.

The procedural rights to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell,* 418 U.S. 539, 564–67, 94 S.Ct. 2963, 2978–80 (1974).[FN11] Under *Wolff,* the constitutionally mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564–67, 94 S.Ct. at 2978–80; *see also Eng v. Coughlin,* 858 F .2d 889, 897–98 (2d Cir.1988). In addition, to pass muster under the Fourteenth Amendment the hearing officer's disciplinary determination must garner the support of at least "some evidence". *Superintendent v. Hill,* 472 U.S. 445, 105 S.Ct. 2768 (1985).

> FN11. Many of the points raised in support of plaintiff's due process claim surround the alleged failure of prison officials to meet the requirements prescribed by regulation for disciplinary hearings. It is well established,

however, that a violation of a state regulation is not actionable under section 1983. *Cusamano,* 604 F.Supp.2d at 482.

*1. Notice of Charges*

**\*8** The record now before the court, when interpreted in a light most favorable to the plaintiff, suggests that while the second of the two MBRs addressed at plaintiff's disciplinary hearing was served on Rodriguez on January 2, 2004, the earlier report was not received by him until the date on which the hearing was to begin.[FN12] Under *Wolff,* an accused inmate is entitled to meaningful advance written notice of the charges against him; in this circuit, a minimum of twenty-four hours of advance notice is generally considered to be required. *Sira v. Morten,* 380 F.3d 57, 70 (2d Cir.2004). The purpose of the notice requirement is to place the inmate on notice of the charges faced in order to permit the preparation of an adequate defense. *Id.* (citing *Taylor v. Rodriguez,* 238 F.3d 188, 192–93 (2d Cir.2001); *see also Martin v. Mitchell,* No. 92–CV–716, 1995 WL 760651, at *2 (N.D.N.Y. Nov. 24, 1995) (McAvoy, J.) (citing *Wolff,* 418 U.S. at 564, 94 S.Ct. at 2978) (holding that the purpose of the twenty-four hour notice rule is to provide inmates with sufficient time to prepare a defense, "not to hold hearing officers to a rigid and useless requirement that they only may call an inmate into a hearing room once they are positive that the inmate received a copy of the misbehavior report at least twenty-four hours earlier").

> FN12. As was previously noted, defendant disputes plaintiff's claim in this regard and asserts instead that both misbehavior reports were served on the plaintiff on January 2, 2004 by Corrections Officer Ferguson on January 2, 2004. Selsky Decl. (Dkt. No. 62–3) ¶ 19 and Exh. A.

In this instance, any failure on the part of prison officials to provide plaintiff with notice of the charges lodged against him prior to the scheduled hearing was

Not Reported in F.Supp.2d, 2011 WL 1086001 (N.D.N.Y.)
(Cite as: 2011 WL 1086001 (N.D.N.Y.))

harmless in light of the hearing officer's agreement to adjourn the hearing, initially from January 7, 2004 to January 8, 2004, and then again to January 13, 2004, in order to allow the Rodriguez to prepare his defense. The record clearly reflects that, during those intervening periods, he was afforded the opportunity to prepare a defense to both charges before any testimony was taken. *See* Plaintiff's Memorandum (Dkt. No. 68–1) at p. 5 (admitting that plaintiff was served with the first misbehavior report at the hearing prior to any testimony having been taken).

The notice requirements of *Wolff* were therefore satisfied in this case, and no reasonable factfinder could conclude otherwise.

2. *Assistance in Preparation of a Defense*

Under *Wolff* and its progeny, a prisoner is entitled to an "employee assistant" to aid in the preparation for a disciplinary hearing when the inmate is illiterate, confined to the SHU, or unable to grasp the complexity of the issues involved. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993); *see also Eng,* 858 F.2d at 897. The Supreme Court has made it clear, however, that the assistance due prisoners is limited and is not equivalent of the right of a criminally accused legal counsel. *Wolff,* 418 U.S. at 570, 94 S.Ct. at 2981. An assistant is only required to act as the inmate's *"surrogate—to do what the inmate would have done were he able."* *Silva,* 992 F.2d at 22 ("The assistant is not obliged to go beyond the specific instructions of the inmate because if he did so he would then be acting as counsel.")

**\*9** Because Rodriguez had been relegated to SHU confinement by the time of the disciplinary hearing he was entitled to and was in fact assigned an employee assistant, Ms. Roddy, to help him prepare for the hearing. Rodriguez asserts that the assistant, however, refused to provide him with requested documents and threatened to "write him up" if he requested further assistance. Plaintiff's Memorandum (Dkt. No. 68–1) at pp. 14–17. Specifically, plaintiff claims that he was

refused access to documents that would have helped prove his innocence, including a list of officers involved in the incidents involved, letters written by another inmate, video footage of a different inmate being led to the SHU, all misbehavior reports concerning other inmates' involvement in the incidents, and all pertinent "To/From" memoranda produced by staff or inmates with knowledge of the relevant events. *Id.* at p. 15.

A careful review of the assistant forms and attachments in the record shows that the assigned assistant fulfilled her duty as plaintiff's surrogate. Plaintiff provided several lists of documents requested to prepare his defense. [FN13] Selsky Decl., Exh. A (Dkt. No. 62–4) pp. 46–49, 54–61. Ms. Roddy indicated on the assistant form that she pursued all of plaintiff's requests and provided him with at least twenty pages of documents. *Id.* at pp. 17–18. On the handwritten lists, Ms. Roddy noted which documents were provided to plaintiff and gave brief explanations as to why some of the requested documents could not be produced. It was noted, for example, that plaintiff was denied access to the handwritten notes of another inmate, several requested "To/From" forms simply did not exist, and that the video footage would be available for viewing at the hearing if deemed pertinent to the pending charges. *Id.* at pp. 46–49.

FN13. It is noted that plaintiff did not request that Ms. Roddy interview any inmates or other persons as potential witnesses and refused to sign the assistant form. Selsky Decl., Exh. A (Dkt. No. 62–4) p. 17.

There is no indication that any documents were withheld from plaintiff without justification or as a result of Ms. Roddy's ineffective assistance. Ms. Roddy's role as plaintiff's assistant was limited to acting as his surrogate; if he was not permitted to receive certain documents, Ms. Roddy likewise could not access them. Even assuming plaintiff's claim that Ms. Roddy was rude and hostile toward him is accu-

Not Reported in F.Supp.2d, 2011 WL 1086001 (N.D.N.Y.)
**(Cite as: 2011 WL 1086001 (N.D.N.Y.))**

rate, such conduct in and of itself does not violate his federal due process rights. *See Gates v. Selsky,* No. 02 CV 496, 2005 WL 2136914, at * 7 (W.D.N.Y. Sept. 02, 2005) (noting that the duty owed by an employee assistant is the provision of requested services in good faith and in the best interest of the inmate and to perform as instructed by the inmate). In short, there is no evidence now before the court from which a reasonable factfinder could conclude that plaintiff was denied effective assistance in preparing his defense to the pending disciplinary charges.

### 3. *Opportunity to Present Evidence*

The due process clause of the Fourteenth Amendment plainly guarantees the right of an accused inmate to present a defense to disciplinary charges. *Wolff,* 418 U.S. at 555–56, 94 S.Ct. at 2974. That right, however, is not unfettered and does not apply to the same extent as the constitutional guarantee to a criminally accused defendant of the right to present a meaningful defense. *Hernandez v. Selsky,* 572 F.Supp.2d 446, 454 (S.D.N.Y.2008) (citing *Wolff* ). Instead, in order to keep a disciplinary hearing to within reasonable limits, a hearing officer "must have the necessary discretion ... to refuse to all witnesses that may create a risk of reprisal or undermine authority" *Wolff,* 418 U.S. at 566, 94 S.Ct. at 2980.

**\*10** An inmate's request to have specific witnesses called to testify may be refused if the hearing officer reasonably finds that such witnesses' testimony would be duplicative, non-probative, or would interfere with correctional goals. *See Russell v. Selsky,* 35 F.3d 55, 58 (2d Cir.1994). "[A] hearing officer does not violate due process by excluding irrelevant or unnecessary testimony." *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999).

In support of his claim that he was denied the opportunity to present a meaningful defense plaintiff first points to the hearing officer's refusal to allow him to call his mother and attorney as witnesses. According to the plaintiff, both would have substantiated his

claim of retaliatory motives on the part of correctional officials. Plaintiff's Memorandum (Dkt. No. 68–1) at p. 8; *see also* Selsky Decl., Exh. B (Dkt. No. 62–6) pp. 98–99. Neither witness, however, was present in the prison during any of the events giving rise to plaintiff's claims. The only testimony those individuals could have offered would not only have been hearsay, but would have come directly from Rodriguez himself, who was present to testify. Accordingly, the hearing officer properly determined that such testimony would have been irrelevant or unnecessarily redundant.

Plaintiff also challenges the hearing officer's failure to submit written questions to two fellow inmates who refused to testify at the hearing. Despite plaintiff's claim to the contrary, a hearing officer is under no affirmative duty to compel a response from an inmate who refuses to testify at a disciplinary hearing. If a witness has indicated that he or she will not testify if called, it would be futile and unnecessary to pursue his or her testimony further. *Silva,* 992 F.2d at 22; *see also Johnson v. Doling,* No. 9:05–CV–376, 2007 WL 3046701, at *7 (N.D.N.Y. Oct. 17, 2007) (McAvoy, J. and Treece, M.J.) (the failure to summon the testimony of a witness who refuses to testify does not violate due process); *Dumpson v. Rourke,* No. CIVA96CV621, 1997 WL 610652, at *5 (N.D.N .Y. Sept. 26, 1997) (Pooler, J. and DiBianco, M.J.) (a hearing officer's failure to investigate why an inmate refused to testify does not constitute a due process violation).

Here, inmates Colon and Berrios flatly refused to testify at plaintiff's disciplinary hearing, signing the appropriate refusal forms on January 14, 2004. Selsky Decl., Exh. A (Dkt. No. 62–4) pp. 110–11. Colon explained his refusal by noting that he had not witnessed the incident, and Berrios likewise claimed to have no relevant information because he was sleeping in his cell at the relevant times. *Id.* Requesting further information from these inmates would have been futile and unnecessary since they claimed not to have actually witnessed the events that led to Rodriguez's

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1086001 (N.D.N.Y.)
**(Cite as: 2011 WL 1086001 (N.D.N.Y.))**

charges. It was therefore not a violation of plaintiff's due process rights for the hearing officer to refuse to inquire further into their involvement.

4. *Impartial Hearing Officer*

**\*11** Among the due process dictates arising under the Fourteenth Amendment is the requirement that a hearing officer assigned to address a disciplinary charge against an inmate be unbiased. *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996); *see also Davidson v. Capuano,* No. 78 Civ. 5724, 1988 WL 68189, at \*8 (S.D.N .Y. June 16, 1988) (citing *McCann v. Coughlin,* 698 F.2d 112, 122 n. 10 (2d Cir.1983)). While the reality is that most hearing officers serving in that capacity are prison officials, and a prison hearing officer's impartiality generally does not have to mirror that of judicial officers, nonetheless the result of a disciplinary hearing should not be "arbitrary and adversely predetermined." *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989). Here again, the inquiry focuses on whether plaintiff was afforded basic due process. *See Wright v. Conway,* 584 F.Supp.2d 604, 609 (W.D.N.Y.2009). Within that context, an impartial hearing officer is one who "does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990).

It should be noted that a plaintiff's disagreement with a hearing officer's rulings alone does not give rise to a finding of bias. *See Johnson,* 2007 WL 3046701, at \*10 (hostile exchanges between plaintiff and the hearing officer throughout the proceeding and adverse rulings did not constitute bias where plaintiff was otherwise provided the opportunity to testify, call witnesses, and raise objections). Similarly, the mere involvement of a hearing officer in related investigations or proceedings does not evidence bias. *See Vega v. Artus,* 610 F.Supp.2d 185, 200 (N.D.N.Y.2009) (failing to find bias where the hearing officer conducted both the disciplinary proceeding and the investigation into the inmate's grievance against the involved corrections officer).

Because prison officials serving as adjudicators enjoy a rebuttable presumption that they are unbiased, *Allen,* 100 F.3d at 259, plaintiff's conclusory allegations of bias in this case are insufficient to overcome this presumption. Plaintiff claims that Hearing Officer Ewanciw was biased because he sought assistance from Lt. Wright, who authored one of the two MBRs in issue. Plaintiff's Memorandum (Dkt. No. 68–1) at pp. 18–20. However, Rodriguez fails to explain how this evidences bias against him, reflects a predetermination on the hearing officer's part, or impacted the outcome of the proceeding. The record reflects that the hearing officer disclosed to the plaintiff that he had consulted with Lt. Wright, the "disciplinary lieutenant," for the purpose of ascertaining whether plaintiff was permitted to receive copies of redacted investigation documents. Selsky Decl., Exh. B (Dkt. No. 62–5) p. 130.

During the hearing plaintiff suggested that the hearing officer and Lt. Wright are friends outside of work. Selsky Decl., Exh. B (Dkt. No. 62–5) pp. 131–32. While the allegation denied by Hearing Officer Ewanciew, even if true this fact does not show that he was predisposed to rule against plaintiff.

**\*12** In sum, plaintiff has failed to adduce evidence from which a reasonable factfinder could conclude that the hearing officer assigned to preside over plaintiff's disciplinary hearing was biased, or had prejudged plaintiff's guilt prior to considering the evidence presented at the hearing.

5. *Determination Supported by "Some Evidence"*

In addition to repeated verbal explanations of his rulings throughout the hearing and of his ultimate findings, Hearing Officer Ewanciw provided plaintiff with a written explanation of the evidence relied upon in reaching his conclusion. Selsky Decl., Exh. A (Dkt. No. 62–4) pp. 3–4. In his written explanation, Hearing Ewanciw acknowledged that he relied in part on in-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1086001 (N.D.N.Y.)
**(Cite as: 2011 WL 1086001 (N.D.N.Y.))**

formation from confidential witnesses. Selksy Decl., Exh. A (Dkt. No. 62–4) p. 4. The question next presented is whether these findings were supported by at least some credible evidence.

The "some evidence" standard is extremely tolerant and is satisfied if "there is any evidence in the record that supports" the disciplinary ruling. *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000). Nonetheless to pass constitute muster, the supporting evidence must be reliable. *Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001). The Second Circuit has made clear that "the reliability of evidence is always properly assessed by reference to the totality of the circumstances and that an informant's record for reliability cannot, by itself, establish the reliability of bald conclusions or third-party hearsay." *Sira,* 380 F.3d at 82; *see also Dawkins v. Gonyea,* 646 F.Supp.2d 594, 614 (S.D.N.Y.2009) (*"Sira* clearly established that an independent assessment is necessary to satisfy the 'some evidence' standard when a disciplinary decision is based solely on confidential information.").

The hearing transcript reflects that the hearing officer did not make an independent inquiry into the reliability of the confidential inmate witnesses himself, but instead relied on Lt. Wright's independent finding of reliability. Selsky Decl., Exh. B (Dkt. No. 62–5) p. 128. Had the disciplinary decision been based solely on such confidential information, an issue of material fact might have been presented as to whether the "some evidence" standard was met. With defendant Selsky's reversal of plaintiff's conviction on the demonstration charge contained within the January 2, 2004 MBR, the remaining charges for which he was found guilty included fighting, refusing a direct order, and violent conduct. To support his finding of guilt on those counts Hearing Officer Ewanciw relied on a correctional officer's assertion that he witnessed plaintiff raise his fists, throw punches, and fail to stop fighting when instructed to do so—an account that was corroborated by another officer's investigation—as well as the results of an investigation into the

incident and evidence found in plaintiff's cell tying him to the relevant events. There was therefore sufficient reliable evidence on which to base a disciplinary decision related to the charges, independent of the confidential witness statements, and no reasonable factfinder could conclude otherwise.

IV. *SUMMARY AND RECOMMENDATION*

**\*13** Plaintiff has failed to establish the existence of a genuine issue of material fact regarding his procedural due process claim. Rodriguez received sufficient notice of the charges against him as well as adequate assistance in preparing a defense, and had ample opportunity to appear, call witnesses, and present evidence in his defense. In addition, the record fails to disclose any basis for concluding that Hearing Officer Ewanciw was biased, and the record before the court proves that he provided plaintiff with a written explanation of the reasons for his decision, which was supported by at least some reliable evidence. I therefore recommend dismissal of plaintiff's due process claim against defendant Selsky on the merits, and in light of this recommendation find it unnecessary to address defendant's claim of qualified immunity. It is therefore respectfully

RECOMMENDED, that defendant's motion for summary judgment (Dkt. No. 62) be GRANTED, and that the complaint be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1086001 (N.D.N.Y.)
**(Cite as: 2011 WL 1086001 (N.D.N.Y.))**

N.D.N.Y.,2011.
Rodriguez v. Selsky
Not Reported in F.Supp.2d, 2011 WL 1086001
(N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Slip Copy, 2015 WL 127864 (N.D.N.Y.)
**(Cite as: 2015 WL 127864 (N.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Harold J. SCOTT, Plaintiff,
v.
Peter FREDERICK, Captain J. Facteau, Mrs. Edna
Aiken, Randy Nichols, and Albert Prack, Defendants.

No. 9:13–CV–605.
Signed Jan. 8, 2015.

Harold J. Scott, Elmira, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the
State of New York, The Capitol, Colleen D. Galligan,
Esq., Assistant Attorney General, of Counsel, Albany,
NY, for Defendants.

**DECISION & ORDER**
THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* civil rights action pursuant to 42
U.S.C. § 1983, alleging violations of Plaintiff's due
process rights under the Fourteenth Amendment of the
United States Constitution during a prison disciplinary
hearing, was referred to the Honorable Randolph F.
Treece, United States Magistrate Judge, for a Re-
port–Recommendation pursuant to 28 U.S.C. § 636(b)
and Local Rule 72.3(c).

In the Report–Recommendation, dated August
28, 2014, Magistrate Judge Treece recommends that
Defendants' motion to dismiss for failure to state a
claim upon which relief can be granted, dkt. # 15, be
granted in part and denied in part. Magistrate Judge
Treece recommends that the motion be: granted with
respect to Defendants Edna Aiken, Captain J. Facteau,
and Randy Nichols; granted without prejudice with

respect to Defendant Albert Prack; granted with re-
spect to Plaintiff's claims that Defendant Peter Fred-
erick violated his due process rights by failing to
provide sufficient notice of the disciplinary
re-hearing, failing to record the entire hearing, and
improperly re-starting the hearing; and denied with
respect to Plaintiff's claims that Defendant Frederick
denied him the opportunity to present a defense and
for being biased.

Plaintiff filed a timely objection to the Re-
port–Recommendation pursuant to 28 U.S.C. §
636(b)(1). When objections to a magistrate judge's
Report–Recommendation are lodged, the Court makes
a *"de novo* determination of those portions of the
report or specified proposed findings or recommen-
dations to which the objection is made." *See* 28 U.S.C.
§ 636(b)(1). After such a review, the Court may "ac-
cept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge.
The judge may also receive further evidence or re-
commit the matter to the magistrate judge with in-
structions." *Id.*

Having reviewed the record *de novo* and having
considered the issues raised in the Plaintiff's objec-
tions, this Court has determined to accept the rec-
ommendation of Magistrate Judge Treece for the
reasons stated in the Report–Recommendation.

It is therefore ordered that:

(1) Plaintiff's Objections, dkt. # 30, to the Re-
port–Recommendation of Magistrate Judge Treece,
dkt. # 25, are hereby OVERRULED;

(2) The Report–Recommendation is hereby
ADOPTED;

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 127864 (N.D.N.Y.)
**(Cite as: 2015 WL 127864 (N.D.N.Y.))**

(3) The Defendants' motion to dismiss, dkt. # 15, is hereby GRANTED in part and DENIED in part, as follows:

a. the motion is GRANTED as to Plaintiff's claims against Defendants Aiken, Facteau and Nicholas and each of these Defendants are DISMISSED from the action;

b. the motion is GRANTED without prejudice as to Plaintiff's claim against Defendant Prack;

c. the motion is GRANTED with respect to Plaintiffs claims that Defendant Frederick violated his due process rights by failing to provide subsequent notice of the re-hearing, failing to record the entire hearing, and improperly re-starting the hearing; and

d. the motion is DENIED with respect to Plaintiffs claims that Defendant Frederick denied him the opportunity to present a defense and for being biased.

**\*2** Plaintiff may file an amended complaint within 30 days of the date of this Order.

**IT IS SO ORDERED.**

**HAROLD J. SCOTT,** Plaintiff,

—v—

**PETER FREDERICK,** *Senior Counsel /Hearing Officer Clinton Correctional Facility,* **CAPTAIN J. FACTEAU,** *Correctional Captain, Clinton Correctional Facility,* **MRS. EDNA AIKEN,** *Correction Counsel / Tier Assistant, Clinton Correctional Facility,* **RANDY NICHOLS,** *Correction Officer, Clinton Correctional Facility,* **ALBERT PRACK,** *Appeals Review Official, Department of Correctional Services and Community Supervision,* Defendants.

**REPORT–RECOMMENDATION and ORDER**

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Harold J. Scott brings this action, pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his due process rights in connection with a Tier III Superintendent's Hearing held at Clinton Correctional Facility ("CCF"). *See generally* Dkt. No. 1, Compl. Defendants move to dismiss Plaintiff's Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), on the grounds that Plaintiff fails to state a claim for which relief can be granted and that they are entitled to qualified immunity. *See generally* Dkt. No. 15–1, Defs.' Mem. of Law. Plaintiff opposes the Motion. Dkt. No. 19, Pl.'s Mem. of Law. For the reasons stated below, we recommend that the Defendants' Motion be **GRANTED** in part and **DENIED** in part.

**I. STANDARD OF REVIEW**

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, ... matters to which the court may take judicial notice[,]" as well as documents incorporated by reference in the complaint. *Spence v. Senkowski,* 1997 WL 394667, at

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 127864 (N.D.N.Y.)
**(Cite as: 2015 WL 127864 (N.D.N.Y.))**

*2 (N.D.N.Y. July 3, 1997) (*citing Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991) (citing Fed. R. C iv. P. 10(c)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint'* may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (quoting *Cortec Indus. ., Inc. v. Sum Holding L.P.,* 949 F.2d at 47). However, "even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir.2006). "It must also be clear that there exists no material disputed issues of fact regarding the relevance of the document." *Id.*

*3 The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Scherm3erhorn,* 373 U.S. 746, 754 n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963); *see also Arar v. Ashcroft,* 585 F.3d 559, 567 (2d Cir.2009). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal,* 556 U.S. at 697 (citing *Twombly* ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,*

556 U.S. at 678. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* In this respect, to survive dismissal, a plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Bell Atl. Corp. v. Twombly,* 440 U.S. at 555). Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* 556 U.S. at 679–80.

With this standard in tow, we consider the plausibility of Plaintiff s Complaint.

## II. DISCUSSION
### A. Background

The following summary is taken from Plaintiff's Complaint.[FN1]

> FN1. In their Memorandum of Law, Defendants state that "Plaintiff quotes extensively from segments of the Tier hearing record and had clearly relied upon that record in the course of drafting the Complaint." Dkt. No. 15–1, Defs.' Mem. of Law, at p. 4 n. 2. They argue, therefore, that documents they submit in support of their Motion should be deemed to be part of Plaintiff's Complaint and considered for purposes of the instant Motion. *Id.* Plaintiff counters that any refer-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ences in his Complaint were made from his own personal handwritten notes and not the documents Defendants offer and, moreover, Defendants failed to provide the Court with a full record. Dkt. No. 19, Pl.'s Mem. of Law, at pp. 2–4. Given Plaintiff's objections, we decline Defendants' invitation. Accordingly, we do not consider the documents offered by Defendants for purposes of deciding the instant Motion. *See Sira v. Morton,* 380 F.3d 57, 67 (2d Cir.2004) (citing *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989), for the proposition that "[l]imited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint.").

On May 5, 2010, while at CCF, Plaintiff was ordered to submit a urine specimen for drug testing. Compl. at ¶ 6–1. Two days later, on May 7, Defendant Randy Nichols, a Corrections Officer at Clinton Annex, tested Plaintiff's urine using a SYVA VIVA–JR Emit drug test. Plaintiff's urine twice tested positive for opiates. *Id.* at ¶ 6–3. Defendant Nichols verified with CCF's main clinic that none of Plaintiff's medications could issue a false urine result. *Id.* at ¶ 6–4. Defendant Nichols issued a Misbehavior Report and had Plaintiff confined to keeplock status. *Id.* at ¶ 6–6.

**\*4** On May 8, 2010, Plaintiff was served with a copy of the Misbehavior Report, however, it lacked a copy of Appendix C to Directive 4937.[FN2] *Id.* at ¶ 6–7. On May 12, Defendant Edna Aiken, who was appointed to act as Plaintiff's employee-assistant, met with Plaintiff. *Id.* at ¶ 6–11. Plaintiff requested that Defendant Aiken produce the following documents:

FN2. In his Complaint, Plaintiff references a New York State Regulation that requires that certain documentation be attached to a misbehavior report. Compl. at ¶ 6–9 (referencing N.Y. Comp.Codes R. & Regs. tit. 7, §

1020.4(e)(1)(iv), which deals with the requisite paperwork that must accompany a misbehavior report issued to an inmate who refuses to submit a urine sample). Although Plaintiff does not cite to the correct section of the pertinent Regulation, the Court takes judicial notice that pursuant to New York State Regulation, when a positive result is obtained from a urine specimen a misbehavior report shall be issued and

> shall be accompanied by the request for urinalysis test form, the inmate's test report from the laboratory or facility, a copy of the methods and procedures used by the testing laboratory or facility, and a statement of the scientific principles and validity of the testing apparatus used by the laboratory or facility.

N.Y. COMP.CODES R. & REGS. tit. 7, § 1020.4(f)(2)(iii).

(a) a copy of the DOCS Leasing Contract for the urinalysis machine currently in use; (b) a copy of the operator's Manual for the urinalysis machine currently in use; (c) the name, make, model number and year of manufacture of the urinalysis machine currently in use; (d) a copy of all maintenance log entries for the urinalysis machine, including, a copy of all scheduled maintenance program(s); (e) a copy of the EMIT OPIATE ASSAY insert instructions, labeling detailing the instructions to be used in conducting the testing which lists limitations etc.; (f) a copy of all sections of the Operator's manual concerning or relating to the effects of operator's error(s) or false results; (g) a copy of the most recent Emit Cross–Activity List for opiates; (h) a copy of all freezer log entries regarding [his] urine; (i) a copy of the procedures for forwarding urine specimens recommended by Clinton Annex; (j) a copy of officer NICHOLS certificate stating he was trained to conduct the testing; and (k) any and all infor-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

mation regarding faulty testing in using the machine. *Id.* at ¶ 6–12.

Defendant Aiken left and returned with "a copy of the DOCS computer entry stating that Officer Nichols[ ] had passed training on the SYVA/ETS System on September 23, 2008, and a copy of Directive No. 4937." *Id.* at ¶ 6–13. Defendant Aiken did not provide Plaintiff with any other requested document, but informed him that "her secretary was 'gathering the remaining documents on the list' and she would put them in the hearing officer's package to be given to him at the hearing." *Id.* at ¶¶ 6–14 & 6–15.

On May 13, 2010, Defendant Peter Frederick, a senior counselor at CCF, commenced a Tier III Superintendent's Hearing. *Id.* at ¶ 6–19. Plaintiff pled not guilty to drug use, objected to the fact that he had not received certain documents as promised, and pointed out that Defendant Aiken claimed she would place certain documents in the Hearing package. *Id.* at ¶¶ 6–20 & 6–21. Upon reviewing the Hearing package, Defendant Frederick found a "Certificate of Training for Officer RANDY E. NICHOLS[,] dated September 23–24, 2008, on a[n] EMIT VIVA–JR SYSTEM, a maintenance record from Siemens's Healthcare Diagnostics [,] dated April 15, 2010, regarding repairs[,] and daily and weekly maintenance records, but nothing else." *Id.* at ¶ 6–23. Defendant Frederick did not provide copies of these documents to Plaintiff. *Id.* at ¶ 6–24. Defendant Frederick determined that the other documents Plaintiff requested were irrelevant and denied their production or introduction at the Hearing. *Id.* at ¶ 6–25.

**\*5** At some point, Defendant Frederick made an off-the-record phone call to an unidentified "senior urine testing officer" at Clinton Annex, who, according to Defendant Frederick, stated that "Officer NICHOLS[ ] was 'properly trained' and that the urinalysis machine was 'reliable.' " *Id.* at ¶¶ 6–31 & 6–32. Defendant Frederick neither recorded this telephone conversation nor noted the officer as a witness on the Hearing record sheet. *Id.* at ¶ 6–33. Instead, Defendant Frederick noted on the record that "he telephoned a more experienced officer at the annex and that the officer 'testified' that officer NICHOLS was properly trained and that the machine was 'reliable.' " *Id.* at ¶ 6–34. Plaintiff then stated that he intended to call the SYVA Company as a witness to "dispute the Certificate of training and manufacturing of the analyzer [;]" the Hearing was then adjourned. *Id.* at ¶ 6–37.

On May 17, 2010, the Hearing reconvened and Defendant Frederick provided Plaintiff with a copy of the CCF-main security urine log entries, but noted that the EMIT OPIATE ASSAY instruction sheet was irrelevant. *Id.* at ¶ 6–38. Plaintiff reinstated a previous objection regarding Defendant Frederick acting as both the hearing officer and his employee-assistant. *Id.* at ¶ 6–39. Defendant Frederick responded that "as long as he can go looking for the information, he can do both. [I]ts [his] prerogative to find out the information [he] need[s]; its [his] choice." *Id.* at ¶ 6–40. Plaintiff objected to not being able to question the officer who had given off-the-record testimony as to the reliability of the urinalysis machine, to which Defendant Frederick remarked that, "it was established that the machine is reliable." *Id.* at ¶¶ 6–41 through 6–44. Plaintiff then asked about the formal procedure recommended by Clinton Annex for forwarding his urine specimen, and the Hearing was adjourned so that the testing officer could be called as a witness. *Id.* at ¶¶ 6–45 & 6–46.

On May 25, 2010, the Hearing was reconvened and Defendant Nichols testified over the phone. *Id.* at ¶ 6–47. Plaintiff sought to ask Defendant Nichols a series of questions regarding his training, at least some of which were designed to "expose weaknesses in his testing ability." *Id.* at ¶¶ 6–49 through 6–53. Defendant Frederick refused to allow Plaintiff to ask several questions on "relevancy grounds claiming that it was not necessary to answer 'because neither you

nor I can understand the technical stuff, we don't have the skill and training to understand those things; what matters is that the machine is *reliable* and *was* working properly.' " *Id.* at ¶ 6–54 (emphasis in original).

In the middle of questioning Defendant Nichols, the tape recorder shut-off. *Id.* at ¶ 6–57. Defendant Frederick turned the cassette tape over and started recording over previously recorded testimony and objections, and then adjourned the Hearing for disposition. *Id.* at ¶ 6–59. Upon realizing this technical snafu, Defendant Frederick sought Plaintiff s permission to begin the Hearing anew, but Plaintiff refused to consent. *Id.* at ¶¶ 6–60 through 6–62. Defendant Frederick then claimed that Defendant Captain Facteau advised him to start the Hearing over. *Id.* at ¶ 6–63. Plaintiff objected claiming that Defendant Facteau had no authority to order or advise Frederick to begin a new hearing, but Defendant Frederick started the Hearing over anyway. *Id.* at ¶¶ 6–64 through 6–66. At that point, Defendant Frederick noted that a copy of Appendix C had not been provided to Plaintiff with his Misbehavior Report and was not in the Hearing package; he adjourned the Hearing, retrieved a copy of the Appendix and, after giving Plaintiff approximately twenty-one minutes to review the Appendix, reconvened the Hearing and reviewed the Appendix on the record. *Id.* at ¶¶ 6–67 through 6–71. Plaintiff once again pled not guilty to the charge of drug use. The Hearing Officer reused Defendant Nichols's testimony from the prior Hearing and allowed Plaintiff to restate some of his previous objections. *Id.* at ¶¶ 6–72 through 6–74.

**\*6** Plaintiff again requested that a witness from the SYVA Company be called and questioned as to whether they manufactured the Viva–Jr. drug testing system, had vouched for its reliability, had certified Defendant Nichols, and if they certify the equipment of other companies. *Id.* at ¶ 6–76. Defendant Frederick refused to call such a witness on the grounds that such testimony "would only show or confirm that another company makes the Viva–Jr analyzer and would not

show that the machine was not reliable." *Id.* at ¶ 6–77. Defendant Frederick refused to write or issue a written statement as to his reason for refusing to call this witness. *Id.* at ¶¶ 6–78 & 6–79.

The Hearing concluded on May 25, 2010, and Plaintiff was found guilty of drug use and assessed a penalty of five months in special housing unit ("SHU") confinement, with one month deferred for seven months. *Id.* at ¶¶ 6–92 & 6–93. "The statement of Evidence relied on clearly states the misbehavior report and testimony given by CO R. NICHOLS and inmate Scott's testimony. 'Reliability of testing done was main reason for finding of guilt. There was no proof offered regarding human or mechanical error.' " *Id.* at ¶ 6–83.

On May 26, 2010, Plaintiff wrote to Superintendent Thomas La Valley [FN3] "complaining about the illegal rehearing, particularly asking whether or not he authorized defendant FACTEAU to direct defendant FREDERICK to commence a *new* hearing." *Id.* at ¶ 6–95 (emphasis in original). On June 2, Defendant Facteau responded to Plaintiff's letter, informing him that " 'I advised SCC Frederick to *re-record* the *parts* of your Tier III hearing which was [sic] recorded over. This direction was proper.' " *Id.* at ¶ 6–96.

> FN3. Superintendent Thomas La Valley was dismissed as a Defendant from this action. *See* Dkt. No. 4, Dec. & Order, dated July 18, 2013.

Plaintiff's cell location was changed to a "lock-down block," cell D–3–8, where each gallery is sealed off and recreation occurs in small single-man cages for one-hour a day. *Id.* at ¶ 6–98.[FN4] "D–3–8 was a filthy cell ... the sink and toilet [were] filthy and covered in black dirty stuff; the walls in the cell were covered in heavy phlegm/mucus (from someone's nose); the cell smelled badly and made your skin crawl[ ]." *Id.* at ¶ 6–99.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 127864 (N.D.N.Y.)
**(Cite as: 2015 WL 127864 (N.D.N.Y.))**

FN4. It is unclear when Plaintiff's cell assignment was changed to D–3–8.

On June 10, 2010, Plaintiff was packed up for a transfer to Upstate Correctional Facility ("UCF"), which is composed entirely of SHU units, to finish out his SHU sentence. *Id.* at ¶ 6–102. Plaintiff arrived at UCF on June 11, 2010. *Id.* at ¶ 6–103. Upon arrival, Plaintiff's property was placed in storage, but later confiscated after he had a verbal altercation with an officer. *Id* . at ¶¶ 6–105 through 6–107. Also, his legal mail was read, over his objection and mental health interviews were conducted within earshot of other inmates. *Id.* at ¶¶ 6–108 through 6–110. Plaintiff complained about being deprived writing materials so as to appeal his Disciplinary Hearing as well as the deprivation of "adequate soap to wash himself with and to wash his clothing with." *Id.* at ¶¶ 6–111 & 6–113.

*7 On June 18, 2010, Plaintiff filed an administrative appeal of his Disciplinary Hearing with Defendant Prack. *Id.* at ¶ 6–112. On July 22, 2010, Defendant Prack affirmed Defendant Nichols's Hearing determination. That same date, the "Disciplinary Review Committee (DRC) at Upstate granted plaintiff a three-week time-cut 'based on [his] positive adjustment' and recalculated his SHU release date to August 17, 2010. *Id.* at ¶ 6–115. Plaintiff was released from SHU on August 23, 2010. *Id.*

On March 11, 2011, Plaintiff initiated an Article 78 proceeding in State court challenging the May 25, 2010 disciplinary determination. *Id.* at ¶ 6–116. "On March 30, 2012, the defendant's FN5 [sic] administratively reversed the Hearing determination, on the advise [sic] of the NYS Attorney General's Office and expunged the May 25, 2010 determination." *Id.* at ¶ 6–117. Thereafter, on July 5, 2010, the Appellate Division dismissed Plaintiff's Article 78 petition as moot.

FN5. It is unclear which Defendant reversed the disposition.

**B. Plaintiffs Claims**

Plaintiff alleges that as a result of his May 2010 Disciplinary Hearing he was confined in keeplock and/or SHU for 109 days. During this confinement, Plaintiff alleges that he was subjected to filthy and unhygienic conditions, including a dirty smelly cell at CCF, and while at UCF was deprived of his property, had his privacy invaded, and was denied adequate soap for washing himself and his clothing. He further expounds upon the isolating and restrictive conditions he endured during his time at UCF. Plaintiff asserts that in connection with his Disciplinary Hearing his due process rights were violated by the Defendants. Specifically, he claims that Defendant Aiken failed to provide adequate assistance by failing to provide him with all the documents he requested prior to his Disciplinary Hearing and also violated his confidentiality when instead of giving documents directly to him, she provided his list of requested documents to the Hearing Officer. Plaintiff claims that Defendant Frederick violated his due process rights during the course of his Disciplinary Hearing when he prejudged his guilt, acted as both assistant and hearing officer, failed to obtain and consider documents requested by Plaintiff, questioned a witness off-the-record and outside of Plaintiff's presence, prevented Plaintiff from fully interrogating certain witnesses as well as refused to call certain witnesses on Plaintiff's behalf, failed to properly record the entire Hearing, and restarted the Hearing without providing adequate notice. Plaintiff further contends that Defendant Nichols testified falsely and that Defendant Facteau improperly authorized Defendant Frederick to restart Plaintiff's Hearing. Lastly, Plaintiff contends that Defendant Prack improperly affirmed Defendant Frederick's disciplinary determination.

**C. Due Process**

The Due Process Clause of the Fourteenth

Slip Copy, 2015 WL 127864 (N.D.N.Y.)
**(Cite as: 2015 WL 127864 (N.D.N.Y.))**

Amendment protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner[.]" *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). To state a due process claim under § 1983, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). Inmates' liberty interests are derived from two sources: (1) the Due Process Clause of the Fourteenth Amendment; and (2) state statute or regulations. *Id.* With regard to liberty interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners[,]' " *Arce v. Walker,* 139 F.3d at 333 (quoting *Hewitt v. Helms,* 459 U.S. 460, 467, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)), and limited to freedom from restraint that "exceed[ ] the sentence in ... an unexpected manner[,]" *Sandin v. Conner,* 515 U.S. 472, 478, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

**\*8** Turning to liberty interests created by the state, the Supreme Court states that such liberty interests shall be limited solely to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. at 484; *see also Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (citing *Sandin* ); *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999).

Factors relevant to an analysis of what constitutes an atypical and significant hardship include "(1) the effect of the confinement on the length of prison incarceration, (2) the extent to which the conditions of segregation differ from other routine prison conditions, and (3) the duration of the disciplinary segregation compared to discretionary confinement." *Spaight v. Cinchon,* 1998 WL 167297, at \*5 (N.D.N.Y. Apr.3, 1998) (citing *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)); *see also Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (stating that

in assessing what constitutes an atypical and significant hardship, "[b]oth the conditions [of confinement] and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical" (citation omitted)). Though the length of the confinement is one guiding factor in a *Sandin* analysis, the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999) (citations omitted). Nevertheless, the Court of Appeals has stated that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer v. Richards,* 364 F.3d at 64–65 (quoting *Colon v. Howard,* 215, F.3d 227, 232 (2d Cir.2000)); *see also Hanrahan v. Doling,* 331 F.3d 93, 97–98 (2d Cir.2003) ("[W]here the actual period of disciplinary confinement is insignificant or the restrictions imposed relatively minor, such confinement may not implicate a constitutionally protected liberty interest."); *Edmonson v. Coughlin,* 1996 WL 622626, at \*4–5 (W.D.N.Y. Oct.4, 1996) (citing cases for the proposition that courts within the Second Circuit tend to rule, as a matter of law, that "disciplinary keeplock or SHU confinement to 60 days or less in New York prisons is not an atypical or significant hardship in relation to the ordinary incidents of prison life"); *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (noting that segregative sentences of 125–288 days are "relatively long" and therefore necessitate "specific articulation of ... factual findings before the district court could properly term the confinement atypical or insignificant"). Accordingly, the court must "make a fact-intensive inquiry" that would examine the actual conditions of confinement within SHU. *Palmer v. Richards,* 364 F.3d at 65 (citations omitted); *see also Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997). If the conditions of confinement are undisputed, a court may decide the

Slip Copy, 2015 WL 127864 (N.D.N.Y.)
**(Cite as: 2015 WL 127864 (N.D.N.Y.))**

*Sandin* issue as a matter of law. *Palmer v. Richards,* 364 F.3d at 65. If, however, normal conditions of SHU exist, but the period of confinement is longer than the intermediate duration, then it would constitute a significant departure from ordinary prison life requiring the protection of procedural due process under *Sandin. Id.*

**\*9** Once a prisoner makes a threshold showing of atypical and significant confinement, the court should determine whether that prisoner, prior to his confinement, was afforded the minimum requirements of due process. *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). A prisoner placed in disciplinary segregation must be provided (1) advanced written notice of the charges against them at least twenty-four hours prior to the hearing; (2) the opportunity to appear at the hearing, to call witnesses, and to present rebuttal evidence; and (3) written statement as to the evidence relied upon and the reasons for the disciplinary action. *Id.* at 564–66; *see also Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986); *Taylor v. Rodriguez,* 238 F.3d 188, 192 (2d Cir.2001) (quoting *Hewitt v. Helms,* 459 U.S. at 476). Additionally, inmates are entitled to be judged by a fair and impartial hearing officer and the disciplinary conviction should be supported by some evidence. *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999) (citing *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (some evidence to support conviction) & *McCann v. Coughlin,* 698 F.2d 112, 121–22 (2d Cir.1983) (fair and impartial hearing officer)).

### 1. Liberty Interest

As noted above, Plaintiff alleges that as a result of his Disciplinary Hearing he was confined in keeplock/SHU for approximately 109 days, during which time he was subjected to filthy and unhygienic conditions and was deprived of adequate soap and other property. In light of the Second Circuit's requirement that we make detailed factual findings of the conditions endured by Plaintiff, and in light of the

record before us, we find that for purposes of the pending Motion, Plaintiff sufficiently alleges that he had a protected liberty interest in remaining free from the atypical and significant hardships he endured during his segregated disciplinary confinement. *See Samms v. Fischer,* 2013 WL 5310215, at \*7 (N.D.N.Y. Sept.20, 2013) (noting that "[i]t is possible that 60 days in an unsanitary cell in SHU could ... constitute an atypical and significant hardship in relation to the ordinary incidents of prison life sufficient to convey on a prisoner a protected liberty interest under the due process clause") (citations omitted); *see also Palmer v. Richards,* 364 F.3d at 65–66 (surveying cases in support of the proposition that "[i]n the absence of a detailed factual record, we have affirmed dismissal of due process claims only in cases where the period of time spent SHU was exceedingly short—less than the 30 days that the *Sandin* plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions.") (citations omitted); *Gonzalez–Cifuentes v. Torres,* 2007 WL499620, at \*3 (N.D.N.Y. Feb. 13, 2007) (finding that for the purposes of a motion to dismiss, plaintiff's allegation that he spent ninety days in keeplock was sufficient to require the court to engage in detailed fact finding before dismissing his claim). Accepting the Complaint as true, Plaintiff has adequately pled a liberty interest, however, we reach no conclusion as to whether or not these claims will be sufficient to withstand a properly filed motion for summary judgment after the development of a more detailed factual record.

**\*10** Accordingly, we must now determine whether Plaintiff has plausibly alleged that any of the Defendants deprived him of one or more of the minimum requirements of due process to which he was entitled.

### 2. Defendant Aiken

Plaintiff alleges that Defendant Aiken provided constitutionally inadequate pre-hearing assistance because, *inter alia,* (1) she violated his duty to main-

Slip Copy, 2015 WL 127864 (N.D.N.Y.)
**(Cite as: 2015 WL 127864 (N.D.N.Y.))**

tain inmate-employee-assistant confidentiality when she provided Defendant Frederick with a copy of the list of documents he had requested, and (2) she failed to provide Plaintiff with all of the documents he requested before the Hearing. *See* Compl. at ¶¶ 6–11 through 6–18, 6–21 through 6–24, 6–27 through 6–29, 7–2, & 7–4.

Plaintiff's claim that Defendant Aiken violated his purported right to inmate-employee-assistant confidentiality is completely meritless. While Plaintiff may have been entitled to prehearing assistance, he is not entitled to any sort of confidentiality by virtue of that arrangement. *Accord Loving v. Selsky,* 2009 WL 87452 at *2 (W.D.N.Y.2009)* (citing *Silva v. Casey,* 992 F.2d 20, 22 (2d. Cir.1993),* for the proposition that the duty to provide pre-hearing assistance "falls far short of the right to counsel that the Sixth Amendment guarantees to criminal defendants.' "); *see also Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998)* ("An assistant's role is to act as 'merely a surrogate for the inmate, not a legal adviser or advocate.").

Plaintiff also contends that Defendant Aiken provided constitutionally deficient assistance to him when she failed to provide him with all the requested documents. The Court acknowledges that Plaintiff had a right to receive some assistance prior to his Hearing, particularly in light of the fact that he was confined to keeplock status before the Hearing. *Eng v. Coughlin,* 858 F.2d 889, 897 (2d Cir.1988)* ("Prison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges."). Indeed, this duty is of particular importance when, as here, the prisoner is in segregative confinement prior to the disciplinary hearing. *Id.* ("When the inmate is disabled, either by being confined full-time to SHU or transferred from the prison in which the incidents occurred, the duty of assistance is greater because the inmate's ability to help himself is reduced."); *Loving v. Selsky,* 2009 WL 87452, at *1* ("In particular, an in-

mate must be provided some assistance when circumstances hamper the inmate's ability to prepare a defense, such as when the inmate is confined to SHU prior to the hearing."); *see also Hernandez v. Selsky,* 572 F.Supp.2d 446, 453 (S.D.N.Y.2008)* ("The obligation to provide assistance is greater as the inmates' ability to prepare a defense is reduced."); *Louis v. Ricks,* 2002 WL 31051633, *10 (S.D.N.Y. Sept.13, 2002)* (holding that inmates in keeplock confinement are entitled to pre-hearing assistance).

**\*11** "While the assigned assistant's precise role is not defined, it certainly should include gathering evidence, obtaining documents, and relevant papers, and interviewing witnesses." *Pilgrim v. Luther,* 2005 WL 6424703, at *8 (S.D.N.Y. Sept.12, 2005)*. Plaintiff's right to assistance, however, does not translate to a wholesale right to receive all of the documentary evidence requested. *Eng v. Coughlin,* 858 F.2d at 898 (noting that assistance "must be provided in good faith and in the best interests of the inmate" and finding that the employee-assistant who was requested to interview an onerous amount of witnesses "must attempt to determine independently who the most relevant witnesses might be and to interview them"); *Shepard v. Coughlin,* 1993 WL 77385, at *5 (S.D.N.Y. Mar.16, 1993)*. Plaintiff has not alleged that Defendant Aiken failed to provide him with any assistance; indeed, Plaintiff acknowledges that Defendant Aiken provided him with some of the documents he requested prior to the Hearing and included others in Plaintiff's Hearing packet. Accordingly, Plaintiff has failed to state a Due Process claim against Defendant Aiken. Nonetheless, even if Defendant Aiken erred by not producing all of the documents requested and by divulging the list of documents to the Hearing Officer, we find that she is entitled to qualified immunity.

The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v.*

*Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Eng v. Coughlin,* 858 F.2d 889, 895 (2d Cir.1988). Qualified immunity provides government officials "immunity from suit, rather than a mere defense to liability." *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). Whether an official protected by qualified immunity may be held liable for an alleged unlawful action turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time the action was taken. *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Lewis v. Cowan,* 165 F.3d 154, 166 (2d Cir.1999).

Qualified immunity is an affirmative defense that must be pled by the official claiming it. *Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984) (citing *Harlow v. Fitzgerald,* 457 U.S. at 815). The only pleading filed in the present case thus far is the Complaint. Defendants have not raised this affirmative defense in a responsive pleading, as set forth in Federal Rule of Civil Procedure 8(c), but rather in their Memorandum of Law in support of the Motion to Dismiss. Dkt. No. 15–1. Generally, "the defense of qualified immunity cannot support the grant of a ... 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir.1983); *see also McKenna v. Wright,* 386 F.3d 432, 435 (2d Cir.2004) (quoting *Green* ). An exception to this general rule exists where the complaint itself sets up, on its face, the qualified immunity defense; in such an occasion, dismissal for failure to state a claim would be appropriate. *Roniger v. McCall,* 22 F.Supp.2d 156, 162 (S.D.N.Y.1998) (citing *Green v. Maraio,* 722 F.2d at 1019); *see also McKenna v. Wright,* 386 F.3d at 435.

**\*12** Based upon the allegations of the Complaint, the Court finds that Defendant Aiken is entitled to qualified immunity because neither of the rights as-

serted by Plaintiff are clearly established and no reasonable person in Aiken's position would have believed that they were acting in such a way that violated Plaintiff's rights. To determine whether a right was clearly established for purposes of qualified immunity, courts must consider "whether the right was defined with reasonable specificity; whether decisional law of the Supreme Court and the [Second Circuit] supports its existence; and whether, under preexisting law, a defendant official would have reasonably understood that his [or her] actions were unlawful." *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *see also Reichle v. Howards,* —— U.S. ——, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012) ("To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." (citations, modifications, and internal quotation marks omitted)); *Nicholas v. Miller,* 189 F.3d 191, 195 (2d Cir.1999).

The Court is unable to find any Supreme Court or Second Circuit precedents clearly establishing that Defendant Aiken either owed a duty of confidentiality to Plaintiff or was required to provide Plaintiff with every document he requested. While attorney-client communications are protected by a privilege of confidentiality, it is clear that Plaintiff was not entitled to assistance from an attorney in order to help prepare a defense to the charges pending against him and that Defendant Aiken was not acting in such capacity. *Silva v. Casey,* 992 F.2d at 22 ("The assistant is not obliged to go beyond the specific instructions of the inmate because if he did so he would then be acting as counsel in a prison disciplinary proceeding, assistance to which a prisoner is not entitled."). Furthermore, the applicable State regulations that establish a New York State inmate's right to employee assistance do not extend a cloak of confidentiality to any discussion between the assistant and inmate, nor do the applicable rules place an obligation on the assistant to procure every item requested by an inmate. *See, e.g.,* N.Y.

COMP.CODES R. & REGS. tit. 7, § 251–4.2.[FN6] Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Plaintiff's claims against Defendant Aiken because we find that no due process violation occurred by her actions and because she would nevertheless be entitled to qualified immunity.[FN7] Defendant Aiken should accordingly be **DISMISSED** from this action.

> FN6. The full text of the relevant Regulations states as follows:
>
> > The assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate. He **may** assist the inmate in obtaining documentary evidence or written statements which may be necessary. The assistant may be required by the hearing officer to be present at the disciplinary or superintendent's hearing.
>
> > N.Y. COMP.CODES R. & REGS. tit. 7, § 251–4.2
>
> FN7. Alternatively, given that Defendant Frederick considered each of Plaintiff's requests and ultimately determined that many of the documents Plaintiff requested from Defendant Aiken were irrelevant, Defendant Aiken's failure to provide Plaintiff with those documents should be dismissed as harmless error. *See Louis v. Ricks,* 2002 WL 31051633, at *15 (S.D.N.Y. Sept.13, 2002) (applying harmless error to plaintiff's claim that his right to due process was violated where he was provided with inadequate assistance prior to his prison disciplinary hearing).

*3. Defendant Nichols*

Plaintiff alleges, *inter alia,*[FN8] that Defendant Nichols intentionally testified falsely "that SYVA was the manufacturer of the Viva–Jr analyzer [.]" Compl. at ¶ 7–18. However, the presentation of false testimony does not deprive an inmate of the minimum requirements of due process. *See Thomas v. Calero,* 824 F.Supp.2d 488, 499 (S.D.N.Y.2011) (citing *Mitchell v. Senkowski,* 158 F. App'x 346, 349 (2d Cir.2005) for the proposition that a prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest "extends as well to false testimony by corrections personnel at prison disciplinary hearings"). Plaintiff does not assert that Defendant Nichols testified falsely in retaliation for the exercise of some constitutional right, and in liberally construing Plaintiff's Complaint, the Court finds that no other plausible claim is stated against Defendant Nichols based upon his role in testing Plaintiff's urine and authoring the Misbehavior Report.

> FN8. In his Complaint, Plaintiff attributes due process violations to Defendant Nichols based upon the actions of other Defendants. For example, Plaintiff claims that Defendant Nichols violated Plaintiff's due process rights by denying him constitutionally adequate pre-hearing assistance and for preventing him from introducing certain documents during the Hearing. Compl. at ¶¶ 7–6 & 7–8. Plaintiff does not, however, assert that Defendant Nichols had a position of authority over any of the other Defendants. And, aside from alleging that Nichols testified falsely, Plaintiff fails to allege any facts from which it would be plausible to infer that Defendant Nichols was somehow personally involved in any other constitutional wrongdoing. *See generally* Compl. We therefore only consider those allegations of due process violations for which Plaintiff provides allegations of fact attributing Defendant Nichols's personal

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

involvement. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (noting that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983").

**\*13** Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Plaintiff's claim against Defendant Nichols and that Defendant Nichols be **DISMISSED** from this action.

### 4. Defendant Frederick

Plaintiff alleges that during the course of his Disciplinary Hearing and Re-hearing, Defendant Frederick violated his due process rights in a variety of ways. Specifically, Plaintiff alleges, *inter alia,*[FN9] that Defendant Frederick (1) took off-the-record testimony from an unidentified witness, Compl. at ¶¶ 6–31 through 6–34; (2) failed to record the entire Hearing, *id.* at ¶¶ 6–57, 6–59, 6–60, & 6–75; (3) illegally re-started the Hearing, *id.* at ¶¶ 6–61, 6–63, 6–64, & 6–66; (4) failed to provide him with twenty-four hours notice of the Rehearing; (5) was biased, in that he had predetermined Plaintiff's guilt, *id.* at ¶¶ 6–86 & 6–87; and, (6) refused to provide certain documents, interrupted his attempts to question Officer Nichols, and refused to call a witness from the SYVA Company to testify as to the reliability and accuracy of the urinalysis tests conducted by Defendant Nichols, *id.* at ¶¶ 6–71, & 6–76 through 6–79.

> FN9. As with his allegations against Defendant Nichols, Plaintiff attributes wrongdoing to Defendant Frederick without alleging concomitant factual allegations supporting Defendant Frederick's personal involvement. For example, Plaintiff accuses Defendant Frederick violated his constitutional rights when Defendant Aiken failed to provide adequate pre-hearing assistance. Compl. at ¶ 7–2. We only consider here, as we must, those claims against Defendant Frederick that are supported by factual alle-

gations regarding his personal involvement in alleged wrongdoing.

As noted above, pursuant to *Wolff,* Plaintiff is entitled to minimum due process protections including (1) advanced written notice of the charges against them at least twenty-four hours prior to the hearing; (2) the opportunity to appear at the hearing, to call witnesses, and to present rebuttal evidence; and (3) written statement as to the evidence relied upon and the reasons for the disciplinary action.[FN10] *Wolff v. McDonnell,* 418 U.S. at 564–66. Additionally, Plaintiff was entitled to be judged by a fair and impartial hearing officer and his disciplinary conviction should be supported by some evidence. *Kalwasinski v. Morse,* 201 F.3d at 108. We consider each of Plaintiff's contentions within the framework of those constitutional protections to which he was entitled.

> FN10. It does not appear that any of Plaintiff's factual allegations regarding purported due process violations fall within this category, therefore, we do not discuss this constitutional protection. In any event, it is uncontested that Plaintiff received a written disposition from Defendant Frederick explaining the reasons for his disciplinary determination. Compl. at ¶ 6–83.

#### a. Notice

"Notice" should be something more than a mere formality. *Benitez v. Wolff,* 985 F.2d 662, 665 (2d Cir.1993). "The effect of the notice should be to compel 'the charging officer to be [sufficiently] specific as to the misconduct with which the inmate is charged' to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report." *Taylor v. Rodriguez,* 238 F.3d at 192–93 (quoting *McKinnon v. Patterson,* 568 F.2d 930, 940 n. 11 (2d Cir.1977)) (alteration in original).

Slip Copy, 2015 WL 127864 (N.D.N.Y.)
**(Cite as: 2015 WL 127864 (N.D.N.Y.))**

Plaintiff's claim that Defendant Frederick failed to give him adequate notice of the Rehearing falls short of stating a due process claim. In liberally construing Plaintiff's Complaint, it appears that once the decision was made to restart the Hearing, Plaintiff believed he was entitled to have the entire process begin anew, including the notion that he be provided with notice of the charges against him twenty-four hours in advance of the hearing. To be clear, Plaintiff does not accuse the Defendants of failing to give proper notice of the charges against him prior to the commencement of the initial Hearing. Instead, he imposes an extra notice requirement on the Defendants at the point in the Hearing when Defendant Frederick determined that he needed to start the Hearing anew. Based upon the allegations in the Complaint, it is clear that Plaintiff received a copy of the Misbehavior Report at 8:30 a.m. on May 8, 2010, and that his Disciplinary Hearing initially began on May 13, 2010. Compl. at ¶¶ 6–7 & 6–19. Thus, it is clear that Plaintiff received constitutionally adequate notice well in advance of the twenty-four hour minimum. *See Sira v. Morton,* 380 F.3d 57, 70 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. at 564, for the proposition that "[d]ue process requires that prison officials give an accused inmate written notice of the charges against him twenty-four hours prior to conducting a disciplinary hearing"). Plaintiff does not challenge the sufficiency of that notice, and, indeed, his specific attempts to gather evidence and mount a defense belie any notion that the content of the initial notice failed to adequately apprise him of the charges against him and the factual basis for such charges. This Court finds no basis for Plaintiff's claim that upon restarting the Hearing, Defendant Frederick was constitutionally compelled to provide identical notice of which Plaintiff already received. Accordingly, we find that Plaintiff was provided with proper notice and has failed to state a due process violation.

*b. Opportunity to Present a Defense*

**\*14** With regard to the second *Wolff* factor, a prisoner is entitled to an opportunity to present his defense by calling witnesses and presenting evidence. *See Wolff v. McDonnell,* 418 U.S. at 566 ("[A]n inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense[.]"). In the case at bar, Plaintiff asserts several violations of his right to call witnesses and present rebuttal evidence. Specifically, Plaintiff alleges that Defendant Frederick refused his request to call a witness from the SYVA Company to testify as to the reliability of the EMIT–Jr. machine, failed to provide written reasons for his denial of certain witnesses, refused to provide him with copies of documents without explanation, improperly denied requests for documents on grounds of relevancy, interfered with his ability to question Defendant Nichols regarding his ability to properly test Plaintiff's urine sample by denying or rephrasing his questions, and took testimony from an unidentified officer off-the-record and outside the presence of Plaintiff. Such claims, as pled, are sufficient at this early stage to plausibly state a due process violation claim against Defendant Frederick. *See Kearney v. Goord,* 2011 WL 1260076, at *7 (W.D.N.Y. Mar.4, 2011) ("Plaintiff's allegation that C.H.O. Schoelkoff denied him due process by refusing to call witnesses requested by plaintiff, by refusing to ask witnesses questions proffered by plaintiff and denying plaintiff access to documents, resulting in four months SHU confinement, is sufficient to state a cause of action."); *Collins v. Ferguson,* 804 F.Supp.2d 134, 139 (W.D.N.Y.2011) (finding plaintiff had stated a due process violation where he alleged that "Ferguson refused to provide plaintiff with documents relating to the testing of plaintiff's urine sample, that he refused to ask witnesses certain 'vital' questions that had been requested by plaintiff, that he 'continually rephrased questions' to the officer witnesses in a way that was designed to elicit answers that were detrimental to plaintiff's defense, and that he accepted the officers' testimony at face value, without any corroborating documentary support"). And because Plaintiff's right

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 127864 (N.D.N.Y.)
**(Cite as: 2015 WL 127864 (N.D.N.Y.))**

to present a defense is clearly established, at this juncture, we cannot state that Defendant Frederick is entitled to qualified immunity. Thus, we recommend that Defendants' Motion be **denied** as to these claims for due process violations against Defendant Frederick.

### c. Hearing Officer Bias

Plaintiff asserts that Defendant Frederick prejudged his guilt and conducted the Hearing in a biased fashion. While an inmate is *not* entitled to a hearing officer with the same level of impartiality required by judges, he is entitled to a hearing untainted by arbitrary or pre-determined findings of guilt. *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989). Nonetheless, a hearing officer's limited impartiality requirements are satisfied where the record contains "some evidence" to support the officer's findings. *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached." *Id.* at 455–56 (citations omitted). That being said, only " 'reliable' evidence can constitute 'some evidence.' " *Sira v. Morton,* 380 F.3d at 76 (citing *Luna v. Pico,* 356 F.3d 481, 488 (2d. Cir.2004)).

**\*15** The Court is mindful that according to the Complaint, Defendant Frederick's Statement of Evidence relied upon referenced the drug tests conducted by Defendant Nichols and that results of such tests may satisfy the requirement of "some evidence." *Scott v. Nichols,* 2013 WL 2237840, at \*10 (N.D.N.Y. May 21, 2013) (surveying cases for the proposition that drug test results are more than sufficient to meet the "some evidence" standard). However, at this early stage, in light of the Court's obligation to liberally construe Plaintiff's Complaint to raise the strongest claim suggested therein, especially considering Plain-

tiff's adamant challenge to the reliability of the test, and based upon the above recommendations regarding Defendant Frederick's alleged interference with Plaintiff's ability to mount a legitimate defense as it pertains to Plaintiff's attempts to contest the validity of the tests, the Court finds that Plaintiff has nudged his claim alleging hearing officer bias into the plausible realm and should be permitted to proceed. Thus, the Court recommends **denying** Defendants' Motion as it pertains to Plaintiff's allegations regarding Defendant Frederick's bias. As with the prior analysis, the Court finds it inappropriate to assess at this juncture whether Defendant Frederick would be entitled to qualified immunity as to Plaintiff's claims of bias.

### d. Other Due Process Allegations

Plaintiff alleges that Defendant Frederick violated his due process rights when he failed to record the entire Hearing improperly restarted the Hearing. Neither of these allegations rise to the level of a due process protection.

First, Defendant Frederick's failure to record the entire Hearing did not deprive Plaintiff of any minimum requirements of due process. *See Ramsey v. Goord,* 661 F.Supp.2d 370, 393 (W.D.N.Y.2009) (failure to record a portion of Plaintiff's disciplinary hearing did not rise to a due process violation). Indeed, "the *only* process due an inmate is that minimal process guaranteed by the Constitution as outlined in *Wolff.*" *Ramsey v. Goord,* 661 F.Supp.2d 370, 393 (W.D.N.Y.2009) (quoting *Shakur v. Selsky,* 391 F.3d 106, 119 (2d Cir.2004)). "Significantly, *Wolff* did not include electronic recording of a disciplinary hearing among the due process requirements." *Id.; see also Holcomb v. Lykens,* 337 F.3d 217, 224 (2d Cir.2003) (cited in *Ramsey* for the proposition that New York State's regulation requiring that a disciplinary hearing be recorded does not impute a federal constitutional protection).

Second, Plaintiff's argument that Defendant Frederick lacked authority/jurisdiction to restart his

Slip Copy, 2015 WL 127864 (N.D.N.Y.)
**(Cite as: 2015 WL 127864 (N.D.N.Y.))**

Hearing purportedly in violation of state regulations, does not allege a cognizable due process violation. *See A'Gard v. Perez,* 919 F.Supp.2d 394, 403 (S.D.N.Y.2013) (citing *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990),* for the proposition that "[a]ny alleged violations of prison directives or regulations do not give rise to a federal claim, because federal constitutional standards rather than state law define the requirements of procedural due process.") (internal alterations and quotation marks omitted); *Johnson v. Goord,* 487 F.Supp.2d 377, 400 (S.D.N.Y.2007) (quoting *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) for the proposition that "a § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulations or state law").

**\*16** As such, we recommend **granting** Defendants' Motion as it pertains to purported due process violations stemming from Defendant Frederick's failure to record the entire Hearing and restarting the Hearing.

### 5. Defendant Facteau

Plaintiff alleges that Defendant Facteau lacked authority to order or advise Defendant Frederick to restart the Hearing. Compl. at ¶¶ 6–61 through 6–64, 6–95, 6–96, 7–22, & 7–23. Plaintiff also claims that Defendant Facteau was aware of, yet failed to remedy, the fact that Plaintiff did not receive twenty-four hours notice of the disciplinary rehearing. *Id.* at ¶¶ 7–10 & 7–11. Plaintiff's theories of liability against Defendant Facteau are diametrically opposed. On the one hand, he appears to question Defendant Facteau's authority to authorize a rehearing, while at the same time, he criticizes Defendant Facteau's failure to remedy purported due process violations committed by Defendant Frederick. Based upon the factual allegations of the Complaint, it appears, to some extent, that Plaintiff seeks to hold Defendant Facteau liable based upon a theory of supervisory liability.

The Second Circuit has held that "personal in-

volvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannotbe applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at \*2 (S.D.N.Y. Sept.15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if he: (1) directly participated in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; or (4) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted). Pointedly, "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)); *see also Wright v. Smith,* 21 F.3d at 501 (defendant may not be held liable simply because he holds a high position of authority).

As noted above, no due process violation occurred when Defendant Frederick restarted Plaintiff's Hearing, thus, Plaintiff cannot maintain an action against Defendant Facteau based on the fact that he authorized or advised Defendant Frederick to re-record the Disciplinary Hearing or for his failure to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 127864 (N.D.N.Y.)
**(Cite as: 2015 WL 127864 (N.D.N.Y.))**

remedy that alleged violation. *See Wesolowski v. Harvey,* 784 F.Supp.2d 231, 234 (W.D.N.Y.2011) (citing *Campo v. Keane,* 913 F.Supp. 814, 826 (S.D.N.Y.1996), for the proposition that "plaintiff cannot state a claim [against a supervisory official] for personal involvement in a constitutional violation, where no underlying constitutional violation occurred").

**\*17** Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Plaintiff's claims against Defendant Facteau and that Defendant Facteau be **DISMISSED** from this action.

### 6. Defendant Prack

Aside from a slew of wholly conclusory allegations in his wherefore clause, Plaintiff's sole allegation against Defendant Prack is that he affirmed Defendant Frederick's disciplinary determination. Compl. at ¶ 6–114. Courts within the Second Circuit are split over whether such an allegation is sufficient to establish personal liability for supervisory officials. We subscribe to the affirmance-plus standard, which holds that the mere rubber-stamping of a disciplinary determination is insufficient to plausibly allege personal involvement. *See Brown v. Brun,* 2010 WL 5072125, at \*2 (W.D.N.Y. Dec.7, 2010) (noting that courts within the Second Circuit are split with regard to whether the act of affirming a disciplinary hearing is sufficient to allege personal involvement of a supervisory official, and concluding that the distinction appears to hinge upon whether the official proactively participated in reviewing the administrative appeal or merely rubber-stamped the results). Here, Plaintiff fails to allege a single fact from which it could plausibly be inferred that Defendant Prack did anything other than rubber-stamp his disciplinary determination. *See generally* Compl. Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Defendant Prack and that he be **DISMISSED** from this action. **However,** the Second Circuit has cautioned courts in this District from dismissing *pro se* complaints "without granting leave to

amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Thompson v. Carter,* 284 F.3d 411, 416 (2d Cir.2002) (quoting *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991)); *see also Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999) ("Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the [*pro se* ] complaint gives any indication that a valid claim might be stated."). Therefore, in light of the Second Circuit's directive and the fact that some of Plaintiff's other claims are proceeding, we recommend that Plaintiff be **GRANTED LEAVE TO AMEND** his Complaint in order to further specify, how, if at all, Defendant Prack proactively participated in reviewing Plaintiff's administrative appeal.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion to Dismiss (Dkt. No. 15) be **GRANTED** in part and **DENIED** in part as follows:

**1. GRANTED** as to Plaintiff's claims against Defendants Aiken, Facteau, and Nichols and each of these Defendants should be **DISMISSED** from this action;

**2. GRANTED without prejudice** as to Plaintiff's claim against Defendant Prack, with the caveat that Plaintiff be granted leave to amend his Complaint in accordance with the above;

**\*18 3. GRANTED** with respect to Plaintiff's claims that Defendant Frederick violated his due process rights by failing to provide sufficient notice of the Re-hearing, failing to record the entire Hearing, and improperly re-starting the Hearing; and

**4. DENIED** with respect to Plaintiff's claims that Defendant Frederick denied him the opportunity to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 127864 (N.D.N.Y.)
**(Cite as: 2015 WL 127864 (N.D.N.Y.))**

present a defense and for being biased; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE AP-PELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

Date: August 28, 2014.

N.D.N.Y.,2015.
Scott v. Frederick
Slip Copy, 2015 WL 127864 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4794432 (N.D.N.Y.)
**(Cite as: 2014 WL 4794432 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Raheem SHABAZZ, Plaintiff,
v.
G.R. BEZIO, Correction Lt., Clinton Annex Correctional Facility; E. Rice, Correction Sgt.; Clinton Annex Correctional Facility; and P. Chase, Correction Lt., Clinton Annex Correctional Facility, Defendants.

No. 9:10–CV–1212 (NAM/DEP).
Signed Sept. 25, 2014.

Raheem Shabazz, Albion, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Tiffinay M. Rutnik Esq., Assistant Attorney General, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**
Hon. NORMAN A. MORDUE, Senior District Judge.
**INTRODUCTION**
*1 Plaintiff Raheem Shabazz, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brought this action under 42 U.S.C. § 1983 for compensatory and punitive damages. Defendants' motion (Dkt. No. 57) for summary judgment dismissing the action was referred to United States Magistrate Judge David E. Peebles pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c). Magistrate Judge Peebles issued a Report and Recommendation (Dkt. No. 72) recommending summary judgment dismissing all claims against all defendants on the basis that: no reasonable factfinder could conclude that plaintiff was denied adequate due process before being sentenced to

keeplock confinement; and verbal harassment, without more, is not cognizable under § 1983.

Plaintiff has objected to Magistrate Judge Peebles's Report and Recommendation. Dkt. No. 73. He claims that: the Administrative Supervisor's reversal of both misbehavior reports, which led to keeplock confinement, demonstrates that both hearing officers were biased; and Magistrate Judge Peebles erred in finding there was no issue of material fact requiring trial with respect to his harassment claim.

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court reviews *de novo* those parts of a report and recommendation to which a party specifically objects. Failure to object to any portion of a report and recommendation waives further judicial review of the matters therein. *See Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir.1993). The Court resolves the issues as set forth below.

**DISCUSSION**
The Court adopts Magistrate Judge Peebles's summary of the facts, procedural history, and applicable law. The Court does not repeat them here.

**Due Process**
In his objection (Dkt. No. 73), plaintiff asserts that the reversal of the misbehavior reports supports his claim that the hearing officers were biased and raises a question of fact requiring trial on his due process claim. Magistrate Judge Peebles addressed both disciplinary hearings (April 17, 2008 and May 2, 2008) and found that: (1) there was an issue of material fact concerning whether plaintiff was deprived of a cognizable liberty interest; (2) but that defendants were nevertheless entitled to summary judgment because plaintiff failed to raise a question of fact with respect to whether he was deprived of that interest without sufficient process.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4794432 (N.D.N.Y.)
**(Cite as: 2014 WL 4794432 (N.D.N.Y.))**

As Magistrate Judge Peebles explained:

As a general matter, to prevail on a section 1983 due process claim arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000); *Hynes v.. Squillace,* 143 F.3d 653, 658 (2d Cir.1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996).

Dkt. No. 72, p. 17. Further:

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established, and include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff v. McDonnell,* 418 U.S. 539, 564–69 (1974); *see also Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004). To pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must garner the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455 (1985); *Luna,* 356 F.3d at 487–88.

**\*2** The due process clause of the Fourteenth Amendment guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to ... an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citing *Wolff,* 418 U.S. 570–71). The Second Circuit has explained that its "conception of an impartial decisionmaker is one who, inter alia,

does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990). "The degree of impartiality required of prison officials[, however,] does not rise to the level of that required of judges." *Allen,* 100 F.3d at 259. Indeed, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Allred v. Knowles,* No. 06–CV–0456, 2010 WL 3911414, at \*5 (W.D.N.Y. Oct. 5, 2010) (quoting *Superintendent v. Hill,* 472 U.S. 445, 455 (1985)).

Dkt. No. 72, pp. 24–25.

Magistrate Judge Peebles found, and plaintiff does not dispute, that the evidence in the record indicates: plaintiff received written notice of the charges underlying the two hearings; an opportunity to appear at the disciplinary hearing and to present witnesses in his defense; a written statement of decision; and the right to assistance in preparing a defense. Plaintiff's principal objection is that the Magistrate Judge failed to consider the fact that both defendants' determinations were ultimately reversed and plaintiff's record expunged as material to the issue of defendants' impartiality as hearing officers. "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Allred v. Knowles,* No. 06–CV–0456, 2010 WL 3911414, at \*5 (W.D.N.Y. Oct. 5, 2010) (quoting *Superintendent v. Hill,* 472 U.S. 445, 455 (1985)).

At the April 17, 2008 hearing, Bezio found plaintiff guilty of refusing a direct order, which was to cut his hair, and not guilty of having "unfastened long hair". Plaintiff admitted at the hearing that he refused to cut his hair. Although the guilty determination was later reversed, plaintiff admitted at the hearing that he

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4794432 (N.D.N.Y.)
**(Cite as: 2014 WL 4794432 (N.D.N.Y.))**

refused to cut his hair, which supports the due process requirement that there be "some evidence" to support Bezio's decision to find plaintiff guilty of refusing to obey a direct order. *See Smith v. Fischer,* No. 9:07–cv–1264, 2010 WL 145292, at *9 (N.D.N.Y. Jan. 11, 2010) (adopting Report–Recommendation which found that even though the guilty determination had been reversed administratively, because there was "some evidence" to support the defendant's decision to find the plaintiff prisoner guilty, the due process standard was satisfied).

**\*3** At the May 2, 2008 hearing, defendant Chase found plaintiff guilty of refusing a direct order by wearing a head covering known as a Tsalot-kob after defendant Bezio instructed him not to, and guilty of having "unfastened long hair". Even viewing the facts in the light most favorable to plaintiff, and assuming that defendant Bezio never told plaintiff that he could not wear a Tsalot-kob, and that there was no evidence to support a finding that plaintiff refused a direct order, defendant Bezio testified at the hearing that he observed plaintiff with his dreadlocks unfastened. Thus, there was "some evidence" to support the guilty finding, the due process standard is satisfied, and there is no question of fact requiring trial on plaintiff's claim that the hearing officers were impartial. Accordingly, the Report and Recommendation is adopted in its entirety as to this claim.

**Harassment**

Plaintiff claims, in his objection to Magistrate Judge Peebles's recommended dismissal of his harassment claims, that he did not file a grievance against defendant Rice, but against defendant Bezio and that "he did the investigation of the harassment grievance himself." This allegation is different than the claim before Magistrate Judge Peebles, which was that defendant Bezio verbally harassed plaintiff during the second disciplinary hearing. Regardless of whether plaintiff's claim is that defendant Bezio harassed plaintiff by filing misbehavior reports or conducted a biased investigation of plaintiff's grievance, his claim

fails. *See See Boddie,* 105 F.3d at 862 ("a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report"); *Green v. Herbert,* 677 F.Supp.2d 633, 639 (W.D.N.Y.2010) ("an inmate 'has no constitutional right to have his grievances processed or investigated in any particular manner.' ") (quoting *Shell v. Brzezniak,* 365 F.Supp.2d 362, 379 (W.D.N.Y.2005)). Thus, plaintiff's objection is without merit.

**CONCLUSION**

For these reasons, it is

**ORDERED** that the Report and Recommendation of United States Magistrate Judge David E. Peebles (Dkt. No. 72) is accepted; and it is further

**ORDERED** that the motion (Dkt. No. 57) for summary judgment is granted; and it is further

**ORDERED** that the amended complaint (Dkt. No. 37) is dismissed with prejudice; and it is further

**ORDERED** that the Clerk of the Court is directed to enter judgment and close this case; and it is further

**ORDERED** that the Clerk of the Court is directed to serve copies of this MemorandumDecision and Order in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

*Pro se* plaintiff Raheem Shabazz, a New York State prison inmate, has brought this action pursuant to 42 U.S.C. § 1983 against three corrections employees alleging that they deprived him of his civil rights. In his complaint, plaintiff claims that his Fourteenth Amendment procedural due process rights

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

were violated when two of the defendants subjected him to two separate impartial disciplinary proceedings that led to guilty determinations and the imposition of punishments resulting in an aggregate period of keeplock confinement of more than thirty days, with the third defendant acting in concert with their actions.

**\*4** Currently pending before the court is a motion brought by the three named defendants for summary judgment seeking dismissal of plaintiff's complaint in its entirety. For the reasons set forth below, I recommend that defendants' motion be granted.

### I. BACKGROUND[FN1]

> FN1. In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

Plaintiff is a prison inmate currently being held in custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *Dkt. No. 37 at 1.* While he is now incarcerated elsewhere, at all times relevant to his claims in this action, Shabazz was confined at the Clinton Correctional Facility Annex ("Clinton Annex"), which is located in Dannemora, New York. *Dkt. No. 37 at 2.*

Plaintiff was transferred to the Clinton Annex on March 27, 2008. *Dkt. No. 57–4 at 1.* Upon his arrival, he was interviewed by defendant Edwin Rice who, at the time, served as a draft sergeant at the facility. *Id.* at 1. When plaintiff arrived at the Clinton Annex, his hair was styled in long dreadlocks. *Dkt. No. 57–4 at 2; Dkt. No. 57–9 at 16–17.* Plaintiff had previously worn his hair in dreadlocks while in DOCCS custody since 1996, and at no point during his period of incarceration had he ever been questioned about, or disciplined as a result of, his hair style. *Dkt. No. 57–9* at 16, 43.

During the initial interview at the Clinton Annex, however, defendant Rice advised plaintiff that only members of the Rastafarian faith were allowed to wear their hair in dreadlocks in DOCCS facilities. *Dkt. No. 57–4 at 2; Dkt. No. 57–9 at 18.* Because plaintiff was, at the time, a DOCCS-registered adherent to the Moorish Science Temple religion, defendant Rice ordered plaintiff to cut his hair or change his religion to Rastafarian. *Dkt. No. 57–4 at 2; Dkt. No. 57–9 at 20.*

On an unknown date between March 27, 2008 and April 2, 2008, plaintiff submitted a written complaint regarding Rice's orders to comply with DOCCS rules, and requested permission to maintain his dreadlocks pursuant to the "grandfather clause." *Dkt. No. 57–5 at 13,* 17–18; *Dkt. No. 57–9 at 25.* Defendant Gary Bezio, a lieutenant at the Clinton Annex who was assigned to investigate the complaint, interviewed plaintiff concerning his dreadlocks on April 2, 2008.[FN2] *Dkt. No. 57–5 at 13.* During the interview, at which defendant Rice was also present, defendant Bezio observed plaintiff wearing a Tsalot–Kob, a head covering that allows a person to tuck long dreadlocks inside. *Dkt. No. 57–3 at 1, 2; Dkt. No. 57–9 at 13, 23–24.* Through his investigation, defendant Bezio learned that plaintiff was not a Rastafarian, and therefore was not permitted to wear dreadlocks pursuant to a DOCCS directive stating that only Rastafarians were allowed to wear dreadlocks. *Dkt. No. 57–3 at 2; Dkt. No. 57–5 at 13–14; Dkt. No. 57–9 at 27,* 28. Thereafter, defendant Bezio gave plaintiff a direct order to comply with DOCCS regulations, though the substance of that direct order is unclear. The record reflects that one of three possible verbal directives may have been given to plaintiff, including to (1) either stop wearing a Tsalot–Kob or change his religion to Rastafarian; (2) cut his dreadlocks because only Rastafarians were permitted to wear dreadlocks; or (3) tie his hair back in a ponytail, which would comply with DOCCS grooming standards. *Dkt. No. 57–3 at 2; Dkt. No. 57–5 at 14,* 18.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN2. In his affidavit, defendant Bezio denies being assigned to investigate plaintiff's written complaint on April 2, 2008. *Dkt. No. 57–3 at 3.* Instead, defendant Bezio states that he was making rounds at the Clinton Annex on that date when he observed plaintiff wearing a Tsalot–Kob, a head covering that enables the wearer to tuck long dreadlocks inside, and questioned him about it. *Id.* at 2. A review of the transcript from plaintiff's disciplinary hearing on May 2, 2008, however, indicates otherwise. *Dkt. No. 57–5 at 13.* At the hearing, defendant Bezio testified, "On April 2 I conducted an interview with Inmate Shabazz pertaining to his ah dreadlocks. Ah he filed a written complaint on [defendant Rice] and it was my duty to ah investigate that complaint and at that time I ah interviewed Inmate Shabazz pertaining to his dreadlocks." *Dkt. No. 57–5 at 13; see also Dkt. No. 57–5 at 17* ("Inmate Shabazz field a written complaint against Sergeant Rice ah during a previous interview and it was my responsibility to ah investigate this ah this complaint."). As will be discussed more completely below, whether defendant Bezio was assigned to investigate plaintiff's complaint against defendant Rice is material to plaintiff's due process claim.

**\*5** Following this interview, plaintiff applied to change his religion to Rastafarian. Dkt. 57–3 at 19. On April 13, 2008, that request was denied on the basis that plaintiff had applied to change his religion within the previous twelve months.<sup>FN3</sup> *Id.*

FN3. According to DOCCS Directive 4202, inmates are only allowed to change religious designations once every twelve months. *Dkt. No. 57–3 at 19.* In this case, plaintiff had last changed his religious designation on September 21, 2007, rendering his request to change his religion in April 2008 untimely.

*Id.*

On or about April 14, 2008, defendant Rice observed plaintiff wearing his hair in a style that violated DOCCS rules, and ordered that he cut his hair. *Dkt. No. 57–4 at 2–3.* When plaintiff refused, defendant Rice issued an inmate misbehavior report charging him with violating two DOCCS rules.<sup>FN4</sup> *Dkt. No. 57–4 at 2,* 5. Although plaintiff contends that defendant Rice issued this report at the direction of defendant Bezio, both defendants Rice and Bezio deny that allegation. *Dkt. No. 57–3 at 3; Dkt. No. 57–4 at 2; Dkt. No. 57–9 at 29; Dkt. No. 66–3 at 2.*

FN4. Specifically, defendant Rice accused plaintiff of violating (1) DOCCS rule 110.33, which provides that "[a]n inmate wearing hair below shoulder length shall keep his or her hair tied back in a ponytail with a barrette, rubber band, or other fastening device approved by the superintendent"; and (2) DOCCS rule 106.10, providing "AN INMATE SHALL OBEY ALL ORDERS OF DEPARTMENT PERSONNEL PROMPTLY AND WITHOUT ARGUMENT." 7 N.Y.C.R.R. § 270.2(B) (emphasis in original).

Three days after the misbehavior report was issued, defendant Bezio conducted a Tier II disciplinary hearing on the charges contained in the report.<sup>FN5</sup> *Dkt. No. 57–3 at 2–3.* At plaintiff's deposition in connection with this action, he testified that he requested defendant Bezio to recuse himself from conducting the disciplinary hearing in light of the fact that defendant Bezio had been involved in the underlying investigation preceding the misbehavior report. *Dkt. No. 57–9 at 44–45.* According to plaintiff, defendant Bezio denied that request.<sup>FN6</sup> *Id.* at 45. During the disciplinary hearing, although plaintiff admitted that he refused defendant Rice's direct order to cut his hair, he claimed he did have his hair tied back in a ponytail. *Dkt. No. 57–3 at 4,* 15; *Dkt. No. 57–5 at 15.* In light of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4794432 (N.D.N.Y.)
**(Cite as: 2014 WL 4794432 (N.D.N.Y.))**

defendant Rice's report and plaintiff's testimony, defendant Bezio found plaintiff guilty of refusing a direct order but found him not guilty of having unfastened hair. *Dkt. No. 57–3 at 4.* Prior to rendering his decision, defendant Bezio also independently reviewed the DOCCS directive that permitted only Rastafarians to wear their hair in dreadlocks. *Id.* Defendant Bezio recorded his findings on a disposition sheet, and sanctioned plaintiff to thirty days of keeplock confinement, with a corresponding loss of certain prison privileges. *Id.* at 4, 21. Plaintiff's appeal of that disposition to the superintendent was denied on April 21, 2008. *Id.* at 24.

> FN5. The DOCCS conducts three types of inmate disciplinary hearings. See 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace,* 143 F.3d 653, 655 n. 1 (2d Cir.1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes,* 143 F.3d 655 n. 1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

> FN6. The transcript of the disciplinary hearing held on April 17, 2008, does not reflect either plaintiff's request that defendant Bezio recuse himself or defendant Bezio's refusal. *Dkt. No. 57–3 at 11–17.*

On April 29, 2008, while plaintiff was being escorted by another corrections officer to receive his daily medication, defendant Bezio again observed him wearing his hair in a Tsalot–Kob, in violation of his order on April 2, 2008. *Dkt. No. 57–3 at 5; Dkt. No. 57–9 at 41.* Plaintiff's Tsalot–Kob was confiscated, revealing that he also did not have his hair tied back in

a ponytail. *Dkt. No. 57–3 at 5.* Following this encounter, defendant Bezio issued an inmate misbehavior report charging plaintiff with violating his April 2, 2008 order, and not wearing his hair tied back in a ponytail. *Id.* at 5, 26.

On May 2, 2008, a Tier II disciplinary hearing was held by defendant Peter Chase, another corrections lieutenant at the Clinton Annex, in connection with the inmate misbehavior report issued by defendant Bezio. *Dkt. No. 57–5 at 1–2.* After plaintiff testified in his defense, defendant Chase adjourned the hearing for approximately one hour while he located defendant Bezio to secure his testimony.[FN7] *Dkt. No. 57–5 at 13; Dkt. No. 66–4 at 2.* While plaintiff understood and consented to the adjournment, he allegedly objected, off the record, to the manner in which defendant Bezio was summoned to testify, arguing that defendant Bezio could (and should) have been paged or summoned by telephone. *Dkt. No. 57–5 at 13,* 30; *Dkt. No. 66–4 at 2.* The hearing tape did not record any conversations that took place during the period of adjournment. *Dkt. No. 57–5 at 13; Dkt. No. 66–4 at 2.* According to defendants Bezio and Chase, they did not discuss defendant Bezio's testimony in advance, and did not have any off-therecord conversations regarding the plaintiff's disciplinary charges. *Dkt. No. 57–3 at 5; Dkt. No. 57–5 at 3.* Plaintiff, however, contends that defendant Chase "held off the record discussions with Bezio about the case." Dkt. No. 66–4 at 2. Plaintiff also alleges that, off the record, defendant Bezio harassed him by instructing him to "just plead guilty and get this over with." *Dkt. No. 57–9 at 60 .*

> FN7. Specifically, defendant Chase adjourned at 11:20 AM, and resumed the hearing at 12:40 PM. *Dkt. No. 57–5 at 13.*

**\*6** After the disciplinary hearing resumed on the record, defendant Bezio testified concerning the information contained in his misbehavior report and the orders he issued to plaintiff on April 2, 2008. *Dkt. No.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*57–5 at 13.* Following defendant Bezio's testimony, defendant Chase found plaintiff guilty of both violating a direct order and having untied hair, and imposed a second sentence of thirty days keeplock confinement, with a corresponding loss of privileges. *Id.* at 3, 13, 27. Plaintiff's appeal of defendant Chase's hearing disposition to the superintendent was denied on May 9, 2008. *Dkt. No. 57–5 at 29.*

On March 16, 2009, the DOCCS administratively reversed and expunged the disciplinary determinations rendered by both defendants Bezio and Chase. *Dkt. No. 57–9 at 49.* By the time his sentences were vacated, plaintiff had served an aggregate total of thirty-six days in keeplock confinement as a result of the two Tier II hearings. *Id.* During that period of confinement, plaintiff was allowed to leave his cell for an hour of recreation each day, twice per day to receive his medication, and during his allotted shower time three days per week. *Dkt. No. 57–9 at 36–37.* Whenever he left his cell, plaintiff was placed in restraints. *Id.* at 36.

At his deposition, plaintiff distinguished between the conditions of his keeplock confinement from those in general population. While inmates in general population have access to a shower at any given time, those in keeplock are allowed to shower only three times per week. *Dkt. No. 57–9 at 37.* During his keeplock confinement, plaintiff was not permitted to attend religious services, work at his job in the tailor shop, or tutor the inmates in the college program, as he had while in general population. *Id.* at 38–39, 74–75.

Some of the conditions of plaintiff's keeplock confinement are disputed between the parties. While defendants contend that the two keeplock cells at the Clinton Annex contain a bed, mattress, pillow, washstand, and lighting, plaintiff testified at his deposition that his cell had no furniture and he was forced to eat his meals on the floor.[FN8] *Dkt. No. 57–8 at 1–2; Dkt. No. 57–9 at 33.* According to plaintiff, while confined in keeplock, the toilet in his cell would not flush for

five days. *Dkt. No. 57–9 at 33–34.* Additionally, plaintiff testified that other inmates on his floor would throw feces and it, "along with urine and water and stuff like that," would seep underneath the door into his cell. *Dkt. No. 57–9 at 33,* 35. Defendants have submitted evidence, however, reflecting that during the time of plaintiff's keeplock confinement, there were no documented instances of either inmates throwing feces on his cell block or feces being cleaned up. *Dkt. No. 57–6 at 3; Dkt. No. 57–8 at 2–3.*

> [FN8]. There is also record evidence that one of the two keeplock cells has a locker and the other has a built-in desk with a chair. *Dkt. No. 57–8 at 2.*

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on October 12, 2010. *Dkt. No. 1.* Plaintiff's complaint names as defendants Corrections Sergeant E. Rice and Corrections Lieutenants G.R. Bezio and Peter Chase, all three of whom were stationed at the Clinton Annex at the relevant times. *See generally id.*

**\*7** In response to plaintiff's complaint, defendants moved to dismiss plaintiff's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Dkt. No. 17.* Following a review of the motion, Magistrate Judge David R. Homer issued a report to Senior District Judge Norman A. Mordue recommending that it be granted. *Dkt. No. 21.* Judge Mordue adopted the report, and plaintiff's complaint was dismissed on February 8, 2012. *Dkt. No. 23.* The resulting judgment dismissing plaintiff's complaint, however, was reversed on appeal by the United States Court of Appeals for the Second Circuit, which concluded, *inter alia,* that plaintiff's complaint should not have been dismissed without first granting him leave to amend.[FN9] *See generally Dkt. No. 31.* Plaintiff's case was remanded for further proceedings, and the matter was reassigned to me. Dkt. Nos. 31, 32.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN9. More completely, following its *de novo* review of the district court's decision, the Second Circuit found the aggregated time plaintiff allegedly spent in keeplock may have been sufficient to constitute an "atypical and significant hardship," but noted that plaintiff failed to allege detailed facts concerning the conditions of his keeplock confinement. *Dkt. No. 31 at 2,* 5. The court also found that plaintiff's complaint alleged facts which, taken as true, were sufficient to plausibly suggest that defendant Bezio was not an impartial decisionmaker. *Id.* at 6. Further, because there was some ambiguity as to which document defendant Bezio relied upon to make his guilty determination at the disciplinary hearing on April 17, 2008, the court was unable to analyze whether there was reliable evidence of plaintiff's guilt. *Id.* at 6–7. In addition, because no case law was cited in support of the dismissal of the claims against defendants Rice and Chase, the Second Circuit held that plaintiff should be afforded an opportunity to amend his complaint to further develop his factual allegations with regard to those defendants. *Id.* at 7–8. Finally, the Second Circuit inquired into whether plaintiff's complaint inartfully alleged a claim against Norman Bezio, the DOCCS employee designated to hear appeals from inmate disciplinary hearings and allegedly the brother of defendant G.R. Bezio, and determined plaintiff should be allowed to add him as a defendant if he decided to file an amended complaint. *Id.* at 8.

Pursuant to the Second Circuit's mandate, plaintiff filed an amended complaint on April 24, 2013.FN10 *Dkt. No. 37.* Liberally construed, plaintiff's amended complaint alleges that he was denied due process because he was twice denied impartial disciplinary hearings as a result of which he was placed in keeplock confinement for an aggregate period of thirty-six days, with a corresponding loss of privileges. *See generally id.*

FN10. Although it appears that plaintiff requested summary judgment in his amended complaint, *Dkt. No. 37 at 10,* he has failed to adhere to requirements governing a summary judgment motion set forth in the local rules of practice for this court. *See* N.D.N.Y. L.R. 5.1(a) (requiring memorandum of law and supporting affidavit for all motions); N.D.N.Y. L.R. 7.1(a)(3) (requiring submission of a statement of material facts in support of a motion for summary judgment). For that reason, to the extent his amended complaint may be liberally construed as a motion for summary judgment, that motion is denied. *See, e.g., Dorsey v. Artus,* No. 09–CV–1011, 2013 WL 5463720, at *6 (N.D.N.Y. Sept. 30, 2013) (Sharpe, C.J., *adopting report and recommendation by* Peebles, M.J.) (dismissing the plaintiff's motion for summary judgment because, *inter alia,* he failed to comply with the procedural requirements set forth in rule 7.1 of the local rules of practice).

Following the completion of discovery, defendants filed the pending motion for summary judgment, arguing that, despite plaintiff's efforts to cure the deficiencies contained in his initial complaint, the claims set forth in his amended complaint nonetheless lack merit. *Dkt. No. 57 at 5.* Defendants further argue that they are entitled to immunity from suit pursuant to the Eleventh Amendment, to the extent they are sued in their official capacities, and are likewise entitled to qualified immunity. *Dkt. No. 57 at 8–9,* 21–22. Defendants' motion, which is now fully briefed, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and the Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

Slip Copy, 2014 WL 4794432 (N.D.N.Y.)
**(Cite as: 2014 WL 4794432 (N.D.N.Y.))**

III. *DISCUSSION*

A. *Legal Standard Governing Motions for Summary Judgment*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Tolan v. Cotton,* 134 S.Ct. 1861, 1866 (2014); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*8** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F .3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Tolan,* 134 S.Ct. at 1866; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d

Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Eleventh Amendment Immunity*

Defendants contend that they are shielded from suit under the Eleventh Amendment to the extent plaintiff's amended complaint asserts claims for damages against them in their official capacities. *Dkt. No. 57–1 at 8–9.* The Eleventh Amendment protects a state against suits brought in federal court by "private parties seeking to impose a liability which must be paid from public funds in the state treasury." *Edelman v. Jordan,* 415 U.S. 651, 662–63 (1974); *Cory v. White,* 457 U.S. 85, 90–91 (1982); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993). This absolute immunity, which states enjoy under the Eleventh Amendment, extends to both state agencies and state officials sued for damages in their official capacities when the essence of the plaintiff's claim seeks recovery from the state as the real party in interest.[FN11] *See, e.g., Daisernia v. State of N.Y.,* 582 F.Supp. 792, 798–99 (N.D.N.Y.1984) (McCurn, J.) ("[A] suit which seeks a money judgment 'which must be paid from the state treasury is barred by the Eleventh Amendment,' even though it is nominally asserted against an individual official." (quoting *Edelman,* 415 U.S. at 663)); *see also Richards v. State of N.Y.App. Div., Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing, *inter alia, Cory v. White,* 457 U.S. 85, 89–91, (1982)). "To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state." [FN12] *Ying Jing Gan,* 996 F.2d at 529; *see also Hafer v. Melo,* 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity therefore should be

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

treated as suits against the State.").

FN11. In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of N.Y. v. Chatham Cnty.,* 547 U.S. 189, 193 (2006).

FN12. By contrast, the Eleventh Amendment does not preclude lawsuits seeking to impose individual or personal liability on state officials under section 1983. *Hafer v. Melo,* 502 U.S. 21, 30–31 (1991).

**\*9** Plaintiff's damage claims in this action against the named defendants in their official capacities are, in reality, claims against the State of New York, and therefore are subject to dismissal. *Daisernia,* 582 F.Supp. at 798–99. Accordingly, I recommend that those claims be dismissed with prejudice.

### C. *Plaintiff's Due Process Claims*

Plaintiff contends that he was denied due process at the April 17, 2008, and May 2, 2008, disciplinary hearings. *Dkt. No. 37 at 2–9.* Liberally construed, plaintiff's complaint alleges that he was deprived of his liberty interest in remaining free from keeplock confinement for an aggregate total of thirty-six days without being afforded sufficient process at those disciplinary hearings. *Id.* Defendants argue that plaintiff's claims are without merit. *Dkt. No. 57–1 at 9–19.*

As a general matter, to prevail on a section 1983 due process claim arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000); *Hynes v.. Squillace,* 143 F.3d 653, 658 (2d Cir.1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996). I will address each requirement in turn.

### 1. *Liberty Interest*

In *Sandin v. Conner,* 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation, and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483–84; *Tellier,* 280 F.3d at 79–80; *Hynes,* 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* inquiry. *See, e.g., LaBounty v. Coombe,* No. 95–CV–2617, 2001 WL 1658245, at \*6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94–CV–0985, 2001 WL 118598, at \*6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.).[FN13] Accordingly, to avoid the entry of summary judgment, plaintiff must have proffered evidence from which a reasonable factfinder could conclude that the conditions of his keeplock confinement rose to the level of an atypical and significant hardship under *Sandin. See, e.g., Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) ("[W]here the nonmoving party bears the burden of proof at trial ... it is [his] burden to come forward to demonstrate that there are issues that must be decided by the factfinder because they may reasonably be decided in favor of either party." (citations omitted)).

FN13. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

Slip Copy, 2014 WL 4794432 (N.D.N.Y.)
**(Cite as: 2014 WL 4794432 (N.D.N.Y.))**

[Editor's Note: Attachments of Westlaw case copies deleted for online display.]

**\*10** When analyzing the conditions of an inmate's keeplock confinement, the relevant factors for consideration include " 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed [.]' " *Davis v. Barrett,* 576 F.3d 129, 133 (2d Cir.2009) (quoting *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)). As to the duration of the disciplinary segregation, restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis,* 576 F.3d at 133 (citing *Colon v. Howard,* 215 F.3d 227 (2d Cir.2000)). Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis,* 576 F.3d at 133 (citing *Colon,* 215 F.3d at 232–33 n. 5). The court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.' " *Davis,* 576 F.3d at 134 (quoting *Welch v. Bartlett,* 196 F.3d 389, 392–93 (2d Cir.1999)).

The Second Circuit has stated that disputes regarding the conditions of a plaintiff's confinement may not be resolved on summary judgment. *Davis,* 576 F.3d at 134 (quoting *Palmer v. Richards,* 364 F.3d 60, 65 (2d Cir.2004). "Only when the conditions are uncontested may a district court resolve the issue of a typicality of confinement as a matter of law." *Id.*

Here, according to plaintiff, he was confined in keeplock for thirty-six days. *Dkt. No. 57–9 at 49.* Accordingly, the court must inquire into the conditions of plaintiff's keeplock confinement because the duration of his disciplinary confinement does not, on its own, rise to the level of an atypical and significant

hardship. *Davis,* 576 F.3d at 133; *see also Rodriguez v. McGinnis,* 1 F.Supp.2d 244, 248 (S.D.N.Y.1998) ("The decisions of the Second Circuit are unanimous that keeplock ... confinement of 30 days or less in New York is not 'atypical or significant hardship' under *Sandin.*" (quotation marks omitted) (listing cases)). Plaintiff has set forth evidence that the conditions of his keeplock confinement were more serious than the conditions imposed on those inmates in general population. For example, at his deposition, plaintiff testified that he had no furniture on which to eat, and was therefore required to eat on the floor. *Dkt. No. 57–9 at 33.* He also testified that, whenever he left his cell, he was restrained by "shackles," and he was permitted a ten-minute shower only three times per week. *Id.* at 36–37. Shabazz was also allegedly precluded from attending church services and working either in the tailor shop or as a tutor, and specifically testified that, "[a]t no time do you leave the keep-lock cell unless you go to medication, hour of recreation, or a ten-minute shower." *Id.* at 37–39. Finally, plaintiff alleges that his toilet would not flush for five days, and feces seeped into his keeplock cell during his confinement. *Id.* at 33, 35.

**\*11** To counter these assertions, defendants have submitted evidence in support of their motion suggesting plaintiff's keeplock cell, at a minimum, had a bed, mattress, pillow, washstand, and lighting. *Dkt. No. 57–8 at 1–2.* Moreover, one of the two keeplock cells at the Clinton Annex had a locker, and the other had a built-in desk with a chair. *Id.* Kathryn Lehman is a Keyboard Specialist 1 for the DOCCS who has access to the Clinton Annex logbook as part of her duties. *Dkt. No. 57–6 at 3.* In her affidavit submitted in support of defendants' pending motion, she stated that, during plaintiff's keeplock confinement, there were "no incidents of inmates on plaintiff's cell block being charged with disciplinary offenses for throwing feces," nor were there any "documented incidents of staff cleaning in that time period[.]" *Id.* at 3. There is also evidence that plaintiff was permitted to leave his cell twice per day for approximately twenty minutes to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4794432 (N.D.N.Y.)
**(Cite as: 2014 WL 4794432 (N.D.N.Y.))**

obtain his medications. *Dkt. No. 57–9 at 36–37.*

Although I am doubtful that plaintiff will be able to demonstrate that the conditions of his keeplock confinement were sufficient to create an "atypical and significant hardship," [FN14] I remain mindful that such a consideration, where there is a dispute of fact regarding the conditions, should be left for the factfinder at trial. *See Palmer,* 364 F.3d at 64 ("Disputes about conditions may not be resolved on summary judgment, but where the conditions are undisputed, the *Sandin* issue should be resolved by the court as a matter of law." (citations omitted)); *Sealey,* 197 F.3d at 585 ("The content of the *Sandin* standard of 'atypical and significant hardship' is an issue of law, but if the facts concerning the conditions or the confinement are reasonably in dispute, the jury ... must resolve those disputes[.]").

> FN14. *See Sealey,* 197 F.3d at 587, 589–90 (affirming the district court's conclusion that the plaintiff's 101–day confinement in the facility's special housing unit did not constitute an atypical hardship, even where the plaintiff was confined in his cell for twenty-three hours a day, permitted one hour for recreation, limited to three showers per week, subject to noisy neighboring cells, lost various privileges, and had feces thrown at him "a few times"); *Arce v. Walker,* 139 F.3d 329, 336–37 (2d Cir.1998) (finding the plaintiff's eighteen-day administrative segregation to did not constitute an atypical and significant hardship where he was entitled to only one hour of exercise per day and could not attend church services or communal meals, even considering that, for fifteen days, the plaintiff was deprived exercise because, during those fifteen days, he was provided "out-of-cell privileges," including attendance at court proceedings).

2. *Process Afforded at the Disciplinary Hearings*

Having found an issue of material fact concerning whether plaintiff was deprived of a cognizable liberty interest, I must next examine whether he was afforded sufficient due process during the disciplinary proceedings resulting in his keeplock confinement. *See Tellier,* 280 F.3d at 79–80 (requiring that a plaintiff demonstrate that he both (1) possessed an actual liberty interest and (2) was deprived of that interest without being afforded sufficient process in order to prevail on a due process cause of action). Plaintiff alleges his due process rights were violated because he was denied impartial disciplinary hearings giving rise to his keeplock confinement. *See generally Dkt. No. 37.* Specifically, with respect to the disciplinary hearing held on April 17, 2008, he contends that defendant Bezio should have recused himself as the hearing officer because he participated in the underlying investigation giving rise to the issuance of the misbehavior report. *Dkt. No. 37 at 2–5; see also Dkt. No. 57–9 at 51* (clarifying allegations in complaint). Plaintiff also maintains that defendant Rice is implicated in the due process violation because he (1) instructed plaintiff to cut his hair and (2) allegedly followed the orders of defendant Bezio to issue plaintiff a misbehavior report. *Dkt. No. 37 at 2–4; see also Dkt. No. 57–9 at 66* (clarifying allegations in complaint). The basis for plaintiff's claim that he was denied an impartial disciplinary hearing on May 2, 2008, is that defendant Chase postponed the hearing for more than an hour while he located defendant Bezio for his testimony. *Dkt. No. 37 at 5–6; see also Dkt. No. 57–9 at 57* (clarifying allegations in complaint). During the adjournment, defendants Bezio and Chase allegedly rehearsed defendant Bezio's testimony. *Dkt. No. 37 at 5–6; see also Dkt. No. 57–9 at 58* (clarifying allegations in complaint).

**\*12** The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established, and include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff v. McDonnell,* 418 U.S. 539, 564–69 (1974); *see also Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004). To pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must garner the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455 (1985); *Luna,* 356 F.3d at 487–88.

The due process clause of the Fourteenth Amendment guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to ... an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citing *Wolff,* 418 U.S. 570–71). The Second Circuit has explained that its "conception of an impartial decisionmaker is one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990). "The degree of impartiality required of prison officials[, however,] does not rise to the level of that required of judges." *Allen,* 100 F.3d at 259. Indeed, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Allred v. Knowles,* No. 06–CV–0456, 2010 WL 3911414, at *5 (W.D.N.Y. Oct. 5, 2010) (quoting *Superintendent v. Hill,* 472 U.S. 445, 455 (1985)).

a. *Disciplinary Hearing on April 17, 2008*

In this case, plaintiff's allegation that he was denied due process at the hearing on April 17, 2008 because defendant Bezio both participated in an investigation on April 2, 2008 regarding plaintiff's

dreadlocks, and conducted the disciplinary hearing is not, on its own, sufficient to give rise to a cognizable due process violation. *See Allred,* 2010 WL 3911414, at *5 (finding no due process violation where the plaintiff alleged that the hearing officer presiding over the disciplinary hearing also participated in the underlying investigation). Moreover, there is no evidence in the record to support plaintiff's suggestion that defendant Bezio prejudged the facts prior to hearing the evidence adduced at the disciplinary hearing.

**\*13** Plaintiff's reliance on the DOCCS regulation that precludes "person[s] who ha[ve] participated in any investigation of the [underlying] acts" from presiding over the hearing as a hearing officer is misplaced. *Dkt. No. 37 at 3–4; Dkt. No. 57–9 at 53–55.* It is well settled that "violations of state law that do not deprive the plaintiff of a right 'secured by the Constitution and laws' are insufficient to support a claim under [section] 1983." *Allred,* 2010 WL 3911414, at *5 (quoting *Baker v. McCollan,* 443 U.S. 137, 139–40 (1979)). Accordingly, to the extent that plaintiff in this case was afforded the protections required by the Constitution, defendant Bezio's apparent violation of state law does not also constitute a due process violation.

Significantly, plaintiff does not allege, and there is no record evidence from which a reasonable factfinder could conclude, that he was denied (1) written notice of the charges giving rise to the hearing on April 17, 2008, (2) an opportunity to appear at the disciplinary hearing, (3) an opportunity to present witnesses in support of his defense, (4) a written statement of decision by defendant Bezio, or (5) the right to assistance in preparing a defense. *See generally Dkt. No. 37; Dkt. No. 57–3 at 11–17,* 21–22; *Wolff,* 418 U.S. at 564–70. Moreover, even viewing the facts in the light most favorable to plaintiff, there was certainly reliable evidence of plaintiff's guilt with respect to the allegation that he failed to follow a direct order—the charge for which plaintiff was ulti-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4794432 (N.D.N.Y.)
**(Cite as: 2014 WL 4794432 (N.D.N.Y.))**

mately found guilty at the hearing on April 17, 2008. The court need not go any further than plaintiff's own admission at the disciplinary hearing that he "refused Sergeant Rice's order" to cut his hair to conclude that reliable evidence existed upon which defendant Bezio could support his guilty finding. *Dkt. No. 57–3 at 15.* In addition, to the extent plaintiff asserts a due process claim against defendant Rice based on allegations that Rice (1) ordered plaintiff to cut his hair and (2) followed defendant Bezio's order to issue him a misbehavior report, it is not cognizable in light of the protections afforded plaintiff during the hearing. For all of these reasons, and based on the record evidence, I find that no reasonable factfinder could conclude that plaintiff was afforded inadequate due process during the disciplinary hearing on April 17, 2008. Accordingly, I recommend that plaintiff's due process claim arising from that hearing be dismissed.

### b. *Disciplinary Hearing on May 2, 2008*

Plaintiff's due process claim in connection with the hearing on May 2, 2008, stems from defendant Chase's alleged impartiality as the hearing officer. *Dkt. No. 37 at 5–6; Dkt. No. 57–9 at 57.* Specifically, plaintiff objects to the decision by defendant Chase to adjourn the proceeding so that he could locate and secure the testimony of defendant Bezio, the author of the misbehavior report at issue in the hearing. *Dkt. No. 37 at 5–6; Dkt. No. 57–9 at 58.* Plaintiff contends that during the adjournment, defendants Chase and Bezio rehearsed defendant Bezio's testimony. *Id.*

**\*14** Initially, I find nothing in the record revealing a dispute of material fact with respect to whether plaintiff was denied (1) written notice of the charges giving rise to the hearing on May 2, 2008, (2) an opportunity to appear at the disciplinary hearing, (3) an opportunity to present witnesses in support of his defense, (4) a written statement of decision by defendant Chase, or (5) the right to assistance in preparing a defense. *Dkt. No. 57–5 at 7–27.* Moreover, a review of the hearing transcript and defendant Chase's written disposition reveals that there was reliable

evidence on which he based his decision, including (1) plaintiff's own testimony that he was wearing the Tsalot–Kob and did not have his hair tied back on the day defendant Bezio issued the misbehavior report; and (2) the testimony of defendant Bezio that, on April 2, 2008, he had ordered plaintiff to cut his hair and not wear the Tsalot–Kob because plaintiff was not Rastafarian. *See id.* at 10 (plaintiff's testimony), 13–14 (defendant Bezio's testimony). Plaintiff's allegation that defendant Chase failed to conduct an impartial hearing—because he allegedly rehearsed the testimony of defendant Bezio off-the-record—is unsupported by any record evidence aside from plaintiff's claim that the two conversed before Bezio testified. *See Dkt. No. 57–9 at 68–69* (plaintiff testifying at his deposition that "Lieutenant Chase admitted and Lieutenant Bezio admitted themselves (sic) that they had off the record conversations"). Both defendants Chase and Bezio flatly deny having rehearsed defendant Bezio's testimony off the record at the disciplinary hearing on May 2, 2008. *Dkt. No. 57–3 at 5; Dkt. No. 57–5 at 3.*

Assuming, however, that defendants Chase and Bezio did discuss defendant Bezio's testimony in advance, that fact alone does not render defendant Chase partial as a hearing officer, or otherwise constitute a violation of plaintiff's due process rights. As an initial matter, plaintiff has failed to provide any legal support for his contention that, within the contours of due process, a right exists prohibiting witnesses participating in a prison disciplinary hearing from speaking with the hearing officer prior to testifying. Notably, despite its efforts, the court has similarly found no legal support for this proposition.[FN15] In any event, whatever due process violation may have occurred (and the court does not concede that a violation did occur) was cured by plaintiff's ample opportunity to question defendant Bezio at the hearing. Defendant Chase permitted plaintiff to ask defendant Bezio nearly all of his proposed questions, with the limited exception of those that were duplicative of earlier questions or those that were deemed irrele-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4794432 (N.D.N.Y.)
**(Cite as: 2014 WL 4794432 (N.D.N.Y.))**

vant.[FN16] *Dkt. No. 57–5 at 14–20.*

> FN15. Relatedly, the court is reminded that, with respect to the law governing the right of inmates to call their own witnesses at a prison disciplinary hearing, hearing officers are afforded significant discretion to permit or deny the testimony of a witness on multiple grounds, including institutional safety, relevance, or futility. *See, e.g., Wolff,* 418 U.S. at 566 ("Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses ... whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases."); *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993) ( "We hold that if a prison official, presiding over a prison disciplinary hearing, reasonably concludes that it would be futile to call a witness to testify, his refusal to do so will not constitute a violation of the prisoner's constitutional rights."). By implication, the existence of this discretion suggests that hearing officers are permitted to contact witnesses in advance of a hearing to evaluate, for example, the relevance or necessity of their proposed testimony. *Cf. Shell v. Brzeniak,* 365 F.Supp.2d 362, 377 (W.D.N.Y.2005) (rejecting an inmate-plaintiff's claim that his due process rights were violated when a hearing officer failed to speak with two inmate witnesses personally to inquire into their reasons for refusing to testify at the plaintiff's hearing).

> FN16. For example, on the basis of relevance, defendant Chase did not permit plaintiff to ask defendant Bezio "[w]hy [defendant Bezio] is racist." *Dkt. No. 57–5 at 16.*

Accordingly, in light of the undisputed record evidence that plaintiff was afforded the process demanded by the Constitution, as identified by the Su-

preme Court, with respect to the May 2, 2008 disciplinary hearing, I recommend that plaintiff's due process claim arising from that hearing be dismissed.

**D.** *Plaintiff's Harassment Claims*

**\*15** Liberally construed, plaintiff's amended complaint also asserts a claim against defendant Bezio stemming from an allegation that he verbally harassed plaintiff during the disciplinary hearing on May 2, 2008. *Dkt. No. 37 at 5; see also Dkt. No. 57–9 at 60* (clarifying allegations in complaint). Verbal harassment, however, without more, is not cognizable under section 1983. *See, e.g., Jermosen v. Coughlin,* 878 F.Supp. 444, 449 (N.D.N.Y.1995) (McAvoy, J.) ("Although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under [section] 1983." (citing cases)). Accordingly, I recommend that plaintiff's harassment claim be dismissed.

**IV.** *SUMMARY AND RECOMMENDATION*

After a careful review of the record in this case, I find that, although a dispute of material fact exists regarding whether plaintiff was deprived of a liberty interest, no reasonable factfinder could conclude, based on the record evidence, that plaintiff was denied adequate due process before being sentenced to keeplock confinement.[FN17]

> FN17. In light of these findings, I have not addressed defendants' argument regarding the applicability of qualified immunity.

Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (*Dkt. No. 57* ) be GRANTED, and that the plaintiff's complaint be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4794432 (N.D.N.Y.)
**(Cite as: 2014 WL 4794432 (N.D.N.Y.))**

report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS RE-PORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated: July 30, 2014.

N.D.N.Y.,2014.
Shabazz v. Bezio
Slip Copy, 2014 WL 4794432 (N.D.N.Y.)

END OF DOCUMENT



Not Reported in F.Supp.2d, 2012 WL 4450015 (N.D.N.Y.)
**(Cite as: 2012 WL 4450015 (N.D.N.Y.))**

H

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Eugene SIDNEY, Plaintiff,
v.
Rian S. FISCHER, et al., Defendants.

No. 9:09–CV–1326 (GTS/ATB).
Jan. 3, 2012.

Eugene Sidney, pro se.

Christopher W. Hall, Assistant Attorney General, for
Defendants.

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate
Judge.

**\*1** This matter has been referred to me for Report
and Recommendation by the Honorable Glenn T.
Suddaby, United States District Judge, pursuant to 28
U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

Judge Suddaby's December 6, 2010 filing order
liberally [FN1] interpreted plaintiff's Amended Com-
plaint ("AC," Dkt. No. 15) as asserting the following
claims against six employees of the New York De-
partment of Correctional Services ("DOCS"): [FN2] (1) a
retaliation claim under the First Amendment; (2) an
access-to-courts claim under the First Amendment; (3)
a free-flow-of-mail claim under the First Amendment;
(4) a claim of inadequate prison conditions under the
Eighth Amendment; (5) a due process claim relating to
the filing of false misbehavior reports and the impo-
sition of sanctions against the plaintiff under the
Fourteenth Amendment; and (6) a conspiracy claim

under 42 U.S.C. § 1983. (Dkt. No. 29 at 6).[FN3] Plaintiff
seeks $150 million in damages, plus costs and dis-
bursements. (AC ¶ 9, Dkt. No. 15 at 13) [FN4].

> FN1. The court is required to read a pro se
> party's papers liberally, and to interpret them
> to raise the strongest arguments that they
> suggest. *Burgos v. Hopkins,* 14 F.3d 787,
> 790 (2d Cir.1994). The Second Circuit has
> stated that "[i]mplicit in the right to
> self-representation is an obligation on the
> part of the court to make reasonable allow-
> ances to protect pro se litigants from inad-
> vertent forfeiture of important rights because
> of their lack of legal training." *Traguth v.
> Zuck,* 710 F.2d 90, 95 (2d Cir.1983). The
> amended complaint in this case is very dif-
> ficult to understand. The extremely liberal
> interpretation of this pleading was for the
> purpose of allowing the amended complaint
> to be filed and served. This interpretation of
> plaintiff's claims has not necessarily survived
> based upon a closer review of the amended
> complaint, together with additional infor-
> mation obtained from the parties in their
> moving papers.

> FN2. On April 1, 2011, DOCS and the New
> York State Division of Parole were merged
> into one agency, named the New York State
> Department of Corrections and Community
> Supervision. Because the events relevant to
> this suit occurred before the merger, I will
> refer to New York State's corrections agency
> as "DOCS."

> FN3. As I stated in my August 8, 2011 Re-
> port–Recommendation, Judge Suddaby's
> MemorandumDecision and Order dated De-
> cember 16, 2010 summarized the procedural

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4450015 (N.D.N.Y.)
**(Cite as: 2012 WL 4450015 (N.D.N.Y.))**

history of this case and interpreted the allegations of the Second Amended Complaint. (Dkt. No. 29 at 2–3, 4–6)

FN4. The page numbers are those assigned by the court's electronic filing system, CM/ECF.

On February 11, 2011, defendants made a motion to dismiss the action based upon 28 U.S.C. § 1915(g),FN5 arguing that plaintiff had accumulated "three-strikes," that his *in forma pauperis* status should be revoked, and he should be made to pay the court's filing fee in full or have his case dismissed. (Dkt. No. 53). On August 8, 2011, I issued a Report–Recommendation in which I found that plaintiff had accumulated only two "strikes" and recommended that the motion to dismiss be denied and that the case proceed. (Dkt. No. 87). Judge Suddaby adopted my recommendation in its entirety and denied defendants' motion. (Dkt. No. 98).

FN5. The "three strikes" section of the Prison Litigation Reform Act (PLRA) prohibits the filing of an action *in forma pauperis* when the plaintiff has had federal actions or appeals dismissed on at least three prior occasions, either for failure to state a claim or for frivolousness. 28 U.S.C. § 1915(g).

Presently before the court is the defendants' motion to dismiss and for summary judgment pursuant to Fed.R.Civ.P. 12(b)(6) and 56. (Dkt. No. 100). Plaintiff has responded in opposition to the motion,FN6 and defendants have filed a reply. (Dkt.Nos.106, 108). For the following reasons, this court agrees with defendants and will recommend dismissing the plaintiff's complaint in its entirety.

FN6. Plaintiff's response to defendants' motion mentions a variety of different issues, many of which were not in the original

complaint. Plaintiff has also filed a large number of exhibits, some of which are relevant to the original claims. Defendants limited themselves to a reply covering matters that were in their motion and discussed plaintiff's response to the extent that it covered relevant material and included exhibits that address the original claims. While plaintiff could have made a motion to amend in response to the motion to dismiss, plaintiff cannot raise completely new claims in a response to a summary judgment motion. *See Hristov v. Roark,* No. 09–CV–2731, 2011 WL 4711885, at *12 (E.D.N.Y. Sept. 30, 2011) (citations omitted); *Torres v. Carry,* No. 08 Civ. 8967, 2011 WL 3444340, at *7 (S.D.N.Y. Aug. 4, 2011) (plaintiff may not raise new claims in response to a summary judgment motion); *Hawana v. City of New York,* 230 F.Supp.2d 518, 534 (S.D.N.Y.2002) (same) (citing *McCallister v. New York City Police Dep't,* 49 F.Supp.2d 688, 698 (S.D.N.Y.1999) (collecting cases)). To the extent that the new claims could be construed as a motion to amend, the court finds that any amendment would be futile. *See Mackensworth v. S.S. American Merchant,* 28 F.3d 246, 251 (2d Cir.1994) (motion to amend may be denied if the proposed amendment is futile).

## DISCUSSION

**I.** *Facts*

The various court decisions in this case have outlined how the court has interpreted plaintiff's claims, based upon the vague and rambling factual statements contained in his amended complaint. (Dkt. Nos. 12 (conditional dismissal); 29 (filing order after Amended Complaint); 87 (Report–Rec. discussing Three Strikes Motion); 98 (Mem. Dec. & Order)). For purposes of this recommendation, the court assumes familiarity with the prior statements of fact, and will highlight the essence of plaintiff's claims.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4450015 (N.D.N.Y.)
**(Cite as: 2012 WL 4450015 (N.D.N.Y.))**

Plaintiff admits that on May 30, 2008, he was given a "negative correspondence list" by Correction Counselor John McGregor at Wende Correctional Facility. (Def.s' Stmt. of Material Facts ¶ 1, Plf.'s Resp. ¶ 1; Caron [FN7] Aff. ¶ 4 & Ex. A) (Dkt.Nos.100–1, 100–3, 106–2). The document *clearly* states that plaintiff must discontinue corresponding with Ms. Vickie McDonald.[FN8] (Caron Aff. ¶ 6 & Ex. A). Plaintiff's signature appears on the document, and the form states that, in addition to being served on the inmate, it was also being placed in plaintiff's guidance and counseling unit case file. (Caron Aff. Ex. A). All of plaintiff's claims in this action appear to have resulted from this negative correspondence list.

> FN7. The affidavit is submitted by defendant Trudy–Lynn Caron, Correction Counselor at Upstate Correctional Facility. (Caron Aff. ¶ 1) (Dkt. No. 100–3).

> FN8. The form contains Ms. McDonald's address and telephone number. (Caron Aff. Ex. A).

**\*2** After plaintiff received this document, he was transferred to Upstate Correctional Facility. Apparently, plaintiff still attempted to contact Ms. McDonald. Between August 3, 2009 and March 17, 2010, defendant Caron wrote at least thirteen misbehavior reports against plaintiff for violating the prohibition stated on the negative correspondence list.[FN9] Plaintiff claims that Ms. McDonald is his wife, and that she never called to complain about receiving communications from plaintiff. Plaintiff now claims that some "impostor" must have called the facilities to complain, causing plaintiff to be improperly disciplined. Plaintiff alleges that he has challenged this prohibition by filing two grievances, one dated August 24, 2009 (filed September 1, 2009) [FN10] and another dated September 14, 2009. However, plaintiff claims that his September

14, 2009 grievance was "mysteriously pilfered." (AC at p. 2).

> FN9. There appears to be at least one more misbehavior report issued by defendant Caron, as will be discussed below.

> FN10. The court will refer to this grievance as the September 1, 2009 grievance because defendants have utilized the filing date as the date of the grievance.

Defendant Caron has attached thirteen misbehavior reports that she issued to plaintiff as Exhibit B to her affidavit. (Caron Aff. Ex. B). Plaintiff submits as an exhibit to his response, a disciplinary disposition, dated September 18, 2009, in which Hearing Officer Laramay found plaintiff "not guilty" of the correspondence violations charged by defendant Caron.[FN11] (Dkt. No. 106–3 at p. 5). The disposition states that there was insufficient documentary evidence showing the identity of the "civilian complainant," identified as the plaintiff's wife. *Id.* The evidence relied upon was listed as defendant Caron's "report" and "associated departmental documentation." *Id.* Plaintiff argues that because Hearing Officer Laramay found plaintiff innocent of the charges on September 18, 2009, none of the misbehavior reports may be sustained .[FN12]

> FN11. The court notes that the misbehavior report, which according to the disposition, would have been dated September 4, 2009, was not included in defendant Caron's Exhibit B as one of the misbehavior reports that she issued. The misbehavior reports in Exhibit B are arranged chronologically. The dates on the reports go from August 27, 2009 to September 9, 2009. (Dkt. No. 100–3 at 10–11).

> FN12. Plaintiff states that defendant Ranieri

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

was the hearing officer, responsible for at least three of the guilty findings, subsequent to Officer Laramay's determination. (AC at p. 10). Plaintiff states that defendant Ranieri "personally disbelieves these proving irrefutable 'same occurrence' set of adjudicated facts and thrice (3) vindictively imposes a 'punative [sic] dietary loaf." (*Id.*)

Plaintiff alleges that, after some of the other disciplinary hearings, he was sentenced to the "Food Loaf" [FN13] for violating the correspondence restriction and defendant Caron's order to stop writing to Ms. McDonald. He claims that he was sentenced to a total of 61 days of this food restriction, that he went on a hunger strike in order to avoid eating the loaf, and that this sanction amounted to unusual punishment in violation of the Eighth Amendment. At first, it does not appear that plaintiff is making any claim about Special Housing Unit (SHU) sanctions, although in the amended complaint, he states that he asked defendants Fischer, Bellnier, Lira, and Ranieri to " 'please stop psychologically humiliating [plaintiff]' with insurmountable S.H.U. sanctions." [FN14] (AC at p. 9). The rest of the sentence does not relate to SHU sanctions, but refers to the District Attorney of Franklin County arresting and prosecuting someone for aggravated harassment. (AC at pp. 9–10). It is unclear from the amended complaint why plaintiff is referring to the District Attorney.

> FN13. Plaintiff refers to the Food Loaf as a "horrific sanction." (AC at p. 10).

> FN14. At different times in his more recent papers, plaintiff does complain about excessive SHU time, allegedly totaling more than 776 days. (*See* Pl.'s Mem. of Law at 3; Dkt. No. 106).

## II. *Legal Standards*

### A. Motion to Dismiss

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is " 'plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, ——, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant " 'fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted).

**\*3** When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat *pro se* pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment).

### B. Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272. As stated above, "in a pro se case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (citing, *inter alia, Burgos v. Hopkins,* 14 F.3d 787 at 790 (a court is to read a pro se party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest")). "However, a pro se party's "bald assertion,"

completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

**\*4** In this case, defendants have addressed their motion for summary judgment to the issue of exhaustion of administrative remedies, while moving to dismiss on all substantive claims. (Dkt. No. 100–5 at 3). The grievance documents that are attached to defendants' papers also clarify the facts surrounding plaintiff's other claims. The court notes that plaintiff has responded as if the motion for summary judgment applies to the defendants' entire argument. Plaintiff has attached a multitude of exhibits to his papers, and the defendants have addressed plaintiff's arguments. The exhibits submitted by plaintiff actually slightly clarify his claims, thus, the court will consider these exhibits and plaintiff's arguments to the extent that they clarify matters to which plaintiff refers in the amended complaint.[FN15]

> FN15. Although generally, the court may not look outside the pleadings on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b) (6), the mandate to read pro se papers liberally makes it appropriate to consider plaintiff's additional materials, including his opposition memorandum. *See Rivera v. Selsky,* No. 9:5:05–CV–0967, 2007 WL 956998, at \* 1 n. 2 (N.D.N.Y. Jan. 5, 2007) (citations omitted).

### III. *Exhaustion of Administrative Remedies*

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes and regardless of the subject matter of the claim. *See e.g. Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004). Inmates must exhaust their administrative remedies even if

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4450015 (N.D.N.Y.)
**(Cite as: 2012 WL 4450015 (N.D.N.Y.))**

they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675. The failure to exhaust is an affirmative defense that must be raised by the defendants. *Scott v. Del Signore,* No. 02–CV–29, 2005 WL 425473, at *4 (W.D.N.Y. Feb. 18, 2005) (citing *inter alia Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004)). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *Id.* at *12–13 (citing *Giano,* 380 F.3d at 675).

In *Jones v. Bock,* 549 U.S. 199, 218–19 (2007), the Supreme Court held that in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Id.* (citing *Woodford v. Ngo,* 548 U.S. 81 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103. In *Woodford,* the Court concluded that the inmates did not properly exhaust their administrative remedies when their grievances were dismissed because the inmates had missed the deadlines set forth in the grievance procedure. *Id.* at 93.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). N.Y. COMP.CODES R. & REGS., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or

formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

**\*5** At the same time that the Second Circuit decided *Giano,* it also decided four other related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement and specifying various instances in which the requirement could be waived or excused. *See Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justified plaintiff's failure to exhaust); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

Pursuant to these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill,* 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether special circumstances justify the inmate's failure to comply with the exhaustion requirement. *Id.*

Even after *Woodford,* courts in this circuit have continued to assume that there are exceptions to the exhaustion requirement, particularly where defendants' conduct is such that they will be estopped from asserting the defense. *See Smart v. Goord,* 04 Civ. 8850, 2008 WL 591230, at *3 (S.D.N.Y. March 3, 2008) (citing *Ziemba v. Wezner,* 366 F.3d 161, 162 (2d

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4450015 (N.D.N.Y.)
**(Cite as: 2012 WL 4450015 (N.D.N.Y.))**

Cir.2004) (plaintiff claimed, inter alia, that prison officials beat him, threatened him, and denied him grievance forms)).

In *Macias v. Zenk,* 495 F.3d 37 (2d Cir.2007), the Second Circuit cited *Woodford,* and also considered whether the defendants' actions would have estopped them from asserting the defense of non-exhaustion. In *Davis v. State of New York,* the Second Circuit continued to utilize this three-part test to determine whether a plaintiff properly exhausted his remedies.[FN16] *Davis v. State of New York,* 311 F. App'x 397, 399 (2d Cir.2009). Most recently, in *Amador v. Andrews,* 655 F.3d 89, 102–103 (2d Cir.2011), the Second Circuit again declined to reach the issue "concluding that, even under pre-*Woodford* case law [plaintiff] failed to establish that the defendants are estopped from raising exhaustion as a defense or that special circumstances excuse her failure to exhaust." The same is true in this case.

> FN16. This court also notes that, based upon the concurring opinion in *Woodford,* it appears that the Second Circuit decisions have **not** been overruled in that respect. In his concurring opinion in *Woodford,* Justice Breyer specifically noted that two circuits, the **Second** Circuit and the Third Circuit that have interpreted the PLRA "in a manner similar to that which the [Supreme] Court today adopts [in *Woodford* ] have concluded that the PLRA's proper exhaustion requirement is not absolute." *Woodford,* 548 U.S. at 104 (citing *Spruill v. Gillis,* 372 F.3d 218, 232 (3d Cir.2004); *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004)) (Breyer, J. concurring). Justice Breyer then stated that on remand, the lower court should "similarly" consider any claims that the inmate might have concerning whether his case "falls into a **traditional exception that the statute implicitly incorporates.**" *Id.* (emphasis added). This statement implies that there are still

exceptions that a court may consider.

**B. Application**

In this case, defendants argue that plaintiff has failed to exhaust his claims of retaliation, imposition of the food loaf sanction, his access to courts claim based on the alleged motion for appointment of counsel that never reached Judge Suddaby's chambers, and any "conspiracy" claims. Plaintiff alleges that he filed two grievances, one on September 1, 2009 and another on September 14, 2009. The first grievance was appealed to the CORC and, although the grievance was difficult to completely understand, it clearly challenged the negative correspondence issue and the alleged "trumped up" misbehavior reports. (White Aff. ¶ 8 & Ex. A; Copy of Sept. 1, 2009 Grievance).

**\*6** In her affidavit, Brandi White, supervisor of the Inmate Grievance Program at Upstate, states that plaintiff filed only one grievance while at Upstate, and confirms that the grievance complained about the negative correspondence issue and the allegedly false misbehavior reports. (White Aff ¶¶ 6–7; *see also* Bellamy Aff. ¶¶ 6–8, 10). That grievance, UST–40094–09 was appealed to, and denied by, the CORC. (Bellamy Aff. ¶¶ 7–8). The grievance appeal records have been attached to Ms. Bellamy's affidavit as Exhibit B. Thus, the only claims exhausted by plaintiff are the claim challenging the negative correspondence list and the due process claim challenging the allegedly false misbehavior reports issued by defendant Corrections Counselor Caron.

Thus, plaintiff's mail claim has been exhausted, but his September 1, 2009 grievance made no reference to "retaliation," the food loaf (eighth amendment claim), mail that never reached the federal court, or any "conspiracy" claim. As the defendants point out, plaintiff could not have challenged the imposition of the food loaf sanction in his first grievance because the sanction was not imposed for several months after the grievance was filed. Various defendants were mentioned in the grievance, but there was no specific

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4450015 (N.D.N.Y.)
**(Cite as: 2012 WL 4450015 (N.D.N.Y.))**

statement that these defendants were retaliating against plaintiff for the exercise of a constitutional right or that the defendants were conspiring with each other to deny plaintiff his rights. Thus, these claims were not exhausted. The court now turns to whether there is an exception to the exhaustion requirement in plaintiff's case.

Clearly, the grievance process was available. Plaintiff claims that he filed one other grievance, just two weeks later, on September 14, 2009, but that grievance was somehow lost or destroyed, implying perhaps that the defendants' actions would estop them from asserting the defense. Even though plaintiff states that his second grievance, (Sept. 14, 2009), mysteriously disappeared, the food loaf claim could not have been in that grievance either because, according to plaintiff, the food loaf sanctions were not imposed until 2010. The plaintiff's allegation that a letter, requesting counsel, addressed to Judge Suddaby "mysteriously" disappeared also could not have been included in the second grievance because the amended complaint alleges that plaintiff's motion for appointment of counsel was dated March 19, 2010.[FN17] Thus, even if defendants had somehow lost or destroyed plaintiff's second grievance, neither the food loaf claim, nor the access-to-courts claim could have been included in the September 14, 2009 grievance, and they remain unexhausted. [FN18] Plaintiff has failed to show any other special circumstances, supporting an argument that the exhaustion requirement should be excused in his case.

> **FN17.** It is unclear from the complaint whether plaintiff is claiming that the motion for appointment of counsel addressed to Judge Suddaby was lost or whether plaintiff is still talking about the grievance that disappeared. A review of the docket sheet in this action shows that plaintiff's March 19, 2010 motion for appointment of counsel was filed on March 22, 2010 (Dkt. No. 11) and was denied without prejudice on April 1, 2010.

(Dkt. No. 13). Clearly, there was no delay in sending, filing, or deciding plaintiff's motion. Thus, to the extent that these statements by plaintiff can be interpreted as an "access to courts" claim, it is unexhausted, and to the extent that it is a claim at all, it is completely meritless. In order to state an access to courts claim, plaintiff would have to show an "actual injury" that resulted from the defendants' conduct. *See Lewis v. Casey,* 518 U.S. 343 (1996). The motion to which plaintiff refers was filed and decided without delay, thus, the motion for appointment of counsel was not lost, there was injury, and no denial of access to courts.

> **FN18.** While there could have been "retaliation" and "conspiracy" claims in the "mysteriously pilfered" grievance, potentially excusing the exhaustion requirement, neither claim can survive dismissal for failure to state a claim, an alternative finding that will be discussed below.

### IV. *Mail Restrictions*

An inmate has the First Amendment right to the free flow of incoming and outgoing mail. *Johnson v. Goord,* 445 F.3d 532, 534 (2d Cir.2006). Regulations limiting the right to send and receive mail are valid if "reasonably related to legitimate penological interests." *Id.* (citing *Rodriguez v. James,* 823 F.2d 8, 12 (2d Cir.1987) (quoting *Turner v. Safely,* 482 U.S. 78, 89 (1987)). In *Turner,* the Supreme Court held that the court should determine whether the government objective is legitimate and neutral, and then whether there is a valid, rational connection between the prison regulation or the official action and the legitimate governmental interest that justifies that action. *Turner v. Safely,* 482 U.S. at 89. Finally, the court must determine whether there are alternative means for the inmate to exercise that constitutional right. *Id.* at 90.

**\*7** In this case, plaintiff acknowledges that on

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4450015 (N.D.N.Y.)
**(Cite as: 2012 WL 4450015 (N.D.N.Y.))**

May 30, 2008, while he was at Wende, he was served with a "negative correspondence/telephone list" by Corrections Counselor, John McGregor. (Dkt. No. 106–2 at ¶ 1; Pls' Statement of Material Facts). The negative correspondence list contained the name "Ms. Vickie McDonald." (Caron Aff. Ex. A; Dkt. No. 100–3 at 4). Plaintiff signed for this document, and the document clearly states that Ms. McDonald "contacted [the] facility and requested that you not be permitted to mail correspondence or make telephone calls to him/her." (*Id.*) Defendant Caron began filing misbehavior reports against plaintiff in August of 2009, after he had been transferred to Upstate. (Caron Aff. Ex. B).

It is reasonable to prohibit an inmate from corresponding with an individual who does not wish to correspond with the inmate. Plaintiff does not take issue with the rule. In some documents, he claims that Ms. McDonald never contacted the facility to request that her name be placed on the negative correspondence list, and in his more recent submissions, he refers to a "master imposter," indicating that someone may have contacted the facility, but it was not Ms. McDonald. The misbehavior reports authored by defendant Caron state that in June of 2009, she spoke with Ms. McDonald who "again" requested that plaintiff be prohibited from corresponding with her. (Caron Aff. Ex. 3; Dkt. No. 100–3 at 6–18). The misbehavior reports state that defendant Caron issued a direct order to plaintiff, to stop writing to Ms. McDonald, but that plaintiff insisted that he would continue to write to her.[19] (*Id.*

> FN19. Plaintiff does not deny continuing this behavior. He argues that the negative correspondence list is either forged or somehow invalid and states, among other things, that defendants should have investigated his allegations properly. The failure to investigate claim is discussed below.

Plaintiff claims that these misbehavior reports are

false. False allegations alone do not rise to the level of a constitutional violation. *Freeman v. Rideout,* 808 F.2d 949, 952–53 (2d Cir.1986), *rehearing denied,* 826 F.2d 194 (2d Cir.1987), *cert. denied,* 485 U.S. 978 (1988). It is true, however, that a false misbehavior report filed in retaliation **for the exercise of a constitutional right** is actionable as a substantive due process violation. *See Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). Although plaintiff has a constitutional right to the free flow of mail, the right is not limitless, and he has no right to correspond with a person who does not wish to correspond with him. This limitation is reasonable and is related to the legitimate penological interest of maintaining security. Thus, plaintiff was not exercising a constitutional right when he was attempting to communicate with someone who had requested that he be prohibited from doing so.

The Standards of Inmate Behavior, Rule 107.11 provides that inmates shall not harass "an employee or any other person verbally or in writing." Prohibited conduct includes communicating with individuals on the inmate's negative correspondence list. N.Y. Comp.Codes R. & Regs., tit. 7, § 270.2(B)(8)(ii). Plaintiff was found guilty of violating Rules 107.11 and 180.11 (facility correspondence rule). Plaintiff did not argue at the administrative level, and does not argue now, that he did not violate the rule, he claims that (1) Vickie McDonald never called the facility, and thus, the negative correspondence list was "forged" or false (AC at p. 10) [20]; and (2) a "master impostor" must have called the facility to complain about the correspondence.[21] In essence, plaintiff complains that the defendants did not properly investigate his allegations about the validity of the negative correspondence list.[22]

> FN20. In the amended complaint, plaintiff states "not only is the NEGATIVE CORRESPONDENCE FORM filled out with 'planned connivance' unbeknown to I[sic] but that my beautiful wife 'VICKIE' never

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

once nor at all spoke to 'JOHN MCGREG-OR' or for here, 'MS.T.L. CARON." (AC at p. 10). Plaintiff made the same argument in his September 1, 2009 grievance. He stated that Vickie "never once or at all 'in the lowest or highest of tides' contacted any civilian correctional staff in the sat upon [sic] range of 27 May 2008 through 30 May 2008, let alone personally spoke with 'MS. T. CA-RON' during the months of June 2009 and/or July 2009 to 'convincingly insinuate' a 'garden variety alarm or otherwise purview of negative correspondence." (White Aff. Ex. A; Dkt. No. 100–4 at 8). In plaintiff's statement of material facts, he states that the corrections counselor (McGregor) uttered a "deceptive lie to plaintiff's tearful face, and such a documented negative correspondence form utterance has been injurious in the range of 1,221 days...." (Pl.'s Stmt. of Material Facts No. 2; Dkt. No. 106–2 at 7). Plaintiff also states that the form is a forgery. (Id. No. 3; Dkt. No. 106–2 at 8).

**FN21.** In plaintiff's Statement of Material Facts, he also states that he has "sought to be arrested, tried and/or convicted by Franklin County District Attorney 'MR. DEREK P. CHAMPAGNE, ESQ.' in order to factually prove beyond a reasonable doubt that a (D.O.C.S.) tied 'MASTER IMPOSTER' along with a (D.O.C.S.) 'INSIDE HAND' and not ever 'MY BEAUTIFUL WIFE' ... convincingly pre arranged the 30 May 2008, 16 June 2009 and 13 July 2009 facility telephone calls." (Pl.'s Stmt. of Material Facts No. 15; Dkt. No. 106–2 at 18). Plaintiff mentions the "master imposter" again in his Memorandum of Law. (Dkt. No. 106 at 14). In his memorandum he repeats that a DOCS-tied "MASTER IMPOSTER" and an "INSIDE HAND" at both Wende and Upstate "pre-arranged an almost perfect plan for

those specified reasons known to confidentially exist by New York State Assistant Attorney General "MS. RACHEL S. PAULEY, ESQ' and her covert cloaked Public Integrity Bureau. (Id. at 14).

**FN22.** Plaintiff states that he wrote to a variety of individuals, including the Attorney General in an attempt to get this issue straightened out, to no avail. In his memorandum of law, plaintiff states that the defendants "deliberately failed to check and double check [Ms. McDonald's alleged cell phone number] against and/or with in place (D.O.C.S.) security databases for those mentioned dates...." (Pl.'s Mem. of Law; Dkt. No. 106 at 14).

**\*8** To the extent that plaintiff claims a failure to investigate or an improper investigation of his grievance, he states no constitutional violation. It is wellestablished that prison grievance procedures do not confer any substantive right upon an inmate requiring the procedural protections envisioned by the Fourteenth Amendment. *Rhodes v. Hoy,* No. 9:05–CV–836, 2007 WL 1343649, at *2, *6 (N.D.N.Y. May 5, 2007) (Scullin, J.) (noting that inmates have "no constitutional right of access to the established inmate grievance program"); *Davis v. Buffardi,* No. 01CV0285, 2005 WL 1174088, at *3 (N.D.N.Y. May 4, 2005) (Magnuson, J.) ("[P]articipation in an inmate grievance process is not a constitutionally protected right."); *Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003) (inmate does not have a protected liberty interest in having his grievances investigated at the level of thoroughness that he desires).

Accordingly, any allegations that the defendants failed to afford him an adequate investigation and/or failed to take appropriate remedial action in response to his grievances and letters of complaint, provide no basis for finding liability against them pursuant to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4450015 (N.D.N.Y.)
**(Cite as: 2012 WL 4450015 (N.D.N.Y.))**

section 1983. *Cancel v. Goord*, 00 Civ.2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) (holding that "inmate grievance procedures are not required by the Constitution" and therefore failure to ensure that grievances are properly processed does not create a claim under section 1983). This reasoning would also apply to the extent that plaintiff is attempting to raise a separate claim regarding the alleged disappearance of his September 14, 2009 grievance.

In plaintiff's response, he states that defendant Caron wrote a fourteenth misbehavior report that was dismissed by a different hearing officer, Officer Laramay.[FN23] Plaintiff submits the hearing officer's decision as an exhibit. On September 18, 2009, Officer Laramay found that there was "no documentary evidence to affirm the identity of this civilian complainant identified as i/m Sidney's wife, therefore the burden of proof is not substantiated." (Dkt. No. 106–3 at 6). Plaintiff claims that the dismissal constitutes "res judicata." Plaintiff may be attempting to assert "collateral estoppel." However, collateral estoppel only bars relitigation of an issue if the identical issue was "necessarily decided" in a prior action and is decisive of the present action, and the party to be precluded from relitigating the issue had a "full and fair opportunity to litigate the issue in the prior action. *In re Hyman*, 502 F.3d 61, 65 (2d Cir.2007).

> FN23. According to the documents submitted by plaintiff, defendant Caron wrote this misbehavior report on September 4, 2009, and the hearing officer dismissed the charges as the result of a Tier II hearing dated September 19, 2009. (Dkt. No. 106–3 at 5–6). Defendant Caron has submitted misbehavior reports for incidents dated August 3, 6, 11, 13, and 27, 2009; September 9, 2009; January 7 and 22, 2010; February 22, and 25, 2010; March 8, 10, and 17, 2010. (Dkt. No. 100–3 at 6–18). There is no misbehavior report for an incident dated September 4, 2009.

While principles of collateral estoppel have been applied to some administrative proceedings, this occurs only when the administrative proceeding is "quasi-judicial" in character and the party against whom collateral estoppel is being asserted had a full and fair opportunity to contest the finding. *See ABN AMRO Bank, N.V. v. MBIA Inc.*, 17 N.Y.3d 208, 226, 928 N.Y.S.2d 647, 657 (2011) (citations omitted). The prison disciplinary hearing in this case does not meet any of the requirements for collateral estoppel. The hearing was not "quasi-judicial," and neither defendant Caron nor defendant Ranieri, who apparently was the hearing officer for at least some of the hearings cited by plaintiff, had a full and fair opportunity to litigate a constitutional issue. Thus, no collateral estoppel or res judicata would apply to the dismissal of defendant Caron's fourteenth misbehavior report.

**\*9** Plaintiff cites *Matter of Gustus v. Fischer*, 64 A.D.3d 1034, 883 N.Y.S.2d 624 (3d Dep't 2009) as support for his claim that res judicata applies after a matter was adjudicated in a disciplinary hearing. As defendants point out, *Matter of Gustus* is distinguishable from this case because the subsequent charges barred by the court related to the same incident that was dismissed in the prior disciplinary hearing. *Id.* In *Calcaterra v. Fischer*, 73 A.D.3d 1370, 901 N.Y.S.2d 395 (3d Dep't 2010), the court distinguished *Matter of Gustus* by stating that when the subsequent charges arose from separate and distinct incidents, res judicata was not applicable. *Id.*

Plaintiff does not specifically challenge the procedures at the disciplinary hearings. There is no question that the negative correspondence list exists, and that plaintiff was told not to correspond with Ms. McDonald. Thus, with regard to the hearings, plaintiff could only be claiming that the evidence was "insufficient" because the list itself was issued improperly.

The constitutional standard that would be appli-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4450015 (N.D.N.Y.)
**(Cite as: 2012 WL 4450015 (N.D.N.Y.))**

cable to a sufficiency of evidence claim relating to a prison disciplinary hearing, (assuming a liberty interest existed),[FN24] is much more lenient that the standard required by the disciplinary officer at the hearing. The constitutional standard for sufficiency is "some" or "a modicum" of evidence to support the determination. *Superintendent v. Hill,* 472 U.S. 445, 455 (1985) (some evidence standard). The state law standard for sufficiency of evidence is whether the hearing officer's determination is supported by "substantial evidence." [FN25] *Foster v. Coughlin,* 76 N.Y.2d 964, 563 N.Y.S.2d 728, 565 N.E.2d 477 (1990). This stricter standard is **not** applicable to federal due process claims, and it has been held that the reversal of a disciplinary ruling on administrative appeal for insufficient evidence, does not necessarily establish a plaintiff's federal due process claim. *See Sira v. Morton,* 380 F.3d 57, 76 n. 9 (2d Cir.2004). Thus, the fact that one hearing officer found insufficient evidence does not establish a constitutional violation in any event.

FN24. This court will not discuss the issue of whether plaintiff had a liberty interest under *Sandin v. Conner,* 515 U.S. 472, 486 (1995) (where the court rejected a claim that thirty days in segregated confinement was sufficient to create a liberty interest). Some of the hearings in this case were Tier II hearings in which plaintiff could only have been sentenced to up to thirty days segregated confinement. All but one of the misbehavior report forms indicate that plaintiff was not confined as a result of the incident because he was under "prior confinement." (Caron Aff. Ex. 3; Dkt. No. 100–3 at 6–18). The only misbehavior report indicating that plaintiff was confined "as a result of the incident" was the report issued on August 6, 2009. (*Id.* at 7). Plaintiff now refers to excessive amounts of SHU confinement, but the statements are so vague, and it is unclear whether any named defendant was responsible for the

confinement, that the court will just assume that a liberty interest existed and decide the merits of a due process claim.

FN25. This court has found at least two state court cases in which the plaintiff was challenging the sufficiency of the evidence relating to a negative correspondence list. *Goldberg v. Goord,* 11 A.D.3d 841, 783 N.Y.S.2d 157 (3d Dep't 2004); *Gibson v. Goord,* 293 A.D.2d 841, 741 N.Y.S.2d 577 (3d Dep't 2002). In *Gibson* the court found substantial evidence to support the hearing determination when the evidence included the testimony of the corrections counselor that the petitioner had received prior notice of the negative correspondence list. *Id.* Plaintiff claimed that the name on the list was not authorized, and the court held that "regardless of whether petitioner's claim was meritorious, he was not entitled to ignore the listing and mail the letter. 'Any holding to the contrary would simply encourage inmates to break rules as a means of addressing their grievances and invite chaos.' " *Id.* (citations omitted). In *Goldberg,* the petitioner claimed that the documents authorizing the mail watch were fabricated and he never received notice of the negative correspondence list until the misbehavior report was issued. 11 A.D .2d at 842, 783 N.Y.S.2d at 158. The court held that these were simply credibility issues for the hearing officer and that substantial evidence existed based upon the misbehavior report and the testimony of the corrections counselor who authored it along with the testimony of prison officials who authorized the monitoring of plaintiff's mail, other documentary evidence, and plaintiff's own admissions. *Id.* As stated above, the substantial evidence standard is more strict that the "some" or "modicum of evidence" standard governing the constitutional issues

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4450015 (N.D.N.Y.)
**(Cite as: 2012 WL 4450015 (N.D.N.Y.))**

in this court. Regardless of plaintiff's allegation in this case that the list was forged, he does not deny writing the letters. The negative correspondence list was issued in May of 2008, and the plaintiff's misbehavior reports indicate that defendant Caron spoke to Ms. McDonald in June and July of 2009 and confirmed that she did not wish to communicate with plaintiff. Corrections Counselor McGregor was not even at the same facility. It is difficult to believe that an individual at a different facility conspired or influenced defendant Caron more than a year later.

Thus, defendants' confiscation of plaintiff's mail was reasonable and justified by the negative correspondence list, and plaintiff's mail claim may be dismissed. Because the negative correspondence list was valid to the extent that it formed the basis for the misbehavior reports, there was sufficient evidence to find plaintiff guilty of the violations regardless of whether the list was properly issued.[FN26]

> FN26. Regardless of the validity of the list, defendant Caron specifically told plaintiff not to correspond with Ms. McDonald, and plaintiff admits that he continued to do so. One of the charges against plaintiff in the misbehavior reports was the failure to abide by a direct order. Plaintiff admits that he failed to abide by defendant Caron's order. Inmates cannot decide which orders they will follow and which ones they will ignore based on their own evaluation of the validity of the order.

## IV. *Retaliation/Conspiracy*

As stated above, plaintiff did not exhaust any claims of retaliation for the exercise of a constitutional right or conspiracy to violate his constitutional rights. The court would note, however, that plaintiff does not state a claim for either retaliation or conspiracy. Con-

clusory allegations of retaliation and conspiracy, like those in plaintiff's complaint, are insufficient to support a viable claim of retaliation. *See, e.g., Douglas v. Smith,* No. 9:05–CV–1000, 2008 WL 434605, at * 15 (N.D.N .Y. Jan. 22, 2008) (Report–Rec.), *adopted,* 2008 WL 434605, at * 1 (N.D.N.Y. Feb. 14, 2008) (Kahn, J.) (retaliation)

**\*10** In order to support a claim for conspiracy pursuant to section 1983, there must be "(1) an agreement ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v.. County of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 468 (N.D.N.Y.2009). An agreement must be proven with specificity, as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action are insufficient. *See Iqbal v. Hasty,* 490 F.3d 143, 177 (2d Cir.2007); *see also Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999). Thus, plaintiff must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted). Conclusory, vague, and general allegations are insufficient to support a conspiracy claim. *Ciambriello,* 292 F.3d at 325.

In this case, plaintiff refers to conspiracy twice in the amended complaint, but never specifies how the defendants conspired or why they might have agreed to violate his rights. (*See* AC at 8, 9). Plaintiff states that "conspired minds" were "already at work," and states that there was a "conspiracy-related 'ongoing investigation headed by New York State Attorney General Mr. Andrew M. Cuomo via the likes of Assistant Attorney General Rachel S. Pauley and the Public Integrity Bureau"; however, there is absolutely no indication what these statements have to do with

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4450015 (N.D.N.Y.)
**(Cite as: 2012 WL 4450015 (N.D.N.Y.))**

the named defendants. Thus, even if plaintiff had exhausted claims of conspiracy or retaliation, the amended complaint may be dismissed for failure to state a claim.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants motion for summary judgment (Dkt. No. 100) be GRANTED, and plaintiff's retaliation (claim # 1), access to courts (claim # 2), inadequate prison conditions/food loaf sanction (claim # 4 and part of # 5), and conspiracy (claim # 6) claims be **DISMISSED FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES,** pursuant to Fed.R.Civ.P. 56, and it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 100) be **GRANTED,** and that plaintiff's correspondence (claim # 3) and due process claims (rest of claim # 5) be dismissed **FOR FAILURE TO STATE A CLAIM,** pursuant to Fed.R.Civ.P. 12(b)(6), and it is further

**RECOMMENDED,** that the complaint be **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2012.
Sidney v. Fischer
Not Reported in F.Supp.2d, 2012 WL 4450015

(N.D.N.Y.)

END OF DOCUMENT


Not Reported in F.Supp., 1994 WL 455170 (S.D.N.Y.)
**(Cite as: 1994 WL 455170 (S.D.N.Y.))**

▷

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Gilberto SILVA, Plaintiff,
v.
Lieutenant Ray SANFORD, et al., Defendants.

No. 91 Civ. 1776 (KMW)(KAR).
Aug. 18, 1994.

*OPINION AND ORDER*

ROBERTS, United States Magistrate Judge:

**\*1** The parties to this § 1983 civil rights action have consented to proceed before me pursuant to 28 U.S.C. § 636(c). Presently before the court are defendants' motion for summary judgment and plaintiff's cross-motion for partial summary judgment. For the reasons set forth below, defendants' motion is denied, and plaintiff's motion is granted in part and denied in part.

## I. ALLEGATIONS OF THE COMPLAINT

The complaint in this action pertains to alleged due process violations that occurred in connection with a disciplinary hearing held in March 1988, at which Ray Sanford ("Sanford") was the hearing officer ("Sanford hearing" or "initial hearing"), and in connection with a subsequent rehearing in May 1988, at which Paul Kimelman ("Kimelman") was the hearing officer ("Kimelman hearing" or "rehearing").

The complaint names the following defendants: Sanford, a Lieutenant at Green Haven Correctional Facility ("Green Haven"); Kimelman, Assistant Deputy Superintendent at Green Haven; Charles Scully ("Scully"), Superintendent of Green Haven; Donald Selsky ("Selsky"), Director of the Department of Corrections Special Housing and Inmate Disciplinary Program; and Thomas Coughlin III ("Coughlin"), Commissioner of the New York State Department of Correctional Services ("DOCS").

Plaintiff alleges that he was denied due process because 1) defendant Sanford failed to recuse himself as hearing officer, even though he concededly participated in the investigation of the incident at issue, prejudged plaintiff's guilt before the hearing was completed, and relied on a videotape of the incident that he refused to permit plaintiff to review (Complaint ¶ 44); 2) defendant Scully appointed Sanford to conduct the hearing, when he knew or should have known that Sanford could not serve as a fair and impartial hearing officer (Complaint ¶ 45); 3) defendants Selsky, Scully and Kimelman deprived plaintiff of a timely rehearing because plaintiff was held in segregated confinement for fourteen days between the reversal of his first hearing and the commencement of the rehearing (Complaint ¶ 46); 4) defendant Kimelman failed to advise plaintiff that he would rely upon certain videotape evidence or give plaintiff an opportunity to address this evidence prior to Kimelman's decision (Complaint ¶ 47); and 5) defendants Selsky and Coughlin [FN1] affirmed the disposition of the rehearing despite the denial of plaintiff's right to a fair and impartial hearing, and failed to release plaintiff from segregation after completing the administrative review (Complaint ¶ 48).

Plaintiff seeks the following relief: 1) a declaration that defendants violated his constitutional right to due process of law; 2) expungement of his disciplinary record; 3) compensatory and punitive damages; and 4) attorney's fees and costs.

## II. THE MOTIONS FOR SUMMARY JUDGMENT [FN2]

Defendants move for summary judgment dis-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 455170 (S.D.N.Y.)
**(Cite as: 1994 WL 455170 (S.D.N.Y.))**

missing the complaint on the grounds that plaintiff's due process rights were not violated because 1) the initial hearing was reversed, thereby curing any procedural defects; 2) the rehearing was commenced within a reasonable time; 3) plaintiff was aware of the videotape evidence prior to the rehearing, but did not ask to view it; and 4) any error regarding the videotape was harmless. Defendants also argue that Selsky is entitled to absolute immunity and that all of the defendants are entitled to qualified immunity.

*2 Plaintiff cross-moves for partial summary judgment (liability only) on the grounds that 1) he was denied a fair and impartial hearing; 2) plaintiff was denied an opportunity to view a videotape of the incident at his initial hearing; 3) the subsequent reversal and rehearing did not cure the initial constitutional violations; 4) the rehearing was untimely; 5) plaintiff was not advised that the rehearing disposition would be based upon the videotape and was not given an opportunity to address this evidence; 6) defendant Selsky is not entitled to absolute immunity; and 7) none of the defendants is entitled to qualified immunity.

### III. FACTS

The following facts are undisputed unless otherwise indicated:

1. On March 5, 1988, plaintiff received a Misbehavior Report,[FN3] signed by Correction Officer T. Glowny ("Glowny"), which charged plaintiff with a violation of Rule 100.11 "Inmates shall not engage in fighting" (the "Fighting Misbehavior Report"). DX–A;[FN4] Pl. 3(g) ¶ 1; Def. 3(g) ¶ 3.

2. The Fighting Misbehavior Report states that on March 5, 1988, at approximately 10:30 a.m., a fight broke out in the Special Housing Unit ("SHU") east yard and that Silva was "one of the inmates in the yard at the time of the incident." Also involved were inmates Allen, Colon, Hicks, Ryan, and Mallary.

DX–A; Def. 3(g) ¶ 5.

3. On March 5, 1988, plaintiff received a second Misbehavior Report, signed by Correction Officers Pease and Cornacchia, which charged plaintiff with violation of Rule 113.10, "Weapons—item classified as a weapon" (the "Weapons Misbehavior Report"). DX–A; Pl. 3(g) ¶ 2; Def. 3(g) ¶ 3.

4. The Weapons Misbehavior Report states that on March 5, 1988, at approximately 10:27 a.m., a fight broke out in the SHU yard, between plaintiff and inmate Allen. As a result of a statement by Allen that he had been "slashed" by Silva, a search was made of the yard and surrounding areas by officers Cornacchia and Pease, who recovered a 4–inch metal weapon, with blood on the sharpened end, about 10 feet from the satellite dish in the west yard, directly below the SHU yard. DX–A; Def. 3(g) ¶ 4.[FN5]

5. Portions of the incident in the SHU yard and subsequent actions were recorded on videotape by closed circuit cameras roving the SHU and other areas (the "Incident Videotape"). Def. 3(g) ¶ 6; Deposition of Ray Sanford, taken Nov. 22, 1991 ("Sanford Dep.") (annexed to Defendants' Notice of Motion), pp. 10–11, 32.

6. Defendant Sanford was the watch commander on duty at the time of the incident. Pl. 3(g) ¶ 3; Def. 3(g) ¶ 7; *see* DX–A. Sanford testified at his deposition that he learned of the incident that morning during his normal rounds of SHU or after hearing a disturbance over the radio and investigating. Def. 3(g) ¶ 7; Sanford Dep., pp. 7–8.

7. Sanford was involved in the investigation of the incident. He received several reports from other officers regarding their interviews with inmates in the yard at the time of the incident. *See* DX–A (containing a March 5, 1988 memorandum to Sanford from Sgt. H. Graham ("Graham") headed "Unusual Incident #

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 455170 (S.D.N.Y.)
**(Cite as: 1994 WL 455170 (S.D.N.Y.))**

3327," and a March 5, 1988 memorandum to Sanford from Sgt. R. Patterson ("Patterson") regarding "Fight in S.H.U. Yard").[FN6] In addition, at some point, Sanford entered the room where inmate Allen was being provided with medical treatment following the alleged fight and spoke briefly with Allen.[FN7] Pl. 3(g) ¶ 3; Sanford Dep., p. 26, 27 Def. 3(g) ¶ 8.

**\*3** 8. On March 5, 1988, plaintiff selected Carlos Maldonado to act as his inmate assistant. DX–A (containing form in Spanish). On March 8, 1988, Maldonado interviewed plaintiff. DX–A (containing Assistance Form). Plaintiff initially requested that Maldonado interview inmates Colon, Ryan and Allen, and on March 12, 1988, added inmate Hicks. DX–A. Maldonado was "unable" to speak with Allen on March 8, 1988. *Id.*

9. By memorandum dated March 17, 1988, Sanford was designated by Superintendent Scully to conduct a Superintendent's Proceeding (Tier III disciplinary hearing) regarding the charges contained in the Fighting and Weapons Misbehavior Reports. Pl. 3(g) ¶ 5; Def. 3(g) ¶ 9; DX–B; Sanford Dep., pp. 12–13.

10. Prior to appointing Sanford as the hearing officer, defendant Scully made no attempt to determine whether defendant Sanford was involved with the investigation into the incident which led to the charges against plaintiff. Pl. 3(g) ¶ 6.

11. The hearing commenced on March 17, 1988. *See* PX–1 (transcript of hearing). Maldonado stated that he had spoken to inmates Colon and Ryan, that Colon agreed to be a witness, and that Ryan said he "never saw anything of whatever happened that day." PX–1 at 9. Maldonado stated that he had not interviewed Allen. PX–1 at 9–10.[FN8] The hearing was then adjourned to permit Maldonado to "complete [his] assistance," including the interview of Allen. Pl. 3(g) ¶ 7; Def. 3(g) ¶ 10; PX–1 at 11.

12. On March 17, 1988, a Green Haven official obtained an extension of the hearing:

> Inmate received a Tier 3 non-confinement report dated 3/5/88. The first hearing was conducted on 3/17/88. The inmate had received assistance but now requests further assistance.

> Extension # 88–P–139 granted 3/17/88. Complete hearing by 3/19/88.

> DX–C.

13. The hearing recommenced on March 18, 1988. DX–A; Pl. 3(g) ¶ 8; Def. 3(g) ¶ 10; PX–1 at 11.

14. At some point prior to March 18, 1988, Sanford reviewed the Incident Videotape, as well as the Interview Videotape.[FN9] Pl. 3(g) ¶¶ 4, 15; *see* PX–1 at 29–33; DX–A (Superintendent's Hearing Disposition Rendered); Sanford Dep., p. 28.

15. The March 18 hearing began with a discussion of the assistance provided by Maldonado. PX–1 at 11–16. During the discussion of the assistance issue, Sanford received a phone call. PX–1 at 16. Sanford's part of the conversation, which was recorded on the hearing tape, but not transcribed on PX–1, is as follows:

> "Lt. Sanford (pause). It's going to be two years. Everything. Yup (pause) Yup (pause) OK."

Pl. 3(g) at ¶ 8; Sanford Dep, p. 39. The hearing continued, and after another minute or so of conversation, there was another phone call:
> "Lt. Sanford, Yeah. Yeah right from the date. Right from the start. 3/5 Well, whatever—you know at the end of what he's doing now. Yeah."

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 455170 (S.D.N.Y.)
**(Cite as: 1994 WL 455170 (S.D.N.Y.))**

Pl. 3(g) ¶ 8; Sanford Dep., p. 40.

16. Sanford's telephone conversations during the hearing on March 18, 1988 took place before any witnesses had been called to testify about the incident or any documents introduced into the record. Pl. 3(g) ¶ 9.

**\*4** 17. Sanford was referring in the above telephone conversations to the disposition in plaintiff's hearing, which Sanford was having typed up before any witnesses had been called. Pl. 3(g) ¶ 10; Sanford Dep. pp. 40–41.

18. At the outset of the March 18 hearing, plaintiff requested "all tapes" concerning the incident. PX–1 at 17. Defendant Sanford denied plaintiff's request, stating that videotapes were for the use of the Department of Correctional Services and that plaintiff could obtain them after the hearing. Pl. 3(g) ¶¶ 11, 12; PX–1 at 17–19. Plaintiff expressed his view that all the evidence "should be brought up now not at a future date." PX–1 at 18. Neither the Incident Videotape nor the Interview Videotape was provided to plaintiff or received into evidence. Plaintiff did not request, and Sanford did not advise plaintiff that the videotapes could be reviewed by his assistant. *See* PX–1 at 17–19; Pl. 3(g) ¶ 16.

19. At the time of the March 18 hearing it was the policy at Green Haven that "videotapes of an incident may be viewed by the hearing officer or the inmate's assistant prior to the hearing. It is Green Haven's practice that inmates do not view the videotape. This is not a written practice."[FN10] This is, however, a DOCS-wide practice." PX–4, Ex. 4B (Defendants' Response to Plaintiff's Interrogatory 9); *see also* Selsky Dep., p. 7 (if an inmate requests an opportunity to view a videotape, his assistant is permitted to view it for him on his behalf); Sanford Dep., pp. 49–54, 56–57.

20. Colon, Hicks, Ryan and Allen testified at the March 18 hearing.[FN11] PX–1 at 26–43. Allen's testimony was taken out of plaintiff's presence, following which Sanford played the recording of Allen's testimony for plaintiff. *See* PX–1 at 41–43; DX–A (containing an undated memo stating that Sanford reviewed with plaintiff a tape recording of Sanford's interview with Allen); *see also* DX–A (containing Hearing Record Sheet reflecting that inmate requested Colon, Allen, Hicks, and Ryan, and that all four testified and that no witnesses were requested by hearing officer).

21. No one who testified at the March 18 hearing stated that there was a fight between plaintiff and another inmate; the only evidence introduced at the hearing that mentioned the fight or weapon was the Fighting and Weapons Misbehavior Reports. Pl. 3(g) ¶ 13; *see* PX–1 *passim.*

22. On March 18, 1988, Sanford rendered his disposition, finding plaintiff guilty of both charges, and imposing a penalty of 2 years' confinement in SHU or keeplock, 2 years' loss of commissary, calls and packages, and 2 years' loss of good time. This penalty was imposed to run consecutively to any time plaintiff already had to serve on any other penalty. Pl. 3(g) ¶ 14; Def. 3(g) ¶ 11; PX–1 at 47–48; DX–A (containing Superintendent's Hearing Disposition Rendered, which plaintiff refused to sign).[FN12]

23. The penalty imposed by Sanford matches the disposition he said "it's going to be" during the telephone calls on March 17, 1988. Pl. 3(g) ¶ 14; *see* Pl. 3(g) ¶ 8.

**\*5** 24. In determining guilt, the evidence that Sanford relied upon consisted of the Fighting and Weapons Misbehavior Reports, the discovery of the weapon, the videotape recording of the fight, and statements taken from Colon and Allen after the incident. *See* Superintendent's Hearing Disposition

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 455170 (S.D.N.Y.)
**(Cite as: 1994 WL 455170 (S.D.N.Y.))**

Rendered (DX–A); Sanford Dep., pp. 48, 49.

25. Plaintiff was served with a written copy of Sanford's disposition, which he refused to sign, on March 18, 1988. DX–A; PX–1 at 56–58.

26. Plaintiff filed a timely appeal to Commissioner Coughlin from Sanford's disposition. *See* DX–D (containing two virtually identical handwritten appeals dated March 18, 1988) The appeal requested that the hearing determination be reversed because 1) the hearing was untimely; 2) the plaintiff was denied an adequate opportunity to meet with his hearing assistant prior to the hearing; and 3) the assistant's delay in interviewing a favorable witness was prejudicial.[FN13] The case was referred to defendant Donald Selsky, the Director of Special Housing Inmate Disciplinary Program, who is Commissioner Coughlin's designee to handle appeals from Tier III hearings. Pl. 3(g) ¶ 17; Def. 3(g) ¶ 13; Selsky Dep., p. 5.

27. In April 1988, sometime after plaintiff filed his appeal, plaintiff's counsel requested a copy of the videotape evidence. Plaintiff's counsel was promised a copy of the videotape evidence would be made available to him by May 11 and then again by May 13, 1988, but it was not actually provided to counsel until on or about May 25, 1988. Pl. 3(g) ¶ 35; Stephens Aff. ¶ 8; PX–6 (May 24, 1988 letter to plaintiff's counsel enclosing videotape).

28. On or about May 6, 1988, defendant Selsky reversed the Superintendent's Hearing of March 18, 1988. In a memorandum to Scully dated May 6, 1988 ("May 6 Memo I"), Selsky stated that "[r]ecords indicate that Hearing Officer was involved in investigation of incident in his role as Watch Commander." Pl. 3(g) ¶ 18; PX–3. In another May 6, 1988 memorandum ("May 6 Memo II"),[FN14] Selsky stated that the hearing was reversed for unspecified "procedural error." Def. 3(g) ¶ 13; Selsky Dep., pp. 19, 20; DX–E. Selsky also directed that all records relating to the

reversed hearing, except for the Fighting and Weapons Misbehavior Reports, be expunged. DX–E.

29. In May 6 Memo II, Selsky directed that a rehearing be conducted within 14 days of receipt of May 6 Memo II. DX–E. At the time Selsky rendered his disposition, it was the practice of his office to inform facilities of the results of appeals of Tier III hearings by mail. Def. 3(g) ¶ 14; Selsky Dep., p. 21.

30. Defendant Scully or his employees learned of the reversal no later than May 10, 1988, the date plaintiff was re-served with copies of the March 5, 1988 Fighting and Weapons Misbehavior Reports. Stipulation ¶ 6; *see also* Pl. 3(g) ¶ 19; Def. 3(g) ¶ 15. Plaintiff subsequently signed a form selecting Maldonado as his inmate assistant for the rehearing. DX–F.

**\*6** 31. A memorandum from Selsky to all Superintendents, dated October 15, 1984 (the "October 1984 Memo"), sets forth DOCS policy with respect to rehearings of Superintendent's Hearings. *See* PX–4, Ex. 4B (Defendants' Responses to Plaintiff's Interrogatories 10 and 11). The October 1984 Memo states in relevant part:

> The [re]hearing should be conducted in accordance with the timeliness requirements stated on the court-order or Departmental Review Board Order. If no direction is given with respect to timeliness, the hearing should be commenced within 7 days if the inmate is confined and completed within 14 days pursuant to Section 251D.1 of Chapter V.

> *Id.*

32. On May 13, 1988, Scully appointed Kimelman to conduct the rehearing. Defendants' Letter to the Court, dated July 21, 1994 (annexing memorandum). This memorandum contained no directions regarding when the rehearing was to be commenced

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 455170 (S.D.N.Y.)
**(Cite as: 1994 WL 455170 (S.D.N.Y.))**

and/or concluded. *Id.*

33. The rehearing was not commenced until May 20, 1988—fourteen (14) days after the reversal and at least ten (10) days after Green Haven officials received notice that a rehearing was necessary. Pl. 3(g) ¶ 23.

34. On or about May 13, 1988, prior to the commencement of the rehearing, plaintiff asked Maldonado to interview Allen, Ryan, Hicks and Colon as potential witnesses. DX–F. There is no evidence that plaintiff made any other requests of his inmate assistant; specifically, there is no evidence that plaintiff asked his assistant to view the Incident Videotape. Def. 3(g) ¶ 16; *see* DX–F ("Assistance Form" dated May 13, 1988).

35. On May 20, 1988, the rehearing on the fighting and weapons charges was commenced by hearing officer Kimelman. Pl. 3(g) ¶ 21; Def. 3(g) ¶ 17; DX–F; DX–G (transcript of hearing); Deposition of Paul Kimelman, taken March 23, 1992 ("Kimelman Dep.") (annexed to Defendants' Notice of Motion), p. 11. Pursuant to plaintiff's request, Kimelman questioned Colon (DX–G at 13–22), Ryan (DX–G at 25–29), and Hicks (DX–G at 30–37). Allen, whose testimony was requested by plaintiff (DX–F), at first refused to testify, but then he complied. *See* DX–G at 22–24, 69.

36. All of the inmates testified that they were in the SHU yard on March 5, 1988, but that no fight occurred and nothing unusual happened. DX–G at 13–37. Colon also testified that Silva was injured while exercising. *Id.* at 15–17. Hicks and Allen claimed not to have noticed that Silva was injured. *Id.* at 37, 72–75. Ryan did not know how Silva or Allen came to be bleeding. *Id.* at 27–28.

37. After the testimony of Colon, Ryan and Hicks, Kimelman adjourned the hearing "to contact any other

witnesses that may be available." DX–G at 38; Pl. 3(g) ¶ 24; Def. 3(g) ¶ 17.

38. On or about May 23, 1988, defendant Kimelman reviewed the Incident Videotape. Pl. 3(g) ¶ 25; *See* Stephens Aff. ¶ 7; PX–5.[FN15]

39. The hearing reconvened on May 24, 1988. Pl. 3(g) ¶ 24; Def. 3(g) ¶ 17; DX–G at 41.

**\*7** 40. Sergeant Graham testified that he was on duty on March 5, 1988, at about 10:45 a.m. when he received a radio communication from Sanford to respond to a fight in SHU. Def. 3(g) ¶ 19; DX–G at 43, 44–45.

41. Graham testified that he did not personally observe the fight, which was over when he arrived. DX–G at 66–67; Pl. 3(g) ¶ 26. Graham was directed to the sergeant's room to watch and question Allen, who was receiving medical treatment for a cut on his face. DX–G at 45, 59–60, 67–68. The cut was a "slash," approximately 5" long and "laid open almost to the bone" on the left jaw, and abrasions and cuts on his knuckles of both hands. *Id.* at 59–60; *see also* Def. 3(g) ¶ 20.

42. Graham asked Allen how he received his injuries; Allen eventually told Graham that he "had a fight, and the other inmate that was involved looks worse than he does." DX–G at 61; Def. 3(g) ¶ 21. Graham continued to testify as follows:

At that point he indicated that he had had a fight with Silva and he had won the fight, and when he turned around and walked away Silva pulled a shank, and as he tried to get away from the shank he fell down.

And once he [fell] down, Silva jumped on him and cut his face.

Not Reported in F.Supp., 1994 WL 455170 (S.D.N.Y.)
**(Cite as: 1994 WL 455170 (S.D.N.Y.))**

And a couple other inmates in the yard then pulled Silva off of him because he had cut him, and as he gave up the fight, boxing the fight, and he was walking away, Silva then cut him from behind, so the other inmates got involved and pulled * * * Silva off.

DX–G at 61–62. Graham stated that Allen told him that "inmates" took plaintiff off him, and that Allen refused to reveal the names of those particular inmates. DX–G at 65. Graham testified that Allen said he didn't know where the shank was, and that Allen was then taken to an outside hospital for further treatment. DX–G at 62.

43. Graham further testified that he had an opportunity to see plaintiff in the medical department, that plaintiff had what appeared to be a broken nose and a cut on his lip, and that it appeared that one of his fingers was cut and possibly broken. DX–G at 63.

44. Graham then investigated the incident further by searching the SHU yard and nearby areas. A bloody handkerchief and toilet paper were found in a small yard below the east yard of the SHU, and a 4 1/2 " long bloody metal shank was found in the yard directly below the west side yard of SHU near a satellite dish. Def. 3(g) ¶ 22; DX–G at 47–48, 51. Graham did not take fingerprints of the weapon. *Id.* at 50. Graham also recovered a medicine bottle with Colon's name and number. *Id.* at 47–48.

45. During the questioning of Graham, Maldonado stated that "Mr. Silva, he wants you to ask the Sgt. Graham, did he have any evidence, any proof or any tape of his investigation with Inmate Allen." DX–G at 45. In response to Maldonado's question, Kimelman asked Graham if he recorded or taped his interview with Allen. Graham stated that he didn't tape or record the interview and that "[t]he only recording would be if they saved the tape from the [monitoring] office downstairs." DX–G at 46.

**\*8** 46. A few minutes later, Maldonado stated that "Mr. Silva wants all type of evidence against him brought to this hearing now." DX–G at 51; Pl. 3(g) ¶ 27. Kimelman replied, "And he has to be specific." DX–G at 51–52. Kimelman then said that he intended to interview the witness without further interruptions from the plaintiff, and plaintiff assented. A short time later, plaintiff asked if Graham had "any statement, any tape, any proof signed by Inmate * * * Allen?" DX–G at 64. Kimelman, directing his statement to Graham, said, "well, you [Graham] already testified that you did not receive a tape. Did you get Allen to make a signed statement?" Graham replied, "No." DX–G at 64. Shortly thereafter, plaintiff asked "if there are any tape[s] or any written statement[s] * * *." *Id.* at 65–66. Kimelman stated: "He's [Graham] already answered." *Id.* at 66.

47. Inmate Allen appeared at the hearing and testified (in plaintiff's presence) that he and plaintiff did not have a fight or altercation on March 5, 1988, and that he did not tell Graham he was cut by plaintiff. DX–G at 71–72, 75–76. Allen testified that there was no fight and no "incident" in the yard, and that he was injured when he fell on the drain in the yard and cut his face. *Id.* at 71–72, 75; Def. 3(g) ¶ 18. Allen testified that he did not see a metal shank, did not notice if plaintiff had any injuries, and did not know whether plaintiff fell and hurt himself. DX–G at 72–75. Allen had twenty-six stitches at an outside hospital. *Id.* at 77.

48. After Allen's testimony, Kimelman asked plaintiff if he had any other evidence or testimony that he wished to present on his own behalf. DX–G at 78. Plaintiff stated that he had "nothing else." *Id.* In response to questioning by Kimelman, plaintiff stated that he got hurt while exercising on the bench, and that there was no fight while he was in the yard. *Id.* at 79.

49. Kimelman then summarized the charges and the evidence presented at the hearing, and announced

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 455170 (S.D.N.Y.)
**(Cite as: 1994 WL 455170 (S.D.N.Y.))**

that he was going to consider the evidence and render a decision. DX–G at 79–82. Shortly thereafter, Kimelman reopened the hearing and called Sergeant Patterson as a witness. *Id.* at 82.

50. Patterson testified that he was assigned to SHU from 7:20 a.m. to 3:20 p.m. on March 5, 1988, and that at approximately 10:45 a.m., he responded to banging on the door of the SHU yard. Def. 3(g) ¶ 23; DX–G at 83–84. When he opened the door, he saw inmate Allen holding a cloth to a cut on his face and stating that he wanted to see a nurse. DX–G at 84–85, 87. Corrections Officers then searched and questioned the other inmates from the yard. *Id.* at 85. Plaintiff's face was swollen, his face was bleeding from a cut that extended from the bridge of his nose to the area of his mouth. *Id.* There was blood and skin missing on plaintiff's hands, and blood on his jacket. *Id.* at 85–86. According to Patterson, plaintiff "was in the worst shape of the inmates that came out of the yard." *Id.* Patterson testified that all of the inmates said nothing had happened and that they didn't see anything. *Id.* at 87. Patterson further testified that he had not received any further information, from any source, about what happened. *Id.* at 87–88.

**\*9** 51. After Patterson was excused, Kimelman asked plaintiff, "is there anything that you want to state before I render a disposition in the case?" DX–G at 89. Plaintiff offered no further evidence or comment. *Id.* at 89.

52. Defendant Kimelman told the plaintiff that:

I'm going to find you guilty of the charges, which is Fighting and Weapon. Although no one has stated, or everyone has stated that there was no fight in the yard at all, I have observed a video tape taken in the Special Housing Area, of the Special Housing Area, in which I observed a fight taking place in the Special Housing yard. There's substantial evidence, and I'm assured that there was a fight in the yard. Even

though you and Allen and the other witnesses claim there was no fight, I have seen evidence that there was a fight.

DX–G at 89–90. This was the first time Kimelman had mentioned reviewing the Incident Videotape.[FN16]

53. Kimelman stated that he credited Graham's testimony that a weapon with blood, and a handkerchief rolled up with toilet paper soaked with blood were found. DX–G at 90. Kimelman further stated that he found Graham's testimony—that Allen told him on the date of the incident that "the other inmate looks worse than he does," and that Allen had a fight with plaintiff—more credible than Allen's testimony that nothing occurred. *Id.* at 90. Kimelman believed that Allen's injuries were caused by a cut rather than a fall, based upon the statement in the Weapons Misbehavior Report that Cornacchia and Pease "frisked the west yard and found a 4 inch metal weapon directly below the S.H.U. yard." *Id.* at 90–91.

54. Kimelman sentenced plaintiff to 18 months in SHU, and 18 months loss of commissary, packages, telephone calls, and special events, in order to impress upon plaintiff that the use of weapons "will be dealt with severely." DX–G at 91–92.

55. Plaintiff then repeatedly asked Kimelman why he had used witnesses who were not called at the first hearing. DX–G at 92–93. Kimelman replied that he knew nothing about the prior hearing. *Id.* at 92–93A. Plaintiff said nothing with respect to the videotape mentioned by Kimelman. *Id.* at 92–93A.

56. Kimelman prepared a written statement of his disposition on May 25, 1988, which was provided to plaintiff the same day; plaintiff refused to sign the disposition. DX–F (Superintendent's Hearing Disposition Rendered). In setting forth the evidence he relied upon, Kimelman stated:

Not Reported in F.Supp., 1994 WL 455170 (S.D.N.Y.)
**(Cite as: 1994 WL 455170 (S.D.N.Y.))**

The hearing officer finds that the testimony of Sgt. Graham regarding the original interview with Inmate Allen on 3/8/88 to be of great credibility then the statement made by Allen and other inmate witnesses that Allen suffered injuries by falling and inmate Silva slipped while doing push-ups in the SHU yard. The fact that a weapon was found, a bloody handkerchief and toilet paper is indicative of an attempt to dispose of evidence.

*Id.* Kimelman concluded by noting that he had viewed a videotape of the SHU yard and "observed two individuals to be fighting. This contradicts the statement of all of the inmate witnesses that there was no altercation." DX–F (Superintendent's Hearing Disposition Rendered, p. 2).

**\*10** 57. Plaintiff filed a timely appeal to defendant Coughlin. Plaintiff's Letter to the Court dated July 21, 1994 (annexing plaintiff's handwritten appeal, dated June 7, 1988 and his attorney's letter appeal, [FN17] dated June 1, 1988). Plaintiff complained of excessive delay in the commencement of the rehearing in violation of § 251D.1(a), and the failure to provide a reason for Allen's initial refusal to testify or evidence that the hearing officer had communicated with Allen regarding his refusal to testify. Plaintiff's appeal does not mention or allege any violation based upon Kimelman's reliance on the Incident Videotape.

58. Selsky, acting on behalf of defendant Coughlin, summarily affirmed Kimelman's disposition on or about July 6, 1988. Pl. 3(g) ¶ 36; DX–H.

59. Plaintiff was confined in SHU as a result of Kimelman's disposition. [FN18] On August 15, 1988, plaintiff's SHU time was converted to keeplock time. Stipulation ¶ 11; Pl. 3(g) ¶ 37. On August 15, 1988, plaintiff was released from keeplock as a result of good behavior. On August 1, 1989, plaintiff's commissary privileges were restored, but his phone and package privileges were not scheduled to be restored until December 26, 1989. Stipulation ¶¶ 12–13.

### IV. DISCUSSION

#### A. *Summary Judgment Law*

Summary judgment is appropriate when "there is no genuine issue as to any material fact" Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the burden of demonstrating the absence of any dispute regarding a material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970). The evidence of the non-movant is to be believed, and all justifiable inferences and ambiguities are to be drawn in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986); *Adickes,* 398 U.S. at 158–59; *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989).

At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249–50; *Donahue v. Windsor Locks Bd. of Fire Commissioners,* 834 F.2d 54, 57–58 (1987); *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932 (1987). Not all allegations will defeat a summary judgment motion. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248.

#### B. *Qualified Immunity Law*

Qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982), or "insofar as it was objectively

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 455170 (S.D.N.Y.)
**(Cite as: 1994 WL 455170 (S.D.N.Y.))**

reasonable for them to believe that their acts did not violate those rights." *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991), *cert. denied,* 505 U.S. 1221, 112 S.Ct. 3032 (1992).

**\*11** A qualified immunity defense turns on whether the right was "clearly established" at the time of the alleged violation. *Harlow,* 457 U.S. at 818; *see also Anderson v. Creighton,* 483 U.S. 635, 639 (1987). In determining whether the right in question was clearly established at the time it was allegedly violated, courts consider: 1) whether the right in question was defined with reasonable specificity; 2) whether the law of the Supreme Court or appropriate circuit court had validated the right under consideration; and 3) whether a reasonable official would have understood that his actions violated established federal law. *Bradway v. Gonzales,* 26 F.3d 313, 318 (2d Cir.1994); *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565 (1992).

### C. The Sanford Hearing
(1) *The Effect of the Administrative Reversal on the Sanford Hearing Violations*

Defendants have withdrawn their argument that the administrative reversal of plaintiff's initial hearing and the subsequent rehearing cured any procedural defects that allegedly occurred during the Sanford hearing in light of the Second Circuit decisions in *Walker v. Bates,* 23 F.3d 652 (2d Cir.1994) and *Mays v. Mahoney,* 23 F.3d 660 (2d Cir.1994). Defendants' July 21, 1994 Letter to the Court. Both of these cases held that "reversal on administrative appeal does not preclude a damage action for a due process violation at a prisoner's disciplinary hearing where the reversal occurs after the prisoner has served at least a portion of the restrictive confinement." *Mays,* 23 F.3d at 662; *Walker,* 23 F.3d at 659 ("We hold * * * that [plaintiff's] success in the administrative appeal process does not bar his section 1983 claim."); *see also Patterson v. Coughlin,* 761 F.2d 886, 893 (2d Cir.1985), *cert. denied,* 474 U.S. 1100 (1986); *Parris v. Coughlin,* 90 Civ. 414, 1993 WL 328199 at *10 (N.D.N.Y.

Aug. 24, 1993) (administrative reversal cannot cure procedural errors when an inmate has already been punished as a result of initial hearing; *Moore v. Scully,* 90 Civ. 3817 (MEL), 1992 WL 322018 at *3 (S.D.N.Y. Oct. 28, 1992) ("An administrative reversal by itself does not immunize a hearing officer's original disposition from due process scrutiny when, as in the present case, plaintiff has suffered harm from it.").

In the instant case, there is no dispute that plaintiff served "at least a portion" of his restrictive confinement prior to the time the determination was reversed and remanded. Specifically, plaintiff was confined between March 28 and May 6, 1988 solely on the charges stemming from the incidents outlined in the Misbehavior and Weapons Reports. *See* Stipulation ¶¶ 3–4. Accordingly, as defendants acknowledge, the administrative reversal did not "cure" the alleged procedural defects of the Sanford hearing.

(2) *Procedural Defects in the Sanford Hearing*

Plaintiff claims that the Sanford hearing violated his due process rights because: 1) Sanford pre-judged the evidence; 2) Sanford played a role in investigating the underlying charges against plaintiff; 3) Scully appointed Sanford without determining whether he had been involved in investigating the charges against plaintiff; and 4) Sanford failed to allow plaintiff to view the videotape of the incident. Complaint ¶¶ 44, 45.

(a) *Pre-judgment of the Evidence*

**\*12** As early as 1975, the Second Circuit held that it is improper for a hearing officer to decide the disposition of a case before the hearing takes place. *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) (citing *Crooks v. Warne,* 516 F.2d 837, 840 (2d Cir.1975), which held that although adjustment committee members may discuss among themselves what procedures to follow, "it would be improper for them to decide the proper disposition of the case before the hearing").

Not Reported in F.Supp., 1994 WL 455170 (S.D.N.Y.)
**(Cite as: 1994 WL 455170 (S.D.N.Y.))**

The evidence that Sanford pre-judged plaintiff's case is overwhelming. For example, during the hearing, Sanford received a phone call. PX–1 at 16. Sanford's part of the conversation, which was recorded on the hearing tape, is as follows:

"Lt. Sanford (pause). It's going to be two years. Everything. Yup (pause) Yup (pause) OK."

Pl. 3(g) at ¶ 8; Sanford Dep., p. 39. The hearing continued, and after another minute or so of conversation, there was another phone call:

"Lt. Sanford, Yeah. Yeah right from the date. Right from the start. 3/5 Well, whatever—you know at the end of what he's doing now. Yeah."

Pl. 3(g) ¶ 8; Sanford Dep., p. 40. Sanford's telephone conversations took place before any witnesses had been called to testify about the incident and before any documents had been introduced into the record. Pl. 3(g) ¶ 9. Sanford admitted in his deposition, that he was referring in these telephone conversations to the disposition of plaintiff's hearing, which he was having typed up before any witnesses had been called. Pl. 3(g) ¶ 10; Sanford Dep., pp. 39–41. I therefore find that Sanford violated plaintiff's due process right to a fair and impartial hearing officer.

### (1) Qualified Immunity

Although defendants raise a general claim of qualified immunity in their answer (*see* ¶¶ 17–18) and in their November 1, 1993 Letter,[FN19] they do not specifically address Sanford's prejudgment of the evidence. I find that Sanford is not entitled to qualified immunity on this claim. The right to have a hearing officer who did not pre-judge the evidence was clearly established at the time of plaintiff's hearing, and it would have been unreasonable for Sanford to believe that his actions did not violate plaintiff's due process rights. Plaintiff's motion for summary judgment on this claim is therefore granted, and defendants' motion

is denied.

(b) *Sanford's Involvement in the Investigation of the Underlying Incident*

Although "the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally," *Francis v. Coughlin,* 891 F.2d at 46, both DOCS regulations and the law of this Circuit prohibit a prison official who was involved in investigating the underlying charges from acting as a hearing officer.

The regulations pertaining to the appointment of hearing officers in effect at the time of plaintiff's hearing provide:

**\*13** "The following persons shall not be appointed to conduct the proceeding: a person who actually witnessed the incident; a person who was directly involved in the incident; the review officer who reviewed the misbehavior report, or a person who has investigated the incident."

7 NYCRR § 254.1.

In *Powell v. Ward,* the court enjoined state prison officials from enforcing disciplinary procedures in violation of the due process rights of a class of women prisoners, holding, *inter alia,* that "it is implicit in the notions of fairness in the due process clause that a hearing officer should not have been an investigative officer or witness." *Powell v. Ward,* 392 F.Supp. 628, 633 (S.D.N.Y.1975) ("*Powell I* "), *aff'd as modified,* 542 F.2d 101 (2d Cir.1976).

Five years later, the court found that the superintendent had failed to comply with the previous order, in part because hearing officers continued to be involved in investigating the underlying incidents. Inmates at the same correctional facility for women moved for an order holding the facility's superintendent in contempt for failing to comply with the *Powell*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 455170 (S.D.N.Y.)
**(Cite as: 1994 WL 455170 (S.D.N.Y.))**

*I. Powell v. Ward,* 487 F.Supp. 917, 931 (S.D.N.Y.1980) ("*Powell II* "), *aff'd as modified,* 643 F.2d 924 (2d Cir.), *cert. denied,* 454 U.S. 832 (1981); *see also McCann v. Coughlin,* 698 F.2d 112, 122 n. 10 (2d Cir.1983) (participation of Adjustment Committee members in investigating charges against inmate would constitute a violation of due process); *Giano v. Sullivan,* 709 F.Supp. 1209, 1216–17 (S.D.N.Y.1989) (recognizing constitutional right to impartial hearing officer and finding risk of unfairness "constitutionally unacceptable," where the hearing officer was unduly influenced by two correction officers who had been disqualified from acting as petitioner's hearing officers because they either investigated or witnessed petitioner's alleged violations).

### (1) Sandord's Liability

In the instant case, it is undisputed that Sanford participated in the investigation of the incident at issue. Sanford was the watch commander on duty at the time of the incident, and learned of the incident that morning during his normal rounds of SHU or after hearing a disturbance over the radio and investigating. He received several reports from other officers regarding their interviews with inmates in the yard at the time of the incident, and also spoke briefly with the inmate plaintiff was accused of fighting with. Pl. 3(g) ¶ 3; Def. 3(g) ¶¶ 7–8. Indeed, Sanford's violation of plaintiff's rights was so blatant that Selsky reversed Sanford's disposition and granted a new hearing even though plaintiff himself had not raised the issue on appeal. *See* PX–3 (May 6, 1988 Memorandum from Selsky to Scully); DX–D (plaintiff's appeal). I therefore find that Sanford violated plaintiff's right to a fair and impartial hearing officer by serving as a hearing officer after having participated in the investigation of the underlying incident.[FN20]

### (2) Scully's Liability

**\*14** Plaintiff claims that Scully violated his right to due process by "appointing defendant Sanford as a hearing officer when he knew or should have known that Sanford could not be fair and impartial," and by

failing to "institute[ ] adequate procedures to pre-screen hearing officers prior to their appointment." Pl.Memo at 13; Complaint ¶ 45.

Paragraph 6 of plaintiff's 3(g) statement, which is uncontroverted by defendants, states that Scully "made no attempt to determine whether defendant Sanford was involved with the investigation into the incident which led to the charges against the plaintiff prior to appointing him as the hearing officer." Pl. 3(g) ¶ 6. Defendants have submitted *no* affidavits or other evidence regarding Scully's selection of Sanford as a hearing officer, and do not address Scully's liability in their summary judgment submissions.[FN21]

In *Russell v. Coughlin,* the plaintiff alleged that Selsky, then a deputy superintendent at Green Haven, violated his right to due process by assigning as a hearing officer an individual who had reviewed plaintiff's misbehavior report prior to the hearing to determine the appropriate charges and level of discipline. *Russell,* 774 F.Supp. at 193. In *Russell,* Judge Sweet dismissed the claim against Selsky on the ground that the plaintiff had presented no evidence that Selsky "either intentionally or with gross negligence, assigned an officer who had had previous involvement in Russell's case. Mere negligence does not constitute a constitutional injury." *Id.* at 198.

Here, by contrast, it is uncontroverted that Scully made *no attempt* to determine whether Sanford had been involved in the investigation of the charges against plaintiff. In view of the decisions in *Powell I* and *Powell II,* I find that the failure to make such an inquiry was grossly negligent and violated plaintiff's right to due process.

### (3) *Qualified Immunity*

*Sanford.* Defendants contend that Sanford is entitled to qualified immunity because it "cannot be claimed that * * * defendant Sanford violated a clearly established right by accepting" appointment as a

Not Reported in F.Supp., 1994 WL 455170 (S.D.N.Y.)
**(Cite as: 1994 WL 455170 (S.D.N.Y.))**

hearing officer. November 1, 1993 Letter at 5. This argument is frivolous in light of the decisions in *Powell I, Powell II* and *McCann.*

*Scully.* With respect to Scully, defendants contend that "it was objectively reasonable for defendant Scully to believe that his appointee, Sanford, would conduct a fair hearing." November 1, 1993 Letter at 6. In light of defendants' failure to controvert plaintiff's contention that Scully "made no attempt to determine whether defendant Sanford was involved with the investigation into the incident which led to the charges against the plaintiff prior to appointing him as the hearing officer," and defendants' failure to submit any evidence to support Scully's asserted belief that Sanford would conduct a fair hearing, I find that defendants have failed to establish that Scully is entitled to qualified immunity.

Plaintiff's motion for summary judgment on this claim is therefore granted and defendants' motion is denied.

(c) *Sanford's Refusal to Provide Plaintiff with Videotape*

Plaintiff claims that his due process rights were violated when Sanford relied on a videotape of the incident that he refused to permit plaintiff to review during the proceeding. Complaint ¶ 44. Although some portions of the 3(g) statements pertain to DOCS policy regarding such videotapes, neither plaintiff nor defendants have addressed Sanford's liability on this claim in their memoranda of law or letter briefs. In the absence of any briefing by the parties, I find that this claim has not been adequately presented for decision as part of the present cross-motions for summary judgment.

### D. *The Kimelman Hearing*
(1) *Commencement of Rehearing*

**\*15** Plaintiff alleges that Selsky, Scully and Kimelman deprived him of a timely rehearing because

plaintiff was held in segregated confinement for fourteen days between the reversal of his first hearing and the commencement of the rehearing. Complaint ¶ 46. Plaintiff further alleges that Selsky violated his right to due process by failing to release plaintiff from segregation after completing the administrative review. Complaint ¶ 48. *See* Pl.Memo at 19–22. Defendants argue that the rehearing was timely because it commenced within the period directed in Selsky's order reversing the initial hearing. Def.Br. at 13.

Defendants do not dispute that plaintiff possessed a liberty interest in remaining in the general prison population pending his rehearing. Accordingly, the critical question regarding this issue is whether plaintiff was deprived of his liberty interest without due process of law.

(a) *DOCS Regulations*

DOCS regulations, which were in effect in May 1988, provide:

Where an officer has reasonable grounds to believe that an inmate should be confined to his cell or room or housing area because he represents an immediate threat to the safety, security or order of the facility or in immediate danger to other persons or to property, such officer shall take reasonable and appropriate steps to so confine the inmate.

7 NYCRR § 251–1.6.

DOCS regulations also specify time limits for the holding of disciplinary hearings after an inmate has been confined. Specifically, 7 NYCRR § 251–5.1 provides in part that:

(a) Where an inmate is confined pending a disciplinary or superintendent's hearing, the hearing must be commenced as soon as is practicable following the inmate's initial confinement * * * but, in no event may it be commenced beyond seven days

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 455170 (S.D.N.Y.)
**(Cite as: 1994 WL 455170 (S.D.N.Y.))**

of said confinement without authorization of the commissioner or his designee.

(b) The disciplinary hearing or superintendent's hearing must be completed within 14 days following the writing of the misbehavior report unless otherwise authorized by the commissioner or his designee. Where a delay is authorized, the record of the hearing should reflect the reasons for any delay or adjournment * * *.

7 NYCRR § 251–5.1.

There are no separate regulations regarding the time limits for commencing and completing a rehearing following administrative reversal of a hearing disposition. The only document that specifically addresses the timing of rehearings is an October 15, 1984 memorandum from Selsky to all superintendents (the "October 1984 Memorandum"), which provides that rehearings be commenced within the same time frame as initial hearings, unless the rehearing order contains alternative instructions.

In certain circumstances, facilities are authorized to conduct re-hearings of Superintendent's Hearings which are reversed by court-order or by this office. Questions have arisen concerning the proper mechanism for conducting such re-hearings. I have discussed this issue with Counsel's Office and have established the following procedures to be followed when re-hearings are ordered:

**\*16** The hearing should be conducted in accordance with the timeliness requirements stated on the court-order or Departmental Review Board order. If no direction is given with respect to timeliness, the hearing should be commenced within 7 days if the inmate is confined and completed within 14 days pursuant to Section 251D.1 of Chapter V.

PX–4, Ex. 4B (Defendants' Responses to Plain-

tiff's Interrogatories 10 and 11); *see also* Selsky Dep., pp. 20–21, 23 (rehearing must commence within seven days of receipt of reversal order and conclude within fourteen days). At least one New York court has held that the October 1984 Memorandum is binding on prison officials as if it were a "rule or regulation." *Hawkins v. Scully,* 536 N.Y.S.2d 846, 848 (2nd Dep't1989). In *Hawkins,* a rehearing, which was ordered on October 24, 1986, commenced on November 26, 1986 and concluded on December 1, 1986. In an Article 78 proceeding, the Appellate Division held that the charges against the inmate had to be dropped and his record expunged because the rehearing was not held within the time requirements outlined in the October 1984 Memorandum and § 251–5.1.

(b) *Case Law*

In 1989, the Second Circuit held that the language of §§ 251–1.6 and 251–5.1 creates a liberty interest in remaining in the general prison population, which may not be denied without due process. *Gittens v. Lefevre,* 891 F.2d 38 (2d Cir.1989); *see also Russell v. Coughlin,* 910 F.2d 75, 77 (2d Cir.1990) ( "New York State's regulations governing keeplock create a liberty interest in remaining free from administrative confinement"). [FN22] Due process requires that an inmate who has been confined pending a hearing be given a hearing within a "reasonable time" after confinement. *Gittens,* 891 F.2d 38, 41 (2d Cir.1989) (quoting *Hewitt v. Helms,* 459 U.S. 460 (1983)).

What constitutes a "reasonable time" for commencing a disciplinary hearing for due process purposes must be determined on a case-by-case basis. *Russell v. Coughlin,* 910 F.2d 75, 78 (2d Cir.1990). A "reasonable time" may be more or less than the time set forth in § 251–5.1. *See, e.g., Santana v. Keane,* 949 F.2d 584, 585 (2d Cir.1991) (reversing dismissal an inmate's § 1983 action because commencement of hearing five days after confinement and conclusion of the hearing four days later could constitute due process violation); *Russell v. Coughlin,* 774 F.Supp. at

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 455170 (S.D.N.Y.)
**(Cite as: 1994 WL 455170 (S.D.N.Y.))**

197 (eleven-day delay in commencement of rehearing reasonable, where record reflected that assigned hearing officer's regular days off precluded an earlier rehearing).

(c) *Commencement of the Kimelman Hearing*

As noted above, Selsky issued his order on May 6, 1988. The order states: "Please conduct rehearing within 14 days of receipt of this notice." DX–E. Selsky's order was received at Green Haven no later than May 10, 1988. Defendants' 3(g) Statement ¶ 15; Stipulation ¶ 6. The rehearing was commenced on May 20, 1988—fourteen days after the issuance of the order and ten days after it was received at Green Haven. The rehearing was completed on May 24, 1988—eighteen days after issuance of the order, and fourteen days after it was received at Green Haven.

**\*17** Defendants contend that the rehearing was held within a reasonable time because it was commenced within the time frame ordered by Selsky, *i.e.,* within 14 days of receipt of this notice. Def.Br. at 13. Plaintiff disagrees. First, plaintiff contends that the time in which to commence the hearing should run from issuance of the order, rather than its receipt at the institution. Second, plaintiff contends that Selsky's order should, at a minimum, be read to conform to the requirements § 251–5.1, *i.e.,* that the rehearing be *completed* within fourteen 14 days (§ 251–5.1(b)), and, implicitly, be commenced within seven days (§ 251–5.1(a)). Defendants' interpretation of the order, plaintiff argues, permits a delay that, in the absence of exigent circumstances, violates § 251–5.1 and is also unreasonable under *Hewitt v. Helms* and subsequent cases. Pl.Memo at 19–22.

I agree with plaintiff that Selsky's order contemplated commencement of the rehearing within seven days as required by § 251–5.1; *see* Selsky Dep., pp. 20–21, 23. Defendants' contention that Selsky's order permitted a delay of ten or fourteen days in commencement of the rehearing conflicts with the clear mandate of § 251–5.1; in any event, Selsky has no

authority to determine or override the requirements of due process.

I further find that the delay in commencing plaintiff's rehearing was unreasonable—whether measured from the date of Selsky's order (14 days) or receipt of his order at Green Haven (10 days). Remarkably, neither the administrative record nor defendants' submissions provide *any* explanation for the ten-day delay in commencing plaintiff's rehearing after receipt of Selsky's order. A delay for which no reason is offered, and which substantially exceeds DOCS own requirements, is, by definition, *un* reasonable. *See Gittens,* 891 F.2d at 41 (unexplained seven-day delay in commencing disciplinary hearing unreasonable); *Scott v. Coughlin,* 727 F.Supp. 806, 809 (W.D.N.Y.1990) (granting summary judgment for plaintiff where there was no showing of circumstances to justify fourteen-day delay in commencing hearing); *cf. Russell v. Coughlin,* 774 F.Supp. at 197 (no due process violation where defendants provided explanation for elapse of eleven days between the disposition of inmate's appeal and the commencement of the rehearing). [FN23] I therefore find that the delay in commencing the rehearing violated plaintiff's right to due process.

(i) *Kimelman's Liability*

Plaintiff contends that Kimelman violated plaintiff's right to due process by commencing the rehearing fourteen days after Selsky's order was issued and ten days after it was received at Green Haven. Kimelman commenced the rehearing seven days after he was appointed by Scully. *See* Defendants' Letter to the Court dated July 21, 1994 (annexing May 13, 1988 memorandum appointing Kimelman); DX–G (rehearing transcript). Defendants have offered *no* reason for the seven-day delay in commencing the rehearing following Kimelman's appointment. In the absence of any explanation for the delay, I find that Kimelman violated plaintiff's right to due process by failing to commence the rehearing within a reasonable time.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 455170 (S.D.N.Y.)
**(Cite as: 1994 WL 455170 (S.D.N.Y.))**

(ii) *Liability of Selsky and Scully*

**\*18** Supervisory personnel may be held liable for the constitutional violations of their subordinates under § 1983 only if it is shown that they (1) were directly involved in the wrongdoing; (2) failed to remedy a wrong after learning of it through report or appeal; (3) created or allowed a policy under which the violation occurred; or (4) were grossly negligent in managing the subordinates who caused the wrongdoing. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).

In *Wright,* a prisoner brought a § 1983 action against Harold Smith ("Smith"), the Superintendent of Attica Correctional Facility, and Thomas Coughlin ("Coughlin"), the Commissioner of the New York Department of Correctional Services, alleging that he was confined in SHU for sixty-seven days without a hearing. The district court granted the defendants' motion for summary judgment and the prisoner appealed. The *Wright* court affirmed the dismissal as to Coughlin and reversed as to Smith.

The court found that Coughlin was not personally involved because although Coughlin received a letter from plaintiff describing the condition of his confinement, the letter did not state that plaintiff "was being retained in the SHU without a hearing, or that he had been deprived of any rights connected with a hearing. Hence, Coughlin was never put on actual or constructive notice of the violation." *Wright,* 21 F.3d at 501 (internal citations omitted). The *Wright* court did, however, find that Smith had notice. Before he initiated the federal action, plaintiff had served Smith with a state court habeas corpus petition. Although the habeas petition did not allege that plaintiff was denied a hearing, it did allege that he was denied rights connected with a hearing, such as an impartial hearing officer and inadequate written notice. The *Wright* court found that "the petition alleging that Wright was denied notice of a hearing and its outcome, an impartial hearing officer, the right to be present, and the

right to be informed of and respond to the evidence against him put Smith on notice that, if the allegations were true, [plaintiff] received no meaningful hearing at all." *Id.* at 502. Because Smith failed to remedy the wrong after receiving notice, the *Wright* court refused to allow him to escape liability. *Id.; see also McCann v. Coughlin,* 698 F.2d 112, 125 (2d Cir.1983) (district court properly rejected claim by Commissioner Coughlin and the facility Superintendent Reid that plaintiff failed to demonstrate personal involvement where Coughlin had actual or constructive notice of the practices employed by the Adjustment Committee and the Superintendent had at least constructive notice, such that they knew that unconstitutional practices were taking place and they failed to remedy them); *Rivera v. Coughlin,* 92 Civ. 3404 (SS), 1994 WL 263417 at \*4–5 (S.D.N.Y. June 13, 1994) (denying summary judgment motion by Commissioner Coughlin and facility superintendent on the ground that plaintiff failed to establish personal involvement, because "[w]hile it appears that Rivera did not notify Coughlin or [the superintendent] that the disciplinary hearing system and the subsequent segregation were, according to Rivera, unconstitutional, Rivera may nevertheless be able to establish their liability. The defendants may have had notice in other ways. Moreover, Rivera may have a viable claim if Coughlin and [the superintendent] had actual or constructive notice of Rivera's continued segregation in keeplock after the administrative reversal of his sanctions, and did nothing to remedy this situation.") *James v. Artuz,* 93 Civ. 2056 (LMM), 1994 WL 174005 at \*7 (S.D.N.Y. May 4, 1994) (rejecting superintendent's argument that he was entitled to summary judgment because his denial of inmate's appeal did not constitute personal involvement where superintendent conducted a de novo review of hearing officer's determination, may have reviewed the tape of the hearing, and, by his own admission, kept informed of the law).

**\*19** *Selsky's Liability.* Plaintiff contends that Selsky violated plaintiff's right to due process in

Not Reported in F.Supp., 1994 WL 455170 (S.D.N.Y.)
**(Cite as: 1994 WL 455170 (S.D.N.Y.))**

connection with the delay in commencement of the rehearing in three ways: First, plaintiff asserts that Selsky's order directing a rehearing failed to set a specific deadline for commencement of the rehearing; second, plaintiff asserts that Selsky failed to send the order directing a rehearing by the fastest means available, *e.g.,* by telephone, fax or "E-mail"; third, plaintiff claims that Selsky failed to remedy the unconstitutional delay in commencement of the rehearing by reversing the Kimelman disposition on appeal. Pl.Memo at 19–22.

I find that Selsky's violated plaintiff's right to due process by failing to reverse the Kimelman disposition, based on the failure to commence the rehearing within a reasonable time. I therefore find it unnecessary to discuss plaintiff's other theories of Selsky's liability.[FN24] It is undisputed that Selsky was on notice of plaintiff's claim that he was denied due process because the rehearing was not commenced within a reasonable time. *See* Plaintiff's Letter to the Court dated July 21, 1994 (annexing plaintiff's handwritten appeal, dated June 7, 1988). As set forth above, defendants have offered no explanation for the failure to commence the rehearing until ten days after the receipt of Selsky's order reversing the Sanford disposition and directing that a new hearing be held. Selsky testified that a rehearing must be commenced within seven days of receipt of the order directing a rehearing. Selsky Dep., pp. 20–23. Selsky's affirmance of the Kimelman disposition (DX–H) provides no explanation for his rejection of plaintiff's claim that the commencement of the rehearing was untimely. I find that Selsky violated plaintiff's right to due process by failing to correct the violation of plaintiff's right to a hearing within a reasonable time.[FN25]

*Scully's Liability.* Plaintiff contends that Scully violated plaintiff's right to due process by failing to direct and ensure that the rehearing commence within a reasonable time. It is undisputed that Scully's memorandum appointing Kimelman contained no directions regarding when the rehearing should be commenced and/or concluded. *See* Defendants' Letter to the Court dated July 21, 1994 (annexing memorandum). Nor did Scully clarify Selsky's directions to ensure that the hearing officer complied with § 251–5.1 and the October 1984 Memorandum. Moreover, Scully did not even appoint Kimelman until three days after receipt of Selsky's order—a delay for which no reason has been offered by defendants. In the absence of any explanation for the delay in commencing the rehearing, and the absence in this record of any evidence that Scully took *any* steps to ensure that the rehearing was commenced in compliance with § 251–5.1 and the October 1984 Memorandum, I find that Scully is personally liable for violating plaintiff's right to due process by his gross negligence in managing the subordinates who caused the wrongdoing. *See Wright,* 21 F.3d at 501.

(c) *Immunity*

(1) *Absolute Immunity: Selsky*

**\*20** Defendants argue that Selsky is entitled to absolute quasi-judicial immunity for his role as appellate review officer. Plaintiff, on the other hand, contends that Selsky is not entitled to absolute quasi-judicial immunity.

Generally, judges are absolutely immune from liability for performing acts within their judicial discretion. *See Pierson v. Ray,* 386 U.S. 547, 553–54 (1967); *Cleavinger v. Saxner,* 474 U.S. 193, 199–200 (1985). This immunity has been selectively extended to other officials. For example, federal hearing officers and administrative law judges are entitled to absolute immunity, *Butz v. Economou,* 438 U.S. 478, 513–14 (1978), while a prison disciplinary board is not. *Cleavinger,* 474 U.S. at 203–04.[FN26]

A number of district courts within the Second Circuit have extended absolute quasi-judicial immunity to Selsky or to others similarly situated. *See, e.g., Pacheco v. Kihl,* 90 Civ. 549T (W.D.N.Y. Dec. 17, 1991); *Parkinson v. Employee Assistant, DCF,* 91 Civ. 7401 (KMW), 1993 WL 118451 (S.D.N.Y. April 12,

Not Reported in F.Supp., 1994 WL 455170 (S.D.N.Y.)
**(Cite as: 1994 WL 455170 (S.D.N.Y.))**

1993) (Selsky entitled to absolute judicial immunity in his role of appellate reviewing officer); *Bolanos v. Coughlin,* 91 Civ. 5330 (S.D.N.Y. Oct. 15, 1993) (Selsky entitled to absolute quasi-judicial immunity because appeal over which he presided was of judicial nature and contained sufficient constitutional safeguards).

I am persuaded, however, by Judge Ward's reasoning in *Moye v. Selsky,* 826 F.Supp. 712, 721–24 (S.D.N.Y.1993), which held that Selsky was not entitled to absolute immunity. Judge Ward denied Selsky absolute immunity because: 1) there was a lack of evidence that Selsky had been harassed by lawsuits; 2) the appeal did not afford the inmate any procedural safeguards that were not present at the level of prison disciplinary board; 3) Selsky lacked independence; and 4) limiting remedy to injunctive or declaratory relief would be insufficient when the inmate has already served time in SHU. I agree with the reasoning and conclusions of the *Moye* court and accordingly find that Selsky is not entitled to absolute "quasi judicial" immunity.

### (2) *Qualified Immunity*

With respect to hearings that took place as late as 1988, courts have generally granted qualified immunity to prison officials for hearings that commenced within the time required by 7 NYCRR § 251–5, even if the delay failed to satisfy the "reasonable time" standard set forth in *Helms.*

For example, in 1989, the *Gittens* court upheld the defendant's qualified immunity claim with respect to a 1986 hearing because it determined that the prison officials could have reasonably believed that by complying with New York's seven-day rule, they were complying with *Helms* ' reasonable time standard. 891 F.2d at 42–43.

Relying on *Gittens,* the court in *Green v. Bauvi* held that prison officials who complied with the seven day rule in 1988 were entitled to qualified immunity. 792 F.Supp. 928, 940 (S.D.N.Y.1992) ("it was reasonable in 1988 for Defendants to believe that compliance with the time limits set forth in § 251–5.1(a) satisfied the 'reasonable time' standard of *Helms.*").

**\*21** Qualified immunity has been rejected, however, where prison officials failed to comply with § 251–5.1 and failed to provide a justification for the delay. For example, in 1990, the Second Circuit held that prison officials who confined an inmate for ten days without a hearing in 1985 were not entitled to qualified immunity. The court first stated that "the seven-day rule itself can provide no basis for qualified immunity" because the prison officials had not released the inmate until his tenth day of confinement. *Russell v. Coughlin,* 910 F.2d at 79. The *Russell* court then stated that:

> "Despite the inexactness of the 'reasonable time' standard, defendants must be held to have recognized that this standard placed some obligation on them to act in a timely fashion * * *. [D]efendants could not have reasonably believed that their release of [plaintiff] on his tenth day in confinement complied with the 'reasonable time' standard."

*Id.* Accordingly, the *Russell* court upheld the district court's rejection of the defendants' qualified immunity defense.

Applying the foregoing standards, I find that none of the defendants could have reasonably believed that commencement of plaintiff's rehearing ten days after receipt of Selsky's order complied with the "reasonable time" standard. Defendants' motion for summary judgment on this claim is therefore denied, and plaintiff's cross-motion is granted as to Kimelman, Selsky and Scully.

### (2) *Right to be Informed of and to Comment on Videotape Evidence*

Not Reported in F.Supp., 1994 WL 455170 (S.D.N.Y.)
**(Cite as: 1994 WL 455170 (S.D.N.Y.))**

Plaintiff alleges that his right to a fair hearing was violated because 1) Kimelman failed to inform plaintiff that the hearing disposition would be based in part on the videotape evidence; and 2) Kimelman failed to provide plaintiff with an opportunity to comment on that evidence prior to Kimelman's decision. Complaint ¶ 47. Plaintiff further alleges that Selsky violated his right to due process by affirming Kimelman's disposition. Complaint ¶ 48.[FN27]

Defendants contend that there was no violation of plaintiff's rights with respect to Kimelman's reliance on the videotape. Defendants point out that plaintiff knew of the existence of the videotape and its general content, and therefore had "the opportunity to ask his inmate assistant to view the videotape on his behalf in preparation for the rehearing," but failed to do so. Def.Br. at 14. In the alternative, defendants assert that any error with respect to the videotape was harmless because the videotape comprised a "relatively insignificant portion of the evidence." Def.Br. at 14.

In response, plaintiff argues that "[t]he right at issue is not whether the accused is aware of the *existence* of the evidence against him[;] rather it is the right to be apprised of the hearing officer's *consideration* of evidence being used against him, informed of its content, and given an opportunity to respond to the evidence at the hearing." Pl.Memo at 15 (emphasis in original). Plaintiff further argues that "[t]he fact that [he] knew of the existence of the videotape *before* the hearing, and was informed of the hearing officer's reliance on the tape *after* the hearing was concluded, does not make up for the fact that he never had a chance to see the tape (or at least have his hearing assistant see it), and incorporate it into his response to the charges *during* the hearing." Pl.Memo at 15–16 (emphasis in original). Finally, although plaintiff acknowledges that he knew a videotape of the incident existed, he did not know that it was available to him, because he had been told by Sanford during the initial hearing "in no uncertain terms that the video tapes were *not* available until after the hearing * * *." No-

vember 30, 1993 Letter at 4 (emphasis in original).

(a) *Case Law*

**\*22** Plaintiff's claims regarding Kimelman's use of the videotape are governed by *Sostre v. McGinnis,* 442 F.2d 178, 198 (2d Cir.1971), *cert. denied,* 404 U.S. 1049 (1972), and its progeny. In *Sostre,* the district court enjoined the prison and its agents from subjecting an inmate to punitive segregation without:

a. giving him, in advance of the hearing, a written copy of any charges made against him, citing the written rule or regulation which it is charged he has violated; b. granting him a recorded hearing before a disinterested official where he will be entitled to cross-examine his accusers and to call witnesses on his own behalf; c. granting him the right to counsel or to appoint a counsel substitute; and d. giving him, in writing, the decision of the hearing officer in which is briefly set forth the evidence upon which it is based * * *.

*Id.* at 188.

On appeal, the Court of Appeals questioned whether these directives were "necessary constitutional ingredients of every proceeding resulting in serious deprivation of a prisoner." *Id.* at 198. Nonetheless, the Court of Appeals concluded that "[i]n most cases it would probably be difficult to find an inquiry minimally fair and rational unless the prisoner were confronted with the accusation, informed of the evidence against him and afforded a reasonable opportunity to explain his actions." *Id.* (internal citations and footnotes omitted).

Three years after *Sostre,* the Supreme Court decided *Wolff v. McDonnell,* 418 U.S. 539 (1974). In *Wolff,* the Supreme Court set forth the minimum due process rights to which a prison inmate facing disciplinary charges is entitled. These rights include advance written notice of the alleged charges, an op-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 455170 (S.D.N.Y.)
**(Cite as: 1994 WL 455170 (S.D.N.Y.))**

portunity to present a defense, and a written statement delineating the evidence relied on in the disposition. *Wolff,* 418 U.S. at 563–64. *See also McCann,* 698 F.2d at 121; *Giano,* 709 F.Supp. at 1212.[FN28]

In 1989, the Second Circuit decided *Francis v. Coughlin,* 891 F.2d 43 (2d Cir.1989), a case in which the plaintiff claimed that the hearing officer "did not inform him of the testimony of an inmate witness * * * and did not inform him of the testimony of the accusing officers." *Id.* at 47. Defendants' assertion of a qualified immunity defense was rejected by the district court, and the Court of Appeals affirmed, holding that "the right to be informed about and to comment upon such evidence was clearly established" by the *Sostre* decision.[FN29] *Id.* The *Francis* court acknowledged that "the Supreme Court [in *Wolff* ] was silent on the right of an inmate to be informed of the evidence *during* the course of a disciplinary hearing * * *." *Id.* It held, however, that "[n]othing in *Wolff,* however, hints that *Sostre's* clear holding is to be limited; indeed, the two cases are entirely consistent." 891 F.3d at 47; *see also Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985) (inmate facing disciplinary charges entitled to "advance written notice of the charges against him and of the evidence available to the factfinder."), *cert. denied,* 474 U.S. 1100 (1986); *cf. Grillo v. Coughlin,* 1994 WL 387209, at *4, (2d Cir. July 22, 1994) (inmate's right to know the evidence against him and to marshal a defense compromised where copies of two documents served on inmate differed from the copies submitted to the hearing officer).

**\*23** Several courts have held that the denial of an inmate's request for evidence may constitute a due process violation if it interferes with the inmate's ability to mount a defense. *See, e.g., Young v. Kann,* 926 F.2d 1396, 1400–02 (3rd Cir.1991) (case remanded to determine whether prison official's refusal to produce requested letter was due process violation); *Muhammad v. Butler,* 655 F.Supp. 1470 (D.N.J.1987) (failure to disclose to inmate the confidential tran-

script of telephone conversation in which prison officials were informed that inmate planned escape violated due process rights).

(1) *Kimelman's Liability.* I find that Kimelman violated plaintiff's due process rights under *Sostre* and *Francis.* Plaintiff concedes that although he knew of the videotape's existence, he never requested the videotape during the rehearing. Nevertheless, I find that Kimelman violated plaintiff's rights by not informing him of the videotape evidence and providing him with an opportunity to comment on that evidence before a decision was rendered. Moreover, nothing in the *Sostre* and *Francis* holdings indicate that they are limited to circumstances in which an inmate specifically requests the evidence, and I refuse to read them so narrowly.

(2) *Selsky's Liability.* Plaintiff alleges that Selsky (and Coughlin) violated his right to due process in connection with the videotape "by affirming defendant KIMELMAN'S disposition, thereby sanctioning, ratifying and adopting the violation of plaintiff's right to a fair and impartial hearing; and by failing to release plaintiff from the Special Housing Unit after completing the administrative review." Complaint ¶ 48.

As noted above, plaintiff may establish liability against a supervisor in a § 1983 action by showing that the supervisor failed to remedy a wrong after learning of it through report or appeal. *Wright,* 21 F.3d at 501. In this case, however, plaintiff did not raise the issue of Kimelman's reliance on the videotape in his appeal of the Kimelman hearing. Plaintiff's Letter to the Court dated July 21, 1994 (annexing plaintiff's handwritten appeal). Accordingly, Selsky was not placed on notice of the violation, and cannot be held personally liable for his failure to reverse Kimelman's disposition on this ground.

(b) *Harmless Error*
Defendants argue—without citation to any au-

Not Reported in F.Supp., 1994 WL 455170 (S.D.N.Y.)
**(Cite as: 1994 WL 455170 (S.D.N.Y.))**

thority—that "any 'error' in not specifically informing plaintiff that Kimelman was also considering the videotape was harmless at best." Def.Br. at 14–15.[FN30] Plaintiff argues that the violations of due process in connection with the Kimelman rehearing are "structural defects," which are not subject to harmless error analysis. Pl.Memo at 17; *see Arizona v. Fulminante*, 494 U.S. 279, 309–10 (1991) (Rehnquist, J., dissenting) (distinguishing between "trial errors" that are subject to harmless error analysis, and "structural defects," that "transcend[ ] the criminal process" such that "no criminal punishment may be regarded as fundamentally fair").

**\*24** I question whether harmless error analysis is appropriate at this stage of the case, *i.e.,* on the issue of whether plaintiff has established a violation of his constitutional right to due process.

Ordinarily, the question of whether the outcome of a prison disciplinary proceeding would have been the same in the absence of a due process violation is addressed in the context of whether plaintiff has demonstrated actual injury, and is therefore entitled to more than nominal damages. For example, in *Patterson v. Coughlin,* 905 F.2d 564 (2d Cir.1990), the district court found that the plaintiff was denied due process in connection with a disciplinary hearing. The prison officials appealed, arguing that the court should have granted summary judgment in their favor "because Patterson had the insurmountable burden of showing that if he had been allowed to present his witnesses at the disciplinary hearing, he would have been found innocent of the assault charges and thus would not have been confined to SHU." *Patterson,* 905 F.2d at 568. The court first observed that

"[i]t is clear that where there has been a denial of due process, the victim is entitled at least to nominal damages. *See Carey v. Piphus,* 435 U.S. 247, 266 (1978). Nonetheless, *Carey* also made it clear that even where a denial of due process has been followed by a liberty deprivation, unless the depriva-

tion was caused by the violation the plaintiff is limited to nominal damages. *Id.* at 263 ("injury caused by a *justified* deprivation * * * is not properly compensable under § 1983" (footnote omitted; emphasis added)).

*Patterson,* 905 F.2d at 568 (parallel citations omitted). Turning to Patterson's case, the court held:

In the present case, it is true that the State violated Patterson's right to due process when it found him guilty and placed him in SHU without allowing him to call witnesses at his disciplinary hearing; but if Patterson would have been found guilty of assault and confined to SHU even if his witnesses would have been called, his confinement in SHU must be considered a justified deprivation of liberty, not a deprivation caused by the State's failure to permit him to call those witnesses. In sum, though the confinement in SHU deprived Patterson of such liberty as his status as an ordinary inmate allowed him, that confinement did not automatically entitle him to more than nominal damages. *See McCann v. Coughlin,* 698 F.2d [112], 126–27 [2d Cir.1983].

*Id.* at 568.[FN31]

Based upon *Patterson* and *McCann,* I find that the question of whether plaintiff's hearing would have been the same in the absence of a due process violation is properly considered on the issue of damages. Alternatively, I find that the constitutional errors in the Kimelman rehearing are "structural defects," not subject to harmless error analysis. *See Giano,* 709 F.Supp. at 1217–18; *Malik,* 1994 WL 125213 at \*2.

(c) *Qualified Immunity*

**\*25** *Kimelman.* I find that Kimelman is not entitled to qualified immunity. As discussed in *Francis,* the law in this circuit has been clear since 1971 that an inmate has a right to be informed about and to comment on evidence during a disciplinary hearing. Moreover, no reasonable hearing officer could have

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 455170 (S.D.N.Y.)
**(Cite as: 1994 WL 455170 (S.D.N.Y.))**

believed that he was entitled to rely on videotape evidence without informing the inmate of his intention to do so until after the hearing had been concluded, and the disposition announced.

### E. *Expungement*

Plaintiff requests that defendants expunge from his records all references to the charges and rehearing.[FN32] *Bradley,* 671 F.2d 686, 690 n. 9 (2d Cir.1982). I find that my decision on the propriety of expungement should await the conclusion of the damages phase of this action. *See Hayes v. Thompson,* 637 F.2d 483, 493 (7th Cir.1980) (expungement is a remedy that should not be granted where the outcome of the hearing would have been the same in the absence of procedural error).

### CONCLUSION

Defendants' motion for summary judgment is denied, and plaintiff's cross-motion for summary judgment is granted in part and denied in part. Counsel are directed to appear before me on September 13, 1994, at 10:00 a.m., at which time the court will set a schedule for further proceedings on the issue of damages.

SO ORDERED.

FN1. Defendant Coughlin has moved for summary judgment dismissing the complaint on the ground that he was not personally involved in the alleged misconduct. Plaintiff represents that Commissioner Coughlin is a defendant solely for purposes of declaratory and injunctive relief, and does not oppose defendant Coughlin's motion insofar as the motion is directed to a claim for damages. Plaintiff's Memorandum of Law at 1.

FN2. In support of their motion for summary judgment defendants have submitted a Notice of Motion for Summary Judgment, the

affidavit of defendants' counsel, Yvonne Powe ("Powe Aff."), a Rule 3(g) Statement ("Def. 3(g)"), and Defendants' Brief in Support of Motion for Summary Judgment ("Def.Br."). Defendants have also submitted letters to the court dated February 5, June 23, September 24, November 1 and November 2, 1993, and February 15 and July 21, 1994.

Plaintiff has submitted a Notice of Cross–Motion for Partial Summary Judgment, a Statement Pursuant to Local Rule 3(g) ("Pl. 3(g)"), the affidavit of plaintiff's counsel, Kenneth R. Stephens ("Stephens Aff."), a Memorandum of Law in Support of Motion for Partial Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment ("Pl.Memo"), and letters to the court dated February 8, July 1, July 8, September 28, and November 30, 1993, and January 24 and July 21, 1994.

In addition, on September 24, 1993, counsel for plaintiff and defendants executed a stipulation pertaining to plaintiff's confinement ("Stipulation").

FN3. This document, and all other documents relating to the disciplinary proceedings were provided to plaintiff in English and Spanish.

FN4. "DX" refers to the exhibits annexed to the Powe Affidavit (included in Defendants' Notice of Motion); "PX" refers to the exhibits annexed to the Stephens Affidavit (included in Plaintiff's Notice of Motion).

FN5. No specific finding was made as to how the knife got from the east side yard to the west side yard or from the SHU yard to the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

yard below. Defendant Graham stated that the east and west yards are divided by a 15 to 20 foot high wall and are on the ground floor beneath the SHU. Deposition of Harold Graham, taken on May 11, 1992 ("Graham Dep.") (annexed to Defendants' Notice of Motion), p. 13. When asked how the knife could have gotten from the east to the west side yard, Graham answered: "The inmate would have thrown it over the wall separating the two yards * * * then pick [ed] it up and thrown it over the wall of the west yard, into the west yard down below." Graham Dep., p. 29.

**FN6.** In the memorandum from Graham to Sanford, Graham reports that on March 5, 1988 he was called to SHU for a fight in progress. When he arrived, he was directed to observe Allen, who was being tended by a nurse. DX–A. Allen informed Graham that he and Silva had a fight, during which Silva slashed Allen. *Id.* After leaving Allen, Graham met up with Pease and was informed that Cornacchia had found blood-soaked toilet paper and a handkerchief in the east side yard. Graham then directed Pease and Cornacchia to search the west side yard, where officer Pease found a 4" knife. *Id.*

The memorandum from Patterson to Sanford states that when Silva was removed from the yard, his face appeared swollen and bloody. DX–A. The memo states that Allen, Colon, Ryan, Hicks, and Mallory were the remaining inmates in the yard. *Id.*

**FN7.** Graham also interviewed Allen immediately following the alleged fight. The interview took place in what is known as the Sergeant's room at SHU. Graham Dep., pp. 21–25. Graham testified during his deposition that he asked Allen "who cut him, and he

[Allen] c[a]me out and told me that he had a fight with inmate Silva in the yard." Graham Dep., p. 7.

The Sergeant's room has a video monitoring system, and during Graham's deposition, plaintiff's counsel played the videotape of Graham's interview with Allen (the "Interview Videotape"). The portions viewed during the deposition did not include any conversations in which Allen implicated Silva. Graham Dep., pp. 20–26.

**FN8.** The record does not reflect whether Maldonado interviewed Hicks.

**FN9.** In addition to Graham's interview with Allen, an interview of Colon was also recorded on videotape. *See* DX–A.

**FN10.** Selsky did not "recall anything being sent" that addressed the use of videotapes during disciplinary and superintendent hearings. Deposition of Donald Selsky, taken September 4, 1991 ("Selsky Dep.") (annexed to Defendants' Notice of Motion), p. 6.

**FN11.** Mallary refused to testify. *See* PX–1 at 43–44; "Requested Inmate Witness Refusal to Testify" signed by Alfred Mallary on March 18, 1988 (DX–A).

**FN12.** As of March 5, 1988, the date of the incident at issue in this case, plaintiff was in disciplinary confinement in SHU based on charges stemming from an earlier, unrelated incident. On March 28, 1988, the charges from that incident were ordered reversed and expunged by the Appellate Division, Second Department. *Silva v. Scully,* 526 N.Y.S.2d 532 (2d Dept.1988). Therefore, as of March 28, 1988, there were no charges pending

Not Reported in F.Supp., 1994 WL 455170 (S.D.N.Y.)
**(Cite as: 1994 WL 455170 (S.D.N.Y.))**

against plaintiff apart from those contained in the Fighting and Weapons Misbehavior Reports. Stipulation ¶¶ 1, 3, 4.

FN13. In his appeal, plaintiff did not raise any of the grounds which form the basis of the instant action, including the allegations that: 1) Sanford pre-judged the evidence; 2) Sanford investigated the underlying charges; and 3) Sanford refused to provide plaintiff with a copy of the videotape evidence.

FN14. The May 6 Memo II, which is headed "Review of Superintendent's Hearing," was not addressed to any person in particular. It was, however, "cc'd" to "Facility Superintendent" and "Central Office Files."

FN15. An excerpt from Green Haven's video monitor log notes that the Incident Videotape was reviewed by Kimelman on May 23, 1988. Stephens Aff. ¶ 7; PX–5.

FN16. As noted above, *supra* ¶ 19, the policy in effect at Green Haven in May 1988 prohibited an inmate, but permitted an inmate's assistant to view videotapes of an incident prior to the hearing. *See* PX–4, Ex. 4B (Defendants' Response to Plaintiff's Interrogatories 9, 10). Kimelman testified that he had never been advised as to the correct procedure to follow regarding the viewing of videotapes during hearings. Kimelman Dep., p. 43.

FN17. Plaintiff's counsel requested that Selsky "review the hearing for compliance with the Department's regulations and constitutional requirements."

FN18. Plaintiff had remained confined prior to and throughout the rehearing. Pl. 3(g) ¶ 22;

Stipulation ¶¶ 3, 7, 8.

FN19. Defendants' November 1, 1993 Letter asserts that all of the claims "should be dismissed against all defendants on the grounds of qualified immunity." November 1, 1993 Letter at 1.

FN20. In *Russell v. Coughlin,* Judge Sweet held that "absent some proof of actual bias, this violation of [7 NYCRR § 254.1] does not amount to a constitutional infraction." *Russell v. Coughlin,* 774 F.Supp. 189, 197 (S.D.N.Y.1991), *modified on other grounds,* 782 F.Supp. 876 (S.D.N.Y.1991), *reversed on other grounds,* 15 F.3d 219 (2d Cir.1993). In light of the *Powell* decisions, I question whether an inmate must in fact show "actual bias" to establish a constitutional violation. In any event, Sanford's blatant pre-judgment of the evidence easily satisfies such a requirement.

FN21. Defendants' November 1, 1993 Letter argues only that plaintiff's claim against Scully should be dismissed on the basis of qualified immunity. November 1, 1993 letter at 5–6.

FN22. 7 NYCRR § 251–5.1 is not applicable if the inmate was already in confinement due to a prior disciplinary hearing. *Young v. Coughlin,* 534 N.Y.S.2d 747, 749 (App.Div.1988) (hearing not required to commence within seven days where inmate already confined due to a prior hearing); *Matter of Maldonado v. Coughlin,* 541 N.Y.S.2d 565 (App.Div.1989) (seven day rule not applicable where inmate already confined due to another proceeding). At the time Selsky ordered the rehearing, plaintiff was not confined on any other charges. *See*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 455170 (S.D.N.Y.)
**(Cite as: 1994 WL 455170 (S.D.N.Y.))**

Stipulation ¶ 4.

**FN23.** In *Russell,* Selsky issued an order on February 1, 1990, directing that a new hearing be commenced within seven days and completed within fourteen days of receipt of Selsky's order. 774 F.Supp. at 192. The delay in commencement of the rehearing was due, at least in part, to accommodation of the hearing officer's regular days off.

**FN24.** I note that plaintiff's second theory of liability was rejected by Judge Sand in *Afrika v. Selsky,* 750 F.Supp. 595, 602–03 (S.D.N.Y.1990). I also believe that although Selsky's order could (and should) have been more precise, Selsky could have reasonably believed that it would be interpreted to comport with the requirements of § 251–5.1.

**FN25.** Defendants contend that Selsky's affirmance of the Kimelman disposition did not violate plaintiff's right to due process because there was "some evidence" to support Kimelman's determination that plaintiff was guilty. Def.Br. at 15–16 (citing *Afrika,* 750 F.Supp. at 600 (S.D.N.Y.1990)). The "some evidence" standard, however, derives from cases involving a challenge to the sufficiency of the evidence, and I decline to apply it in assessing Selsky's liability for failing to correct a violation of plaintiff's procedural rights. *See Superintendent, Mass. Correctional Inst. v. Hill,* 472 U.S. 445, 456 (1985); *see also Smith v. Tucker,* 88 Civ. 2798 (VLB), 1991 WL 211209 at *8 (S.D.N.Y. Oct. 4, 1991) (acting superintendent may be held liable for affirming hearing officer's disposition "notwithstanding the existence of any evidence in the record that might support a finding of plaintiff's guilt" if hearing violated inmate's constitutional rights and superintendent was on notice of violation).

**FN26.** To determine whether a government official is entitled to absolute quasi-judicial immunity, a six-part test is applied:

> (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

> *Cleavinger,* 474 U.S. at 202 (*citing Butz,* 438 U.S. at 512).

**FN27.** Paragraph 48 of the complaint also names Coughlin; plaintiff, however, does not seek damages against Coughlin. *See supra* n. 2.

**FN28.** The right to marshal a defense may be curtailed if to grant it would be "unduly hazardous to institutional safety or correctional goals." *Wolff,* 418 U.S. at 566. For example, in *Hop Wah v. Coughlin,* 88 Civ. 1087, 1991 WL 245022 (N.D.N.Y. Nov. 19, 1991), the plaintiff inmate alleged that defendant denied him due process of law by failing to provide him with an opportunity to review videotape evidence. The defendant responded that access to the videotape was denied because to allow the tape to be viewed would have created a security risk. The *Hop* court found that the hearing satisfied due process requirements with respect to this allegation. There is no evidence in this case that the videotape evidence was withheld from plaintiff on grounds of institutional

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 455170 (S.D.N.Y.)
**(Cite as: 1994 WL 455170 (S.D.N.Y.))**

safety.

FN29. Just as with the rights outlined in *Wolff,* however, an inmate may be denied the rights delineated in *Francis* if granting them would implicate institutional safety concerns. *Francis v. Coughlin,* 891 F.2d at 47. Again, defendants do not rely on such concerns in this case.

FN30. Defendants do not assert harmless error with respect to the untimely commencement of the rehearing.

FN31. In *Powell v. Coughlin,* the Second Circuit held that the violation of an inmate's right to due process in connection with a disciplinary hearing may be deemed harmless error. *Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991). *Powell* is distinguishable, however, because it involved an appeal from an order by Judge Stewart reversing the outcome of several disciplinary hearings, based upon the failure to comply with an injunction requiring officials at Bedford Hills to conduct disciplinary proceedings in conformity with the procedural due process requirements of *Wolff v. McDonnell,* 418 U.S. 539 (1974) (*see Powell I* ). *See Malik v. Wilkerson,* 1994 WL 125213 at *2 (E.D.Pa. Apr. 12, 1994) (finding that harmless error analysis limited to civil contempt proceedings).

FN32. The records related to the Sanford hearing, except for the weapons and misbehavior reports, were expunged by Selsky's May 6, 1988 order. *See* DX–E.

S.D.N.Y.,1994.
Silva v. Sanford
Not Reported in F.Supp., 1994 WL 455170 (S.D.N.Y.)

END OF DOCUMENT

Slip Copy, 2014 WL 1451984 (W.D.N.Y.)
**(Cite as: 2014 WL 1451984 (W.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Jack VIGLIOTTI, Plaintiff,
v.
Director Donald SELSKY, et al., Defendants.

No. 08–CV–00875–JJM.
Signed April 14, 2014.

Hedwig M. Auletta, Patrick B. Curran, Damon Morey LLP, Buffalo, NY, for Plaintiff.

David J. Sleight, George Michael Zimmermann, Office of the Attorney General, Buffalo, NY, for Defendants.

### DECISION AND ORDER

JEREMIAH J. McCARTHY, United States Magistrate Judge.

**\*1** The parties have consented to proceed before a Magistrate Judge pursuant to 28 U.S.C. § 636(c) [29].[FN1] Before me are the parties' cross-motions for partial summary judgment [123, 131]. Oral argument was held on February 14, 2014[147]. For the following reasons, defendants' motion is granted in part and denied in part, and plaintiff's motion is denied.

> FN1. Bracketed references are to the CM/ECF docket entries.

### BACKGROUND

Plaintiff commenced this action *pro se* on November 25, 2008 pursuant to 42 U.S.C. § 1983, alleging that on September 12, 2005, while he was incarcerated at the Wende Correctional Facility, he was assaulted by defendant Correctional Officer Timothy Benson. Complaint [1], First Cause of Action. Plaintiff further alleges that certain due process violations occurred at his disciplinary hearing arising from the incident, which was conducted by defendant Captain Martin Kearney. *Id.,* Second Cause of Action. On October 18, 2005 defendant Kearney found plaintiff guilty of some of the charges against him and sentenced him to 180 days of confinement in the Special Housing Unit ("SHU") and 180 days loss of packages, television, commissary, and telephone. *Id.* at ¶ 21, p. 11. On December 7, 2005, defendant Donald Selsky, the Director of Special Housing, denied plaintiff's appeal and affirmed defendant Kearney's determination. *Id.* at ¶ 24, p. 14.

The parties cross-move for partial summary judgment on the Second and Third Causes of Action alleging due process violations against defendants Kearney and Selsky.

### ANALYSIS
**A. Summary Judgment Standard**

The standard to be applied on a motion for summary judgment in this Circuit is well settled. "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003).

Slip Copy, 2014 WL 1451984 (W.D.N.Y.)
**(Cite as: 2014 WL 1451984 (W.D.N.Y.))**

**B. Due Process Standard**

"Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Nevertheless, inmates are "entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as ... special confinement that imposes an atypical hardship". *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004).[FN2] These protections include "advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken". *Id.* (citing *Wolff,* 418 U.S. at 563–67). "In addition, due process requires that there be some evidence to support the findings made in the disciplinary hearing." *Washington v. Gonyea,* 538 Fed.Appx. 23, 25 (2d Cir.2013) (Summary Order). *See Luna v. Pico,* 356 F.3d 481, 491 (2d Cir.2004) (interpreting the "some evidence" standard to require "reliable evidence").

> FN2. Neither party has moved for summary judgment on the issue of whether plaintiff's six months of confinement in the Special Housing constitutes an atypical and significant hardship under *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

**\*2** "[R]egardless of state procedural guarantees, the only process due an inmate is that minimal process guaranteed by the Constitution, as outlined in *Wolff*". *Shakur v. Selsky,* 391 F.3d 106, 119 (2d Cir.2004). Therefore, violations of "state regulations during [a] disciplinary hearing do not give rise to a § 1983 due process claim". *Austin v. Fischer,* 453 Fed.Appx. 80, 83 (2d Cir.2011) (Summary Order). *See also Russell v. Coughlin,* 910 F.2d 75, 78 (2d Cir.1990) ("Federal

constitutional standards rather than state law define the requirements of procedural due process").

"[P]rison disciplinary hearings are subject to a harmless error analysis." *Tafari v. Rock,* 2012 WL 1340799, \*5 (W.D.N.Y.2012) (Telesca, J.) (*citing Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991)). Thus, "to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing." *Eleby v. Selsky,* 682 F.Supp.2d 289, 292 (W.D.N.Y.2010) (Larimer, J.).

With this standard in mind, I will address each of the alleged deficiencies raised by plaintiff.

**C. Inadequate Assistance**

Plaintiff was assigned an Inmate Assistant, Angelo Amato, to prepare for his disciplinary hearing. Defendants' Statement of Undisputed Facts [124], ¶ 8. He alleges that Amato failed to provide him with adequate assistance, in violation of his due process rights, by not contacting witnesses and by not providing him with certain documentation. Plaintiff's Memorandum of Law [134], pp. 4–5.

"Prison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges." *Eng v. Coughlin,* 858 F.2d 889, 897 (2d Cir.1988). However, since Amato is not named as a defendant, it is unnecessary for me to determine whether he provided plaintiff with adequate assistance. *See Sowell v. Weed,* 2013 WL 3324049, \*13 (W.D.N.Y.2013) (Telesca, J.) ("Sowell's claim founders ... because he has failed to sue either of his legal assistants"). Therefore, this claim is dismissed.

**D. Defendant Kearney**

**1. Delay in Completing the Disciplinary Hearing**

Slip Copy, 2014 WL 1451984 (W.D.N.Y.)
**(Cite as: 2014 WL 1451984 (W.D.N.Y.))**

Plaintiff alleges a due process violation arising from the failure of defendant Kearney to complete the hearing within 14 days as the New York State Department of Corrections and Community Supervision regulations require (7 NYCRR § 251 5.1(b)). Defendants argue that this claim must be dismissed since "a violation of a state ... regulation, in and of itself, does not give rise to liability under § 1983". Defendants' Memorandum of Law [125], p. 6. I agree with defendants. *See Nimmons v. Fischer,* 2013 WL 4495006, *4, 10 (W.D.N.Y.2013) (Arcara, J./Foschio, M.J.) (dismissing claim that a disciplinary hearing was not completed within 14 days). Therefore, this claim is dismissed.

**2. Notice**

**\*3** Plaintiff alleges that he was not provided with adequate notice that Correction Officer Glen Krathaus was going to be called as a witness. Plaintiff's Memorandum of Law [134], pp. 5–6. Due process requires advance written notice of the claimed violation in order "to give the charged party a chance to marshal the facts in his defense and to clarify what the charges are". *Wolff,* 418 U.S. at 564.

However, plaintiff cites no authority suggesting that due process requires advance notice of the witnesses a hearing officer may call. In any event, since Krathaus was a participant in the incident and a co-signator to the Misbehavior Report ( [124–1], Bates No. 000189), it should not have been a surprise to plaintiff that he would be called as a witness. Moreover, when plaintiff indicated that he was not prepared to question Krathaus, defendant Kearney advised plaintiff to "[t]ake [his] time" before he proceeded with his questioning (*id.,* Bates No. 000060). Therefore, this claim is dismissed.

**3. Opportunity to Present a Defense**

Plaintiff claims that he was denied documentary evidence, was precluded from questioning defendant

Benson in a meaningful way, and not permitted to be present for the questioning of his inmate witnesses. Plaintiff's Memorandum of Law [134], pp. 6–10. An "inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals". *Wolff,* 418 U.S. at 566. However, "a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony". *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d. Cir.1999).FN3

> FN3. *Compare with Amaker v. Coombe,* 2002 WL 523388, * 10 (S.D.N.Y.2002) ("[A]n inmate's right to present documentary evidence in his defense does not entail an obligation on the part of prison officials to retrieve every document that an inmate requests for his case [,][e]ven when documents are relevant and obtainable").

**a. Denial of Documentary Evidence**

Plaintiff points to three pieces of documentary evidence which were denied to him. First, he alleges that he was denied the Final Unusual Incident Report (plaintiff's Counterstatement of Facts [133], ¶ 1),FN4 which would have alerted him that defendant Kearney was the reporting officer and permitted him to challenge directly with defendant Kearney whether this was a basis for his recusal. [131–3], Bates No. 000243. The Final Unusual Incident Report also contained a number of relevant documents. As defendant Kearney testified, the preliminary version of the report was "only two sheets", whereas the final version "consists of all documentation related to the incident, medical reports, use of force reports, and all employee names and any witnesses". Kearney's deposition transcript [131–2], p. 25.

> FN4. Defendants allege that the Unusual Incident Report was finalized on September 20, 2005, and a copy was provided to plaintiff

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1451984 (W.D.N.Y.)
**(Cite as: 2014 WL 1451984 (W.D.N.Y.))**

some time before the conclusion of the hearing. Defendants' Reply Memorandum of Law [144], p. 5 of 15 (*citing* Kearney's deposition transcript [145], pp. 30–31). However, it is not clear from the transcript of the disciplinary hearing whether the Final Unusual Incident Report was provided to plaintiff. In fact, plaintiff alleges that even in discovery he has never been provided with the Final Unusual Incident Report, thereby leaving him to attempt to reconstruct what would have been contained in that report from defendant Kearney's testimony. Curran Affidavit [131–1], ¶ 4.

Second, plaintiff points to defendant Kearney's denial of his request for defendant Benson's injury report. Defendant Kearney summarily denied this request, stating only "That's something that's not done". Even when plaintiff offered him case law in support of his entitlement to that information, he stated-"I do not do case law.OK?" Hearing transcript [124–2], Bates Nos. 000015–16.

**\*4** Due process requires more. "Although [the right to documentary evidence] can give way to legitimate concerns over institutional safety ... an inmate is still entitled to *some* explanation of the basis for a hearing officer's denial of the inmate's request for ... items of evidence." *Loret v. Selsky,* 595 F.Supp.2d 231, 234 (W.D.N.Y.2009) (Larimer, J.) (emphasis in original). *See also Collins v. Ferguson,* 804 F.Supp.2d 134, 139 (W.D.N.Y.2011) (Larimer, J.) ("prison officials may be required to explain, in a limited manner, the reason ... why requested evidence was excluded or denied" *quoting Ponte v. Real,* 471 U.S. 491, 497, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985)).

Lastly, plaintiff also requested the logbook to establish that defendant Benson was not located where he was stationed at the time of the alleged assault. Hearing transcript [124–2], Bates No. 000015. However, the hearing transcript does not indicate that this

was ever provided to plaintiff, and it is not clear from the transcript what justification, if any, defendant Kearney would have for withholding this information from plaintiff.

Defendants argue that even if these materials were not provided to plaintiff, he has not established that he was prejudiced by the denial of this information. Defendants' Reply Memorandum of Law [144], pp. 2–6 of 15. However, the documents plaintiff was allegedly deprived of were plainly relevant, and what use he may have made of those documents in defending against the charges cannot be resolved as a matter of law. Therefore, this claim must be resolved by the jury.

**b. Opportunity to Meaningfully Question Defendant Benson and to be Present for the Questioning of the Inmate Witnesses**

Plaintiff argues that he was denied a meaningful opportunity to question defendant Benson and was not permitted to be present for the questioning of his inmate witnesses. However, "it is well settled that an inmate does not possess a constitutional right to confront or cross-examine witnesses in prison disciplinary hearings". *Fernandez v. Callens,* 2010 WL 4320362, \*11 (W.D.N.Y.2010) (Schroeder, M.J.) (*citing Wolff,* 418 U.S. at 567 68). *See also Silva v. Casey,* 992 F.2d 20, 22 (2d. Cir.1993) ("an inmate has no constitutional right of confrontation"); *Sowell,* 2013 WL 3324049 at \*10 ("As a matter of federal constitutional law, an inmate does not have a right to cross-examine adverse witnesses at a disciplinary hearing") [FN5]; *Toliver v. New York City Department of Corrections,* 2013 WL 3779125, \*10–11 (S.D.N.Y.2013) ("Mr. Toliver also claims that he was denied his right to call the officers, who had issued him [the infraction], to testify at the hearing. However, due process protection does not provide inmates right to confront and cross-examine those furnishing evidence against the inmate"). It is also "not a violation of due process at a disciplinary hearing to take the testimony of a witness outside the presence of an inmate". *Kalwasinski,* 201 F.3d at 109;

Slip Copy, 2014 WL 1451984 (W.D.N.Y.)
**(Cite as: 2014 WL 1451984 (W.D.N.Y.))**

*Francis v. Coughlin,* 891 F.2d 43, 48 (2d Cir.1989) ("Prison inmates do not possess a constitutional right to be present during the testimony of witnesses during a disciplinary proceeding") [FN6]; *LeBron v. Artus,* 2008 WL 111194, *10 (W.D.N.Y.2008) (Bianchini, M.J.) ("Due process is not violated when the hearing officer decides to take the testimony of a witness outside the presence of an inmate"). *See also Bogle v. Murphy,* 2003 WL 22384792, *7 (W.D.N.Y.2003) (Siragusa, J.) ("[A]lthough New York regulation section 254.6 explicitly provides inmates a right to be present at their disciplinary proceedings, it does not create a constitutional due process right. Since, under *Wolff,* inmates are not afforded a constitutional due process right to be present at their hearings, plaintiff's ejection during his disciplinary hearing was not a due process violation").[FN7]

> FN5. Although plaintiff disputes whether his questioning of defendant Benson was cross-examination (plaintiff's Reply Memorandum of Law [146] ), he was plainly an adverse witness.

> FN6. *Compare with Young v. Kihl,* 1990 WL 33183, *3 (W.D.N.Y.1990) (Elfvin, J.) (*Francis* does not provide "a rationale for extending the per se rule against the confrontation of adverse witnesses to the realm of the friendly or favorable witness. In this Court's view, absent a justification for a per se rule in the latter circumstances, the balance of interests in each case should be decided on an individualized basis in keeping with the general principle that inmates may enjoy those constitutional rights which are not inconsistent with legitimate penological objectives. Nevertheless, this Court is obliged to follow the appellate court's clear determination").

> FN7. Plaintiff's reliance on *Young v. Hoffman,* 970 F.2d 1154, 1156 (2d Cir.1992)

(plaintiff's Memorandum of Law [134], p. 10) is unavailing. In *Young,* the disciplinary hearing was conducted in the defendant's absence and the hearing officer had determined that the inmate had forfeited his right to call witnesses. 970 F.2d at 1156. Those circumstances are distinct from questioning certain witnesses outside the presence of an inmate, but otherwise permitting the inmate to be present during the disciplinary hearing. *See Vogelfang v. Capra,* 889 F.Supp.2d 489, 512–15 (S.D.N.Y.2012).

**\*5** Plaintiff also argues that he was deprived of the ability to ask follow-up questions of his inmate witnesses after he heard the recording of their testimony. "While inmates do have the right to question witnesses at their disciplinary hearings, that right is not unlimited and its contours are under the discretion of prison officials." *Reed v. Wolczyk,* 2012 WL 5520714, *10 (N.D.N.Y.), *adopted* 2012 WL 5520679 (N.D.N.Y.2012). Although plaintiff may not have been permitted to ask every question he may have wanted, a review of the hearing transcript demonstrates that defendant Kearney permitted him to extensively question not just his inmate witnesses, but defendant Benson and Krathaus as well.

Therefore, this claim is dismissed.

### 4. Impartial Hearing Officer

"The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). In the prison context, "an impartial decisionmaker is one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen". *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990). "Administrators serving as adjudicators are presumed to be unbiased." *Allen,* 100 F.3d at 259. *See Rodriguez v. Selsky,* 2011 WL 1086001, *11 (N.D.N.Y.), *adopted* 2011 WL 830639 (N.D.N.Y.2011) ("Because prison

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1451984 (W.D.N.Y.)
**(Cite as: 2014 WL 1451984 (W.D.N.Y.))**

officials serving as adjudicators enjoy a rebuttable presumption that they are unbiased").[FN8]

> FN8. Although not argued by defendants, some cases have noted that "[a] hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing". *Fernandez,* 2010 WL 4320362 at *12 *citing Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). *See Murray v. Jacobs,* 2011 WL 4074531, *8 (W.D.N.Y.2011)* (Siragusa, J.) (same).

Plaintiff argues that as the "reporting person" on the Unusual Incident Report, defendant Kearney was prohibited from acting as the hearing officer. Plaintiff's Memorandum of Law [125], pp. 13–14. However, "the mere involvement of a hearing officer in related investigations or proceedings does not evidence bias". *Phelan v. Hersh,* 2011 WL 6031940, *9 (N.D.N.Y.),* adopted 2011 WL 6031071 (N.D.N.Y.2011). *See Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1994) (rejecting argument that a violation of regulation prohibiting a review officer from acting as a hearing officer in a case that he has reviewed constitutes a due process violation).

While defendant Kearney's role as the reporting officer was limited, he testified that he did not "rubber stamp" the Final Unusual Incident Report and that he was responsible to "insure that the report is complete and factual" and that "the facts and the misbehavior report are all consistent". Kearney deposition transcript [131–2], pp. 20–21. The Final Unusual Incident Report dated September 21, 2005, which was prepared prior to the completion of the disciplinary hearing, indicated that the incident was caused by plaintiff coming off "of the wall during a pat frisk and str[iking] ... Benson in the chest", but failed to mention plaintiff's version of events. [131–3], Bates No. 000243. To the extent it was defendant Kearney's role to ensure that the Final Unusual Incident Report was

factual, this suggests that, even before the conclusion of the hearing, he may have viewed it as being a complete and factual verison of the events.

**\*6** During the hearing, defendant Kearney's conduct, at times, also suggested that he had prejudged the witnesses' credibility. For example, when plaintiff attempted to question defendant Benson about whether he was already on the wall when he allegedly reached his hand into his pocket, defendant Kearney stated-"I will ask him any question that you give me to ask him, however, it's clearly in the body of the report". Hearing transcript [124–2], Bates Nos. 00040–41. After plaintiff explained that he was asking this question in order to attempt to demonstrate inconsistences in defendant Benson's version of events, defendant Kearney stated-"I understand that you're defending yourself .... [b]ut I can't sit here while you say that he lied in the report" (*id.,* Bates No. 000041). While defendants characterize this as defendant Keareny's attempt to remind plaintiff that he could not call defendant Benson a liar (defendants' Reply Memorandum of Law [144], p. 10 of 15), this explanation is difficult to reconcile with the fact that plaintiff never directly accused defendant Benson of lying, and with defendant Kearney's testimony that he considered plaintiff to be respectful toward him and the witnesses. Kearney's deposition transcript [145], p. 141.

Likewise, when plaintiff attempted to question Krathaus about his version of events, defendant Kearney reverted to the misbehavior report, apparently considering it to be an accurate report of the incident. For example, when plaintiff attempted to ask-"Did Officer Benson grab me with one hand or two hands?", defendant Kearney stated-"Well, the body of the report indicates that ... you moved his arm into your arm". Hearing transcript [124–2], Bates No. 000062. Significantly, at the conclusion of Krathaus' testimony, Kearney told him "good job" (*id.,* 000063).

Furthermore when plaintiff attempted to ask de-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1451984 (W.D.N.Y.)
**(Cite as: 2014 WL 1451984 (W.D.N.Y.))**

fendant Benson how he grabbed him, defendant Kearney stated-"He's testified that he grabbed your shirt" (*id.,* Bates No. 000037). Yet, defendant Benson never testified that he grabbed plaintiff's shirt. In fact, when defendant Benson was later asked this question, he did not testify that he grabbed plaintiff's shirt (*id.*).

Defendants point to a variety of conduct as establishing defendant Kearney's impartiality, including assisting plaintiff to identify and locate his inmate witnesses, finding plaintiff not guilty of some of the charges, permitting plaintiff to speak at length in his own defense and to raise a number of objections, and advising him of his appeal rights if he disagreed with his rulings at the hearing. Defendants' Memorandum of Law [125], p. 8. On balance, I conclude that there exists a genuine issue of material fact as to whether defendant Kearney was an impartial hearing officer which must be resolved by a jury.

**5. Written Disposition**
Plaintiff argues that "by merely reciting every piece of evidence and identifying every testifying witness, as defendant Kearney did, the fact-finder does not give any meaningful idea of either the evidence that he rejected or the evidence upon which he relied". Plaintiff's Memorandum of Law [134], p. 18.

**\*7** Defendant Kearney prepared a written statement of the evidence he relied upon ( [124–1], Bates No. 000182), which he read into the record:

"[T]he misbehavior report authored by Correction Officer Benson. The testimony of Officers Benson and Krathaus at the tier hearing, the testimony of Inmate Vigliotti at the hearing, the vigorous defense he put on, as well as the numerous objections he raised. Also taken into consideration is the unusual incident packet, the use of force forms and the memos contained therein, the testimony of Inmate Vigliotti's witnesses, inmates Hall and Wells". Hearing transcript [124–2], Bates No. 000082.

Defendant Kearney also prepared a written statement of the reasons for his disposition ( [124–1], Bates No. 000182), which he read into the record:
"The disposition as always is put in place in an effort to modify the inmates behavior to acceptable limits. It is hoped that it will do so in the future. The disposition shall serve to impress upon the inmate that this type of behavior will not be tolerated in the correctional setting. The hearing officer notes that this the second time charges of this type have been lodged against the inmate during this incarceration." Hearing Transcript [124–2], Bates Nos. 000082–83.

"[I]n order to comply with constitutional due process standards, the only record of a disciplinary hearing that must be maintained is a written statement describing the evidence relied upon and the reasons for the determination". *Murray v. Jacobs,* 2011 WL 4074531, \*6 (W.D.N.Y.2011) (Siragusa, J.). As explained in *Wolff,* the purpose of requiring a written statement containing the evidence relied on and reasons for the disciplinary action is to "protect the inmate against collateral consequences based on a misunderstanding of the nature of the original proceeding" and "to insure that administrators, faced with possible scrutiny by state officials and the public, and perhaps even the courts, where fundamental constitutional rights may have been abridged, will act fairly." *Wolff,* 418 U.S. at 565.

"While a more detailed discussion of the evidence on which [the hearing officer] relied would have been desirable, given the existence of the transcript, due process has been satisfied." *Allah–Kasiem v. Sidorowicz,* 2012 WL 2912930, \*12 (S.D.N.Y.2012). Therefore, this claim is dismissed.

**E. Defendant Selsky**
Defendants argue that since due process does not include the right to an administrative appeal, plaintiff's claims against defendant Selsky must be dismissed.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1451984 (W.D.N.Y.)
**(Cite as: 2014 WL 1451984 (W.D.N.Y.))**

Defendants' Memorandum of Law [125], p. 9 of 13. "Courts have repeatedly held that the Fourteenth Amendment does not require any administrative review of disciplinary convictions". *Excell v. Woods,* 2009 WL 3124424, *22 (N.D.N.Y.2009) (citing cases). "Nevertheless, once the state has created a right to administrative review, it cannot deprive a prisoner of that right arbitrarily.... Therefore, once an officer has been assigned by state law to decide an issue that may result in the loss of a liberty interest, that officer may, depending on how he exercises his authority, be personally involved in the deprivation of a due-process right that arises from the imposition of a disciplinary sentence of sufficient severity." *Thomas v. Calero,* 824 F.Supp.2d 488, 504 (S.D.N.Y.2011).[FN9]

> FN9. *Compare with Gates v. Selsky,* 2005 WL 2136914, * 10 (W.D.N.Y.), *recon. granted on other grounds* 2005 WL 3132725 (W.D.N.Y.2005) (Scott, M.J.) ("As for defendant Selsky, plaintiff does not have a due process right to an administrative appeal or to a particular result in such an appeal. Therefore, plaintiff's due process claims against ... Selsky also fails").

**\*8** Defendants next argue that defendant Selsky lacks sufficient personal involvement since there is "no evidence ... that [he] took a proactive role in reviewing Plaintiff's administrative appeal". Defendants' Memorandum of Law [125], pp. 10–11 of 13. "Courts within this circuit have held ... that while personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results." *Collins v. Ferguson,* 804 F.Supp.2d 134, 140 (W.D.N.Y.2011) (Larimer, J.).

Since I have found a question of fact as to whether certain of defendant Kearney's conduct violated plaintiff's due process rights, I likewise find that a triable issue of material fact exists as to whether de-

fendant Selsky's conduct in affirming defendant Kearney's determination also violated plaintiff's due process rights, especially given the fact that he received from plaintiff a voluminous written appeal [132–5], followed by subsequent lengthy motion for reconsideration [132–6] and testified that his decision on the appeal was "not a rubber stamp decision". Selsky deposition transcript [131], pp. 42–43. *See Smith v. Rosati,* 2013 WL 1500422, *8 (N.D.N.Y.), *adopted* 2013 WL 1501022 (N.D.N.Y.2013) ("I find that a reasonable factfinder could conclude, if plaintiff's testimony is credited, that defendant Prack's review of plaintiff's disciplinary conviction revealed a due process violation, and by defendant Prack dismissing plaintiff's appeal, he failed to remedy that violation"). Therefore, defendant Selsky is not dismissed from this action.

**CONCLUSION**

For these reasons, defendants' motion for partial summary judgment [123] is granted in part and denied in part, and plaintiff's motion for partial summary judgment [131] is denied.

**SO ORDERED.**

W.D.N.Y.,2014.
Vigliotti v. Selsky
Slip Copy, 2014 WL 1451984 (W.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.